Exhibit 4

1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA  DIVISION

3

4
  SKY HARBOR, ATLANTA        )
5  NORTHEAST, LLC and CRESTLINE)
  HOTELS & RESORTS, LLC,     )
6                            )
   Plaintiffs,              )
7                          ) CIVIL ACTION FILE
    vs.                    ) NO.: 1:17-CV-03910-AT
8                          )
  AFFILIATED FM INSURANCE    )
9  COMPANY,                 )
                            )
10   Defendant.              )
  _____ )
11

12

13              Deposition of

14            JOEL BROWN

15            March 29, 2019

16            10:00 a.m.

17            ZELLE, LLP
          1170 Peachtree Street, N.E.
18            Suite 1200
          Atlanta, Georgia  30309
19
          Signature reserved
20
        Marianne Vargas, CCR, CVR-M
21

22  _____

23      ESQUIRE DEPOSITION SOLUTIONS
          101 Marietta Street
24          2700 Centennial Tower
        Atlanta, Georgia  30303
25            404.443.3468

1         APPEARANCES OF COUNSEL:

2  ON BEHALF OF THE PLAINTIFFS:

3  KEITH HASSON, ESQ.
  HASSON LAW GROUP, LLP
4  3379 Peachtree Road, N.E.
  Suite 625
5  Atlanta, Georgia 30326
  678.701.2869
6  keith@hassonlawgroup.com

7  RAYMOND STEINBRECHER, ESQ.
  RAYMOND STEINBRECHER, PLLC
8  1016 Thomas Drive
  Suite 103
9  Panama City Beach, Florida  32408
  850.238.5130
10  raymond.steinbrecher@yahoo.com

11

12  ON BEHALF OF THE DEFENDANT:

13  JAMES V. CHIN, ESQ.
   ZELLE, LLP
14  1170 Peachtree Street, N.E.
  Suite 1200
15  Atlanta, Georgia  30309
  470.867.3041
16  jchin@zelle.com

17

18

19

20

21

22

23

24

25

1          INDEX OF EXAMINATIONS

2                              PAGE
   JOEL BROWN
3

4   Examination by MR. HASSON                    5

5   Examination by MR. CHIN              234

6

7             INDEX OF EXHIBITS

8
   PLAINTIFFS'
9   NO.          DESCRIPTION          PAGE

10  Exhibit 286 10/16/2015, e-mail from Ragland to     74
           Brown and others, Bates AFM-0013397
11
   Exhibit 287 October 22, 2015 e-mail from J.       77
12        Brown to M. Adams, Bates Plaintiffs
           026141 - 026142
13
   Exhibit 288 October 22, 2014, report from       80
14        Engineered Solutions to J. Brown,
           Bates ES-0014867 - 0014869
15
   Exhibit 289 February 5, 2016 e-mail from J.       97
16        Brown to D. Thurston, Bates
           AFM-0017149 - 0017158
17
   Exhibit 290 February 11, 2016, letter from J.     108
18        Brown to S. Adair, Bates Plaintiffs
           025856 - 025861
19
   Exhibit 291 March 14, 2016, Letter from J. Brown  151
20        to S. Adair, Bates Plaintiffs 025862
           - 025862
21
   Exhibit 292 March 29, 2015 e-mail string, J.     164
22        Brown to R. Steinbrecher and others,
           Bates AFM-0016693 - 0016699
23
   Exhibit 293 March 30, 2016, Letter from J. Brown  167
24        to F. Lin, Bates Plaintiffs 025881 -
           025882
25

1              INDEX OF EXHIBITS
                  (Continued)
2
  PLAINTIFFS'
3 NO.            DESCRIPTION            PAGE

4 Exhibit 294 May 13, 2016 letter from J. Brown to   179
            R. Steinbrecher, Bates Plaintiffs
5              025869 - 025874

6 Exhibit 295 May 20, 2016 letter from J. Brown to   192
            R. Steinbrecher, Bates Sky Harbor
7              082272 - 082274

8 Exhibit 296 June 8, 2016, Letter from J. Brown      201
            to R. Steinbrecher, Bates Sky Harbor
9              082428 - 082431

10 Exhibit 297 August 5, 2016 e-mail string, J.       217
            Hunnius to J. Brown, Bates
11              AFM-0020387 plus 3 additional pages

12 Exhibit 298 October 4, 2016 e-mail string, T.      221
            Dodd to J. Brown and others, Bates
13              ES-0015537 - 0015538

14 Exhibit 299 January 6, 2017, Letter from J.        225
            Brown to P. Donahue Sky Harbor
15              175977 - 175986

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2                   10:47 a.m.

3           MR. HASSON:  Will you go ahead and swear

4      the witness?

5                   (The court reporter swore in

6                   the witness.)

7           ----------------------------

8                   JOEL BROWN,

9      having first been duly sworn, was examined and

10                  testified as follows:

11                  EXAMINATION

12     BY MR. HASSON:

13          Q.   What is your name and what do you do for

14     living, sir?

15          A.   My name is Joel Brown, and I'm an

16     insurance adjuster for Factory Mutual Insurance.

17          Q.   What is Factory Mutual Insurance?

18          A.   It's the insurance company I work for.

19          Q.   What is the relationship between Factory

20     Mutual Insurance and Affiliated FM?

21          A.   Affiliated FM is a subsidiary of Factory

22     Mutual Insurance.

23          Q.   Okay.  What is FM Global?

24          A.   I believe it's the marketing name they

25     have for Factory Mutual Insurance and their group of

1  companies.

2      Q.   How long have you had your current

3  position?

4      A.   I've worked in the Claims Department for

5  about 12 years.

6      Q.   What did you do before working in the

7  Claims Department for your current employer?

8      A.   I was an adjuster for Progressive

9  Insurance.

10     Q.   How long did you work as an adjuster for

11 Progressive?

12     A.   Four or five years.

13     Q.   What did you do before that?

14     A.   Prior to that I was going to school,

15 working on a teaching certificate, and I worked

16 part-time in a sports bar as a waiter.

17     Q.   When you started with Progressive, did

18 they provide you with any training on how to do your

19 job?

20     A.   I did have training when was I hired by

21 Factory Mutual Insurance.

22     Q.   What kind of training did Factory Mutual

23 Insurance do?

24     A.   There were several classes they had us

25 take in a training facility in Massachusetts, and then

1   there was training material they had us look at, and

2   then we worked with other adjusters.

3       Q.   The classes that you took in

4   Massachusetts, how long did that last?

5       A.   I think there was a one-week class, and

6   then there was a follow-up class that I think was

7   about the same time frame.

8       Q.   What kinds of things were discussed during

9   the classes in Massachusetts?

10      A.   It was reviewing the policy, probably the

11  vast majority of what we did.

12      Q.   When you say "the policy," in this case

13  we've got some All Risk policies that we're going to

14  look at later.

15      A.   Okay.

16      Q.   Do you know what I'm talking about?  Have

17  you seen All Risk policies that were issued to

18  Crestline?

19      A.   Yes, I've seen All Risk policies, yes.

20      Q.   And when you say the training involved

21  reviewing the policy, are you talking about the policy

22  that was issued to Crestline or one similar to it?

23      A.   I would say one similar to it.

24      Q.   Because the training class you're

25  describing was 12 years ago, and there are changes

1  that are made to those policies periodically, right?

2      A.   Yes.

3           MR. CHIN:  Objection to form.

4  BY MR. HASSON:

5      Q.   So when you say that the training class in

6  Massachusetts involved reviewing the policy, can you

7  explain to me what that means?

8      A.   They would present the terms and

9  conditions of the policy and review what the words

10 said in the policy and what that meant.

11     Q.   Since you did that -- I assume those

12 classes were back around the time you first went to

13 work for Factory Mutual?

14     A.   (No audible response.)

15     Q.   Were those classes around the time you

16 went to work for Factory Mutual?

17     A.   Yes.

18     Q.   And that was about 12 years ago?

19     A.   Approximately.

20     Q.   Since then, have you been to other

21 trainings or classes offered by Factory Mutual talking

22 about the terms and conditions in the policies and how

23 to interpret and apply them?

24     A.   I have been to additional training since

25 that time, yes.

1    Q.    Have you been to trainings where they

2  discussed how to interpret what an "occurrence" is

3  under the policy?

4    A.    We have had training on how to apply the

5  "occurrence" definition and how it applies to losses.

6    Q.    When was that training?

7    A.    I do not remember specifically.

8    Q.    Was it recently or many years ago?

9    A.    I've been to a number of training classes

10  since I've been at FM Global.  I think my most recent

11  training I've been to there in Johnston -- or, I'm

12  sorry, in Norwood, Massachusetts, was probably

13  sometime last year.

14    Q.    What about in 2013, 2014, 2015 time frame?

15  Do you remember anything?

16    A.    I don't remember exactly.

17    Q.    You made reference to a training or

18  perhaps several trainings where you talked about how

19  to apply the term "occurrence."  Do you recall from

20  any of your trainings what you were taught about how

21  to apply the term "occurrence"?

22        MR. CHIN:  Object to form.

23        THE WITNESS:  I think that the biggest

24      takeaway from that was that we're looking for a

25      discrete event of physical loss or damage.

1   BY MR. HASSON:

2       Q.    Were you provided any training by Factory

3   Mutual as to what constituted a discrete event?

4       A.    Would you repeat that question?

5       Q.    Sure.  Were you provided any training by

6   Factory Mutual as to what constituted a discrete

7   event?

8       A.    I would say yes.

9       Q.    Okay.  And what did Factory Mutual train

10  you constituted a discrete event?

11      A.    I think that the biggest thing that we

12  looked at is we're looking for an event that can be

13  identified in time and place; a discrete event that

14  occurred at some time, at some place.

15      Q.    Anything else you can recall about the

16  training that you received regarding what constituted

17  a discrete event?

18      A.    I can't remember anything specifically.

19      Q.    Do you recall a discussion in any of your

20  training about an exclusion in the policy based on

21  changes in temperature, dampness or dryness?

22      A.    Yes.

23      Q.    What do you recall about that from your

24  training?

25      A.    We discussed all the exclusions in the

1  policy during the training.

2      Q.   Specifically with respect to the exclusion

3  in the policy for changes in temperature, dampness or

4  dryness, can you recall anything from the training

5  talking about what that meant?

6      A.   No.

7          MR. CHIN:  Object to the form.

8          THE WITNESS:  I don't remember anything

9      specifically.

10 BY MR. HASSON:

11     Q    What is your understanding of what that

12 exclusion refers to?

13     A.   I'd have to review the policy

14 specifically.  There's leading language to the

15 exclusions that are very important for when you're

16 trying to determine if an exclusion applies, or how it

17 applies.

18     Q.   Have you ever received any training from

19 Factory Mutual Insurance on how to apply that

20 temperature, damage or dryness exclusion contained

21 within the policy?

22     A.   Can you repeat that one more time?  I'm

23 sorry.

24     Q.   Have you ever received any training from

25 Factory Mutual Insurance on how to apply the

1  temperature, damage or dryness exclusion contained

2  within the policy?

3     A.   Yes.

4     Q.   Do you recall when?

5     A.   Not specifically.

6     Q.   Do you recall anything about that

7  training?

8         MR. CHIN:  I'm going to object to the form

9      as to the previous question referring to this

10      policy.

11         THE WITNESS:  Could you repeat the

12      question?

13  BY MR. HASSON:

14     Q.   Do you recall anything about the training

15  regarding a temperature, dampness or dryness exclusion

16  within policies issued under the Factory Mutual brand?

17     A.   I don't recall any specific things from

18  the training about that.

19     Q.   Do you recall any other training you

20  received from Factory Mutual regarding provisions

21  within the policy that you believe have special

22  application to this case?

23     A.   Can you say that one more time?

24     Q.   Do you recall --

25         MR. HASSON:  Actually, can you read that

1    back?

2              (The record was read as

3              requested.)

4         THE COURT REPORTER:  Question:  "Do you

5    recall any other training you received from

6    Factory Mutual regarding provisions within the

7    policy that you believe have special application

8    to this case?"

9         MR. CHIN:  Object to the form.

10         THE WITNESS:  I'm not sure what you're

11    asking me about.  There are other provisions I

12    believe that provide to this case, and I think

13    I've received training on almost all of the

14    provisions in the policy, and so therefore I

15    think, yes, I would've received training on

16    provisions in the policy.

17  BY MR. HASSON:

18    Q.   Well, let me approach it this way, then.

19  How would you describe your job at Factory Mutual

20  Insurance?

21    A.   I am an adjuster.  When losses are

22  reported to the insurance company, we investigate the

23  loss, determine the facts of what had happened.  We

24  then apply the policy to determine whether coverage

25  would apply.  We then work with the policyholder to

1  reach an agreement about what the measurement for the

2  loss would be, again, using the terms within the

3  policy.  And once that agreement is reached, to, if

4  applicable, have a payment issued.

5       Q.   In this case, was there ultimately a

6  decision on whether coverage under policies issued to

7  Crestline applied to any of the damages Crestline and

8  Sky Harbor submitted as part of the claim?

9          MR. CHIN:  Object to the form.

10          THE WITNESS:  We ended up issuing a denial

11       letter for this loss.

12  BY MR. HASSON:

13       Q.   Who was involved in the decision to deny

14  coverage?

15       A.   Myself, Dominic Thurston, Mike Hagan, John

16  Ragland.

17       Q.   Who is Mike Hagan?

18       A.   Mike Hagan was, at the time, another

19  adjuster with the company.

20       Q.   What office did he work out of?

21       A.   He worked out of our Boston operations.

22       Q.   What office did you work out of in 2015?

23       A.   The Atlanta operations.

24       Q.   Were you assigned to this case because the

25  hotel is in the Atlanta area?

1      A.   Yes.

2      Q.   Why was Mike Hagan involved in this case?

3      A.   Mike Hagan is -- was the Division Senior

4  General Adjuster for the Eastern Division.

5      Q.   Is he involved in all claims?

6      A.   No.

7      Q.   Why was he involved in this particular

8  matter?

9      A.   He was involved because the loss was open

10  as Liability to be Determined, and the policy is

11  written out of our Washington, D.C. operations, which

12  is an Eastern Division operation.

13      Q.   Does Mr. Hagan become involved in all

14  claims that are assigned to you -- or at that time,

15  back in 2015, was he involved in all claims assigned

16  to you as the adjuster where liability was to be

17  determined?

18      A.   No.

19      Q.   How was a decision made as to which of the

20  claims assigned to you involving liability to be

21  determined Mr. Hagan would become involved in?

22      A.   Mr. Hagan would be involved in losses that

23  liability to be determined was for that loss if it was

24  written out of the Eastern Division operation.

25      Q.   What does Mr. Ragland do?

1    A.   He is a Claims Manager.

2    Q.   Do you report to him?

3    A.   I do not report to him.

4    Q.   Did you report to him in 2015?

5    A.   I did not report to him in 2015.

6    Q.   Who does he manage?

7    A.   He, at the time, managed the Washington,

8  D.C. operation.

9    Q.   Was he involved in the claims decision in

10 this case because the policy was issued out of D.C.?

11   A.   Yes.

12   Q.   What does Dominic Thurston do for the

13 company?

14   A.   He's an adjuster also.

15   Q.   How did Mr. Thurston become involved in

16 this case?

17   A.   He was a supervising adjuster on the loss.

18   Q.   Was this claim assigned to you?

19   A.   Yes.

20   Q.   Was Mr. Thurston your supervisor?

21   A.   No.

22   Q.   Was he -- did he have some seniority over

23 you?

24   A.   He has worked at FM Global longer than me.

25 He has a higher title, but he's not -- "seniority over

1  me," I'm not sure how to use that term.

2      Q.   Would it have been typical in 2015 for a

3  supervising adjuster to have been brought in on a

4  claim like the one presented by Crestline in this

5  case?

6      A.   I don't know what you mean by, "like this

7  claim from Crestline."  I don't know what you mean by

8  that.

9      Q.   Well, I'm trying to figure out, did you

10  have claims in 2015 that you were assigned as the

11  primary adjuster and you made the coverage decision

12  yourself?

13     A.   Yes.

14     Q.   Were there other claims, like this one,

15  where other people were brought in?

16     A.   Yes.

17     Q.   Did Factory Mutual Insurance have a policy

18  at that time regarding when other people would be

19  brought in to make that decision?

20        MR. CHIN:  Object to form.

21        THE WITNESS:  There is a policy for when

22        there is a supervising adjuster assigned to a

23        loss, but I don't know about the tail end of

24        that question where you asked about making a

25        decision.

1  BY MR. HASSON:

2      Q.   What was the policy back in 2015 regarding

3  when a supervising adjuster was assigned to a loss?

4      A.   I think there's a dollar amount threshold

5  for potential exposure, and I think it's $3 million

6  potential exposure.

7      Q.   Do you recall approximately when

8  Mr. Thurston was brought in to assist with this claim?

9      A.   I do not remember exactly.

10     Q.    Was there a similar policy in 2015 at

11  Factory Mutual Insurance that involved whether to

12  bring in people like Mr. Hagan or Mr. Ragland?

13     A.    As to Mr. Ragland, a claims manager for an

14  operation is supposed to be aware of all the losses

15  for all of the accounts that are written out of the

16  operation.

17     Q.   What about Mr. Hagan?

18     A.   For the Division Senior General Adjuster,

19  he would be responsible for losses that were above a

20  certain dollar threshold, and I don't remember what

21  the dollar threshold is, for them as potential

22  exposure.  And then also if there was some sort of

23  complexity, it was liability to be determined work, or

24  if there was some other special condition or issue

25  with the loss.

1      Q.    We're going to talk more later about the

2   decision to deny coverage in the case, but just to

3   follow up on training, when the decision was made to

4   deny coverage in this case, do you recall relying on

5   any specific aspects of the training you had received

6   from Factory Mutual Insurance in making that

7   determination?

8      A.    I do not remember relying on any specific

9   aspects of training received.

10      Q.    Do you have any formal education related

11   to your work as an adjuster outside of the training

12   provided to you by Factory Mutual Insurance?

13      A.    I'm a licensed adjuster.  I'm licensed in

14   the states of Florida, Georgia, North Carolina.  I

15   think that's it.

16      Q.    What does one have to do to become a

17   licensed adjuster in the state of Georgia?

18      A.    I took a 40-hour class, and then there's a

19   test you take.  You pass the class, you pass the test,

20   you get your license, and then there's continuing

21   education that's required to maintain your license.

22      Q.    Does the 40-hour class that you took to

23   become licensed in the state of Georgia contain

24   training on how to apply policy language to determine

25   if coverage applies to a particular loss?

1    A.   I don't remember specifically.

2    Q.   Is it fair to say that you took the

3 40-hour class to become licensed in Georgia many years

4 ago?

5    A.   I believe I took that class in 2007, but

6 I'm not 100-percent positive that was the year.

7    Q.   And your continuing education credits, are

8 those a certain amount of classes or credits that you

9 have to get on an annual basis?

10    A.   It was originally on an annual basis.

11 Georgia has recently switched to every two years you

12 have to get so many hours.

13    Q.   In the time frame 2012, '13, '14, '15, was

14 it still an annual basis?

15    A.   I'd have to go back and see when that

16 transitioned, but that was about the time it switched.

17    Q.   Here's where I'm headed.  Do you recall

18 specifically relying upon any information from any of

19 your continuing education classes in making a decision

20 to deny coverage in this case?

21    A.   I don't remember -- no.  No.

22    Q.   Do you recall any continuing education

23 courses dealing with how to apply a temperature,

24 dampness or dryness exclusion within an insurance

25 policy?

1    A.   I don't recall.

2    Q.   Do you recall any training in any of your

3  continuing education courses specifically devoted to

4  what constituted a discrete event of a physical loss?

5    A.   I don't recall.

6    Q.   In 2015, can you give me a sense of

7  approximately how many claims were assigned to you as

8  the primary adjuster?

9    A.   It would be a guess.  I would guess

10  somewhere between 50 and 100, but I don't know the

11  exact number.

12    Q.   What about for 2016?  Do you think that

13  number would go up or down or be about the same?

14    A.   About the same.

15    Q.   What about for 2017?  Would it go up or

16  down --

17    A.   I guess it would --

18    Q.   -- or --

19    A.   -- be about the same.

20    Q.   Has there been a period of time during

21  which you were working for Factory Mutual Insurance

22  where you feel like that number likely went up or went

23  down significantly?

24         MR. CHIN:  Object to form.

25         THE WITNESS:  I mean, it's not consistent,

1     so there may be a given month where you get more

2     than normal and other months we get less, but

3     probably on average over that time frame it's

4     been in that same realm.

5   BY MR. HASSON:

6       Q.   Have you had other claims prior to this

7   one that involved water or mold damage inside a hotel?

8       A.   Yes.  I've had claims with water or mold

9   damage inside a hotel, yes.

10      Q.   How often has that come up in your work

11  for Factory Mutual?

12      A.   I don't know specifically.

13      Q.   How many claims involving water or mold

14  damage in a hotel can you recall being the primary

15  adjuster on prior to this case?

16      A.   I can specifically remember one.  I may

17  have had others.  I don't remember.

18      Q.   What do you recall about the one case of

19  water or mold damage in a hotel?

20      A.   It was a Hurricane Ike loss at a hotel

21  located in Houston.

22      Q.   Did that involve water damage or mold

23  damage or both?

24      A.   It had water damage, and there was mold

25  that was found.

1    Q.   Do you recall if there was any payment

2  issued under that claim?

3    A.   Yes, there was payment issued under that

4  claim?

5    Q.   Was it for water or mold or both?

6    A.   It was for water damage.  There was mold

7  damage.  There was a portion of the roof that

8  collapsed.  There was other damage beyond that, but

9  all of that was part of the loss measurement.

10    Q.   Can you recall any other claims involving

11  water or mold damage in a hotel prior to this one,

12  other than that hotel in Houston?

13    A.   Not specifically.

14    Q.   Of the 50 to 100 claims that were assigned

15  to you as the primary adjuster in 2015, do you have a

16  sense of approximately what percentage of those claims

17  were ultimately denied?

18        MR. CHIN:  Objection to form.

19        THE WITNESS:  I don't remember.

20  BY MR. HASSON:

21    Q.   Do you keep track of the percentage of

22  claims that are paid or denied in some way?

23    A.   No.

24    Q.   To the best of your knowledge, does

25  Factory Mutual keep track of how many of the claims

1   assigned to you are paid or denied?

2          MR. CHIN:  Objection to form.

3          THE WITNESS:  I know that we track what

4      the final -- what the final outcome of any claim

5      that's open is.  I don't know if we track

6      percentage of denied or percentage paid.  I

7      don't know if we track that specifically.

8   BY MR. HASSON:

9      Q.   How does Factory Mutual evaluate your

10  performance as an adjuster?

11     A.   I'm reviewed by my manager on an annual

12  basis, and there's a number of objectives for which

13  I'm -- my performance is measured.

14     Q.   What is your understanding of what

15  criteria Factory Mutual uses to evaluate your

16  performance?

17     A.   Can you repeat that?  Can say that one

18  more time?

19     Q.   Sure.  What is your understanding of what

20  aspects of your performance Factory Mutual evaluates?

21     A.   We are evaluated on how promptly losses

22  are paid, how quickly files are closed.  We are

23  evaluated on our performance for internal audits.  We

24  are measured on our accuracy of our estimating, our

25  reserves.  That's all I can remember.

1      Q.    What are internal audits?

2      A.    Other employees review a file to see that

3  they're being handled according to our procedures.

4      Q.    Do you know whether the claim at issue in

5  this case was ever subject to an internal audit?

6      A.    I don't remember if it was ever audited.

7      Q.    You made reference to estimating reserves.

8      A.    Yes.

9      Q.    What does that mean?

10      A.    So the objective is comparing our reserves

11  at certain time periods for when the loss is open

12  compared to what the final payment on the loss was.

13  And then depending on the size of the loss, we use a

14  certain percentage of that final payment amount.  And

15  I think it's, like, at 60 days, 120 days, 180 days,

16  there are certain time frames; was the reserve

17  accurate at that point in time?

18      Q.    Do you recall ever setting a reserve on

19  the claim at issue in this case?

20      A.    When the loss is open as Liability to be

21  Determined, the reserve is set at zero.

22      Q.    Does Factory Mutual have a policy or

23  guideline regarding when to open a claim file under

24  the heading Liability to be Determined?

25      A.    If the liability is not clear, it's opened

1   as Liability to be Determined.

2      Q.   How do you as an adjuster assess whether

3   liability is clear or not?

4      A.   I try to identify the discrete event that

5   caused the physical loss or damage, and if there's any

6   sort of exclusions that may or may not apply to

7   whatever the situation is on a particular loss.  If it

8   looks like there's a peril that's covered, you open

9   it.  If there's a question about it, it's Liability to

10  be Determined.

11     Q.   Do you have any sense as to how often you

12  open up claim files under the heading Liability to be

13  Determined?

14     A.   I will say infrequently.

15     Q.   Did you open the claim file in this case

16  using that heading Liability to be Determined?

17     A.   I did.

18     Q.   Why?

19     A.   It wasn't clear when the damage occurred

20  or what events caused the moldy condition at the

21  hotel.  It looked like there were multiple sources of

22  water.

23     Q.   Was that based on your own observations or

24  observations from engineers that you were consulting

25  with, or both?

1      A.   Both.

2      Q.   Do you recall approximately when you

3  decided to set a reserve of zero and open up the claim

4  as Liability to be Determined?

5      A.   I don't remember exactly.  Probably within

6  a month, within that first month.

7      Q.   Do you recall approximately when you first

8  became aware of this claim?

9      A.   I believe I got an e-mail from my manager

10  assigning the loss to me sometime in September.  I

11  think it's September 21st, but I could be wrong on

12  that date.

13      Q.   Generally speaking, in 2015, when you were

14  assigned to a claim, did you have a process that you

15  went through to do your work as an adjuster?

16           MR. CHIN:  Object to form.

17           THE WITNESS:  I don't understand what

18      you're asking me.

19  BY MR. HASSON:

20      Q.   Back in 2015 when you got assigned to a

21  claim --

22      A.   Yeah.

23      Q.   -- what steps did you take in order to

24  perform your work as an adjuster?

25      A.   So a loss would get assigned to me --

1        MR. CHIN:  Object to the form.

2        THE WITNESS:  -- there would be whatever

3    loss notice we had that came in.  There would

4    usually be some sort of contact from whomever

5    was on the notice.  We would contact them, find

6    out what the reported loss was, and then you

7    just set up a site visit to go and see what was

8    going on.

9  BY MR. HASSON:

10       Q.    When you were assigned to this loss, do

11   you recall attempting to make contact with whoever had

12   made a note, made the claim, or given notice of the

13   claim?

14       A.    I remember that I went out to the hotel

15   the following day, and I contacted the manager at the

16   hotel.  I think her name is Marcy Adams.  And I'm

17   assuming I had made contact with her to arrange that

18   visit.  I don't remember if I had contacted anybody

19   else in addition to her.  I don't remember.

20       Q.    When notice of the claim was provided, do

21   you know whether it came from Marsh or from Crestline?

22       A.    I think it came from Marsh, but I'm not

23   positive on that.

24       Q.    And who is Marsh?

25       A.    Marsh is an insurance broker.

1    Q.    Was there someone at Marsh that you

2    communicated with about this claim?

3    A.    I think I spoke to Tommy Gray on occasion

4    about this loss.  I don't know that I contacted him

5    immediately.

6    Q.    Was Tommy Gray someone that you knew

7    already before being assigned to this claim?

8    A.    I don't think so.  I don't know, though.

9    Q.    Do you know what Tommy Gray does for

10   Marsh?

11   A.    No, not really.

12   Q.    How many times do you recall speaking with

13   Mr. Gray about this claim?

14   A.    I don't -- I don't remember any time

15   specifically talking to him.

16   Q.    You just think it's likely that you did?

17   A.    Yes.

18   Q.    Do you recall receiving any information

19   from Marsh in this case that you believed was

20   important in making the coverage determination that

21   you made?

22   A.    No.

23   Q.    Are you familiar with an entity known as

24   Sky Harbor Atlanta Northeast?

25   A.    I'm aware of Sky Harbor.

1    Q.   Okay.  And you just anticipated my next

2  question.

3    A.   I wouldn't say I'm familiar with them, no.

4    Q.   Okay.  What is your understanding of who

5  Sky Harbor is?

6    A.   I believe they are the owners of the

7  hotel.

8    Q.   When do you recall first communicating

9  with Sky Harbor about this case?

10    A.   If I remember right, I think Frank Lin is

11  somehow associated with Sky Harbor, and I believe he

12  was at the loss site when I made that first visit in

13  September of 2015.

14    Q.   What do you remember about that first

15  visit?

16    A.   I went to the hotel.  I was accompanied by

17  a building consultant.  His name is Chris Dawkins.  We

18  got to the hotel, met with Marcy Adams.  The

19  maintenance guy, whose name is Dan Tracy, Frank Lin,

20  who I already mentioned, and we were taken to the 9th

21  and 10th floors of the hotel and shown areas where

22  mold was discovered during the renovation.

23    Q.   Was drywall still up on those floors?

24    A.   There was some drywall up.  There was a

25  significant amount of areas where the drywall had been

1  removed.

2      Q.   Had the vinyl wall coverings been removed

3  from the drywall?

4      A.   Well, in the areas where the drywall had

5  been removed from the wall, it was obviously gone in

6  those areas, and I don't remember specifically in the

7  other areas.

8      Q.   Did you personally observe what appeared

9  to be mold on any of the drywall that was still

10 present on the 9th and 10th floor?

11     A.   Yes.

12     Q.   Where?

13     A.   I don't remember exactly.

14     Q.   Would you describe the mold that you saw

15 as significant?

16         MR. CHIN:  Objection to form.

17         THE WITNESS:  I don't remember exactly

18     from the first day.

19 BY MR. HASSON:

20     Q.   Would you describe the mold that you saw

21 on the remaining drywall on the 9th and 10th floors

22 during that first visit as widespread?

23     A.   Probably.

24     Q.   What do you recall, if anything, about

25 what Ms. Adams and Mr. Lin and Mr. Tracy told you

1    during that first visit?

2        A.    I don't remember anything specifically

3    that they told me from that first visit.

4        Q.    Do you recall any discussion about

5    construction on an ongoing renovation project having

6    come to a halt?

7        A.    I don't remember discussing the renovation

8    stopping during that first visit.

9        Q.    Do you recall any discussions about that

10   later?

11       A.    I remember that it was discussed, but I

12   don't remember when.

13       Q.    Do you recall who relayed that information

14   to you?

15       A.    No.

16       Q.    Do you recall during that first

17   visit -- Strike that.

18           During that first visit, did you ask to

19   view any documentation at the hotel?

20       A.    I don't recall.

21       Q.    During that first visit, do you recall

22   having any discussions with your own engineer about

23   the cause or causes of the mold you observed?

24       A.    I remember talking to Chris about the

25   exterior walls.  We observed metal studs that were

1   rusted out.  And they weren't just surface rust.  They

2   were like missing sections of these metal studs.

3   There had been a lot of corrosion over a long period

4   of time that we observed.

5       Q.    Where were those studs located?

6       A.    That would've been on the 10th floor, and

7   they would've been near windows at the exterior of the

8   building.  And there may have been some in the

9   bathroom, but I don't remember that one specifically.

10      Q.    When you say that there were studs that

11  were near the windows, are we talking about on the

12  exterior wall of the building?

13      A.    The exterior wall of the building, yes.

14      Q.    And was the rust that you remember seeing

15  primarily right around the window itself?

16          MR. CHIN:  Object to form.

17          THE WITNESS:  There was rust near the

18      window.  There was also rust at the floor.

19  BY MR. CHIN:

20      Q     And I understood you to say you might have

21  seen rust around some of the bathrooms?

22      A.    Yes.

23      Q.    Do you recall specifically any bathrooms

24  on the 9th or 10th floor were you saw rust on the

25  studs?

1    A.   I don't recall specifically, no.

2    Q.   Had the bathrooms been demolished at that

3  point?

4    A.   Some of the bathrooms on that floor had

5  been demolished at that point, yes.

6    Q.   Did Mr. Dawkins prepare a report based on

7  that first visit?

8    A.   Yes, he did.

9    Q.   I seem to recall a report by a company

10  called ESI.  Does ESI mean anything to you?

11    A.   I believe ESI is Engineered Solutions

12  International.

13    Q.   Is that Mr. Dawkins' company?

14    A.   That's the firm he works for, yes.

15    Q.   Prior to preparing that report, did he

16  send you any notes or any preliminary observations?

17    A.   We discussed his preliminary findings that

18  day of the loss -- I mean, the first day of the visit,

19  and I relayed that information to Marcy, Daniel and

20  Frank.

21    Q.   What did you tell them?

22    A.   That it looked like we were not able to

23  identify a single source of water.  It look like there

24  were multiple sources, multiple issues, and it would

25  take further investigation to determine what was going

1   on.

2          And I think we did a conference call to

3   somebody, and I don't remember who was on the call.

4      Q.   Did you ever meet a woman named Lori

5   Remington?

6      A.   That name sounds familiar to me.  I don't

7   know.

8      Q.   Did you ever meet a man named Henk

9   Poyderoyan?

10     A.   I don't know.

11     Q.   Who at Sky Harbor did you communicate with

12  most frequently regarding this claim early on?

13     A.   I don't know that I communicated with

14  anyone from Sky Harbor early on.  I mean, I met Frank

15  Lin initially.  Most of my correspondence were from

16  people at Crestline.  And then once we started talking

17  to Sky Harbor, most of that correspondence was

18  directed through Ray.

19         MR. CHIN:  Mr. Steinbrecher.

20         When we get to a stopping point, can we

21      take a couple-of-minute break?

22         MR. HASSON:  Sure.  We can go ahead right

23      now.

24         (Off the record at 11:48 a.m.)

25             --------------

1           (On the record at 11:58 a.m.)

2    BY MR. HASSON:

3       Q.   Do you believe that the amount that you

4    pay out in claims assigned to you affects your

5    compensation in any way?

6       A.   No.

7       Q.   Why do you believe that it does not affect

8    your compensation?

9           MR. CHIN:  Object to form.

10          THE WITNESS:  Because I don't.

11   BY MR. HASSON:

12      Q.   Has anyone ever told you that?  Have you

13   ever seen any information that says that?

14      A.   No.

15      Q.   And who do you report to directly?

16          MR. CHIN:  I'm going to object to the

17   previous question.

18          Go ahead.

19          THE WITNESS:  I report to Mike Brugh.

20   BY MR. HASSON:

21      Q    He manages the Atlanta area?

22      A.   He's the Claims Manager for Plan

23   Operations.

24      Q.   Other than assigning you as the adjuster

25   to this case, did Mr. Brugh have any involvement in

1   the claims decision in this case?

2        A.   No.

3        Q.   And then who does Mr. Brugh report to?

4        A.   Randy Perkins.

5        Q.   What is Mr. Perkins' position?

6        A.   He's the Division Claims Manager for

7   Central Division.

8        Q.   Who is above him?

9        A.   I'm not sure.  I don't have the org chart

10  memorized.

11       Q.   Fair enough.  Do you know a fellow named

12  Brian Cook?

13       A.   Yes, I know Brian Cook.

14       Q.   Who is Brian Cook.

15       A.   Brian Cook works in Staff Claims.

16       Q.   What are Staff Claims?

17       A.   Staff people who work in our corporate

18  office.

19       Q.   Okay.  Was Mr. Cook involved in the

20  coverage decision that was made in this case?

21       A.   Yes.

22       Q.   What was Mr. Cook's involvement in the

23  claims decision made in this case?

24       A.   I don't know.

25       Q.   Did you ever speak with Mr. Cook about the

1   claim in this case?

2       A.   Yes.

3       Q.   On more than one occasion?

4       A.   Yes.

5       Q.   What do you recall about those

6   conversations?

7       A.   I don't remember any specifics from

8   conversations with him.

9       Q.   Was Mr. Cook routinely involved in the

10  coverage decisions in claims assigned to you in 2015?

11      A.   No.

12      Q.   Do you know why Mr. Cook was involved in

13  the claims decision in this case?

14      A.   No.

15      Q.   Do you recall whether he was involved in

16  any other claims decisions made on any of your 2015

17  claims?

18      A.   I don't remember.

19      Q.   Was there something unusual about the

20  claim in this case that caused you to ask Mr. Cook to

21  become involved?

22           MR. CHIN:  Object to form.

23           THE WITNESS:  I did not ask Mr. Cook to

24       become involved.

25  BY MR. HASSON:

1    Q.    Do you know who did?

2    A.    No.

3    Q.    Do you recall when the coverage decision

4  was made in this case?

5    A.    No.

6    Q.    Earlier we talked about a reserve of zero

7  being assigned to this case early on.  Do you recall

8  that?

9    A.    I recall stating that we opened the loss

10  as Liability to be Determined, yes.

11    Q.    And that when you assign Liability to be

12  Determined to a case, you assign a reserve of zero,

13  right?

14    A.    Yes.

15    Q.    Okay.  My question is did you ever change

16  the assignment of a reserve of zero?

17    A.    No.

18    Q.    Did you ever change the finding of

19  Liability to be Determined?

20    A.    Yes.

21    Q.    How did you change the finding of

22  Liability to be Determined?

23    A.    The file was marked off as Closed, as

24  Denied, I think.

25    Q.    You say you think.  Was there a policy or

1   procedure for coming back when a claim is denied and

2   marking a file as File Closed, Claim Denied?

3       A.   Can you repeat the question one more time,

4   please?

5       Q.   Sure.  Was there a policy or procedure in

6   2015 or 2016 for coming back once a coverage decision

7   had been made and marking the claim as File Closed,

8   Claim Denied?

9       A.   I don't know.

10      Q.   Have you ever marked a file as File

11  Closed, Claim Denied?

12      A.   Yes.

13      Q.   How do you go about doing that?

14      A.   You write a loss memo.  That memo is then

15  submitted within the Claims Management System, and

16  that's approved by somebody within claims for that

17  mark-off.

18      Q.   Do you know if that was ever done in this

19  case?

20      A.   No, I don't know.

21      Q.   If it was not done in this case, should it

22  have been?

23      A.   I don't know.

24      Q.   Why do you think that that was done in

25  this case?

1       A.   Because I know we sent a denial letter.

2       Q.   Would it be a typical practice of yours to

3   prepare a loss memo at or around the time you issue a

4   notice to the insured that the claim has been denied?

5       A.   Yes.

6       Q.   If a loss memo was written in this case,

7   would you have written it?

8       A.   Yes.

9       Q.   How do you decide as the adjuster what

10  kind of information you want to receive from an

11  insured in order to evaluate a claim?

12      A.   I would ask for information that would

13  allow me to complete our investigation to figure out

14  what the discrete event is and what resulting damage

15  occurred from that discrete event.

16      Q.   Is there some checklist or other document

17  provided by your employer that tells you what

18  information to ask for --

19      A.   No.

20      Q.   -- in a particular type of claim?

21      A.   No.

22      Q.   In your work as an adjuster in this case,

23  did you do any investigation or research to determine

24  whether Affiliated FM had any history with this

25  particular property?

1      A.   No.

2      Q.   Would you agree with me that if Affiliated

3   FM had a history with this particular property, that

4   information might've been useful to you in doing your

5   work as an adjuster on this claim?

6           MR. CHIN:  Objection to form.

7           THE WITNESS:  I don't understand what

8       you're asking me.

9   BY MR. HASSON:

10     Q.   If you are assigned to handle a claim for

11  a particular property involving water or mold damage,

12  wouldn't you want to know if Affiliated FM had ever

13  handled a water or mold damage claim at that location?

14     A.   Yes.

15     Q.   Do you know whether Affiliated FM had ever

16  handled a water or mold claim at this particular

17  location?

18     A.   I don't know the answer to that question.

19     Q.   If you wanted to answer that question, how

20  would you figure it out?

21     A.   I don't know.

22     Q.   Is there a computer database on which you

23  could look to ascertain whether any reports had ever

24  been issued by Affiliated FM with respect to this

25  particular property location?

1      A.   Yes.

2      Q.   Are you familiar with how that computer

3   system worked?

4      A.   Yes.

5      Q.   In the course of your work for Factory

6   Mutual, do you ever look at that database and look at

7   the reports that are on it?

8      A.   Yes.

9      Q.   Have you ever looked to see if there is

10  any historical information in that database about this

11  property from before September of 2015?

12     A.   Can you repeat the question one more time?

13     Q.   Sure.  Have you ever looked at that

14  database to ascertain whether there is any information

15  about this particular property from before September

16  of 2015?

17     A.   I will say yes.

18     Q.   What did you see?

19     A.   I think I, doing this, became aware of a

20  loss handled by another adjuster for a boiler loss at

21  the hotel.  But other than that, I don't remember.

22     Q.   Do you have any knowledge of Affiliated FM

23  having ever issued a policy of insurance on this

24  property for a prior owner?

25     A.   I'll say yes.

1      Q.    When did you learn that Affiliated FM had

2   issued a policy of insurance on the Hilton Atlanta

3   Northeast for a prior owner?

4      A.    I don't know.

5      Q.    Was that something you learned recently,

6   or was that something you learned back in '15 or '16?

7      A.    I don't remember exactly when I found that

8   out.

9      Q.    How did you learn that Affiliated FM had

10  issued a policy for a prior owner on the Hilton

11  Atlanta Northeast?

12     A.    I don't remember.

13     Q.    When you learned that Affiliated FM had

14  issued a policy for a prior owner of the Hilton

15  Atlanta Northeast, did you take any steps to determine

16  whether any prior claims had been submitted under that

17  prior policy?

18     A.    I don't know.

19     Q.    When you learned that Affiliated FM had

20  issued a policy on the Hilton Atlanta Northeast for a

21  prior owner, did you take any steps to determine

22  whether, regardless of whether a claim was filed, any

23  engineers at Affiliated FM had done a site visit or

24  prepared any reports regarding loss prevention

25  measures in place at the hotel?

1      A.   I don't remember.

2      Q.   Is looking for information like that

3   something you would normally do in the course of your

4   work as an adjuster on a claim?

5           MR. CHIN:  Object to the form.

6           THE WITNESS:  Maybe.

7   BY MR. HASSON:

8      Q.   As an adjuster, how would you decide

9   whether, in a particular claim, to go and look and see

10   whether Affiliated FM had any prior experience with a

11   particular location?

12      A.   If it would help our investigation, I

13   would do it.

14      Q.   Do you recall ever thinking that prior

15   experience Affiliated FM might have had with the

16   Hilton Atlanta Northeast might assist you in your

17   investigation?

18      A.   I don't remember.

19      Q.   The incident involving a boiler loss at

20   the Hilton Atlanta Northeast that you made reference

21   to a few moments ago, did you ever go look at the

22   claim file for that boiler loss?

23      A.   No.

24      Q.   Did you ever contact the adjuster assigned

25   to that claim to see if he had any documentation that

1    might assist you in your work in this case?

2        A.   No.

3        Q.   Have you been deposed previously?

4        A.   Yes.

5        Q.   How many times have you been in

6    depositions in legal proceedings?

7        A.   Counting today, two.

8        Q.   What was your deposition testimony in the

9    other case about?

10       A.   It was a subrogation matter.

11       Q.   How long ago?

12       A.   I don't recall.

13       Q.   In the course of that, were you asked to

14   provide any testimony or explanation regarding your

15   analysis of a policy or a decision that you had made

16   to provide coverage or deny coverage?

17       A.   No.

18       Q.   Who made the decision to get Chris Dawkins

19   and his company involved in assisting with this case?

20       A.   I did.

21       Q.   Had you worked with Mr. Dawkins

22   previously?

23       A.   Yes.

24       Q.   Approximately how many times?

25       A.   I don't recall exactly.

1    Q.    More than a handful?

2    A.    I don't know how many a handful is.

3    Q.    Okay.  More than four or five times?

4    A.    Maybe.

5    Q.    More than 20 times?

6    A.    I'm guessing at this point.  I don't know.

7  No, probably not.

8    Q.    And is Mr. Dawkins a friend of yours?

9          MR. CHIN:  Did you say "probably" or

10    "probably not"?

11         THE WITNESS:  I said "probably not."

12         And I don't know exactly how many times.

13    I would guess it's more than four.  Beyond that,

14    I don't know.

15  BY MR. HASSON:

16    Q.    Probably not more than 20?

17    A.    Probably not.

18    Q.    And are you and Mr. Dawkins friends?

19    A.    Yes.

20    Q.    Do you ever socialize together?

21    A.    No.

22    Q.    After Mr. Dawkins prepared that initial

23  report after the initial visit, did he continue to be

24  involved in the claims process in this case?

25    A.    Yes.

1    Q.   Did he continue to assist you through the

2  ultimate decision to deny coverage?

3    A.   Yes.

4    Q.   Did he issue other reports to you?

5    A.   No.

6    Q.   Why not?

7    A.   I don't -- I didn't ask for any of the

8  reports.

9    Q.   Did Mr. Dawkins ever recommend any testing

10  be done on the hotel?

11    A.   Yes.

12    Q.   What kind of testing did he recommend be

13  done?

14    A.   I don't remember.

15    Q.   Do you recall whether the testing he

16  recommended was done?

17    A.   I don't remember what testing he

18  requested, so I don't know whether it was done or not.

19    Q.   Fair enough.  Who is JS Held?

20    A.   JS Held is a consulting group that we use

21  occasionally.

22    Q.   Was a decision made to get them involved

23  in this case?

24    A.   Yes.

25    Q.   Who made that decision?

1       A.    It was either myself or Dominic Thurston.

2    I don't remember.

3       Q.    Had you worked with JS Held before?

4       A.    Yes.

5       Q.    How many times?

6       A.    I don't know.

7       Q.    Had you worked with him four or five times

8    before?

9       A.    I don't know.

10      Q.    Had you worked with him -- can you --

11    well, let's do it this way.  Do you recall any

12    specific cases that you've worked on with him?

13      A.    I can think of one case specifically.

14      Q.    What was that case about?

15      A.    It was a hotel loss.  I'm sorry, a

16    hospital loss.  It was a hospital loss.  I misspoke.

17    It was a hospital.

18      Q.    Like, loss of the entire building, or a

19    loss at a hospital?

20      A.    It was a loss at a hospital.

21      Q.    Do you recall what caused that loss?

22      A.    I think it was a pipe rupture.

23      Q.    Was JS Held brought in in that case to

24    help you determine the cause and extent of the loss?

25      A.    They were not brought in for the cause.

1   The cause was obvious at that point.  They were

2   brought in to assist in the scope and cost for the

3   repairs.

4        Q.   In that case, did Affiliated FM make

5   recommendations or provide information to the insured

6   about what you all believed was the appropriate scope

7   of work?

8             MR. CHIN:  Objection to form.

9             THE WITNESS:  I believe we had

10            conversations with the insured on what we

11            believed the proper scope would be.

12   BY MR. HASSON:

13        Q.   Was there disagreement?

14        A.   Initially, but we reached a resolution.

15        Q.   What was -- do you recall what the

16   disagreement was in that case?

17        A.   If I remember right, it had to do with

18   carpet in a lobby.  There was some damage in one area

19   of the lobby, and I believe they were requesting to

20   replace the carpet through the entire area, including

21   areas that were undamaged, and it was about where

22   would be a reasonable stopping point.  What could be

23   the line between damaged and undamaged?  And that was

24   the disagreement.  We reached a resolution on that.

25        Q.   Do you recall what the resolution was?

1      A.   Not specifically.

2      Q.   Okay.  Does Factory Mutual ever provide

3    advice or information to its insureds regarding scopes

4    of work for repairs or renovations to damaged

5    property?

6      A.   Yes.

7      Q.   Under what circumstances would Factory

8    Mutual offer that kind of advice or information?

9          MR. CHIN:  Objection to form.  And

10         objection to the last question, as well.

11          THE WITNESS:  Can you repeat the -- can

12         you repeat the question, please?

13   BY MR. HASSON:

14      Q.   Under what circumstances would Factory

15   Mutual provide advice or assistance to an insured

16   regarding the appropriate scope of work for repairs to

17   damaged property?

18          MR. CHIN:  Objection to form.

19          THE WITNESS:  I don't think we provide

20         advice on repair to damaged property.  The

21         advice probably comes from determining whether

22         something is damaged or not damaged, or if the

23         dividing line between damaged or undamaged is in

24         question.

25   BY MR. HASSON:

1      Q    So would Factory Mutual provide advice or

2   information to an insured about how to determine

3   whether property has been damaged?

4           MR. CHIN:  Objection to form.

5           THE WITNESS:  I'll say no to that

6      question.

7   BY MR. HASSON:

8      Q    To the best of your knowledge, does

9   Factory Mutual ever provide loss prevention advice or

10  information to its insureds?

11     A.   Yes.

12          MR. CHIN:  Objection to form.

13  BY MR. HASSON:

14     Q.   What type of loss prevention information

15  does Factory Mutual provide to its insureds?

16     A.   I don't know.

17     Q.   Would loss prevention information to

18  insureds come from people in the Claims Department, or

19  from some other department within the company?

20          MR. CHIN:  Objection to form.

21          THE WITNESS:  I would say it would come

22     from some other department.

23  BY MR. HASSON:

24     Q    Do you, in your work as an adjuster, ever

25  provide loss prevention information to insureds of the

1   company?

2       A.   No.

3       Q.   Did there come a time in this case where

4   you felt the steps being taken by Crestline and Sky

5   Harbor to address conditions within the hotel were not

6   appropriate?

7           MR. CHIN:  Objection to form.

8           THE WITNESS:  Can you state it one more

9       time?

10  BY MR. HASSON:

11      Q.   Did there come a time where you felt as

12  the adjuster in this case that the steps being taken

13  by Crestline and Sky Harbor to address conditions in

14  the hotel were not appropriate?

15          MR. CHIN:  Same objection.

16          THE WITNESS:  I'll say yes.

17  BY MR. HASSON:

18      Q    Tell me about that.

19      A.   The concern I had was that the renovations

20  to the hotel continued when it did not seem that the

21  sources -- that all the sources of the water getting

22  into the hotel had been addressed.

23      Q.   Which sources of water intrusion did you

24  believe Crestline and Sky Harbor had not addressed?

25          MR. CHIN:  Objection to form.

1          THE WITNESS:  There were numerous sources

2     and causes of water infiltration into the hotel,

3     and those sources were spelled out in the

4     Liberty Report, and Chris Dawkins' report, and I

5     don't think steps had been taken to correct

6     those conditions prior to the renovations

7     continuing.

8  BY MR. HASSON:

9          Q     To the best of your recollection, had any

10  of those conditions been addressed at the point you

11  became concerned that Crestline and Sky Harbor were

12  proceeding with --

13         A.    I don't know the answer to that question.

14         Q.    Did you express your concern to anyone at

15  Crestline or Sky Harbor?

16         A.    Yes.

17         Q.    Who did you address that concern to?

18         A.    I think I told Ray in one of the

19  subsequent visits to the hotel.  Mr. Steinbrecher.

20  I'm sorry.  Mr. Steinbrecher.

21         Q.    What do you recall telling

22  Mr. Steinbrecher about your concerns?

23         A.    I think I told him that if water is still

24  getting into the hotel and you put new finishes up on

25  the hotel and they get damaged, that's not going to

1  be -- that would be recoverable under this -- that's

2  new damage from a separate source, or something to

3  that effect.  I don't remember exactly.

4      Q.   Did Mr. Steinbrecher respond to that?

5      A.   I don't remember what he said.

6      Q.   Do you recall any other concerns that you

7  had as an adjuster in this case that the scope of work

8  for repairs being made by Crestline or Sky Harbor were

9  not appropriate?

10     A.   Yes.

11     Q.   Tell me about that.

12     A.   The scope of repairs identified in the

13 Proofs of Loss were for suspected damage.  It looked

14 like it was an Xactimate report where they took the --

15 a scope from the top floors, 9 and 10, and

16 extrapolated to floors they hadn't done any sort of

17 demolition on yet.

18          And in subsequent visits to the hotel in

19 our inspections, we found that the moldy conditions

20 were still present but not as extensive on the lower

21 floors as they were on the higher floors.  And we had

22 consultants with us that provided us with what they

23 believed to be an appropriate scope for repairs, and

24 that that scope was less than the scope provided by

25 Crestline or Sky Harbor in their Proofs of Loss.

1    Q.    Did you provide the scope prepared by your

2  consultants to Crestline or to Sky Harbor?

3    A.    We had conversations with representatives

4  at those inspections regarding the differences in the

5  scope.

6    Q.    Was any agreement reached with respect to

7  an alteration of the scope of work that Crestline and

8  Sky Harbor were in the middle of?

9    A.    No.

10    Q.    Who representing Crestline or Sky Harbor

11  responded to those concerns?

12    A.    I don't remember exactly.  Again,

13  Mr. Steinbrecher was present at most of the

14  inspections --

15    Q.    Were representatives --

16    A.    -- at the hotel.

17    Q.    I'm sorry.  I didn't mean to cut you off.

18      Anyone else that you can recall that

19  would've been involved in discussions about

20  alterations in the scope of work?

21    A.    I don't remember.

22    Q.    Do you recall if anyone from Liberty was

23  present at the hotel when those discussions were

24  ongoing?

25    A.    I believe, yes.

1    Q.    Did consultants hired by Affiliated FM and

2   representatives of Liberty get an opportunity to

3   discuss that?

4    A.    I believe that they did.

5    Q.    Did Liberty or anyone else representing

6   Crestline or Sky Harbor provide any explanation as to

7   why they were proceeding in the way they were?

8         MR. CHIN:  Objection to form.

9         THE WITNESS:  I don't remember exactly

10      what was said.

11  BY MR. HASSON:

12   Q.    What is Xactimate?

13   A.    It's a software used for estimating repair

14  costs.

15   Q.    Does AFM ever use it?

16   A.    No.

17   Q.    Have you worked with that software before?

18   A.    I have not.

19   Q.    Do you have any understanding of how it

20  works or whether its information is reliable?

21   A.    I have very general information about the

22  software, not any specifics.

23   Q.    Do you know anything about the reliability

24  of the software?

25         MR. CHIN:  I object.

1          THE WITNESS:  I don't know about the

2     reliability of the software.

3  BY MR. HASSON:

4     Q.    Does Affiliated FM have software that it

5  uses to anticipate repair costs?

6     A.    No.

7     Q.    Do you know whether ESI or JS Held have

8  such software?

9     A.    I don't know.

10     Q.    Does Affiliated FM ever attempt to

11  anticipate repair costs on a loss when a claim is

12  reported to the company, but repairs have not yet been

13  made?

14     A.    Yes.

15          MR. CHIN:  Object to form.

16  BY MR. HASSON:

17     Q.    How do you go about that?

18     A.    I would probably use some sort of

19  estimated cost per square-foot regarding the type of

20  repairs that need to be made.

21     Q.    What information would you use in order to

22  estimate the cost per square-foot of anticipated

23  repair costs?

24     A.    The type of repairs that were being

25  performed, the square footage for the area where they

1   were being repaired.

2       Q.   Is there any information that Factory

3   Mutual tracks that would assist you in estimating

4   those anticipated repair costs?

5       A.   No.

6       Q.   What is RiskMark?

7       A.   I'm not entirely sure.

8       Q.   Is it something you ever use?

9       A.   No.

10      Q.   Does Factory Mutual have in-house

11  consulting engineers who are involved in decisions

12  about whether to insure a particular property or not?

13      A.   Yes.

14      Q.   Do you ever utilize or rely on those

15  consulting engineers in the claims process?

16      A.   Yes.

17      Q.   How?

18      A.   I might use a report to find out

19  information about a location to which I haven't been

20  before to find out what they do there, the size of the

21  facility, what kind of production they do, production

22  volumes.

23      Q.   Would the use of the consulting --

24  in-house consulting engineers, then, be limited to

25  reviews of existing reports about the property?

1      A.   Yes.

2      Q.   In other words, you would never bring a

3   consulting engineer on as a consultant for some claim

4   that you had been assigned to?

5      A.   No.  No.

6      Q.   So there were no in-house consulting

7   engineers who were asked to come in and provide

8   consultation or assistance with respect to the claim

9   in this case?

10     A.   No.

11     Q.   Do you recall whether any of your

12  consultants in this case ever recommended any testing

13  being done on the roof of the Hilton Atlanta

14  Northeast?

15     A.   I don't recall what testing they

16  requested.

17     Q.   Do you know what uplift testing is?

18     A.   I have a general idea of what uplift tests

19  are.

20     Q.   What's your understanding of what an

21  uplift test is?

22     A.   An uplift test would test a roof, a

23  membrane roof for its adherence to the structure.

24     Q.   Did the guest tower at the Hilton Atlanta

25  Northeast have a membrane roof?

1      A.    I don't recall the roof construction of

2   the hotel.

3      Q.    Do you recall any discussions about water

4   penetration through the guest tower roof at the Hilton

5   Atlanta Hilton Northeast?

6      A.    Yes.

7      Q.    Is it your understanding that damages from

8   water penetration through that guest tower roof were

9   part of the claim submitted in this case?

10         MR. CHIN:  Object to form.

11         THE WITNESS:  Can you repeat the question?

12   BY MR. HASSON:

13      Q.    Is it your understanding that damages

14   resulting from water penetration through the roof of

15   the guest tower at the Hilton Atlanta Northeast are

16   part of the damages that have been submitted by the

17   insured in this case?

18         MR. CHIN:  Object to form.

19         THE WITNESS:  I can't tell from the claim

20      made and the proofs what the damage is from.

21   BY MR. HASSON:

22      Q     Did you ever evaluate whether water

23   penetration through the roof as a result of a

24   particular rain event might have triggered coverage

25   under the policy in this case?

1        MR. CHIN:  Object to form.

2        THE WITNESS:  I would say yes.

3   BY MR. HASSON:

4        Q.    What information did you consider when

5   evaluating whether water penetration through the guest

6   tower roof had triggered coverage under the policy?

7        A.    I didn't say the water penetrating through

8   the roof had triggered coverage.

9        Q.    And I don't think my question suggested

10  that you did, so let me try it again.

11       A.    All right.

12       Q.    Did you consider whether water penetration

13  through the roof had damaged parts of the hotel and

14  triggered coverage under the policy?

15       A.    I'll say yes.

16       Q.    What information did you rely on when

17  evaluating whether the water penetration through the

18  roof had or had not triggered coverage under the

19  policy?

20       A.    As part of my investigation into

21  determining whether or not coverage had been triggered

22  or not triggered, I attempted to determine sources of

23  water -- there were multiple sources of water

24  intrusion at this building, and moisture in this

25  building, as spelled out by consultants for both

1    sides -- and to determine when those events occurred.

2           And it looks like that the conditions of

3    the water getting into the building is a chronic

4    condition that has occurred over many years that

5    predate ownership of the building by Sky Harbor, and

6    predates when we issued any policies for the building.

7       Q.   Is it your understanding that water

8    penetration through the roof of the guest tower was

9    ongoing at the time --

10      A.   Yes.

11      Q.   -- the policy that was already in place

12   with Crestline was extended to cover the Hilton

13   Atlanta Northeast?

14      A.   I'm sorry.  I answered the question

15   halfway through it, and I'm not sure what I'm

16   answering anymore.

17      Q.   Let's do it this way and it will be clear.

18      A.   Okay.

19      Q.   When the Proof of Loss was submitted, it

20   made reference to two different policies issued by

21   Affiliated FM; is that correct?

22      A.   I don't remember if it was in the proof,

23   but I'll take you at your word.

24      Q.   Do you recall there being one policy

25   issued to Crestline that was in place from January

1   1 of 2015 to January 1 of 2016?

2       A.   I don't recall the start dates for the

3   policies.

4       Q.   All right.  The claim was reported in

5   2015, right?

6       A.   Yes.

7       Q.   There was an Affiliated FM policy issued

8   to Crestline that was in place at that time, right?

9       A.   Yes.

10      Q.   Was there one for the prior year?

11      A.   I think so.

12      Q.   Okay.  Good.  When that prior year policy

13  was issued, whether it was January 1 or whether it was

14  later in the year, is it your understanding that there

15  was water penetration ongoing through the roof at the

16  Hilton Atlanta Northeast at the time that coverage

17  went into effect at the Hilton Atlanta Northeast?

18      A.   I have no idea.

19      Q.   One of the sources of water intrusion that

20  the ESI folks and Liberty folks identified was water

21  penetration through the exterior façade, correct?

22      A.   Yes.

23           MR. HASSON:  Let's go off the record for a

24      second.

25           (Off the record at 12:53 p.m.)

1              --------------

2              (On the record at 1:39 p.m.)

3    BY MR. HASSON:

4       Q.   The initial visit to the hotel back in

5    September of 2015 with Mr. Dawkins that we discussed

6    earlier, do you remember that?

7       A.   I remember.

8       Q.   So that initial visit, would that initial

9    visit have taken more or less than an hour?

10      A.   I don't remember how long the visit took.

11      Q.   Was that visit confined to the 10th floor,

12   or did you look at other floors in the hotel?

13      A.   I don't remember.

14      Q.   Were there any areas of the hotel that you

15   wanted to see that day but were not able to?

16         MR. CHIN:  Object to the form.

17         THE WITNESS:  I would've liked to have

18       been able to see all of the areas where there

19       was damage, but the hotel was open and running

20       and I was not able to look at all the rooms at

21       that time.

22   BY MR. HASSON:

23      Q    Did you make you request at that time to

24   inspect all of the rooms?

25      A.   No.

1    Q.    Was there any discussion at that initial

2  meeting about how the investigation would progress in

3  terms of being able to see other areas of the hotel

4  that might've been affected by similar conditions?

5    A.    I don't remember.

6    Q.    Ultimately was there some sort of

7  agreement reached with respect to how and when

8  Affiliated FM would be able to inspect other areas of

9  the hotel?

10    A.    Yes.

11    Q.    What was that agreement?

12    A.    The agreement was we would come to inspect

13  areas of the hotel as they were being demolished as

14  part of the renovation.

15    Q.    Was AFM ultimately able to inspect all of

16  the areas of the hotel that it wanted to inspect?

17    A.    Yes.

18    Q.    How many times during the investigation

19  and claim did you personally go to the hotel?

20    A.    Many.

21    Q.    Did you personally walk each of the

22  floors?

23    A.    I have been on every floor in that hotel.

24    Q.    Did you observe mold on every floor in

25  that hotel?

1    A.    Yes.

2    Q.    Did you observe evidence of water damage

3  on every floor in that hotel?

4    A.    Yes.

5    Q.    The mold that you observed in the hotel,

6  was it primarily located on dry-board after vinyl wall

7  coverings on that drywall board were removed?

8    A.    I observed mold on the drywall after the

9  wall covering had been removed.

10    Q.    On every floor in the hotel?

11    A.    Yes.

12    Q.    Including the lobby area?

13    A.    I'm not sure about the lobby area.  The

14  guest room floors.  I'll say guest room floors.

15    Q.    The guest room floors.  All right.  Do you

16  know what a Risk Report is?

17    A.    Yes.

18    Q.    Is a Risk Report one of the reports

19  prepared by one of your in-house consulting engineers

20  after a site visit at a location?

21    A.    Yes.

22    Q.    Have you ever reviewed a Risk Report?

23    A.    I have looked at Risk Reports.

24    Q.    Have you ever looked at a Risk Report on

25  this particular hotel?

1    A.   I don't remember.

2    Q.   Do you know whether Mr. Thurston or

3  Mr. Ragland looked at a Risk Report on this particular

4  hotel?

5    A.   I don't know what Mr. Thurston and

6  Mr. Ragland did in reference to Risk Reports.

7    Q.   Is it fair to say that Risk Reports do not

8  plan appropriate -- Strike that.

9        Is it fair to say that any Risk Reports

10  which may have been done on this hotel did not play a

11  significant factor in the claims determination in this

12  case?

13    A.   I did not use any Risk Reports in our

14  coverage determination.

15    Q.   Did you make the coverage determination

16  yourself, or was that a decision made in collaboration

17  with others?

18    A.   I would say I made the decision.

19    Q.   Did you obtain advice or input from anyone

20  else at Factory Mutual in making that decision?

21    A.   I did.

22    Q.   Who did you get advice from?

23    A.   Dominic Thurston and Mike Hagan.

24    Q.   What about Mr. Ragland?

25    A.   I'm not sure.

1    Q.   What about Mr. Cook?

2    A.   I'm not sure.

3    Q.   What advice did you get from

4  Mr. Thurston --

5    A.   I don't remember --

6    Q.   -- about --

7    A.   -- specific advice from Mr. Thurston about

8  that claim.

9         MR. CHIN:  You've gotta let him finish.

10        THE WITNESS:  I'm sorry.

11  BY MR. HASSON:

12    Q.   That's okay.  You don't recall any advice

13  from Mr. Thurston about -- or that you relied on in

14  making your claims determination in this case; is that

15  true?

16    A.   Yes.

17    Q.   Similarly, you don't recall any specific

18  advice that you obtained from Mr. Hagan that you

19  relied on in making your coverage determination in

20  this case; is that true?

21    A.   I don't recall any specific advice from

22  Mr. Hagan.

23    Q.   Is there a handbook that adjusters use in

24  order to evaluate and handle claims at AFM?

25    A.   No.

1     Q.    Does AFM have any written guidelines or

2  protocols on how to about go about evaluating a claim?

3     A.    I'm not sure I understand what you're

4  asking me in that question.

5     Q.    Are there any written guidelines or

6  protocols issued by your company that you use as an

7  adjuster in evaluating claims for AFM?

8     A.    We don't have any things we use for

9  evaluating a claim.

10     Q.    Okay.  Do you use any written guidelines

11  or protocols in your work as an adjuster?

12     A.    Yes.

13     Q.    What guidelines or protocols do you use in

14  your work as an adjuster?

15     A.    There are claims procedures, but they

16  don't deal with the evaluation of a loss.

17     Q.    What are the claims procedures?

18     A.    They're the procedures that we use for how

19  claims are moved through the system.

20     Q.    What system?

21     A.    There's a Claims Management System, but I

22  was also using "system" in the more general term of

23  just getting the loss from point A to point B.

24     Q.    Could you describe for me briefly the

25  claims procedure process?

1     A.   No, I couldn't describe it briefly.

2     Q.   Why is that?

3     A.   The procedures cover unusual

4   circumstances, different things.  There are a lot of

5   things that are loss-specific that may or may not

6   apply to a particular loss.  It's a document of I

7   don't know how many pages.

8     Q.   Extensive?

9     A.   I would say yes.

10     Q.   Did you review or rely on any of those

11   claims procedures in performing your work in this

12   case?

13     A.   Yes.

14     Q.   Do you recall which ones?

15     A.   No.

16     Q.   Are there particular issues that you

17   wanted to look to see if the claims procedures

18   addressed?

19     A.   The thing that I would've used the

20   procedures for in this case would've been the other

21   internal people at FM Global who needed to be involved

22   in any sort of denial for a loss.

23     Q.   And why does that stand out as something

24   that you would have looked at in this case?

25     A.   Denial of a loss is not something that we

1  normally do.

2      Q.    Have you ever done it before?

3      A.    Yes.

4      Q.    How many times?

5      A.    I don't know.

6      Q.    You said that there is a Claims Management

7  System?

8      A.    Yes.

9      Q.    Is that a computer system?

10     A.    Yes.

11     Q.    When you were first assigned to the claim,

12  would that file have already been opened?

13         MR. CHIN:  Object to form.

14         THE WITNESS:  I don't remember.  Not

15      necessarily.

16  BY MR. HASSON:

17     Q.    Okay.  What is the normal process for a

18  claim being entered into that Claims Management

19  System?

20     A.    Normally the lead adjuster would input the

21  information into the system and identify the insured

22  party, the location, the date of the loss, peril,

23  other information along those lines.  And then that

24  information would then be used to generate internal

25  documents, advise people of an initial loss notice.

1   And then if there were going to be any changes further

2   on, that would be used also.

3        Q.   Do you recall whether you entered the

4   information in that Claims Management System

5   initially?

6        A.   I don't remember if I'm the one that

7   entered it or not.

8        Q.   Do you remain the primary adjuster on this

9   claim throughout the entire claim?

10       A.   Yes.

11       Q.   Is there a particular process or protocol

12   that AFM uses in investigating mold or water damage

13   claims to an insured property?

14       A.   There's not a particular process, no.

15       Q.   How did you go about deciding what

16   investigation you were going to conduct into this

17   reported loss?

18            MR. CHIN:  Object to form.

19            THE WITNESS:  I don't know how I decided

20       what investigation I was going to do.

21   BY MR. HASSON:

22       Q    Have you yourself ever stayed at the

23   Hilton Atlanta Northeast?

24       A.   I don't think so, no.

25       Q.   Do you recall ever having been in the

1   building before September of 2015?

2       A.   I don't recall.

3       Q.   Let me show you what's been marked as

4   Exhibit 286.  Do you recognize this as an e-mail from

5   Mr. Ragland to you in October of 2015?

6       A.   That's what this looks like.

7                     (Exhibit 286 was

8                     marked/identified.)

9   BY MR. HASSON:

10      Q.   In the second line of this e-mail it makes

11  reference to an LTBD claim.  Does that stand for

12  Liability to be Determined?

13      A.   It does.

14      Q.   Do you recall whether Mr. Ragland

15  communicated any information to you about his

16  conversations with Marsh?

17      A.   I don't remember.

18      Q.   Do you have any understanding as to why

19  Mr. Ragland would have been giving the folks at Marsh

20  a heads-up on the claim?

21      A.   I don't know why Mr. Ragland would have

22  been doing it.

23      Q.   He makes reference to a "Tommy" as being

24  the Marsh claims guy.  Do you see that?

25      A.   I see that.

1    Q.   Do you have any experience dealing with

2   the claims people at Marsh?

3    A.   I have dealt with claims people from

4   Marsh.

5    Q.   What do claims -- Marsh is a broker,

6   right?

7    A.   Marsh is a broker, yes.

8    Q.   What do claims people at Marsh do?

9    A.   I think -- I'm not sure.

10    Q.   Do claims people at Marsh work to gather

11   information for insurance companies like AFM to use in

12   investigating and evaluating claims?

13        MR. CHIN:  Object to form.

14        THE WITNESS:  Maybe.  I don't know.

15   BY MR. HASSON:

16    Q.   Did Marsh provide any information about

17   this claim that you relied on in making your coverage

18   determination?

19    A.   I don't remember getting information from

20   Marsh in regards to this loss.

21    Q.   Mr. Ragland then writes, "I told them that

22   is fine, but to date we have found no trigger of

23   coverage under the policy."  Do you have any

24   understanding as to what was meant by "no trigger of

25   coverage"?

1      A.    I don't know what John meant by that.  I

2   would be guessing.

3      Q.    In October of 2015, had you formed an

4   opinion that there was no trigger of coverage under

5   the policy?

6      A.    I think --

7           MR. CHIN:  Object to the form.

8           Go ahead.

9           THE WITNESS:  I think it would be accurate

10          to say we hadn't found one yet, not that there

11          was no trigger.  We just hadn't identified one

12          yet.

13  BY MR. HASSON:

14     Q.    What does the phrase "trigger of coverage"

15  mean to you?

16     A.    We are looking for an event of physical

17  loss or damage that causes physical loss or damage

18  that would trigger coverage, as the policy requires,

19  and so we have to look for that.  Once we are able to

20  identify that, then we can go further along in the

21  process.

22     Q.    Is it accurate to say that as of October

23  of 2015, based on the information that had been

24  provided to you, you had not seen any trigger of

25  coverage?

1      A.   Yes, we had not identified a discrete

2   event of physical loss or damage at that point in

3   time.

4      Q.   What had you done in order to try and

5   identify an event of discrete loss or damage as of

6   that time?

7         MR. CHIN:  Object to form.

8         THE WITNESS:  We had visited the loss site

9     and started our investigation, and it was

10     ongoing at that point.

11  BY MR. HASSON:

12     Q.   Mr. Ragland then goes on to make a comment

13  in this e-mail about a visit he had to the hotel back

14  in 2014.  Do you see that?

15     A.   I see that in the e-mail.

16     Q.   Did you rely on his comment about his

17  prior visit to the hotel in making a coverage

18  determination in this case?

19     A.   No.

20     Q.   Let me show you what has been marked as

21  Exhibit 287.  Do you recognize that as an e-mail you

22  sent to Ms. Marcy Adams back in October of 2015?

23     A.   Yes.

24                  (Exhibit 287 was

25                  marked/identified.)

1   BY MR. HASSON:

2       Q.   In the middle of the page there's a

3   paragraph that begins, "Our coverage investigation is

4   ongoing."  Do you see that?

5       A.   I do.

6       Q.   And you wrote, "We are trying to determine

7   the source of water and/or moisture which led to the

8   discovery of mold growth," right?

9       A.   That's what the e-mail says, yes.

10      Q.   Were you trying to determine the sources

11  of water and/or moisture which led to the discovery of

12  mold growth in October of '15?

13      A.   Yes, we were.

14      Q.   Was that being done primarily through

15  Mr. Dawkins' work?

16      A.   It was being done through -- by

17  consultants, and I also, in the following paragraph,

18  requested from the -- from Crestline if they had any

19  written reports or correspondence that talk about

20  mold, or if they have anything that could help us in

21  determining the event of physical loss or damage that

22  led to the resulting -- so we're also asking the --

23  Crestline to help us in that matter.

24      Q.   Did you talk with anyone at Crestline

25  about what might have caused the mold around this

1   time?

2          MR. CHIN:  Object to form.

3          THE WITNESS:  During my initial visit back

4   in September, I think -- I believe that I

5   mentioned to them that we believed that there

6   was water coming in through the exterior façade

7   and multiple sources, and that we hadn't

8   identified the discrete event where the water

9   would have gotten in.  And so I think, yes, we

10   talked to Crestline about that at that point in

11   time already.

12  BY MR. HASSON:

13      Q.   When you wrote in this e-mail "event of

14  physical loss or damage," what did you mean by "event

15  of physical loss or damage"?

16      A.   We were trying to identify a discrete

17  event of physical loss or damage, and this comes back

18  to what the policy says, that we're looking for the

19  occurrence when the damage occurs.  That's what we're

20  looking for.

21      Q.   At this time did you offer any advice or

22  information to Crestline or Sky Harbor about steps

23  that they should take to make sure the damage

24  discovered in the hotel was remediated appropriately?

25          MR. CHIN:  Objection to form.

1          THE WITNESS:  I don't think so.  I think

2     at that point I was aware they had brought in a

3     firm to do the remediation.

4   BY MR. HASSON:

5      Q.   Is that Preferred Environmental or

6   Preferred Engineering or something like that?

7      A.   I think so.

8      Q.   Did you ever talk to those folks?

9      A.   I don't remember.

10      Q.    I'll show you what's been marked

11   Exhibit 288.  Does this appear to be the initial

12   report that Mr. Dawkins prepared for you after your

13   first site visit?

14      A.   Yes.

15                  (Exhibit 288 was

16                  marked/identified.)

17   BY MR. HASSON:

18      Q.   He makes reference to views of the

19   exterior walls of the building.  Did you and

20   Mr. Dawkins spend time on the initial site visit

21   examining the exterior walls of the building?

22      A.   I don't remember everything that we did on

23   that initial visit.

24      Q.    Do you recall him saying anything to you

25   about significant findings related to the exterior

1 façade?

2    A.   I don't remember what he said to me.

3    Q.   Did you provide a copy of this report to

4 anyone at Crestline or Sky Harbor?

5    A.   I believe I did forward this on to

6 somebody at Crestline.

7    Q.   At that time, were you communicating

8 primarily with Ms. Adams or Mr. Adair or do you know?

9    A.   I think I'm talking to Marcy Adams at that

10 point.

11    Q.   On the second page at the bottom there's a

12 little Bates number.  Do you know what Bates numbers

13 are?

14    A.   I think so.

15    Q.   Okay.  You see the little alphanumeric

16 code in the little right-hand portion of the page?

17    A.   I see that Bates number, yes.

18    Q.   And this is 14868?  Are we on the same

19 page?

20    A.   Yes.

21    Q.   All right.  There's a discussion, or

22 there's a paragraph about the interior walls, second

23 paragraph from the top.  Do you see that?

24    A.   Second paragraph from the top, yes.

25    Q.   And in the second sentence he wrote,

1   "These mold/mildew stains to interior drywall and

2   rusty studs/sill tracks indicate recurring moisture

3   that has been present within these interior wall

4   assemblies."  Do you see that?

5       A.   I'm sorry, I thought I was following you

6   along, and then the words did not match up, so I think

7   I was looking at the wrong line.  Which line are you

8   looking at?

9       Q.   The second sentence of that paragraph

10  about the interior walls.

11      A.   "On the interior side of the exposed

12  gypsum wallboard, or drywall."  Yeah.  Okay.  "A

13  significant rusting at a number of interior walls'

14  steel studs and sill tracks at the base of the studs."

15      Q.   Right.

16      A.   Yep.

17      Q.   And then he goes on to say, "These

18  mold/mildew stains to interior drywall and rusting of

19  studs/sill tracks indicate recurring moisture has been

20  present within these interior wall assemblies."  Do

21  you see that?

22      A.   I do see that, yes.

23      Q.   Did Mr. Dawkins offer any opinion at that

24  time as to how long that moisture had been occurring?

25      A.   I don't know, other than that it had been

1    ongoing.  Other than that, I don't think -- at that

2    point, I don't know.  I don't remember what he told me

3    in October at that time.

4        Q.    Did you have a conversation with him later

5    where he expressed an opinion as to how long it had

6    been occurring?

7        A.    Yes.

8        Q.    What did he tell you?

9        A.    That there were construction defects, and

10   this has likely been going on since the day the

11   building was built.

12       Q.    What construction defects did he attribute

13   the penetration of moisture to?

14       A.    Their angle irons.  It's a component that

15   holds up the exterior brick façade; that the joints at

16   the corners were not constructed properly and left a

17   gap, and that gap allowed moisture to get into the

18   building.

19       Q.    Did he offer --

20       A.    And he offered other things, too, but I

21   don't remember everything else.  That one specifically

22   I remember.  Then there was something else, too, but I

23   don't remember what it was.

24       Q.    Did he offer any opinion about any

25   attempts that appear to have been made over the life

1    of the building to address that condition?

2         A.    I don't remember.

3         Q.    He then talks about condensation

4    occurring/recurring within these wall cavities or at

5    the drywall surfaces underlying the vinyl wall cover.

6         A.    Yes.

7         Q.    Did Mr. Dawkins ever indicate to you what

8    he believed to be the source of that condensation?

9         A.    I think he -- yes, he did.

10        Q.    In fact, in the very next sentence he

11   talks about "This condensation, from abnormally high

12   humidity within the wall cavities, air migrating to

13   surfaces with temperatures below the dew point of this

14   air, has likely recurred to varying degrees over the

15   life of this building."  Do you see that?

16        A.    Yes.

17        Q.    Do you understand what he meant by any of

18   that?

19        A.    Yes.

20        Q.    What is he saying there?

21        A.    Humid air is coming through the wall.

22   It's a cold surface.  Water condenses out of the air.

23   Makes the drywall wet.  You get wet drywall, mold

24   grows on it, and it's been happening over the life of

25   the building.

1       Q.   Do you know what information he used to

2   make the determination that it's likely been occurring

3   over the life of the building?

4       A.   I do not.

5       Q.   He then writes, "The mold/mildew stains on

6   many interior walls is most severe at locations

7   closest to HVAC supply registers."  Do you see that?

8       A.   I do see that.

9       Q.   Do you know what he meant by "HVAC supply

10  registers"?

11      A.   The grate on the wall where the HVAC air

12  is either coming into the room or going back out.

13      Q.   In the guestrooms?

14      A.   He doesn't say it there, but I would

15  assume he's talking about in the guestrooms, yes.  It

16  could be other places.  He doesn't specify.

17      Q.   And then it has a paragraph, the next

18  paragraph talks about "The mold/mildew stains within

19  the building's interior walls indicates that the

20  building is under negative pressure."  Do you have any

21  understanding of what that meant?

22      A.   I think he explains it in the parentheses

23  right after that.  The HVAC systems are pulling in

24  more air than the supply system can provide.

25      Q.   Did Mr. Dawkins ever express to you how

1   long that had been ongoing?

2       A.   I don't remember.

3       Q.   Did anyone else provide you with any

4   information as to how long the building had been

5   operating under negative pressure?

6       A.   I don't remember.

7       Q.   When the HVAC system is working the way it

8   is supposed to, is it supposed to create negative

9   pressure?

10          MR. CHIN:  Objection to form.

11          THE WITNESS:  I don't know.  I don't think

12       so, but I don't know.

13   BY MR. HASSON:

14       Q    He then writes, "This negative pressure

15   condition needs to be further evaluated."

16       A.   I see that it says that.

17       Q.   Did you ask Mr. Dawkins or anyone else to

18   do any further evaluation of the negative pressure?

19       A.   I did not ask him to do -- no, I did not

20   ask Chris to do that.

21       Q.   Did anyone as a consultant for AFM, to

22   your knowledge, ever do any further evaluation of the

23   negative pressure condition?

24       A.   No.

25       Q.   Down below he's got an Analysis and

1   Summary of Conclusions, which begins "During rain

2   events, water has recurrently entered the cavity

3   between the brick veneer and presumed building

4   paper-covered wall sheeting."  Do you see that?

5       A.   I do.

6       Q.    Did Mr. Dawkins or anyone else ever

7   identify any particular rain events that they believed

8   had caused this kind of water penetration?

9       A.    Can you ask that one more time?

10      Q.    Did Mr. Dawkins or anyone else working for

11  AFM ever identify any particular rain events that had

12  led to this kind of water penetration?

13      A.    No, I don't think we identified any

14  particular rain events.

15      Q.    Did anyone working for Crestline or Sky

16  Harbor ever communicate to you that they had

17  identified particular rain events that led to this

18  kind of water penetration?

19      A.    I don't know.

20      Q.    Would that kind of a finding be important

21  to you in doing your work as an adjuster on this

22  claim?

23      A.    To me the critical point of this is not a

24  particular rain event, but that it has been recurrent;

25  that it has happened again and again when you have a

1  rain event.

2      Q.    And why is that important to you, sir?

3      A.    It's the difference between having a

4  condition of a building and a discrete physical event.

5  Those aren't the same things.  And this points to this

6  as an ongoing issue that's been going on for an

7  extended period of time.

8      Q.    Can't a rain event be a discrete physical

9  event?

10          MR. CHIN:  Object to form.

11          THE WITNESS:  It is possible for a rain

12      event to be a discrete event.

13  BY MR. HASSON:

14      Q    Did you make a determination in this case

15  that any rain events which resulted in water

16  penetration into the building were not discrete

17  physical events?

18      A.    I did not make a determination, no.

19      Q.    Did you consider, in doing your work as an

20  adjuster in this case, whether a rain event might have

21  triggered coverage under the policy?

22      A.    I did.

23      Q.    What conclusion did you come to?

24      A.    That we were unable to identify a

25  particular rain event that caused -- that would

1  trigger coverage.

2      Q.   The next paragraph that begins, "In

3  summary, the cause/origin of water intrusion and

4  mold/mildew within the building is improper

5  installation of the building's waterproofing," do you

6  see that?

7      A.   I see that.

8      Q.   Do you have any understanding as to why

9  the building's waterproofing was, at least in

10  Mr. Dawkins' opinion, improperly installed?

11      A.   I don't remember.

12      Q.   He then goes on to say that it was

13  "exacerbated by the use of vinyl wall covering on the

14  walls."  Do you see that?

15      A.   I do see that.

16      Q.   Do you know whether Hilton required vinyl

17  wall coverings in this location?

18      A.   I do not know the answer to that question.

19      Q.   "And very likely exacerbated by the

20  building's HVAC system being out of balance, which has

21  led to the building being under negative pressure."

22  Do you see that?

23      A.   I see that.

24      Q.   Did you ever consider whether the

25  building's HVAC system being out of balance

1  constituted a trigger of coverage under the policy?

2      A.   Yes --

3          MR. CHIN:  Objection --

4          THE WITNESS:  -- we did.

5          MR. CHIN:  -- to form.

6  BY MR. HASSON:

7      Q.   Did you ever consider or did you ever come

8  to a conclusion as to whether the building's HVAC

9  system being out of balance constituted a trigger of

10  coverage under the policy?

11     A.   I'm sorry, what are you asking me?  It

12  seems like the same question.  Sorry.

13     Q.   The first question was whether you

14  considered it.  The next question is whether you came

15  to a conclusion, so let me try it again.  Okay?

16     A.   Okay.

17     Q.   Did you ever come to a conclusion as to

18  whether the HVAC system being out of balance

19  constituted a trigger of coverage under the policy?

20     A.   Yes, we considered that, but our

21  conclusion was that it did not.

22     Q.   What was the basis of your conclusion that

23  the HVAC system being out of balance was not a trigger

24  of coverage under the policy?

25     A.   We were unable to identify when the HVAC

1   system went out of balance.

2       Q.   Can malfunctioning of equipment within a

3   building constitute a discrete event of physical loss?

4          MR. CHIN:  Objection to form.

5          THE WITNESS:  You're asking me a

6       hypothetical question about something that

7       didn't happen.  I don't know how -- there's so

8       many details that go into that, I don't know how

9       to answer that question.

10  BY MR. HASSON:

11      Q.   Well, let me try it this way.  In your

12  work as an adjuster, have you ever seen malfunctioning

13  of equipment lead to damage within a building that

14  resulted in a claim?

15      A.   I feel like I can't answer the question.

16  It has to do with that malfunctioning HVAC equipment.

17  That by itself -- that may or may not be physical

18  damage of the type insured.

19      Q.   Okay.

20      A.   And that would -- would follow from there

21  whether that malfunctioning is something that would --

22  the policy responds to or not.

23      Q.   What type of malfunction to HVAC equipment

24  would, in your mind, be covered under an AFM policy?

25          MR. CHIN:  Objection to form.

1          THE WITNESS:  I can't think of an example

2      off the top of my head.

3  BY MR. HASSON:

4      Q.   Have you as an adjuster working for AFM

5  ever evaluated a claim involving damage caused by

6  malfunctioning equipment?

7      A.   I don't know.  I don't know.  I feel like

8  I'm caught up on this -- to me, that's where I'm

9  getting hung up, on this malfunctioning equipment.

10  That's a broad term that can mean many things.

11          Some things the policy may respond to.

12  Some things somebody may call a "malfunctioning" might

13  be excluded, like a wear-and-tear issue or something

14  like that.  And so without being able to know the

15  answer to that question, I can't answer the following.

16          So till I -- I don't know.  If all you're

17  going to do is call it a malfunction, I can't answer

18  the question.

19      Q.   Okay.  Have you ever denied a claim

20  working as an adjuster because you determined that

21  malfunctioning equipment had malfunctioned because of

22  wear and tear?

23          MR. CHIN:  Objection to form.

24          THE WITNESS:  I don't recall specifically

25      if I've denied a loss because of wear and tear

1    on, your term, "malfunctioning equipment."

2  BY MR. HASSON:

3    Q.   Is there a better term?  You seem to be

4  struggling with "malfunctioning."  Is there

5  terminology that you would use in your work as an

6  adjuster different from "malfunctioning" that would be

7  preferable?

8        MR. CHIN:  Objection to form.

9        THE WITNESS:  I can't think of a term that

10    I would use.  I would try to identify what

11    component broke or was damaged, what caused that

12    damage.  That's probably -- I mean, I don't have

13    a simple term to use there to insert instead of

14    "malfunction."  I just don't.

15  BY MR. HASSON:

16    Q.   Okay.  Sitting here today, do you have any

17  understanding as to what caused the HVAC equipment at

18  the Hilton Atlanta Northeast to go out of balance and

19  create this negative pressure that Mr. Dawkins was

20  describing?

21    A.   I do not.

22    Q.   What did you do as an adjuster in order to

23  evaluate the cause of the negative pressure that

24  Mr. Dawkins describes in this report?

25    A.   I don't know.  I don't know.

1      Q.    Did you do anything to further evaluate

2  the causes of the negative pressure that Mr. Dawkins

3  evaluates or describes in his report?

4      A.    I asked Crestline if they could identify

5  the events, discrete events of physical loss or

6  damage, which would've led to the water, and I never

7  got any sort of response to that question of them

8  saying, "Hey, our HVAC system broke on this date," or

9  "This is what happened to it" to be able to review

10  that information.  I didn't get that answer.

11         And so, no, other than asking them, "Hey,

12  when did this damage occur" or what damage occurred

13  for us to be able to look at, no.

14      Q.    Did you ever have any conversations with

15  anyone at Crestline as to whether they were aware that

16  the building was operating under negative pressure?

17      A.    I don't know if I had any conversations

18  with someone from Crestline about that.

19      Q.    Do you remember talking to anybody at Sky

20  Harbor about that?

21      A.    I don't remember talking to anybody at Sky

22  Harbor about that.

23      Q.    In this initial report, I don't see

24  anything about roof leaks or rain leader pipe leaks.

25  Do you recall any discussions about roof leaks or rain

1   leader pipe leaks at this early part in the

2   investigation?

3        A.   I do not remember when conversations about

4   roof leaks or rain leader head pipes, I don't remember

5   it.

6        Q.   Do you remember discussions about roof

7   leader pipe leaks or roof leaks coming up at some

8   point later in the claims investigation?

9        A.   Yes.  They're identified in the Liberty

10  Report.

11       Q.   Have you talked with Mr. Dawkins about the

12  findings in the Liberty Report?

13       A.   I did.

14       Q.   Do you recall whether Mr. Dawkins

15  generally agreed or disagreed with the findings in the

16  Liberty Report?

17            MR. CHIN:  Object to form.

18            THE WITNESS:  I don't remember.

19  BY MR. HASSON:

20       Q.   Do you recall Mr. Dawkins telling you that

21  there were particular aspects of the Liberty Report

22  that he disagreed with?

23       A.   I don't remember.

24       Q.   Do you recall talking with anyone at JS

25  Held about the contents of the Liberty Report?

1    A.   I don't remember.

2    Q.   Do you recall anyone at JS Held ever

3  telling you that they agreed with or disagreed with

4  any of the comments made in the Liberty Report?

5    A.   No, I never talked with anyone at JS Held

6  about that.

7    Q.   Did you yourself read through the Liberty

8  Report?

9    A.   Yes.

10    Q.   Did you rely on any of the information in

11  those reports in making your coverage determination in

12  this case?

13    A.   Yes.

14    Q.   What did you rely on?

15    A.   That he had identified multiple sources of

16  water intrusion, and similar to the findings in Chris

17  Dawkins' report, that they were -- they had identified

18  an event that appeared to be re-occurrent, things that

19  occurred over time.  So they identified conditions,

20  but not an event of physical loss or damage.

21    Q.   So it is your understanding that the

22  Liberty Report does not make reference to anything

23  that you would characterize as an event of discrete

24  loss or damage?

25    A.   If I remember right, the Liberty Report

1   refers to some rain event in August of 2015.  Other

2   than that, I don't remember any specific dates.

3       Q.   Did you consider whether the rain event

4   you are describing now constituted a discrete event of

5   physical loss or damage?

6       A.   The event they were referring to

7   speculated about potential water intrusion and made

8   some assumptions that there was no -- I couldn't find

9   the basis for some of the assumptions made in that

10  report.

11      Q.   What assumptions do you recall not being

12  able to find a basis for?

13      A.   I'd have to review the report to remember

14  what it was.  I don't have it in front of me.

15      Q.   I'll show you what's been marked

16  Exhibit 289.  Do you recognize this as an e-mail

17  exchange between you and Dominic Thurston back in

18  February of 2016?

19      A.   That's what this looks like, yes.

20               (Exhibit 289 was

21               marked/identified.)

22  BY MR. HASSON:

23      Q.   And he asked you to send him the policy

24  for the loss, and then you wrote him back saying,

25  "Here you go," and it had some attachments?

1    A.    Right.  That's what this looks like, yes.

2    Q.    Take a look at the next several pages.  Do

3  those appear to be the attachments to your e-mail?

4  And if it helps, I'll tell you that those alphanumeric

5  codes --

6    A.    It looks like --

7    Q.    -- in the lower --

8    A.    -- it's some, but --

9    Q.    -- right-hand corner --

10   A.    -- not all.  It looks like I had one, two,

11  three attachments, and it looks like this may only be

12  one of those attachments.

13   Q.    Can you tell which one of the attachments

14  this is?

15   A.    I'm guessing that this is the additional

16  interest information, this "A-D-I-N-T-L-N-F-O," but I

17  don't have the Policy WB879 for the mailing

18  instructions.

19   Q.    Okay.  And this A-D-I-N-T-L-N-F-O, is that

20  something you recognize?

21   A.    Not really.

22   Q.    Okay.

23   A.    No, I don't recognize it.  I mean, I'd be

24  trying to put two and two together.  That's all.

25   Q.    In other words, that's not an acronym or a

1   description --

2        A.   No.

3        Q.   -- that you routinely use?

4        A.   No.  I don't know.

5        Q.   The second page marked 17150 looks like an

6   intracompany memo from someone named Yang Liu, L-I-U,

7   to you?

8        A.   Yes.

9        Q.   Who is Yang Liu?

10        A.   She's a Claims Technical Assistant in our

11  Washington operations, I think.

12        Q.   And what follows, then, are some documents

13  labeled Evidence of Commercial Property Insurance,

14  right?

15        A.   Yes.

16        Q.   Have you seen documents like this before?

17        A.   Yes.

18        Q.   Do you regularly see documents like this

19  in your work?

20        A.   Yes.

21        Q.   Are these what are sometimes referred to

22  as Certificates of Insurance?

23            MR. CHIN:  Object to form.

24            THE WITNESS:  I would guess.  I think

25       there are some specific Accord forms that are

1    Certificates of Insurance.  This does look

2    something similar to that, but I don't think

3    it's the exact same thing.

4  BY MR. HASSON:

5    Q.    Well, on that the memo, the 17150 page --

6    A.    Yes.

7    Q.    -- there's a little box that's checked.

8    A.    I see the box checked.

9    Q.    It says, "Attached are Certificates of

10  Insurance that apply to this loss" --

11    A.    I see that.

12    Q.    -- "for additional interests not included

13  in the policy."

14    A.    I see that.

15    Q.    All right.  What does that mean to you?

16    A.    What does that mean?  When someone sends

17  this to me, what does this mean?

18    Q.    Yes.

19    A.    If the first box is checked, all the

20  information I need about payables are going to be --

21  I'll find in the policy.  If the second box is

22  checked, they send me some other information I have to

23  look at for payables.

24    Q.    And then the forms themselves, on the Page

25  17151 down at the bottom there's an Additional

1   Interest that's named?

2      A.   Yes.

3      Q.   And the box is checked Loss Payee; do you

4   see that?

5      A.   Yes.

6      Q.   And then it says Industrial and Commercial

7   Bank of China, USA, N.A.?

8      A.   Yes.

9      Q.   What's a loss payee?

10      A.   Well, "check mortgagee" and "loss payee."

11   There's two boxes that have been checked.

12      Q.   Okay.

13      A.   A loss payee would be an additional party

14   to be included on any payments that might be made for

15   any losses involving the property described.

16      Q.   And then on the next page, 17152 --

17      A.   Yes.

18      Q.   -- on the very last line it says, "The

19   following are named as additional insured on the

20   property described above as their interests may

21   appear:  Industrial and Commercial Bank of China, USA,

22   N.A., Atlanta Hotel Holdings, LLC, and Sky Harbor

23   Atlanta Northeast, LLC."  Do you see that?

24      A.   I see that.

25      Q.   Do you know where Ms. Liu got this

1  document?

2      A.   I do not know where Ms. Liu got this

3  document.

4      Q.   Is this the kind of document that you

5  would expect to have been on file with AFM?

6          MR. CHIN:  Object to form.

7          THE WITNESS:  I've seen documents similar

8      to this.

9  BY MR. HASSON:

10     Q.   Does AFM regularly take documents like

11  this and put them onto a computer system associated

12  with a particular policy?

13         MR. CHIN:  Object to form.

14         THE WITNESS:  I really don't know where

15     the claim technical assistants get these

16     documents from.  I don't know.  It's sent to me

17     for part of my file.  Where they get them from,

18     I don't know.

19  BY MR. HASSON:

20     Q.   What was the significance to you, if any,

21  of these additional named insureds on this document?

22         MR. CHIN:  Object to form.

23         THE WITNESS:  Like I said previously, the

24     reason I get these forms are to determine if

25     there's any other parties besides the named

1   insured policyholder that need to be included as

2   payees.  So I'm looking for things like

3   mortgagee and stuff like that.

4  BY MR. HASSON:

5      Q.   Would you have taken information from this

6  form and entered it into that Claims Management System

7  that was described earlier?

8      A.   No.  No, I would not.

9      Q.   What would you do with information like

10  this about other parties that might need to receive

11  payment in the event a claim is paid?

12     A.   Like I did in this loss when I identified

13  the policy we would apply, I specifically spelled out

14  the information that was on this form in that letter I

15  sent to Crestline, so I advised them of what this form

16  said.

17         And then if any payment had been issued,

18  probably before a check had gone out I would have

19  reconfirmed with them, "Hey, these are the people

20  whose names are going to be on the check."

21         And then when I fill out the form for the

22  check was made, that was going to be made, I would

23  say, "These are the names to put on the check."

24  That's probably what I would have done with this.

25     Q.   Do you have some notes you make for

1  yourself or some information that you enter into a

2  computer system about people who may need to be

3  included on a check so that you'll be able to remember

4  it when it comes time to issue payment?

5      A.   No, other than the confirmation to the

6  policyholder.  I usually will review that when I do

7  that.  That's the documentation.

8      Q.   Do you recall being aware, before seeing

9  these documents, that there was documentation

10  purporting to name Sky Harbor as an additional named

11  insured under the policy?

12          MR. CHIN:  Object to form.

13          THE WITNESS:  I'm sorry.  You're asking me

14      when did I know what?  You're asking about if I

15      knew something at a certain point.  I'm confused

16      about what I'm supposed to know when and who.

17      I'm sorry.

18  BY MR. HASSON:

19      Q    These documents talk about Sky Harbor

20  being an additional named insured under the policy.

21          MR. CHIN:  Object to form.

22          THE WITNESS:  It doesn't say that.  It

23      says, "The following are named as the additional

24      insureds on the property described above."

25  BY MR. HASSON:

1        Q.   What's the distinction in your mind

2   between an "additional insured" and an "additional

3   named insured"?

4        A.   The distinction I have in my mind is an

5   "additional named insured" is a named insured on the

6   policy.  "Additional insured" is a term used within

7   the liability insurance realm, and they're not exactly

8   the same meanings.  And that's the way that I view

9   that.  Whether I have "named" on there, "property,"

10  just "additional insured," it's a liability thing.

11  That's all that means to me.

12       Q.   To you, is the term "additional insured"

13  equivalent to the term "loss payee," or do they have

14  different meanings?

15       A.   I would say they have different meanings,

16  and it's not clear from this certificate what is

17  intended.

18       Q.   What is the difference in your mind

19  between an additional insured and a loss payee?

20       A.   Between an additional insured -- an

21  additional named insured and loss payee?

22       Q.   No.  An additional insured and a loss

23  payee.

24       A.   I'll say "additional insured" doesn't mean

25  anything to me.  It doesn't.  A "loss payee" is

1  someone whose name needs to be included on a check for

2  a loss involving whatever -- the property they have

3  interest in.  That's what that "loss payee" means.

4  Their name goes on the check.  That's what that means.

5      Q.   And what does "additional named insured"

6  mean to you?

7      A.   They have additional rights under the

8  policy.  They can present a claim, and we have

9  obligations to them and they have obligations to us.

10     Q.   And the term "additional insured"?

11     A.   Again, it's not a term that we use

12  within -- so it does not have meaning to us.  So I

13  believe in the letter that I sent to Crestline where I

14  addressed this to him about what the certificate said,

15  I asked for clarification about who these parties are

16  and what interests they had.

17     Q.   This was a document that was prepared by

18  Marsh, right?

19     A.   I think so.  I don't know.  I didn't

20  prepare it.

21     Q.   Did you ever reach out to anybody at Marsh

22  and ask them to explain what that term "additional

23  insured" was intended to convey?

24     A.   I did not.

25     Q.   When you saw this, did you go to anyone at

1   Affiliated FM and say, "Hey, guys, we've got a

2   problem.  It looks like Marsh added Sky Harbor as an

3   additional insured.  I don't know if that's right or

4   not," or anything to that effect?

5       A.   I don't remember.

6       Q.   Do you recall this appearing unusual to

7   you when you first saw it?

8       A.   I think I remember it being unusual in

9   that it was the "additional insured" instead of

10  "additional named insured."  But other than that, I

11  don't -- it didn't really raise any red flags for me.

12      Q.   Did you take any steps based on that

13  standing out to you as unusual?

14      A.   No.

15           MR. CHIN:  Can we take a quick break?

16           MR. HASSON:  Sure.

17           (Off the record at 2:44 p.m.)

18                --------------

19           (On the record at 2:54 p.m.)

20  BY MR. HASSON:

21      Q.   I'll show you what's been marked as

22  Exhibit 290.  Do you recognize that as a letter you

23  sent to Mr. Stacey Adair at Crestline back in February

24  2016?

25      A.   Yes.

1              (Exhibit 290 was

2              marked/identified.)

3    BY MR. HASSON:

4       Q.    By this time, had Affiliated FM been able

5    to make a coverage determination?

6       A.    We had not made a coverage determination

7    by this point in time.

8       Q.    In the second paragraph about the third

9    line down you write, "The insureds have failed to

10   provide the information required."  Do you recall what

11   that referred to?

12      A.    No.  It might probably say here.  I don't

13   know.

14      Q.    About the eighth line down there's a

15   sentence that begins, in the middle of the page

16   reading, "Delay by the insureds in making repairs over

17   an extended period of time may have contributed to the

18   conditions found, including but not limited to the

19   amount of wetting and mold."  Do you see that?

20      A.    I see that line, yes.

21      Q.    What was the basis for that statement?

22      A.    There is exclusion within the policy for

23   any increase in loss or damages due to delay.  I think

24   I'm just trying to bring attention to that in my

25   statement.

1      Q.    Did you have reason to believe at that

2   time that the insureds had delayed in making repairs

3   over an extended period of time, and that that had

4   contributed to the wetting and mold within the hotel?

5      A.    I don't remember exactly what I was

6   thinking.

7          MR. CHIN:  Why don't you just read your

8       letter.  It's a six-page letter here.

9          THE WITNESS:  Okay.  (Reviews document.)

10   BY MR. HASSON:

11      Q.    All set.

12      A.    I don't know if I am or not.  Please

13   proceed.

14      Q.    All right.  Well, we'll try, and if you

15   need more time to review, you let me know.  Okay?

16          All right.  If you go to the Bates-stamped

17   Page No. 025857, second paragraph beginning with

18   "review of the policy," are you with me?

19      A.    Yes.

20      Q.    In the second sentence of that letter --

21   and this is a letter you wrote, right?

22      A.    This is a letter that I wrote.

23      Q.    It reads, "Based on the Certificates of

24   Insurance on file, the Industrial and Commercial Bank

25   of China, its successors and/or assigns is listed as a

1   mortgagee, additional insured, and loss payee as their

2   interest may appear.  Atlanta Hotel Holdings is named

3   as an additional insured as their interest may appear.

4   Sky Harbor Atlanta Northeast, LLC is named as

5   additional insured as their interest may appear,"

6   right?

7       A.   Yes.

8       Q.   All right.  Where did you get the

9   information that "Sky Harbor Atlanta Northeast, LLC is

10  named as additional insured as their interest may

11  appear"?

12      A.   From those Accord forms that I had gotten

13  from the CTA previously.

14      Q.   Why did you choose to include that

15  information in this letter?

16      A.   The purpose of this paragraph here was to

17  convey to Crestline that we have information that

18  there are other additional parties that potentially

19  need to be included as payees on any payment that may

20  be made, which is what I think I'm saying here.

21  That's what this paragraph, the first sentence is

22  about "Any payment that may be made will be payable

23  to," and then we have additional people who may be

24  included.

25      Q.   Do you recall a time later on where you

1   raised a concern about whether Marsh had authority to

2   issue those Accord forms that we looked at earlier?

3       A.   Yes.

4       Q.   Were you aware when you wrote this letter

5   that there was an issue as to whether Marsh had

6   authority to issue those Accord forms?

7       A.   I was not aware at that time.

8       Q.   At the time you wrote this letter, were

9   you treating Sky Harbor as an additional named insured

10  under the policy?

11      A.   At this point in time I am only dealing

12  with Crestline and letting them know, "Hey, there's

13  other people that need to be included on the check."

14  And so I state that here, and then I ask for

15  additional information about who these entities are.

16      Q.   Okay.  Eventually, did Crestline or Sky

17  Harbor provide you with a copy of a contract between

18  Sky Harbor and Crestline, a management agreement?

19      A.   At some point I got a management

20  agreement.  I don't remember who sent it to me.

21      Q.   And is it your understanding that under

22  that management agreement, Crestline managed the

23  property --

24      A.   Yes.

25      Q.   -- for the owner --

1      A.   Yes.

2      Q.   -- who is Sky Harbor?

3      A.   Yes.

4      Q.   Do you recall reviewing that management

5   agreement?

6      A.   I reviewed it.  I don't recall when I

7   reviewed it.

8      Q.   Was it important to you in your work as an

9   adjuster on this claim to determine whether Crestline

10  had any insurable interest in the property itself?

11     A.   Yes.

12     Q.   Why is that important?

13     A.   Somebody has to have an insurable interest

14  for them to be able to have coverage under the policy.

15          I can't take out an insurance policy on

16  your house.  And if I did and there's a loss that

17  happened, there's nothing I can -- I don't have any

18  insurable interest in it.

19          The Management Agreement, the contract

20  between Crestline and Sky Harbor creates that

21  insurable interest.  The Management Agreement requires

22  that the management company carries insurance.

23     Q.   That's what the Management Agreement

24  requires?

25     A.   I think so.  I'd have to look at it again,

1  but I believe it did.

2      Q.   When people in the insurance industry talk

3  about an "insurable interest," what does that mean to

4  you?

5      A.   I think I just described "insurable

6  interest."

7      Q.   Is it your understanding that Crestline

8  had an insurable interest in the Hilton Atlanta

9  Northeast?

10     A.   It's my understanding that they had an

11  insurable interest in that, yes.

12     Q.   All right.  In the middle of that page

13  there's a section labeled Occurrences and Other

14  Insurance.

15     A.   Yes.

16     Q.   And you wrote, "Based on the information

17  and discussions with regard to this claim notice to

18  date, it is apparent that various conditions in the

19  building have resulted in water being available in

20  various areas over a long period of time involving

21  many water intrusions."  Do you see that?

22     A.   I see that.

23     Q.   What did you base that statement on?

24     A.   That statement was based on the

25  observations I made visiting the hotel, the report

1   from my consultant, and at that point in time I

2   believe I had already received a copy of the Liberty

3   Report, the findings in that report.

4       Q.    What did you mean by "over a long period

5   of time"?

6       A.    That -- just what it says:  Over a long

7   period of time.

8       Q.    Had you been able to make any

9   determination at this point as to how long a period of

10  time you believed that water intrusion had been

11  ongoing?

12      A.    Not a specific period of time.

13      Q.    And when you said many water intrusions,

14  had you made a determination as to how many water

15  intrusions there had been?

16      A.    No, other than that there had been

17  multiple sources, some of them involved when it

18  rained, and it did rain several times since the hotel

19  had been built.

20      Q.    Then you wrote, "Water is one of the

21  components necessary for mold to grow"?

22      A.    Yes.

23      Q.    And then you wrote, "We will need you to

24  identify the dates of loss during the policy period

25  and the damages for each event," right?

1    A.    Yes.

2    Q.    What did you mean by that?

3    A.    That I need to be able to identify a date,

4 a discreet event of physical loss or damage, and what

5 damage occurred from that event.  I guess what it says

6 there.

7    Q.    When you wrote "date of loss," what you

8 meant was "discreet event of physical loss or damage"?

9    A.    Yes.  I don't know.  Maybe.  Yes.

10   Q.    I'm not trying to put words in your mouth.

11   A.    No.  But I -- Yes.

12   Q.    If there's --

13       MR. CHIN:  I'm just reading the sentence

14    again, and I'd say you did.

15 BY MR. HASSON:

16   Q.    If there's a distinction in your mind

17 between "date of loss" as you're using it here and --

18   A.    No, no, I don't -- I don't think so.

19   Q.    You believe it's fair to interpret "date

20 of loss" as you've used it here --

21   A.    "Date of loss" and "discrete event" would

22 be -- in this context here, "date of loss" and

23 "discrete event" would be the same things.

24   Q.    Gotcha.  I'm with you.

25       All right.  And then down below in the

1  next paragraph, starting in the middle of the

2  paragraph you wrote, "The information provided to date

3  in the form of the Liberty Building Group report does

4  not satisfy the policy requirements, and is

5  insufficient to assert only that water and mold damage

6  happened during the policy period."  Do you see that?

7       A.   I see that, yes.

8       Q.   Are you suggesting there that the Liberty

9  Report simply asserts that the water and mold damage

10  occurred during the policy period?

11       A.   I would not say that the Liberty Report

12  asserts the water and mold damage happened during the

13  policy period.

14       Q.   What did you mean, then, when you wrote,

15  "It is insufficient to assert only that water and mold

16  damage happened during the policy period"?

17       A.   So same thing as before.  We need to

18  identify a specific -- a discrete event of physical

19  loss or damage, so that's going to have a time and a

20  place.  The Liberty Report does not do that, and it is

21  not sufficient to say, "We have mold and water damage.

22  We don't know what happened or why, but we think it

23  happened during our policy period."

24            We have to identify, again, what the

25  discrete event of physical loss or damage is and what

1    that resulting damage is from that.

2        Q.    Was it your understanding as the adjuster

3    that if Crestline could not identify an exact date

4    associated with damage to the hotel, you were to deny

5    the claim?

6        A.    No, not exactly, no.

7        Q.    Why is this an inaccurate statement?

8            MR. CHIN:  Object to form.

9            THE WITNESS:  It may be possible to

10        identify that a discrete event has occurred

11        without necessarily knowing exactly when it

12        happened.

13    BY MR. HASSON:

14        Q.    Can you give me an example of a time when

15    you have been able to identify a discrete event of

16    physical loss that triggered coverage under an AFM

17    policy, but were unable to identify the exact date on

18    which it occurred?

19        A.    Yes.

20        Q.    What would that example be?

21        A.    It was a frozen water pipe.  The office

22    closed on Friday at 5:00 o'clock.  Somebody shows up

23    on Monday at 9:00 a.m., they open the door and water

24    pours out.  The pipe broke.  Discreet event.  I don't

25    know when it happened between Friday and Monday.  We

1  don't tell them, "If you don't know if it happened on

2  Saturday or Sunday, there's no coverage."  We know a

3  pipe broke, and it happened somewhere in here.  This

4  is the resulting damage.  We're able to respond to

5  that.

6      Q.   Have you encountered situations as an

7  adjuster where the discrete event of physical loss or

8  damage was an event that occurred over a longer period

9  of time than a weekend?

10         MR. CHIN:  Objection to form.

11         THE WITNESS:  I don't understand.  I feel

12      like -- I'm confused.  I don't know what you're

13      asking me.

14  BY MR. HASSON:

15      Q.   Earlier we had a discussion about

16  malfunctioning equipment, right?

17      A.   Yes.

18      Q.   Have you ever encountered a situation

19  where equipment was malfunctioning and continued to

20  malfunction for a period of time, but the damage that

21  that was causing was latent?  It wasn't immediately

22  apparent?

23         MR. CHIN:  Objection to form.

24         THE WITNESS:  I'm still -- I feel like --

25      well, I don't think I understand this second

1    question, and I also feel like it's a different

2    question from the first one.

3        So I'm confused that if you were trying to

4    restate the first question, what I'm supposed to

5    be answering.  So I don't know what you're

6    asking me now.

7  BY MR. HASSON:

8    Q.   Okay.  Have you ever encountered a

9  situation where a loss was going on over a period of

10  time, longer than a weekend, and yet you were able to

11  identify it as a discrete event of physical loss?

12    A.   I can't remember anything specifically.

13    Q.    In any of your trainings, have you ever

14  encountered a situation where they talked about an

15  event of physical loss that occurred over a period of

16  time that wasn't immediately apparent, how to address

17  that as an adjuster?

18    A.   I don't remember.

19    Q.   This concept of negative pressure created

20  by an air conditioning system --

21    A.   Yeah.

22    Q.    -- was that a concept that you had run

23  into before in your work as an adjuster?

24    A.   I don't think so.  I don't think so, but I

25  don't know.

1       Q.   Can you recall that condition, negative

2   pressure created by air supply in the HVAC system,

3   being something that was addressed in any of your

4   training?

5       A.   No.

6       Q.   Have you encountered a situation in your

7   work as an adjuster where a hole developed in a

8   waterproof membrane in a roof, but that membrane

9   penetration was not immediately discovered and water

10  had intruded through that hole for some period of

11  time?

12      A.   I guess, yes.  Yes.  I'll say yes.  Yes.

13      Q.   And have you been the primary adjuster on

14  claims involving situations like that where a hole

15  developed in a roof and there were perhaps multiple

16  rain events?

17      A.   Not that situation you describe, no.

18      Q.   Do you have any understanding as to what

19  you are supposed to do as an adjuster for AFM when you

20  encounter such a situation?

21         MR. CHIN:  Objection to form.

22         THE WITNESS:  What am I supposed to do

23      when I identify such a situation?  What's the

24      situation again?

25  BY MR. HASSON:

1      Q.   The situation where a hole has developed

2  in a membrane, a waterproof membrane in a roofing

3  system.

4      A.   Okay.

5      Q.   And there been multiple rain events, which

6  have allowed water to penetrate through that roofing

7  system.

8      A.   Okay.

9      Q.   Is it your understanding as an adjuster

10  for AFM that you are supposed to deny that claim?

11          MR. CHIN:  Objection to form.

12          THE WITNESS:  I would say no.

13  BY MR. HASSON:

14      Q.   Why do you say no?

15      A.   I guess the shortest answer is I'm

16  instructed to try to find coverage, not to deny

17  coverage.

18      Q.   Is that what you did in this case?  You

19  tried to find coverage?

20      A.   Yes.

21      Q.   What did you do to try and find coverage

22  in this case?

23      A.   I tried to -- I asked Crestline to help me

24  identify discrete events of physical loss or damage

25  which could have led to water damage and resulting

1    mold damage.

2        Q.    What about the consultants that were

3    engaged by AFM?  Did you ask them to go and identify

4    discrete events of physical loss or damage that might

5    trigger coverage?

6        A.    I instructed my consultants to identify

7    the potential sources of water.

8        Q.    But that's different from asking them to

9    go find coverage, right?

10           MR. CHIN:  Object to form.

11           THE WITNESS:  My consultants don't do

12       anything with the coverage.  That's -- they do

13       investigations for scopes that I describe to

14       them, they present their findings to me, and

15       then I take those findings, along with my

16       investigation, and perform the coverage

17       analysis.  They're not -- they don't do -- they

18       don't do coverage analysis.  I don't hire

19       consultants for coverage analysis.

20    BY MR. HASSON:

21        Q.    Do you ever have discussions with your

22    consultants about what constitutes an event of --

23    discrete event of physical loss or damage?

24           MR. CHIN:  Object to form.

25           THE WITNESS:  No, I don't think I use the

1    term "discrete event of physical loss or damage"

2    with my consultants.

3  BY MR. HASSON:

4      Q.   What about "date of loss"?

5      A.   That probably -- if they can tell me when

6  and where this happened or what caused this; where

7  it's coming from and when it was.

8      Q.   Did you tell your consultants in this case

9  that you were looking for the dates of loss?

10     A.   I don't remember if I used that term

11  specifically.

12     Q.   Did you ask them to go and find a date of

13  loss?

14     A.   I don't know if I asked them to find a

15  date of loss, no.

16     Q.   Other than the one situation you described

17  earlier where a pipe had burst over a weekend, and we

18  didn't know whether it was Saturday or Sunday, but we

19  knew that it was sometime over that weekend, have you

20  ever paid a claim when the insured was not able to

21  identify an exact date of loss?

22     A.   I don't --

23          MR. CHIN:  Object to form.

24          THE WITNESS:  -- remember.  I don't know.

25  BY MR. HASSON:

1     Q.    Take a look at the next page for me,

2   02858.

3     A.    Okay.

4     Q.    In the middle paragraph you've got

5   Business Interruption in bold.  And then on that next

6   line there's a reference to "one discrete event of

7   physical loss or damage"?

8     A.    Yes.

9     Q.    Am I correct that in this part of your

10  letter you're communicating to the insured what

11  constitutes an occurrence under the policy?

12    A.    Yeah, that's what the -- it says.  "This

13  policy defines an occurrence as," quote, and then

14  there's the words, unquote.

15    Q.    What is your understanding of what

16  constitutes a discrete event of physical loss or

17  damage as defined in this policy?

18    A.    I think it's what the words -- it's a

19  discrete event of physical loss or damage.  So I think

20  it's those -- there's this concept of "discrete

21  event," I think that's what those words mean, and you

22  have a physical loss or damage.

23    Q.    Have you encountered previously

24  construction defects that allowed water intrusion into

25  a building prior to this claim?

1    A.   I don't remember.

2    Q.   There's an exclusion within this policy

3  for construction defects, correct?

4    A.   Yes.  There's no exclusion for -- yes.  I

5  don't know the exact wording for it, but there's --

6  yes.

7    Q.   But set that exclusion aside for a moment.

8  Could a construction defect be considered a discrete

9  event of physical loss or damage?

10       MR. CHIN:  Object to form.

11       THE WITNESS:  I want to say no.

12  BY MR. HASSON:

13   Q    Why is that?

14   A.   I'm going to say no.

15   Q.   Why is that?

16   A.   Well, it's excluded, for one thing.  I

17  mean, you could say, "Well, it could still be

18  discreet, even if it's excluded."  But I will say no.

19  Yeah, I will say no.

20   Q.   Why is that?  Why can't a -- it may be

21  excluded by the exclusion for construction defects,

22  but why can't a construction defect in itself not

23  constitute a discrete event of physical loss or

24  damage, as you understand it?

25       MR. CHIN:  Object to form.

1          THE WITNESS:  I don't know that a

2      construction defect would be a discrete event.

3   BY MR. HASSON:

4      Q.   We talked earlier about being able to nail

5   a date of loss down to a particular day, right?

6      A.   Yeah.

7      Q.   In your mind, does a discrete event have

8   to occur in one day?

9          MR. CHIN:  Object to form.

10         THE WITNESS:  I would say no.

11  BY MR. HASSON:

12     Q.   So based on your understanding, a discrete

13  event could go multiple days.

14     A.   I would describe a hurricane as a discrete

15  event, and that could happen -- occur over multiple

16  days.

17     Q.   And you can't recall ever having

18  encountered malfunctioning of equipment as an example

19  of a discrete event of physical loss or damage; is

20  that correct?

21     A.   I can't recall.

22     Q.   When you wrote that "The mold did not

23  result from a single occurrence of damage from a risk

24  of loss not excluded by the policy," what did you mean

25  by that?

1        A.    I think I mean what it says.  "The mold

2   did not result from a single occurrence from a risk of

3   loss not excluded by the policy."  That there was

4   mold, but there were multiple occurrences, and there

5   were -- also resulted from things that were excluded

6   by the policy.

7        Q.    Is that a determination that you had made

8   as of February 2016?

9        A.    I would -- yes, yes, I think -- yes, I

10  think -- yes, that determination would have been made

11  by that time.

12       Q.    Because you wouldn't have written that and

13  included it in this letter if you hadn't determined

14  that, right?

15       A.    Well, I would say it's a pretty soft

16  statement that mold did not result from a single

17  occurrence.  It just -- it's more than one occurrence,

18  and there's -- I mean, I don't think this is a very

19  firm statement.  I think it was something I was

20  confident knowing as of February of 2016.

21       Q.    As of February of 2016, had you made a

22  determination that there was no coverage for this

23  claim?

24       A.    I hadn't made a coverage determination at

25  that point.

1      Q.    Why not?

2      A.    We hadn't inspected the entire building

3   yet.  I think at that point we had only looked at the

4   top two or three floors.

5      Q.    How was inspecting the lower floors going

6   to inform your coverage determination?

7      A.    Same thing we do from when we first got

8   the loss and didn't have any information.  We might

9   have been able to help identify a discrete event of

10  physical loss or damage which led to an insurable

11  event.  At that point we hadn't identified anything

12  yet.  It's possible in further investigation we

13  could've found something.

14     Q.    Well, water flows downhill, right?

15     A.    It's been my experience that water flows

16  downhill.

17     Q.    And I'm not trying to be obnoxious, but

18  was it likely that you were going to find anything on

19  the lower floors that would explain or would point to

20  a discrete event of loss or damage that explained the

21  damages on the upper floors you had already examined?

22         MR. CHIN:  Object to form.

23         THE WITNESS:  Probably not.

24  BY MR. HASSON:

25     Q.    So as of the time you wrote this letter,

1  you had determined that there was no coverage for the

2  damage you had observed on the upper floors; is that

3  right?

4          MR. CHIN:  Object to form.

5          THE WITNESS:  I don't know if I would

6    state it that way.

7  BY MR. HASSON:

8    Q.   How would you state it?

9    A.   We hadn't, at that point in time, found

10  any -- we hadn't identified any discrete event that

11  would have led to those damages.  And I see this --

12  the point you're making that how does inspecting the

13  3rd floor affect what we find on the 10th floor?  I

14  can see where --

15          But it's possible there could have been

16  something we would find, we hadn't seen yet, that

17  would've pointed to a discrete event that could've

18  caused damage on the 10th floor.

19          And at that point we're still inspecting

20  the building.  There's no reason not to say, "10th

21  floor, and we're done" with it.  I mean, that seems to

22  be --

23          And it hadn't been presented that way.  At

24  this point in time there -- that was not what had been

25  presented to us.

1    Q.   Had you -- have you ever heard of a phrase

2  that used sometimes in medicine called a "differential

3  diagnosis"?

4    A.   I think I've heard the term before.

5    Q.   Doctors will sometimes, when they're first

6  examining a patient, come up with a list of things

7  that they think might be causing a patient's symptoms,

8  and that's referred to as a differential diagnosis.

9        At this time in 2016, did you have

10  something similar?  Did you have a list of events that

11  you were looking at that, "These might be potential

12  discreet events of physical loss or damage that might

13  trigger coverage"?

14       MR. CHIN:  Objection to form.

15       THE WITNESS:  I don't know if I had an

16       explicit list of discreet events.  I think at

17       this point we had identified the multiple

18       sources.  I think we were still trying to figure

19       out if any of those could've potentially been

20       described as a discrete event or not, and they

21       were still -- it's possible there was

22       information we didn't know that we would find

23       out.

24  BY MR. HASSON:

25    Q.   All right.  The next thing in the letter

1   is you have some exclusions from a policy that you put

2   into the letter, right?

3      A.   Yes.

4      Q.   And there's a group of exclusions referred

5   to as the Group II Exclusions that are set forth on

6   this page and on the following, right?

7      A.   Yes.

8      Q.   The introductory paragraph, or the

9   introductory sentence to the Group II Exclusions

10  reads, "This policy does not insure against loss or

11  damage caused by the following.  However, if direct

12  physical loss or damage insured by this policy

13  results, then that resulting direct physical loss or

14  damage is covered."  Do you see that?

15     A.   I see that.

16     Q.   What does that mean to you?

17     A.   It means what it says.  This policy does

18  not insure against physical loss or damage caused by

19  the following, but if physical damage insured by the

20  policy results, then that resulting damage is covered.

21     Q.   Have you ever heard of what is sometime

22  referred to in the industry as an "ensuing loss"

23  clause?

24     A.   I'm not -- I think I've heard the term

25  before, but I'm not familiar with that.

1    Q.   You don't know what it means?

2    A.   No.

3    Q.   Okay.  So Exclusion No. 1 reads, "Wear and

4  tear, deterioration, depletion, rust, corrosion,

5  erosion, inherent vice, latent defect," right?

6    A.   That's what that says, yes.

7    Q.   Okay.  By "wear and tear" are we referring

8  to just sort of natural, over time things wear out?

9        MR. CHIN:  Object to form.

10       THE WITNESS:  I don't know if I would call

11     that "natural over time."

12  BY MR. HASSON:

13    Q.   Okay.

14    A.   I think "wear and tear" probably refers to

15  use.  I think it means what it means.  It's wear and

16  tear.  I think that's -- yeah.  I think it's a pretty

17  exhaustive list there.

18    Q    Have you denied coverage in prior claims

19  because the loss resulted from what you determined to

20  be wear and tear?

21    A.   I don't remember exactly if I've denied

22  loss for wear and tear.

23    Q.   Did you consider whether the losses

24  reported by Crestline in this case resulted from wear

25  and tear?

JOEL BROWN                                          March 29, 2019
SKY HARBOR vs AFFILIATED FM INSURANCE                        133

1    A.   I -- yes.  Well -- yes.

2    Q.   Did you determine that any of the damages

3  reported by Crestline in this case resulted from wear

4  and tear?

5    A.   I don't know.  No, I didn't determine

6  specific damages resulting from wear and tear.

7    Q.   What about deterioration and depletion?

8  Did any of the damages asserted by -- did you

9  determine that any of the damages asserted by

10  Crestline in this case resulted from deterioration or

11  depletion?

12    A.   I did not specifically identify damages

13  that were occurring by any of these specific terms

14  that are listed in this exclusion.

15    Q.   What is your understanding of what's meant

16  by "inherent vice"?

17    A.   I think it's what the term means.

18  "Inherent vice" is a vice that is inherent in whatever

19  the object or whatever we're talking about.

20    Q.   Sitting here today, does that have

21  anything to do, in your understanding, with any of the

22  issues in this case?

23    A.   I don't know.  No.

24    Q.   Okay.  No. 2 reads, "Defects in materials,

25  faulty workmanship, faulty construction or faulty

JOEL BROWN
SKY HARBOR vs AFFILIATED FM INSURANCE

March 29, 2019
134

1  design."  Are those what are sometimes referred to as

2  construction and design defects?

3          MR. CHIN:  Objection to form.

4          THE WITNESS:  I don't know how people

5      refer to them.  I think it's -- that exclusion

6      means what those are:  The defects in materials,

7      faulty workmanship, faulty construction and

8      faulty design.  I think it means what those

9      words mean.

10  BY MR. HASSON:

11      Q.   Did you determine whether some of the

12  water penetration through the exterior façade at the

13  Hilton Atlanta Northeast was due to faulty design or

14  faulty construction?

15      A.   I would say yes.

16      Q.   Take a look back for me at this language.

17  "However, if direct physical loss or damage insured by

18  this policy results, then that resulting physical loss

19  or damage is covered."

20      A.   Yes.

21      Q.   If you have water penetration as a result

22  of a construction defect, does this language here,

23  starting with "however," mean that repairing the

24  construction defect is excluded under the policy, but

25  a rainwater event that penetrates through the hole

1  created by the defective construction might still

2  trigger coverage?

3          MR. CHIN:  Object to form.

4          THE WITNESS:  I think it means exactly

5      what it says here.  If we can identify direct

6      physical loss or damage insured by the policy

7      results.  If we can do that, then it does what

8      it says.

9  BY MR. HASSON:

10     Q    Does that mean that if you have a

11  construction defect that is excluded under No. 2, in

12  the Group II Exclusions, because it's a construction

13  defect, but that construction defect allows water to

14  penetrate through the exterior façade of a building,

15  that the resulting water penetration might be covered

16  under the policy?

17         MR. CHIN:  Object to form.

18         THE WITNESS:  Again, it goes back to the

19      -- or this condition you're describing here, if

20      it meets this direct physical loss or damage

21      insured by the policy.

22         And I don't know necessarily that that's

23      been done at this point in time for this loss,

24      because for it to be insured, we have to

25      identify the discrete event, the occurrence.

1    And absent that, it's not insured.

2        So if it happens outside of the policy

3    period, it's a condition that exists before, the

4    policy doesn't respond to that.

5  BY MR. HASSON:

6    Q.    If you are able to identify a rain event

7  that occurred during the policy period, though, would

8  you agree with me that this language, "However, if

9  direct physical loss or damage insured by this policy

10  results" might apply?

11    A.    If I was --

12        MR. CHIN:  Object to the form.

13        THE WITNESS:  -- able to identify the

14    direct loss from that identified rain event,

15    then potentially the policy could respond.

16  BY MR. HASSON:

17    Q    Okay.  The next exclusion says, "Changes

18  of temperature, dampness or dryness, all whether

19  atmospheric or not," right?

20    A.    Yes.

21    Q.    What is your understanding of what is

22  meant by "changes of temperature, dampness or dryness,

23  all whether atmospheric or not"?

24    A.    I think it means what those words mean;

25  that if you have changes of temperature, dampness or

1   dryness, then it doesn't matter if it's because of

2   some -- if it's atmospheric or not.  So it doesn't --

3           It could just be that it's humid outside.

4   That would be atmospheric dampness.  That by itself

5   would be -- would meet that.  It -- that doesn't

6   matter, or if it's due to some other condition that

7   makes it humid.  That's -- that's what that's

8   referring to.

9       Q.   Is it your understanding that this refers

10   to changes that occur both inside and outside the

11   building?

12           MR. CHIN:  Object to form.

13           THE WITNESS:  I think it means what it

14       says.  I mean, it doesn't refer to where the

15       temperature -- change of temperature, dampness

16       or dryness occurs.

17   BY MR. HASSON:

18       Q.   Do you have any understanding as to

19   whether the change of temperature, dampness or dryness

20   has to occur throughout the building, or only in

21   discrete portions of the building in order for this

22   exclusion to apply?

23           MR. CHIN:  Object to form.

24           THE WITNESS:  I don't understand the

25       distinction you're trying to make there.  I

1        don't understand what the question is.

2   BY MR. HASSON:

3        Q.   Okay.  Let's try it this way.

4             What's dryness?

5        A.   It's dryness.  I mean, it's what it --

6   it's dry air.  It means what it says, dryness.

7        Q.   The absence of water, right?

8        A.   Well, I think it -- I think it may mean

9   more than that, I mean, because you could have dry

10  air.  You have, like, the relative humidity, how much

11  water is in the air.

12            So you could have damp air that's humid or

13  you could have dry air, like in the winter, that dries

14  your skin out, things like that.  That -- I think

15  that's kind of what that's -- dampness and dryness.

16  It's not just water/not water.

17       Q.   Okay.  Well, when it says, "temperature,

18  dampness or dryness," is it your understanding that

19  it's referring only to air, or could it refer to both

20  the air and water?

21       A.   I think it would refer -- I think it's --

22  I think it means what it says.  I think it could be

23  both.  I don't know how water would be atmospheric,

24  but, yes, I think it's both.

25       Q.   Is it your reading of this exclusion that

1  the change in temperature, dampness or dryness has to

2  be atmospheric in order for this exclusion to apply?

3      A.   No.

4          MR. CHIN:  Object to form.

5          THE WITNESS:  And it say specifically,

6      "atmospheric or not."

7  BY MR. HASSON:

8      Q.   Okay.  So if you have a change in dryness

9  within a building, you believe this exclusion will

10 apply?

11         MR. CHIN:  Objection to form.

12         THE WITNESS:  No.  That -- this exclusion

13     refers to damage caused by this, not just the

14     presence or the absence of the conditions

15     described here.

16 BY MR. HASSON:

17     Q.   Okay.  So if you have --

18     A.   So you could have the dampness and no

19 damage, and it doesn't make it -- this isn't in

20 reference to the dampness or dryness of the air at

21 all.  It's in reference to the damage that results

22 from it.

23     Q.   Okay.  So if you had water inside a

24 building that causes damage, do you believe this

25 exclusion applies?

1          MR. CHIN:  Objection to form.

2          THE WITNESS:  I feel like the question

3      you've asked me here is water in a building and

4      dampness.  Those are not the same things.  I

5      feel like you conflated the two, and I don't

6      think that's what that says.  I think it says

7      dampness.

8  BY MR. HASSON:

9      Q.   So, for example, if there is a pipe leak

10  within a building and the pipe leak results in water

11  going where the water shouldn't be and the water

12  causes damage, that isn't a change in dampness or

13  dryness within the building, is it?

14          MR. CHIN:  Objection to form.

15          THE WITNESS:  You're giving me a

16      hypothetical situation here.  I'm not sure the

17      position you -- the scenario you've spelled out

18      for me and this exclusion, they relate to each

19      other.  I'm not sure that they would.  I don't

20      know what you're telling me, so I don't know how

21      to answer the question.

22  BY MR. HASSON:

23      Q.   All right.  Well, so let's try it this

24  way.

25          You made reference earlier to another

1    claim where there had been a pipe leak within a

2    building over a weekend.  Do you remember that?

3       A.   Yes.

4       Q.   You didn't deny that claim on the basis

5    that the pipe leak had resulted in a change of

6    dampness or dryness within the building, did you?

7       A.   No.

8            MR. CHIN:  Object to form.  That

9       mischaracterizes his testimony.  He didn't say

10      it was a pipe leak.

11           We've been going now for an hour, so I'd

12      like to take a break.

13           MR. HASSON:  Sure.

14           (Off the record at 3:47 p.m.)

15                --------------

16           (On the record at 3:52 p.m.)

17   BY MR. HASSON:

18      Q.   So this exclusion for changes in

19   temperature, dampness and dryness that we were just

20   discussing, did that language play a significant role

21   in your decision to deny coverage in this case?

22      A.   It was a component.

23      Q.   How so?

24      A.   One of the conditions described in the

25   reports talk about there being humid air that would

1  get into the wall cavities, and that then created damp

2  conditions where mold grew.  I think this exclusion

3  would apply to that condition as described.

4      Q.   Would humid air within the building be

5  equivalent to a change in dampness or dryness as

6  described in this exclusion, to your understanding?

7          MR. CHIN:  Objection to form.

8          THE WITNESS:  Yes.

9  BY MR. HASSON:

10     Q.   In your mind, dampness and humidity are

11  interchangeable?

12     A.   No, they're not exactly the same.  They're

13  not interchangeable.

14     Q.   What's the distinction?

15     A.   I don't know what the distinction is here,

16  but it comes down to there was this dampness, damage

17  caused by that, and there was mold that grew on that

18  dampness.  Mold is also excluded.

19          So at that point in time, there's not any

20  sort of event.  You had a construction defect, you've

21  got dampness, and you have mold.  At no point in time

22  have I triggered coverage with any of those things

23  that I'm still looking for.

24          We don't cover the construction defect, we

25  don't cover the damage, and we don't cover the mold.

1  At that point in time, that's -- that -- I'm looking

2  for somewhere along there, is there something that's,

3  "Hey, this is an event, a discrete event I can point

4  to," and that's not happening there.

5       Q.   When you say mold grew on that dampness,

6  what does that mean?

7       A.   So I think it means what it means.  Mold

8  will grow in wet environments.  I'm not a biologist.

9  Mold grows where it's wet.

10      Q.   I'm not a biologist either, but it's my

11 understanding that mold grows on stuff, not just in

12 the air.  Is that your understanding?

13      A.   Yes, I would -- yeah.

14      Q.   It may release spores into the air, but

15 mold grows on stuff, right?

16           MR. CHIN:  Object to the form.

17           THE WITNESS:  That would -- yeah, sure,

18      I'll agree with that.

19 BY MR. HASSON:

20      Q.   When you say mold grows on dampness, do

21 you mean that materials have gotten wet and mold is

22 growing on those wet materials?

23           MR. CHIN:  Object to form.

24           THE WITNESS:  I think in that situation I

25      described there where we had the construction

1    defect, the dampness will condense onto the

2    drywall.  You have wet drywall.  Well, that's --

3    but still, along that chain there, there's not a

4    discrete event anywhere that occurs in there.

5  BY MR. HASSON:

6       Q.    All right.  So in your mind, if water

7  vapor in the air condenses onto material, is that a

8  change in dampness as referenced in this exclusion?

9           MR. CHIN:  Objection to form.

10           THE WITNESS:  Yes.

11  BY MR. HASSON:

12       Q.    In the sentence below that, you reference

13  cost to correct any of the pre-existing conditions.

14  What are pre-existing conditions?

15       A.    Conditions that existed before.

16       Q.    Before what?

17       A.    Before this -- the loss that -- you had

18  this rain event in August.  You presented the loss you

19  -- I found on the 21st.  There are conditions that

20  existed before then.  So if there are these other

21  pre-existing conditions, we don't -- the policy is not

22  to pay to fix the pre-existing conditions.

23       Q.    So on the exterior façade on the building,

24  were there cracks in the mortar between the bricks on

25  the brick façade?

1      A.    I don't remember.

2      Q.    Do you recall whether there was a problem

3   with the window seals that had deteriorated over time

4   around the windows on the exterior façade?

5      A.    I think I remember that being there.

6      Q.    And do you remember somebody noting that

7   there was probably water penetration around those

8   windows through the deteriorated seals?

9      A.    I've seen several reports that note

10   deteriorated seals from water penetration.

11      Q.    Would that constitute what you would

12   describe as wear and tear, the deterioration of those

13   window seals?

14      A.    You described them as deteriorated seals,

15   so I would probably use "deteriorated."

16      Q.    Is that a "yes"?  I'm not trying to argue

17   with you, but if the window seals around the windows

18   in the building deteriorate over time and allowed

19   water to penetrate in the building, then the

20   deterioration of the grout or sealant or whatever

21   around the window, that would be what you would think

22   of when you think of wear and tear --

23      A.    No.

24      Q.    -- under Exclusion No. 1?

25      A.    No.

1          MR. CHIN:  Object to form.

2    BY MR. HASSON:

3        Q     Why not?

4        A     The second word in that No. 1 exclusion is

5    "deterioration."  The deterioration of the grout would

6    be the deterioration.

7        Q     Okay.  So it's excluded under Exclusion

8    No. 1, but because of the word "deterioration," not

9    because of wear and tear?

10       A     Whether I call it wear and tear or

11   deterioration or anything of these things here, it's

12   within this -- I don't have to to specifically

13   identify it as wear and tear.  It falls into this

14   grouping of terms in the policy.

15       Q     And, again, I'm just trying to interpret

16   the language in your letter here when you say "cost to

17   correct pre-existing conditions," one of the things

18   that you might have been referring to is, "Hey, we're

19   not going to pay you to seal those windows because the

20   deterioration of the window sealant is as a result of

21   wear and tear or deterioration."  Is that what you

22   meant?

23          MR. CHIN:  Objection to form.

24          THE WITNESS:  I think I meant what the

25    words say here.  I think the words here would

1      include the example that you gave.

2    BY MR. HASSON:

3      Q.   Okay.  And so you say "We're not going to

4    pay the pre-existing condition," which in the example

5    I just gave would mean "We're not going to pay to

6    reseal the window," right?

7          MR. CHIN:  Objection to form.

8    BY MR. HASSON:

9      Q.   That may not be the only thing you meant,

10   there may be other examples, but that's one of the

11   things that you meant when you said "cost to correct

12   pre-existing conditions are not recoverable"?

13         MR. CHIN:  Objection to form.

14         THE WITNESS:  In this specific letter that

15         we're looking at here that I wrote in February,

16         I don't think I'm intending to say a final

17         determination has been made.  I think what I'm

18         trying to do is to point out the provisions of

19         the policy, which may have an impact on what may

20         or may not be recoverable through the policy.

21   BY MR. HASSON:

22     Q.   I understand that answer, and I think I

23   understand your hesitation now.  I'm not suggesting at

24   the moment that you had made a determination on

25   coverage at this stage.  What I'm trying to do is

1  distinguish between the condition itself which may be

2  subject to the exclusion, and the water penetration

3  that resulted from that excluded condition.

4          And so, for example, if you have a hole in

5  the roof, and the hole in the roof resulted from wear

6  and tear, the exclusion for wear and tear within the

7  policy means AFM isn't going to pay to fix the hole

8  itself, right?

9          MR. CHIN:  Objection to form.

10         THE WITNESS:  Yes.

11  BY MR. HASSON:

12     Q.   But if water penetrates through that hole

13  and causes damage within the hotel, AFM might pay for

14  that water intrusion, right?

15         MR. CHIN:  Objection to form.

16         THE WITNESS:  You're giving a lot of

17         conditions and mays and mights and whatever

18         else.  It is possible there could be resulting

19         damage from an excluded thing that resulted in

20         insurable damages.

21  BY MR. HASSON:

22     Q.   Okay.  Good.  And so this says "cost to

23  correct any pre-existing conditions which allowed

24  water intrusions or condensation are not recoverable."

25  You were not intending to convey to the insured,

1   "We've made a coverage determination, and there is no

2   coverage;" you were saying simply, "We're not going to

3   pay for the things that are excluded by these

4   exclusions," such as if the window seals, for example,

5   had deteriorated.

6         MR. CHIN:  Objection to form.

7         THE WITNESS:  I think it says that -- what

8      it says there.  Yeah.  The cost to correct these

9      pre-existing conditions wouldn't be recoverable.

10     I think I mean for that term to be encompassing

11      of the multiple exclusions in that paragraph

12      ahead of that.

13  BY MR. HASSON:

14     Q.   Okay.  Did there come a time during the

15  claims investigation that Crestline or Sky Harbor or

16  both related to you that the mold and water damages

17  that they were seeking recovery for were working a

18  significant financial hardship on the hotel?

19     A.   Yes.

20     Q.   What do you recall about that?

21     A.   I think it was mentioned in a letter or

22  two.  I don't remember exactly.

23     Q.   Were they asking for an advance payment?

24     A.   I received a request, at least one request

25  for an advance payment.

1    Q.    Does Affiliated FM ever issue advance

2  payments?

3    A.    Yes.

4    Q.    Under what circumstances does Affiliated

5  FM issue advance payments?

6         MR. CHIN:  Objection to form.

7         THE WITNESS:  We will issue advance

8    payments on losses where we determine coverage

9    applies and the loss would be in excess of any

10    applicable deductibles.

11  BY MR. HASSON:

12    Q.    Have you personally approved advance

13  payments?

14    A.    Yes.

15    Q.    Many times?

16    A.    Yes.

17    Q.    Does it happen often?

18    A.    Yes.

19    Q.    In this case you rejected the request for

20  advanced payments, right?

21    A.    That is correct.

22    Q.    The basis of your decision to reject

23  advanced payments is because you had not made a

24  determination as to coverage for the losses submitted

25  by the insured?

1          MR. CHIN:  Objection to form.

2          THE WITNESS:  We were unable to make an

3     advance because we had not determined that there

4     was a covered loss in excess of any deductible.

5 BY MR. HASSON:

6     Q.    I'll hand you what's been marked as

7 Exhibit 291.  Let me know when you're ready and I'll

8 have a couple of questions about it.

9     A.    (Reviews document.)  All right.

10                    (Exhibit 291 was

11                    marked/identified.)

12 BY MR. HASSON:

13     Q.    In the second paragraph -- well, this is a

14 letter from you to Mr. Adair in March of 2016, right?

15     A.    Yes.

16     Q.    And Mr. Adair is a paralegal at Crestline?

17     A.    I believe so.

18     Q.    In the second paragraph, second sentence

19 you wrote, "During our meetings, Liberty advised that

20 several brick cuts were made to inspect the exterior

21 sheeting, and water tests of the exterior walls were

22 performed.  The findings of these inspections and test

23 results were not recorded in their report.  We request

24 this information be provided to us."

25                Do you recall whether that was ever

1  provided to you?

2      A.   I don't remember.

3      Q.   Had AFM had access to the building on a

4  number of different occasions by March of 2016?

5          MR. CHIN:  Objection to form.

6          THE WITNESS:  We had visited the hotel on

7      multiple occasions.

8  BY MR. HASSON:

9      Q.   And we're now a little over five months

10  since the claim was submitted, right?

11     A.   No.  We were notified of the loss in

12  September.  I don't think we got a claims submission

13  until February.

14     Q.   Okay.  So we're a little over five months

15  since you were notified of the claim?  Is that a more

16  accurate way of saying it?

17     A.   Notified of the loss.  It was reported to

18  us in September.

19     Q.   And then the next paragraph refers to

20  two-day inspections.  "We performed our evaluations,

21  including, but not limited to, confirming the

22  measurements of all rooms."  Do you recall when those

23  two-day inspections took place?

24     A.   I don't recall, but the letter says at the

25  top of the first paragraph, "This confirms our visit

1  to the Hilton Hotel March 8th and 9th," but I don't

2  know if that's the -- I'm assuming that's the same

3  dates.

4       Q.   Were you present during those inspections?

5       A.   Yes.

6       Q.   Were you able to access the areas of the

7  hotel that you asked to inspect?

8            MR. CHIN:  Objection to form.

9            THE WITNESS:  We had limited access to the

10       hotel because it was still in operation, so they

11       were still using the hotel rooms and guests were

12       there.  So we looked at rooms either on floors

13       where renovations were occurring and it was

14       under construction, and occasionally we looked

15       at rooms on other floors that were unoccupied,

16       because they were just visual inspections and

17       there wasn't any sort of removal of any material

18       or anything like that.

19  BY MR. HASSON:

20       Q.   In this third paragraph there is a

21  sentence that says, "We were unable to confirm the

22  nature and extent/scope of damage for the reported

23  repairs and remediation performed as it had already

24  been completed in the guestrooms on Floors 8 through

25  10."

1        Does that mean that by the time y'all came

2   out on March 8th and 9th they had put the drywall back

3   up on Floors 8 through 10?

4        MR. CHIN:  Objection to form.

5        THE WITNESS:  I don't remember exactly.

6   BY MR. HASSON:

7        Q.   Well, the very next sentence reads, "Also,

8   we noted that the renovation of the 10th floor has

9   commenced with drywall reinstalled in most of the

10  guestrooms, and also started on Floors 8 and 9."

11       A.   Yes.

12       Q.   Okay.  So my question is when you said you

13  were unable to confirm the nature and extent/scope of

14  damage for the reported repairs and remediation

15  performed, are you referring to the fact that drywall

16  had been reinstalled, at least in part, on those

17  floors, or are you referring to something else?

18       A.   I think I'm referring to that, but I don't

19  know if it would -- it could include something else.

20  I think it may include that we've been unable to

21  determine the extent of mold or water damage that may

22  have been present in a room.

23        And if you're removing all the drywall,

24  then I don't know whether all the drywall needed to

25  come out or half of it or -- I think I'm referring to

1  the scope of extent of damages of the reported

2  repairs.

3      Q.   Was there a concern at some point that the

4  contractor that was hired to do mold remediation and

5  drywall removal was removing too much drywall?

6          MR. CHIN:  Objection to form.

7          THE WITNESS:  I think there was a -- there

8       was not an agreement about the scope for the

9       removal of drywall in the rooms where mold was

10      found.

11  BY MR. HASSON:

12      Q.   Was there an attempt to reach an agreement

13  about such a scope?

14      A.   I recall that it was discussed onsite on

15  at least one occasion.

16      Q.   Okay.  What do you remember about that

17  discussion?

18      A.   I don't recall specifics, but I believe

19  that myself, a couple of folks from US Helm and some

20  folks from Liberty were onsite and discussed about how

21  far beyond visible mold on the drywall would be a

22  proper place to make a cut to repair damage.

23          So when you come into a room and there'd

24  be some mold on the wall, okay, so you see that.

25  What's the proper -- where's the proper place to make

1   the cut to repair that damage?

2       Q.    Did Liberty want to cut off more drywall

3   than your consultants felt was appropriate?

4           MR. CHIN:  Objection to form.

5           THE WITNESS:  Yes.

6   BY MR. HASSON:

7       Q.    Was there any agreement reached about

8   that?

9       A.    No.  I think there was a discussion that

10  we were not in agreement.  I don't think a final

11  resolution was reached.

12      Q.    Did Liberty explain to you why they felt

13  that additional drywall needed to be removed?

14      A.    I don't remember the specifics of what --

15  what were those criteria they were using.  I don't

16  remember exactly.

17      Q.    Did they discuss with you a concern that

18  even though you might be able to see visible mold on a

19  wall, there might be mold growth that you couldn't

20  see, and if you didn't remove that drywall, you were

21  going to get further damage?

22      A.    I don't remember that.

23      Q.    Then you raise in this letter an issue we

24  discussed earlier today, "The reconstruction and

25  renovations have proceeded, even though the underlying

1  source of water intrusions in the hotel as outlined in

2  the Liberty Report have not been corrected or

3  addressed."

4       Do you recall what you were referring to

5  about what source or sources of water intrusion had

6  not been addressed as of this time?

7     A.   I don't remember specifically.  I think

8  I'm referring to the exterior façade, and the water

9  intrusion through that façade.

10    Q.   Did you or did any of your consultants

11  ever determine that additional damage was sustained at

12  the hotel to floors after renovations of those floors

13  had been completed?

14       MR. CHIN:  Objection to form.

15       THE WITNESS:  No, I don't think we -- I

16    don't think we inspected any of those floors

17    after renovations were completed.  I think we

18    observed them, then I don't think we did any

19    sort of inspections on those floors.

20  BY MR. HASSON:

21    Q.   You're not aware of any time where

22  consultants hired by FM may have come onto the

23  property, walked through the floors where remediation

24  was complete with moisture meters or anything like

25  that?

1     A.   I think I knew that we had consultants

2   onsite where remediation was ongoing or renovations

3   were ongoing and they had moisture meters.  I don't

4   think we went back to floors after renovations were

5   completed.

6     Q.   What about infrared cameras?

7     A.   We were onsite with infrared cameras, and

8   I don't remember us using those on floors after

9   renovations were completed.

10     Q.   Did you use the infrared cameras on floors

11   that were undergoing renovation?

12     A.   I didn't.

13        MR. CHIN:  Objection to form.

14        THE WITNESS:  I didn't use the infrared

15        camera.  I believe it was the group from US Helm

16        that used the infrared cameras.  And I believe

17        that those inspections when we completed those

18        were being done on floors during the renovation,

19        the -- that was being done on those floors when

20        they were being renovated.

21   BY MR. HASSON:

22     Q.   Do you recall a particular time where one

23   of your consultants spent a lot of time in a

24   particular room on the 10th floor, maybe Room 1027?

25   Does that stand out?

1    A.   No.

2         MR. CHIN:  Objection to form.

3         THE WITNESS:  No.  I don't -- no.

4    BY MR. HASSON:

5    Q    When your consultants who were onsite

6    would identify significant findings through the use of

7    those infrared cameras or otherwise, is that

8    information that you would relay or you would have

9    them relay to Crestline or Crestline's

10   representatives?

11        MR. CHIN:  Objection to form.

12        THE WITNESS:  I don't know.  I don't know.

13   BY MR. HASSON:

14   Q.   All right.  At the very bottom of this

15   page and going on to the next one you write, "As

16   discussed during our meetings to expedite our

17   investigation, another option would be to have

18   Crestline engage a contractor to open up select walls

19   in areas for our inspection so as to minimize the

20   impact on operations in the guestrooms."

21        Do you have any recollection as to why you

22   were presenting that option?

23   A.   I guess as I stated before, that our

24   inspections had essentially been limited to the areas

25   where -- floors where renovations were occurring.  So

1    I think they were taking three floors out at a time,

2    completing all the renovations, doing them back up and

3    then taking out.  So there would be a limited number

4    of floors that would be out of service at any given

5    time, because the hotel was operating throughout this

6    time frame.

7              And there were areas which we hadn't been

8    able to inspect.  We couldn't agree on a scope,

9    because we couldn't confirm what those damages are

10   because it's hidden behind, so I think this was an

11   option we talked about being able to inspect areas

12   ahead of the renovation occurring.

13       Q.    I apologize.  I can't think of a less

14   obnoxious way to ask this question, so I'm just going

15   to have to.

16             Why would the insured need to pay a

17   contractor for your inspection?  Why wouldn't AFM pay?

18       A.    We don't do destructive testing to our

19   insured's property.  We're not going to come in and

20   bust up walls.  We will be present when that kind of

21   work is occurring, we'll try to be there when that

22   stuff is going on, but we're not going to do work to

23   somebody else's property or hire somebody to do that

24   for us.

25       Q.    That's just a company policy not to do

1   destructive testing?

2        A.   Yeah.  I mean -- yeah.

3        Q.   And that company policy to not do

4   destructive testing, that extends to your consultants

5   that you bring in on cases like this?

6        A.   Yes.

7        Q.   So, for example, in this case, we talked

8   about ESI and -- I think I was calling them JS Held,

9   you're calling them US Held, you're probably right and

10  I'm probably wrong, but ESI and US Held would not be

11  doing destructive testing in the Hilton Atlanta

12  Northeast, right?

13       A.   I'll say yes.

14       Q.   And by "destructive testing," would

15  cutting into wallboard be destructive testing?

16       A.   Yes.

17       Q.   What about removing vinyl wall coverings,

18  would that be considered destructive testing?

19       A.   I'll say yes.

20       Q.   And then in the next paragraph you said,

21  "Based on our meetings with Liberty, we developed a

22  Supplemental Request for Information, which is

23  attached.  These items are in addition to our prior

24  request for information," right?

25       A.   That's what that says.

1      Q.    Do you have any recollection as to why you

2  were formulating supplemental requests for information

3  in March of 2016?

4      A.    There probably was additional information

5  we were looking for as part of our investigation.

6  There may have been questions we found through

7  information that had been provided or inspections we

8  had done, but I don't remember specifically.  I don't

9  have the -- you didn't give me the request with the --

10  so I don't have it, so I don't know what it says.

11     Q.    Earlier we talked about one of the

12  performance evaluation criteria that you were

13  evaluated on by your employer is how quickly from

14  start to finish a claim gets resolved, right?

15     A.    Yes.

16     Q.    Does AFM have some policy about how long a

17  particular claim should be resolved within or anything

18  to that effect?

19          MR. CHIN:  Objection to form.

20          THE WITNESS:  No, there's no specific

21      policy on how long a particular loss should be.

22  BY MR. HASSON:

23     Q.    How quickly are your claims typically

24  resolved?

25          MR. CHIN:  Objection to form.

1          THE WITNESS:  There's not a -- I don't

2      have a typical loss.  They're all over the

3      board.

4    BY MR. HASSON:

5          Q.   Have you had lots of claims that have been

6    settled within, say, 30 or 60 days?

7          A.   I've had some claims that have been

8    settled that fast, yes.

9          Q.   Have you had other claims that were

10   resolved within six months?

11         A.   Yes.

12         Q.   Have you had many claims that have taken

13   longer than six months to resolve?

14         A.   Yes.

15         Q.   Have you had many claims that have taken

16   longer than a year to resolve?

17         A.   I've had claims that have taken longer

18   than a year to resolve, yes.

19         Q.   What percentage of the claims you have

20   personally handled in the last, let's say, four years

21   do you think have taken longer than six months to

22   resolve?

23         A.   I don't know.  It would be a guess.

24         Q.   What about longer than a year?

25         A.   Same thing.  I don't know that.  I don't

1  know the percentage.

2      Q.    I'll hand you what's been marked as

3  Exhibit 292.  Do you recognize this is an e-mail

4  exchange between you and Mr. Steinbrecher back in

5  March of 2016?

6      A.    That's what it looks like.

7                        (Exhibit 292 was

8                        marked/identified.)

9  BY MR. HASSON:

10     Q.    And in your e-mail you reference another

11  inspection of the hotel that was apparently done on

12  March 28th of 2016 on the 7th floor?

13     A.    That's what the e-mail says.

14     Q.    So by this time, had the 7th floor been

15  demolished or at least partially demolished to allow

16  you all to come in and inspect conditions?

17     A.    I don't remember.  I would guess yes, but

18  I don't know.

19     Q.    Do you recall whether you were present for

20  this inspection or not?

21     A.    I think I was present for this inspection.

22     Q.    Do you recall whether you were able to

23  observe the conditions on the 7th floor of the hotel

24  without meeting interference from the insured?

25     A.    I don't remember specifics from this date.

1      Q.    Well, do you recall generally that when

2   you all came out to inspect conditions at the hotel,

3   did the insured restrict your ability to examine those

4   areas of the hotel that you had agreed upon?

5      A.    We were able to inspect the 7th floor when

6   they told us we could come inspect the 7th floor.

7      Q.    Is that true of the other floors?

8      A.    I would say yes.

9      Q.    Do you recall a time when there was a

10  request that the process of remediation or renovation

11  ongoing at the hotel be halted to allow your

12  consultants to come out and inspect conditions at the

13  hotel?

14         MR. CHIN:  Objection to form.

15         THE WITNESS:  I don't remember that.

16  BY MR. HASSON:

17     Q.    And I'm not trying to trick you.  If

18  you'll take a look at the second page of this e-mail,

19  the one marked as 16694, in the second paragraph of a

20  message that it appears you sent to Mr. Steinbrecher,

21  part of what you asked is "We ask that you hold all

22  remediation until we can arrive at the site on Monday

23  morning."

24     A.    That's what that looks like.

25     Q.    Do you have any recollection of what was

1   going on here?

2       A.   No.  It looks like it was an e-mail on

3   Friday evening, and then we were going to be there on

4   Monday morning.

5       Q.   Were there times when the process of

6   remediation and renovation at the hotel were halted

7   for any length of time, that you recall?

8           MR. CHIN:  Objection to form.

9           THE WITNESS:  I don't recall.

10  BY MR. HASSON:

11      Q    And then attached to this e-mail chain is

12  an e-mail from Tracy Dodd of US Helm to you that

13  appears to identify some places on the 7th floor where

14  he's concerned about more drywall being removed than

15  necessary.  Is that a fair characterization?

16          MR. CHIN:  Object to form.

17          THE WITNESS:  The e-mail says, "Please see

18      below the list of rooms where US Helm is

19      requesting clarification from the insured and/or

20      their consultant regarding the reasons/rationale

21      as to why walls are being removed when limited

22      fungal growth is present or fungal growth is

23      absent on these walls."

24  BY MR. HASSON:

25      Q.   Did this lead to the meeting at the hotel

1 that we discussed earlier where Liberty and your

2 consultants were talking about scope of work or

3 protocol for removal of drywall?

4    A.   I don't remember what led to that.

5    Q.   I'll show you what's been marked as

6 Exhibit 293.  Is this a letter you wrote to Frank Lin

7 in March of 2016?

8    A.   That's what it looks like.

9              (Exhibit 293 was

10              marked/identified.)

11 BY MR. HASSON:

12    Q.   In the RE: line it says, "Crestline Hotels

13 & Resorts, LLC, additional named insured, Sky Harbor

14 Atlanta Northeast LLC."  Do you see that?

15    A.   I see that.

16    Q.   Earlier we had a discussion about the

17 significance of the term "additional named insured,"

18 right?

19    A.   We did.

20    Q.   And you talked about there being a

21 distinction in your mind between an additional insured

22 and an additional named insured?

23    A.   Yes.

24    Q.   Here you are specifically referring to Sky

25 Harbor Atlanta Northeast as an additional named

1   insured, right?

2        A.   That's what's in this letter, yes.

3        Q.   Do you have any recollection as to what

4   caused you to conclude that Sky Harbor Atlanta

5   Northeast was an additional named insured under the

6   policy?

7            MR. CHIN:  Object to form.

8            THE WITNESS:  I don't recall specifically

9         what made me change that RE: line there at the

10        top of the letter.

11  BY MR. HASSON:

12       Q.   At the time you wrote this letter, did you

13  think that Sky Harbor Atlanta Northeast was an

14  additional named insured under the policy?

15       A.   I don't know.

16       Q.   Can you think of a reason why you would

17  have referred to them as an additional named insured

18  if you didn't believe that they were?

19       A.   I think I had gotten correspondence -- I

20  got the Proof of Loss from them.  I think I had gotten

21  correspondence from other people, from Ray, stating

22  they were an insured under the policy, and I think

23  that the addition of that line item identifying Sky

24  Harbor was there.

25            Because I think until this point, my

1  letters had been addressed to Crestline.  I think this

2  is the first letter I've written to Sky Harbor

3  directly.

4      Q.    In this letter I don't see anything about

5  you raising a concern that Marsh had not been

6  authorized to issue a Certificate of Insurance naming

7  Sky Harbor as an additional named insured, do you?

8      A.    I don't see that in this letter.

9      Q.    The second paragraph, "This will

10  acknowledge receipt of your March 11, 2016 Proof of

11  Loss.  This also confirms our original acknowledgment

12  in our letter dated February 26 of another Proof of

13  Loss that Stacey Adair at Crestline provided by e-mail

14  on February 11, 2016."  Do you see that?

15      A.    I see that.

16      Q.    In the policy, is there a deadline for

17  submission of what is referred to as a Proof of Loss?

18      A.    I think so.

19      Q.    Do you know whether the Proofs of Loss

20  submitted by Sky Harbor and Crestline were timely?

21          MR. CHIN:  Object to form.

22          THE WITNESS:  I think that the deadline

23      had been extended.  It might've been extended

24      more than once.  I don't remember when the

25      extensions were or for how long.  I don't

1    remember.

2  BY MR. HASSON:

3    Q.   When you made your decision to deny

4  coverage in this case, you didn't make that decision

5  based on the insured having not submitted a Proof of

6  Loss in a timely manner, did you?

7    A.   No.  Our coverage determination did not

8  have to do with when either of the Proofs of Loss were

9  submitted.

10    Q.   And, similarly, your coverage decision was

11  not based on some inadequacy, technical inadequacy in

12  the Proof of Loss itself, was it?

13        MR. CHIN:  Objection to form.

14        THE WITNESS:  No.  No.  Our coverage

15     determination was not.

16  BY MR. HASSON:

17    Q.   All right.  Second paragraph.

18    A.   No.  Wait.  I'm going to change that

19  answer.  I'm going to say yes, there is an inadequacy

20  in the proofs.  The proofs are required to state the

21  time and date of the loss and describe the damages,

22  and neither of the proofs provided a time and date of

23  loss.

24    Q.   Okay.  Is that the only technical

25  deficiency that you believe contributed to your

1    decision to deny coverage?

2            MR. CHIN:  Objection to form.

3            THE WITNESS:  Again, I don't think we

4        denied it from technical reasons on these

5        proofs.

6    BY MR. HASSON:

7        Q.    Okay.  So I just want to make sure you and

8    I understand each other.  You think there is a

9    deficiency in the proof because you believe that the

10   insureds did not identify the exact date and time of

11   the loss, but your decision to deny coverage was not

12   based on that?

13           MR. CHIN:  Objection to form.

14           THE WITNESS:  Our coverage decision was

15        not based solely on the Proofs of Loss.

16   BY MR. HASSON:

17       Q.    All right.  Same paragraph in this letter

18   of March 30th to Frank Lin.  "Since both entities have

19   submitted a separate and distinct Proof of Loss and

20   both Proofs of Loss refer to the same or similar

21   insured property, we will need both claiming entities

22   to identify the property damage or business

23   interruption claimed, and what insurable interest each

24   party asserts."

25           At some point, did you come to understand

1  that Crestline and Sky Harbor were not seeking two

2  separate recoveries, but were seeking a single

3  recovery for the same loss, and that they were going

4  to divvy up the payment between the two of them?

5          MR. CHIN:  Objection to form.

6          THE WITNESS:  I believe I received a

7      letter signed by parties from both Crestline and

8      Sky Harbor stating they were making a single

9      claim.  Sky Harbor would be making the claim.  I

10      don't think the letter spoke at all about

11      divvying up the proceeds or anything like that.

12  BY MR. HASSON:

13      Q.   The point is this:  You didn't think that

14  Sky Harbor was trying to recover money, and Crestline

15  was then trying to recover the same money?

16          MR. CHIN:  Objection to form.

17          THE WITNESS:  I don't know what they were

18      trying to do.  I don't know what they were

19      trying to do.

20  BY MR. HASSON:

21      Q.   At the time you made your coverage

22  determination, did you believe that Sky Harbor and

23  Crestline were attempting to obtain a double recovery

24  for the same loss?

25          MR. CHIN:  Objection to form.

1       THE WITNESS:  At that time I denied the

2    loss, I do not think they were trying to make a

3    double claim for the loss.

4  BY MR. HASSON:

5       Q.   On the second page of this letter, Bates

6  No. Plaintiffs 025882, the first full paragraph, at

7  the end of that paragraph you wrote that you are

8  "requesting an extension of time to respond to your

9  Proof of Loss to May 14th, 2016."

10      A.   I see that.

11      Q.   Why were you requesting an extension of

12   time to respond to the Proof of Loss?

13      A.   I don't remember.  I'm assuming we needed

14   more time, but I don't remember specifically.

15      Q.   Did you make a series of requests for

16   information from Sky Harbor and Crestline during the

17   claims process?

18      A.   I made multiple requests for information

19   to Crestline.  I don't know if I made specific

20   requests to Sky Harbor.  I believe that I did, but I

21   don't know.

22      Q.   Well, that same paragraph, the second

23   sentence, "We hereby request that you provide, before

24   April 14th, 2016, a full and complete response to both

25   our October 22, 2015, which is attached, and our March

1   4th, 2016 request for information, on which you were

2   copied"?

3        A.   Then, yes, I did request it.

4        Q.   And this is a letter that was written to

5   Sky Harbor, so those requests were made of Sky Harbor,

6   right?

7        A.   They're in this letter.

8        Q.   So did Crestline and Sky Harbor produced

9   to you a substantial volume of written materials?

10            MR. CHIN:  Objection to form.

11            THE WITNESS:  We got some, but not all of

12        the information that we requested.

13   BY MR. HASSON:

14        Q.   How many pages of materials --

15        A.   I don't know the exact --

16        Q.   -- do you think they delivered to you?

17        A.   I don't know the number of pages.

18        Q.   Was it a lot?

19            MR. CHIN:  Object to form.

20            THE WITNESS:  I think we requested

21        information they had, they knew that they had,

22        and they didn't send it to us.

23   BY MR. HASSON:

24        Q.   What is the basis of that belief?

25        A.   I've become aware of documents that have

1  been obtained during discovery in this process which I

2  believe are material to -- or would have been material

3  to our investigation, that point to questions we were

4  asked and received answers which are not consistent

5  with those documents, and that's what I base that on.

6      Q.   What documents do you believe were

7  intentionally withheld?

8          MR. CHIN:  Objection to form.

9      Mischaracterizing testimony.

10          THE WITNESS:  I don't think I said

11      "intentionally."  I said there were documents

12      that they had that were not sent to us.  I think

13      I may have said that you knew you had, but there

14      are documents that I think you had and did not

15      provide until the discovery process.

16  BY MR. HASSON:

17      Q.   When you say "you," are you talking about

18  me or are you talking about Crestline or are you

19  talking about Sky Harbor or are you talking about all

20  of us?

21      A.   I don't know who was actually in

22  possession of it, and so therefore I can't say you

23  specifically or Ray or Sky Harbor or Crestline.  I

24  don't know specifically for that, but there are

25  documents that I'm aware of.

1      Q.    Can you give me some examples of documents

2   that were not produced to you that are relevant, you

3   believe, to your claims limitation and which you

4   believe Sky Harbor knew that they had?

5           MR. CHIN:  Objection to form.

6           THE WITNESS:  I think there was a mold

7        test that was done sometime in early 2015.  I

8        don't remember the name of the firm, but that

9        testing and the results would predate the

10        supposed discovery of when the loss was --

11        notice of loss was sent to Affiliated FM.

12   BY MR. HASSON:

13      Q.    To the best of your recollection, when was

14   that mold testing done?

15      A.    I believe it was early 2015, but I don't

16   know the exact date.

17      Q.    Are you familiar with a company called

18   Finite Reimaging?

19      A.    That may be the -- the firm.

20      Q.    Are you familiar with a company that came

21   out in February of 2015 to do some work in two rooms

22   within the hotel?  Does that strike a bell?

23      A.    That does not, no.

24      Q.    No?  Different thing?

25      A.    I'm not --

1          MR. CHIN:  Objection to form.

2          THE WITNESS:  I'm not sure what you're

3      asking about.

4   BY MR. HASSON:

5      Q     The mold testing, do you have any

6   recollection -- the mold testing that was done in

7   early 2015 that you're talking about, do you have any

8   recollection of when you believe that mold testing was

9   done or what areas of the hotel it was done?

10     A.   I have not reviewed the actual report

11   itself.

12     Q.   But you believe this was a report that was

13   produced in this litigation?

14     A.   Yes.

15     Q.   Do you believe it to have been produced by

16   Sky Harbor or by Crestline?

17     A.   I don't know who produced it.

18     Q.   Have you yourself seen documents produced

19   in this litigation which you believe Crestline and Sky

20   Harbor had which you believe were material to your

21   claims investigation and which you believe were

22   withheld?

23         MR. CHIN:  Object to form.

24         THE WITNESS:  I don't know.  I think there

25      were documents that were not produced until we

JOEL BROWN                                    March 29, 2019
SKY HARBOR vs AFFILIATED FM INSURANCE                    178

1      did Examinations Under Oath, which I believe

2      were done in late 2016, and I think those were

3      material to Requests for Information that we had

4      made as early as that October 2015 letter.

5   BY MR. HASSON:

6      Q.   Do you believe that there's a limit on

7   what an insured is obligated to provide to an

8   insurance company in response for Requests for

9   Information?

10          MR. CHIN:  Object to form.

11          THE WITNESS:  I don't know the answer to

12      that question.

13   BY MR. HASSON:

14      Q.   Have you looked at the policy to make any

15   evaluation of what you think the insured's obligations

16   are in terms of responding to document requests?

17      A.   I don't know.

18      Q.   Did you personally go over the information

19   that was provided by Crestline and Sky Harbor in

20   response to your requests during the claims

21   investigation process?

22          MR. CHIN:  Object to form.

23          THE WITNESS:  Can you say that one more

24      time?

25   BY MR. HASSON:

1      Q.    Did you personally go through the

2   materials that were produced to you by Sky Harbor and

3   Crestline in response to your request for information?

4      A.    Yes.

5      Q.    How long did it take?

6      A.    I -- a long time.  I don't know exactly.

7      Q.    Days?

8      A.    Yes, more than days.

9      Q.    Weeks?

10      A.    I don't know exactly.  I had to spend a

11   large portion of my time working on this loss.

12            MR. CHIN:  Can we take a quick break?

13            MR. HASSON:  Yes.

14            (Off the record at 4:56 p.m.)

15               --------------

16            (On the record at 5:03 p.m.)

17   BY MR. HASSON:

18      Q.    I'll show you what's been marked as

19   Exhibit 294.  If you'll take a look at that.

20      A.    (Reviews document.)  Okay.

21                  (Exhibit 294 was

22                  marked/identified.)

23   BY MR. HASSON:

24      Q.    So this is a letter you wrote to Ray

25   Steinbrecher on May 13th of 2016, right?

1    A.   Yes.

2    Q.   And, again, in the RE: line we've got a

3  reference to an additional named insured, Sky Harbor

4  Atlanta Northeast, LLC, right?

5    A.   Yes.

6    Q.   And we discussed earlier that you had put

7  that reference on a prior letter.  Do you have any

8  understanding as to where you got the information or

9  what led you to that conclusion that Sky Harbor

10 Atlanta Northeast was an additional named insured?

11       MR. CHIN:  Objection to form.

12       THE WITNESS:  I think I copied and pasted

13       that RE: line from another letter, and I don't

14       know where I copied it -- or where I copied it

15       from, or could have copied it from.  I don't

16       know.  And, again, I don't know I -- if that was

17       anything other than taking it from another

18       letter.

19 BY MR. HASSON:

20    Q    So sitting here today, you don't recall

21 anything happening between that prior letter and this

22 one that would have caused you to conclude that Sky

23 Harbor Atlanta Northeast was an additional named

24 insured under the policy?

25       MR. CHIN:  Objection to form.

1          THE WITNESS:  I don't know.  I know there

2      were questions about whether or not they were

3      properly added as an additional named insured.

4      I know there were discussions about it.  I don't

5      remember the timing of that in reference to when

6      these letters occurred.

7   BY MR. HASSON:

8      Q.   Is it possible that the discussions about

9   whether they were an additional named insured occurred

10  after this letter was written?

11     A.   I don't know.

12     Q.   Do you see anything in this letter that

13  you wrote to Sky Harbor to put them on notice that,

14  "Hey, Marsh did not have authority to issue an Accord

15  form naming you as an additional named insured" or

16  anything to that effect?

17     A.   I don't think that's in this letter.

18     Q.   The discussions that you recall having

19  about whether Marsh had that authority and whether Sky

20  Harbor was, in fact, an additional named insured, who

21  were those discussions with?

22     A.   I don't remember.

23     Q.   In the fourth paragraph you wrote,

24  "Additionally, the scope described in the Liberty

25  Report is based on their initial evaluation of the

1   upper Floors 8, 9 and 10 with the assumption that the

2   claimed mold and water damage would be the same on the

3   lower floors.  The Preferred Environmental Solutions

4   report shows that the extent of drywall removal

5   required was less than that described in the Liberty

6   Report.  In our joint inspections of Floors 5, 6 and

7   7, the extent of water and mold damage found was less

8   than that found on the upper floors, and also less

9   than that indicated in the Liberty Report."

10          Do you see that?

11     A.   I see that.

12     Q.   As the claims investigation progressed and

13  you were able to observe conditions upon the lower

14  floors, would you agree with me that you did continue

15  to see water and mold damage on those lower floors?

16     A.   Water and mold damage was observed on the

17  lower floors, yes.

18     Q.   Your point here is that on the lower

19  floors it appears to be less than what was documented

20  on the upper floors?

21          MR. CHIN:  Objection to form.

22          THE WITNESS:  The damage observed and the

23      damage supported by the Preferred Environmental

24      Solutions was a smaller scope that that included

25      in the Proofs of Loss submitted previously,

1      which were based on the Liberty Report.

2   BY MR. HASSON:

3      Q.   But the Preferred Environmental Solutions

4   documentation was submitted with the Proof of Loss,

5   right?

6          MR. CHIN:  Objection to form.

7          THE WITNESS:  I don't remember exactly

8      which document was submitted with the Proof of

9      Loss.  I really don't remember what

10      documentation was submitted with the Proof of

11      the Loss.

12   BY MR. HASSON:

13      Q     Did you or, to the best of your knowledge,

14   anyone with AFM attempt to quantify the amount of

15   damage observed on the lower floors?

16          MR. CHIN:  Objection to form.

17          THE WITNESS:  Yes.  We worked with our

18      consultants at US Helm and JS Held to develop a

19      reasonable cost to -- for the scope and the

20      repair cost for the areas observed that had

21      mold, that were moldy.

22   BY MR. HASSON:

23      Q.   Do you know if that was produced to

24   Crestline and Sky Harbor during the claims

25   investigation?

1       A.   I don't believe that was produced to

2   Crestline and Sky Harbor.

3       Q.   Did the mold and water damage observed on

4   the lower floors appear to have -- I understand you're

5   not an expert -- appear to have originated from

6   different sources than the mold and water damage

7   observed on the upper floor?

8          MR. CHIN:  Objection to form.

9          THE WITNESS:  The sources of water, there

10          were many sources observed, potential sources,

11          and I think the sources on the lower floors

12          would not have necessarily have been the same

13          sources that -- for the water that was observed

14          on the upper floors.

15   BY MR. HASSON:

16       Q.   What is the basis for that statement?

17       A.   At least one of the sources identified was

18   oversplash in a bathroom.  Oversplash in a bathroom on

19   the 10th floor did not cause water damage in a

20   bathroom on the 7th floor.  There was oversplash

21   there.  Those would've been distinct and independent

22   oversplash.  And oversplash by itself would not

23   necessarily be a discrete event.  It would've been

24   oversplash that occurred multiple times.

25       Q.   Would another example be that there might

1  have been pinhole leaks in pipes on the 10th floor

2  that might have caused damage to an area within the

3  hotel that wouldn't necessarily have shown up on the

4  2nd floor?

5         MR. CHIN:  Objection to form.

6         THE WITNESS:  It's possible.

7  BY MR. HASSON:

8      Q.   On the lower floors, did you continue to

9  observed mold on what has been referred to by some of

10  the witnesses "as demising walls between the rooms"?

11     A.   Yes.

12     Q.   Did you continue to observe mold -- what

13  appeared to be mold and water damage to the exterior

14  walls?

15     A.   Yes.

16     Q.   Did you continue to observe water damages

17  in some of the bathrooms on the lower floors?

18     A.   Yes.

19     Q.   Attached to this letter is, at Plaintiffs'

20  025871, what appears to be a screenshot or an index of

21  documents that were shared with you via Dropbox; is

22  that right?

23     A.   That's what my letter says, and that's

24  what it looks like.

25     Q.   Are these documents that were shared by

1  you via Dropbox in response to requests for

2  information that you had made of either Sky Harbor or

3  Crestline or both?

4      A.   These are not documents that I shared.

5  These are documents that were shared with me.

6      Q.   By either Sky Harbor or Crestline?

7      A.   Yes.

8      Q.   And they were shared with you in response

9  to your requests for information?

10      A.   I would assume that's why they were

11  shared.

12      Q.   Were these documents responsive to the

13  requests that you had made?

14          MR. CHIN:  Objection to form.

15          THE WITNESS:  I believe they responded to

16      some of our requests.  I don't think they

17      responded to all of our requests.  And I think

18      some of the responses were not complete.

19  BY MR. HASSON:

20      Q   Okay.

21      A.   I think the following --

22      Q.   I guess I was asking --

23      A.   -- spreadsheet --

24      Q.   -- a little bit -- a little bit different

25  question.

1    A.   Then I don't know what you're asking me.

2    Q.   This information that's on this

3 spreadsheet, or on this page right here, 025871, this

4 may not have been everything that you asked for,

5 right?

6    A.   This is not everything I asked for.

7    Q.   But all the information that was provided

8 here was responsive to your requests, was it not?

9         MR. CHIN:  Objection to form.

10        THE WITNESS:  I don't remember.

11        MR. CHIN:  And let the record reflect that

12    02571 is not information.  It is a screenshot of

13    PDF file names.

14        THE WITNESS:  I don't remember what

15    information was provided in these documents, in

16    these PDFs here.  I don't remember.

17 BY MR. HASSON:

18    Q.   Did you go through these documents

19 yourself?

20    A.   I looked at these documents, yes.

21    Q.   And was there a bunch of stuff in these

22 PDFs that was unrelated to your claims investigation?

23        MR. CHIN:  Objection to form.

24        THE WITNESS:  Some of the information

25    there was not related to the claims

1    investigation.

2  BY MR. HASSON:

3    Q.   Can you give me an example of something in

4  there that was not related to the claims

5  investigation?

6    A.   I believe some of these files are meeting

7  notes.  I think it's OAC or DAC.  I can't really read

8  the font.  It's all kind of blurry, "meeting," and it

9  has a Hilton and it has a date and there's a whole

10  bunch of those.

11    Q.   Right.

12    A.   I think those are meeting notes on the

13  renovations, and they're just what's going on with the

14  renovation.  Some of that stuff had information that

15  referred to what was going on with the mold

16  discovered; some of it was just, "Hey, we've got a

17  construction project going on."

18    Q.   In the requests for information that you

19  had made of Crestline and Sky Harbor, had you asked

20  for meeting notes related to the renovation project?

21    A.   We did.

22    Q.   In other words, Crestline and Sky Harbor

23  didn't produce a bunch of information that was not

24  responsive to your requests, did they?

25         MR. CHIN:  Objection to form.

1          THE WITNESS:  I don't think they gave me

2     irrelevant -- well, I don't know.  I think it

3     goes back to the question I was asked before;

4     that they responded, they gave us some

5     information, some of our requests we didn't get

6     informa- -- responses to, and some of the

7     responses we got were not complete responses.  I

8     think that's -- I don't know how else to say it

9     better than that.

10   BY MR. HASSON:

11       Q.    Sometimes in litigation a tactic that

12   lawyers will employ is to respond to requests for

13   information by submitting huge volumes of

14   totally-irrelevant documents.  Do you believe that

15   Crestline or Sky Harbor submitted large volumes of

16   totally irrelevant documents to you to waste your

17   time?

18          MR. CHIN:  Objection to form.  Premise,

19     foundation, relevance.

20          THE WITNESS:  We weren't in litigation at

21     this point.  At this point we're still friendly

22     to each other, trying to get -- find out what

23     happened, determine, "Hey, what are these

24     discrete events?" and trying to get those

25     questions answered.

1          And I feel like we asked these questions

2      starting back in the initial site visit, we

3      asked if they had information in the written

4      confirmation there that month after that first

5      site visit, and this is in May of 2016 where it

6      seems like I'm finally starting to get some

7      responses to information we requested a long

8      time ago.

9          So, yes, you gave us some information, you

10      didn't answer all of our questions, or respond

11      to all of our requests for information, and some

12      of the information received was not a complete

13      answer.

14          I don't think you sent me the Dallas phone

15      book in here anywhere, but I don't remember

16      exactly all that -- I remember looking through

17      and getting headaches, but I don't remember

18      beyond that.

19  BY MR. HASSON:

20      Q.    In this same letter 294 from May of 2016,

21  on the second page, second paragraph, you are

22  requesting an extension of time to respond to Proof of

23  Loss.

24      A.    Yes.

25      Q.    And one of the reasons you are requesting

1   an extension of time to respond to the Proof of Loss

2   is because joint inspections to confirm the actual

3   scope of damages to Floors 2, 3 and 4 has not been

4   completed, right?

5       A.   Yeah.  I think the reason we're asking for

6   an extension is that I don't think the proofs by

7   themselves fully responded to the questions we needed

8   to answer to determine the coverage, and that we were

9   still doing our investigation.

10          And as part of that investigation, we're

11  still doing our inspections, we note here.  And then

12  we get receipt of all the Requests for Information.

13          And then once we have those things, we

14  want time to review it, so we're asking for 30 days

15  after those things have been completed.

16          So I think that's what we're asking for.

17  "Hey, we've got questions that we need to answer.

18  Once we have the information to be able to answer

19  those questions, we want to be able to review it, and

20  then we can respond to that," and that's all that's

21  going on there.

22      Q.   Do you recall at this time what questions

23  you still needed to answer in order to make a coverage

24  determination?

25      A.   I think it's the same question we've been

1   trying to answer the whole time:  What is the discrete

2   event of physical loss or damage that resulted in this

3   mold that we're finding?  I think that's all we've

4   ever tried to be doing on this loss.

5       Q.   And were you continuing to inspect floors

6   as they were partially demolished to be renovated?

7       A.   Yes.  I think we looked at -- yes.

8       Q.   Was AFM's plan at this point to complete

9   its inspections of all floors before making a coverage

10  determination?

11           MR. CHIN:  Objection to form.

12           THE WITNESS:  I don't think we had a plan.

13       In fact, I think we actually sent the denial

14       letter before we had completed the inspections

15       of all the floors, and that we inspected floors

16       after our denial letter had been sent.  I'm not

17       positive on that, but I think that's what

18       happened.

19  BY MR. HASSON:

20       Q.   I'll hand you what's been marked as

21  Exhibit 295, and this is a letter that you wrote to

22  Mr. Steinbrecher on May 20th of 2016, right?

23       A.   Yes.

24               (Exhibit 295 was

25               marked/identified.)

1  BY MR. HASSON:

2      Q.   And, again, in the RE: line there's a

3  reference to additional named insured, Sky Harbor

4  Atlanta Northeast, right?

5      A.   Yes.  Again, I think I copied that from

6  another letter.  I don't know where it came from.  I

7  think I type out the additional named insured again.

8      Q.   In the letter you informed Mr. Steinberger

9  that you are rejecting and returning the Proof of Loss

10  submitted by Sky Harbor, right?

11     A.   I put that in there, yes.

12     Q.   Are you aware of a provision within the

13  policy that gives an insurance company the option to

14  reject and return a Proof of Loss?

15         MR. CHIN:  Objection to form.

16         THE WITNESS:  I'm not familiar enough with

17     the Proof of Loss provisions within the policy

18     to speak on that without looking at the

19     policies.

20  BY MR. HASSON:

21     Q.   When you wrote this letter, did you go

22  consult the policy to determine whether there was an

23  option within the policy for rejecting and returning a

24  Proof of Loss?

25         MR. CHIN:  Objection to form.

1          THE WITNESS:  The reason that proof was

2     rejected and returned was that we still had not

3     determined that there was coverage for the loss.

4          MR. HASSON:  I'm going to object to that

5     response as nonresponsive.

6   BY MR. HASSON:

7     Q.   Did you, when you wrote this letter, go

8   and consult the policy to determine whether AFM had an

9   option to reject and return a Proof of Loss?

10         MR. CHIN:  Object to the form.

11         THE WITNESS:  I don't understand the

12     question.

13   BY MR. HASSON:

14     Q.   When you wrote the letter, did you go read

15   the policy?

16     A.   I had read the policy, yes.

17     Q.   Okay.  Specifically, did you go look in

18   the policy for anything that had to do with an option

19   AFM had to reject and return a Proof of Loss?

20         MR. CHIN:  Object to form.

21         THE WITNESS:  Like I said before, I'm not

22     familiar enough with the policy to tell you what

23     it says about rejecting or what -- anything

24     about the Proof of Loss without looking at the

25     policy.  If you have a copy of the policy you'd

1    like me to look at, I can look at that and

2    answer your question.  But short of that, I

3    don't know.

4  BY MR. HASSON:

5      Q.   Okay.  We could look at the policy today

6  to see if there's language in there that addresses

7  whether you can reject a Proof of Loss.

8      A.   Okay.

9      Q.   I'm trying to get at a different

10  question --

11     A.   That I don't understand.

12     Q.   -- and maybe you and I are talking past

13  each other.

14         What I'm getting at is have you ever

15  rejected a Proof of Loss before?

16     A.   I don't think I've ever rejected a Proof

17  of Loss before, no.

18     Q.   Was this something unusual that you were

19  doing?

20     A.   Yes.  This is not typically how a loss is

21  -- I have had to deal with a loss.  Yes, this is

22  unusual.

23     Q.   Before you wrote a letter rejecting the

24  Proof of Loss --

25     A.   Yes.

1      Q.   -- did you consult the policy to see if

2   there was any language in there that might affect the

3   content of this letter?

4          MR. CHIN:  Objection to form.

5          THE WITNESS:  I don't know.

6   BY MR. HASSON:

7      Q    Do you believe that Crestline and Sky

8   Harbor were obligated to give AFM an extension of time

9   to respond to the Proofs of Loss?

10         MR. CHIN:  Object to form.

11         THE WITNESS:  I'll say yes.

12  BY MR. HASSON:

13     Q.   Why were Crestline and Sky Harbor

14  obligated to give an extension of time to respond to

15  the Proof of Loss at this point?

16     A.   I think the policy requires us to

17  investigate the loss and ascertain whether or not the

18  policy is going to apply.  And short of being able to

19  determine that, I'm unable to accept a proof.

20         A proof is saying, "Hey, these are our

21  damages.  Pay me this money."  I can't pay you money

22  if I don't even know if the policy responds to what

23  you're claiming.  I have to answer the first question

24  before I can really even do the other thing.  The fact

25  that there's a timeline on there doesn't help me

1   answer the first question.

2       Q.   Did you want to complete your inspections

3   of the lower floors before you made a coverage

4   determination?

5       A.   What I wanted to be able to do was to find

6   a discrete event and determine what, if any, covered

7   loss there would be that resulted from that, to

8   measure that, and to move on and go about my day.

9   That's what I wanted to do.

10      Q.   Were you hoping that inspections of the

11  lower floors would reveal such a discrete event?

12      A.   Yeah.

13          MR. CHIN:  Objection to the form of the

14      last question.

15  BY MR. HASSON:

16      Q.   Down in the last paragraph on this first

17  page in the middle there's a reference to "AFM has not

18  been allowed to fully assess any possible damage on

19  these lower floors after the loss was reported."

20      A.   I see that.

21      Q.   Is that a reference to this process of

22  inspecting floors as they were demolished?

23      A.   I believe so, yes.  Yes.

24      Q.   At any point, did you ask Crestline or Sky

25  Harbor to conduct destructive testing on those lower

1   floors so that you could complete your investigation?

2       A.   Yes.  We had a letter earlier we talked

3   about.  That was in there.

4       Q.   Did Crestline or Sky Harbor ever conduct

5   any destructive testing on the lower floors?

6       A.   The destructive testing was done when the

7   renovation occurred.

8       Q.   As the renovation process was ongoing?

9       A.   As the renovation, yeah, exactly.

10      Q.   And I think we talked earlier, I just want

11  to be sure, neither AFM nor its consultants removed

12  any drywall at the hotel, because that would have been

13  destructive testing, and you all don't do that?

14      A.   No.  It may be possible on a floor where

15  demolition was occurring as part of the renovation and

16  a wall that had not yet been removed.  They may have

17  pulled down wallpaper on a wall that was scheduled to

18  be torn down, but there wasn't any rooms where we went

19  into and did any destructive testing and then put it

20  back so it could be put back in service.

21      Q.   So if I understand what you're saying, if

22  there was a floor that was already partially

23  demolished, they might have pulled back some

24  wallpaper, but they wouldn't have removed wallboard?

25      A.   No, I don't think so.

1    Q.   On the second page, second paragraph, you

2    wrote, "Sky Harbor recognizes the actual repair costs

3    will differ from the projected repair costs which are

4    identified on the Proof of Loss, and will neither

5    grant AFM an extension to complete our investigation,

6    nor provide requested information necessary to

7    determine liability under the policy.  Therefore, we

8    have no alternative but to reject and return the Proof

9    of Loss with this letter."

10          Were there reasons for the rejection of

11   the Proof of Loss that are not expressed in this

12   letter?

13    A.   In my mind, the rejection of the Proof of

14   Loss has to do with us paying the demand that's in the

15   Proof of Loss.  The rejection of the proof is not the

16   denial.  Those are separate things, and they're not

17   equal to each other.

18          So I think this is just saying that we

19   can't pay your proof as presented, and I think we list

20   two reasons here in this paragraph.  One is what

21   you've claimed in your proof and what the costs are

22   going to actually be are different, and the other one

23   being is that we still haven't completed our

24   investigation and determined that liability exists.

25          And then your question was, is there other

1   reasons?  I don't know.  But I think those are the --

2   like I said before, this is not a denial.  This is "We

3   can't pay it.  Here's two reasons why we can't pay

4   it."  And there may be other reasons, but still we're

5   not going to be able to pay it at that point in time.

6       Q.   There was a deadline imposed by the policy

7   for AFM to respond to the Proofs of Loss, right?

8           MR. CHIN:  Objection to form.

9           THE WITNESS:  Again, I'm -- I'm not

10          familiar enough with the Proof of Loss

11          provisions in the policy to talk about it

12          without looking at it.

13  BY MR. HASSON:

14      Q.   Okay.  When you said Sky Harbor recognizes

15  the actual repair costs will differ from the projected

16  repair costs, what does that mean?

17      A.   I think you referenced earlier the

18  differences from the Preferred Environmental Solutions

19  costs and the scope and how that differed from the

20  Liberty estimate that was done.  I believe that the

21  proof was based off the estimate that Liberty had

22  provided, and I think this was just a restatement of

23  that same issue, is that there was a difference in the

24  scope.  It's a smaller scope.  It costs less to do a

25  small amount of work than a larger amount of work.

1   That's really what that is pointing to.

2       Q.   Okay.  The Proofs of Loss that were

3   submitted to you containing projected remediation

4   costs that had not -- the work had not yet been done,

5   right?

6       A.   That is -- yes.

7       Q.   And what are actual repair costs?

8       A.   The actual repair costs.

9       Q.   Okay.  So you weren't suggesting, were

10  you, that they needed to complete the entire

11  renovation before you could make a coverage

12  determination, were you?

13      A.   No.

14           MR. CHIN:  Objection to form.

15  BY MR. HASSON:

16      Q.   You weren't suggesting that they needed to

17  complete all of the renovations in order to be able to

18  assess what amount would be paid under the claim, were

19  you?

20      A.   No.

21      Q.   Is this a letter that you wrote to

22  Mr. Adair and Mr. Steinbrecher on June 8th, 2016?

23      A.   Yes.

24                     (Exhibit 296 was

25                     marked/identified.)

1   BY MR. HASSON:

2       Q.   In the second paragraph of this letter

3   there is a reference to Marsh and Affiliated FM having

4   not authorized Marsh to add additional named insureds

5   to the policy by Certificates of Insurance, right?

6       A.   Yes.

7       Q.   Is this the first time, to the best of

8   your recollection, that Affiliated FM raised this

9   issue with Crestline and Sky Harbor?

10           MR. CHIN:  Objection to form.

11           THE WITNESS:  I don't know.

12   BY MR. HASSON:

13      Q.   Sitting here today, do you recall ever

14   telling anyone at Sky Harbor or Crestline that Marsh

15   had not had authority to issue certificates of

16   insurance naming Sky Harbor as an additional named

17   insured before this letter?

18      A.   I don't know.  I don't know.  I don't

19   know.

20      Q.   Sitting here today, do you have any

21   understanding as to why AFM waited from September

22   21st, 2015, to June 8th, 2016, to raise this issue?

23           MR. CHIN:  Objection to form.

24           THE WITNESS:  I don't know why it was that

25       long before it was brought up.

1   BY MR. HASSON:

2        Q.   Do you recall having discussions with

3   anyone at AFM earlier about this issue?

4        A.   Well, I obviously discussed it with

5   somebody before the letter was written.  The issue

6   with the certificates, the Accord forms, and Sky

7   Harbor being listed as an owner, it was an issue, and

8   I brought it up in that letter where I had said this

9   is the policy and these are the payables, but to me,

10  it -- I didn't think it was a significant issue.

11            It was something that was -- this isn't a

12  term we normally use, "I think these people need to be

13  on the check."  That's kind of how -- all the more

14  really thought process had gone into it for me, in

15  telling Crestline, "Hey, these people are going to be

16  on the check."

17       Q.   Had something changed about that by the

18  time you sat down to write this letter?

19       A.   Yes.

20       Q.   What changed?

21       A.   We had received a Proof of Loss from Sky

22  Harbor.  And at some point, I don't remember which

23  letter, but at some point I think there had been the

24  threat of a lawsuit at some point.  I don't remember

25  exactly when that occurred, but at some point in time

1   that did occur.  I think it occurred -- yeah, I don't

2   remember exactly when.  I don't know if it occurred

3   before this letter or not, but --

4       Q.   Why did a submission of a Proof of Loss by

5   Sky Harbor and possibly the threat of a lawsuit cause

6   you to change your thinking about Sky Harbor's status

7   as an additional named insured?

8          MR. CHIN:  Wait a minute.

9   BY MR. HASSON:

10      Q.   And he's probably going to caution you.

11  If the answer involves discussions you had with

12  counsel, just tell me you can't answer the question.

13      A.   The reason it is an issue to me as an

14  adjuster is that there are certain rights and

15  responsibilities that a named insured has under the

16  policy that a loss payee does not have.

17          A loss payee cannot make a claim directly

18  under the policy.  A named insured can do that.

19          The loss payee is included on a check for

20  proceeds for a property which they might have an

21  interest in, for which we have an -- evidence that

22  they have an interest, but they don't -- they can't

23  make a claim directly.

24          And then like I said before, I think there

25  had been -- I don't know if I'd call it a threat of a

1  lawsuit, but mentioned we would end up in court,

2  whatever, but same sort of lines.

3        I think there may have been a bad faith

4  mention in one letter.  I don't remember.  It had been

5  mentioned in letters.  I don't remember the timing

6  from when that occurred, that somebody who's not party

7  to a contract doesn't have standing for bad faith

8  versus somebody who is a named party would have

9  standing for it, I think.

10        So if all I'm trying to determine is

11  should this person be on the check or not on the

12  check, I tell Crestline, "Hey, these people look like

13  they need to be on the check."  Crestline is either

14  going to say, yes, they need to be on the check or no,

15  they don't.  That's a fairly simple issue.

16        Now all the sudden I'm getting a Proof of

17  Loss, I'm getting threats of lawsuits.  It's now an

18  issue that needs to be resolved.

19        And so that's what's occurring here in

20  this letter:  That you've stated you're a named

21  insured; our review of the information says that

22  you're not.  It was based off the Accord form, and the

23  Accord form is provided by Marsh.

24        Marsh incorrectly identified you on there.

25  They can't make you a named insured that way.  It has

1   to be done by endorsement.  And I think this is just

2   to spell that out here in that letter to make that

3   clear, I guess.

4       Q.   Had you in previous claims seen Marsh

5   purport to add people as additional named insureds to

6   a policy without authority?

7       A.   I don't know.

8       Q.   On the third page of the letter that's

9   marked Sky Harbor 082430, the first full paragraph on

10  that page, "The Proof of Loss that Sky Harbor

11  previously submitted to AFM states when the alleged

12  damage was reportedly discovered, and refers to the

13  Liberty Report which describes purported water and

14  mold damage from multiple distinct water sources.  In

15  its Proof of Loss, Sky Harbor claims all of the

16  alleged damages as a single loss, which is not

17  supported by the Liberty Report."

18           What did you mean that "Sky Harbor claims

19  all of its alleged damages as a single loss, which is

20  not supported by the Liberty Report"?

21      A.   I mean what it says there.  The proof

22  claimed damages.  There wasn't any sort of allotment

23  of damages to different sources.  It was a "This is

24  our claim."

25           So I think it's what it says there.  They

1   made all these claims, and saying there was a single

2   loss.  There wasn't any discussion about occurrences

3   or deductibles or anything like that that may or may

4   not apply.

5       Q.   Do insureds often identify deductibles in

6   Proofs of Loss that are submitted to you?

7           MR. CHIN:  Objection to form.

8           THE WITNESS:  I don't know.

9   BY MR. HASSON:

10      Q    When you made reference in this sentence

11  to a single loss, what did you mean by single loss?

12      A.   A discrete event of physical loss or

13  damage.

14      Q.   So as you read the Proof of Loss that was

15  submitted by Sky Harbor, you read that Proof of Loss

16  as purporting to identify all of the damages contained

17  in the proof as resulting from a single discrete event

18  of physical loss or damage?

19          MR. CHIN:  Objection to form.

20          THE WITNESS:  The proof didn't purport to

21      identify any event.  It didn't really state the

22      damages.

23  BY MR. HASSON:

24      Q    What about the Liberty Report that was

25  produced with the proof?  Did it purport to identify

1  any sources of damages?

2      A.   The report --

3          MR. CHIN:  Object to form.

4          THE WITNESS:  -- identified many sources

5      of damage, or of water, is a -- probably a

6      better way to say that.

7  BY MR. HASSON:

8      Q.   On the same page down below you quote from

9  two provisions within the policy, which appear to

10  relate to the insured's duty to provide information in

11  connection with the claims investigation.  Do you see

12  that?

13      A.   Just so -- I'm reading through this.  I

14  think that first paragraph talks about Examinations

15  Under Oath, and "As often as may reasonably be

16  required, shall produce for examination all books of

17  account, bills, invoices and other vouchers, or

18  certified copies thereof if originals be lost."

19      Q.   With respect to the Examinations Under

20  Oath, both Sky Harbor and Crestline submitted to

21  Examinations Under Oath, did they not?

22          MR. CHIN:  Objection to form.

23          THE WITNESS:  Examinations Under Oath were

24      taken for some individuals.  Some from Sky

25      Harbor, some from Crestline.

1   BY MR. HASSON:

2       Q    Are there any witnesses that AFM wanted to

3   take Examinations Under Oath of that weren't provided?

4           MR. CHIN:  Objection to form.

5           THE WITNESS:  I don't remember.  I think

6       we made requests was to people, schedules, and

7       who actually could answer questions.  I don't

8       remember exactly.

9   BY MR. HASSON:

10      Q.   Did you review those Examinations Under

11  Oath?

12      A.   I attended several of them.

13      Q.   In this paragraph when it talks about

14  documents which the insured must share, that includes

15  books of account, bills, invoices and other vouchers,

16  right?

17      A.   Yes.

18      Q.   Does it say anything about producing

19  reports of prior inspections of the hotel?

20          MR. CHIN:  Objection to form.

21          THE WITNESS:  It says what it says.  I

22      don't know.

23  BY MR. HASSON:

24      Q.   I'm not trying to argue with you.  I can

25  read it.

1    A.   Yeah.

2    Q.   My question is, was it your understanding,

3  when you quoted from this provision of the policy,

4  that this policy provision required Crestline and Sky

5  Harbor to share with you any reports they had of

6  conditions at the hotel?

7         MR. CHIN:  Objection to form.

8         THE WITNESS:  I think yes.

9  BY MR. HASSON:

10   Q.   Would you describe a report of conditions

11  within the hotel as a bill?

12   A.   No.

13   Q.   Would you describe a report of conditions

14  within the hotel as an invoice?

15   A.   No.

16   Q.   Would you describe a report of conditions

17  within the hotel as a voucher?

18   A.   No.

19   Q.   Would you describe a report of conditions

20  within the hotel as books of account?

21   A.   No.

22   Q.   And then you have another section that you

23  quote from the policy where you say, "This entire

24  policy shall be void if, whether before or after a

25  loss, the insured has wilfully concealed or

1   misrepresented any material fact or circumstance

2   concerning this insurance or the subject thereof, or

3   the interests of the insured therein, or in case of

4   any fraud or false swearing by the insured relating

5   thereto."

6          Why did you quote that provision from the

7   policy in this letter?

8      A.   I don't remember why I quoted that in this

9   letter.

10     Q.   When you wrote this letter, did you

11  believe that the insured was defrauding you in some

12  way?

13         MR. CHIN:  Object to form.

14         THE WITNESS:  I don't believe when this

15     letter was written that I thought Crestline or

16     Sky Harbor were attempting to defraud AFM.  I do

17     think that they had been less than forthcoming

18     with responses to questions we had.

19  BY MR. HASSON:

20     Q.   In what way?

21     A.   In asking them about the conditions which

22  we discovered during our inspections, which appeared

23  to be conditions which existed over a long period of

24  time, if they had been aware of any of these things

25  that had happened.  And they said, "No, we didn't know

1   about anything until it was discovered in September

2   of 2015 during this renovation."

3          But in online material available, like,

4   from travel sites or whatever, you're seeing things

5   about mold or whatever.  And in some of the

6   information that had been provided at that point, I

7   think with some of the hotel maintenance requests and

8   those items, some of those items specifically discuss

9   mold in bathrooms in some areas.

10          And so this whole concept that they

11   somehow didn't think there was any mold in the

12   building anywhere until this point in time seemed to

13   be incongruous.

14          So I think what we were trying to do was

15   to say, "We're trying to determine an event of

16   physical loss or damage which results in these things.

17   Help us find these things," and all we got was, "Nope,

18   we didn't know anything about anything until this

19   date," and that was kind of -- it was a kind of very

20   standoff approach.  And it was very unusual for

21   somebody to be less than fully cooperative.

22          MR. CHIN:  I'd like to take another break.

23          MR. HASSON:  Yeah, sure.

24          (Off the record at 6:01 p.m.)

25          --------------

1              (Time noted: 6:05 p.m.)

2    BY MR. HASSON:

3        Q.   You aren't suggesting, are you, Mr. Brown,

4    that you believe the folks at Crestline and Sky Harbor

5    were expecting to find all this mold and water damage

6    during the renovation, are you?

7            MR. CHIN:  Objection to form.

8            THE WITNESS:  I'm sorry?

9    BY MR. HASSON:

10       Q    You aren't suggesting that you believe

11   that the folks at Crestline and Sky Harbor were

12   expecting to find all this mold and water damage

13   during the renovation, are you?

14           MR. CHIN:  Objection to form.  What time

15           period are you talking about?

16   BY MR. HASSON:

17       Q.   Sitting here today.

18       A.   Today?

19       Q.   Yes.

20       A.   I think Sky Harbor knew that they bought

21   an older building that had conditions that would

22   create an environment where this mold would exist.  I

23   don't know if they knew how bad or to the extent that

24   it was.

25           I think they knew they had a building that

1  had mold in it, and that they were aware of these

2  conditions that are spelled out in the Liberty Report,

3  that are spelled out in Chris Dawkins' report, and

4  many of which that are spelled out in the reports that

5  they would've gotten during their due diligence when

6  they purchased the building.

7         Now, whether they thought it was going

8  to -- how much it was going to take to fix it, if they

9  knew what that was, I don't know the answer to that,

10 but I think they knew the condition of the building.

11     Q.   Sitting here today, do you believe that

12 the historical documentation about mold and water

13 damage at the hotel means that there was mold in the

14 hotel when Sky Harbor bought it?

15         MR. CHIN:  Objection to form.

16         THE WITNESS:  There are reports in the

17     1990s, 2000's which identify mold in the

18     guestrooms.  We've obviously found mold here in

19     2015 in these guestrooms.  And at no time has

20     anybody said there was ever any remediation

21     done.  Mold doesn't just go away.

22 BY MR. HASSON:

23     Q    No one has ever said remediation was done?

24     A.   If there was mold this date and there's

25 mold that date and no remediation has ever been done,

1   there's been mold in there the entire time.

2       Q.   No.  I'm asking you to confirm.  Your

3   statement is you believe no one has ever said

4   remediation was done?

5       A.   Nobody's ever said remediation was done.

6       Q.   And you believe that the prior owners and

7   managers of the hotel who apparently commissioned

8   these reports allowed those conditions to remain and

9   continue renting guestrooms knowing that there was

10  mold in the hotel?

11          MR. CHIN:  Objection to form.

12          THE WITNESS:  I don't know what somebody

13      -- the prior owner would've done with the

14      building.

15  BY MR. HASSON:

16      Q.   Does that seem commercially reasonable to

17  you that an owner or a manager of a hotel would

18  continue renting rooms knowing they had a widespread

19  mold problem of this level?

20      A.   Do you want me to answer that question?

21          MR. CHIN:  Objection to form.

22  BY MR. HASSON:

23      Q.   Yes.

24      A.   Sky Harbor continued to rent rooms in this

25  hotels when it had widespread mold conditions inside

1  the building.

2      Q.   Did Sky Harbor take steps to make sure

3  that that mold --

4      A.   Wait.  Wait.  You asked me the question.

5  Would someone continue?  And I said, "Yes.  Sky Harbor

6  did."

7      Q.   Did Sky Harbor take steps to only expose

8  vinyl wall coverings and expose the mold as floors

9  were taken out of service?

10         MR. CHIN:  Objection to form.

11         THE WITNESS:  So what's the question

12     again?

13  BY MR. HASSON:

14     Q.   Did Sky Harbor take steps to only pull

15  vinyl wall coverings off the walls as rooms were taken

16  -- as floors were taken out of service?

17     A.   Yes.  They did the remediation during the

18  renovation project, and they limited it to those

19  floors during that renovation time frame.

20     Q.   Did Sky Harbor follow remediation

21  protocols followed by an independent vendor they hired

22  who knows about mold remediation?

23     A.   I assume that they did.

24     Q.   Do you believe that Sky Harbor should have

25  shut the hotel down?

1    A.   No.

2    Q.   Were you involved in the decision to

3  request Examinations Under Oath of certain

4  representatives of Sky Harbor and of Crestline?

5    A.   Yes.

6    Q.   Would you agree with me that only a named

7  insured or additional named insured under a policy has

8  an obligation to submit to an Examination Under Oath?

9        MR. CHIN:  Object to the form.

10        THE WITNESS:  I would agree that the

11     obligations under the policy or contract would

12     be limited to those parties to the contract.

13  BY MR. HASSON:

14    Q    And AFM did decide to take Examinations

15  Under Oath from Sky Harbor representatives, right?

16    A.   We requested Examinations Under Oath of

17  Sky Harbor representatives, and they submitted to

18  Examinations Under Oath.

19    Q.   Okay.  I've just handed you what I've

20  marked as Exhibit 297.  Do you recognize this?

21    A.   It looks like an e-mail from Joe Hunnius

22  to myself.

23              (Exhibit 297 was

24              marked/identified.)

25  BY MR. HASSON:

1    Q.   Who is Joe Hunnius?

2    A.   Joe Hunnius works for Maxim, Driscoll and

3  D'Amico.

4    Q.   And there's an attachment to that e-mail.

5  Do you have any understanding of what this attachment

6  is?

7    A.   I'd have to look at it, other than reading

8  what the labels are, and I'd probably have to ask Joe

9  again for specifics on it.

10   Q.   Well, is this an estimate for business

11  interruption for damages sustained at the Hilton

12  Atlanta Northeast?

13   A.   This is not --

14        MR. CHIN:  Object to form.

15        THE WITNESS:  No, this is not that.

16  BY MR. HASSON:

17   Q.   Well, what is your understanding of

18  Estimated BI Value Per Room/Night?  What does that

19  mean?

20   A.   That it is the Estimated BI Value Per

21  Room/Night.

22   Q.   I understand that.  Does BI stand for

23  Business Interruption?

24   A.   BI, I would assume to be Business

25  Interruption on there, yes.

1    Q.   Okay.  And it refers underneath that to

2  Crestline Hotels & Resorts, Inc., Norcross, Georgia,

3  right?

4    A.   It does.

5    Q.   Does this have to do with the Hilton

6  Atlanta Northeast?

7    A.   It looks like it does, yes.

8    Q.   Is this some attempt to quantify business

9  interruption damages?

10         MR. CHIN:  Object to form.

11         THE WITNESS:  This attachment that I'm

12    looking, this Schedule BI Value Per Room/Night,

13    this doesn't have Bates stamps numbers on it.  I

14    don't know how you want me to refer to it.

15         MR. CHIN:  AFM; is that right?

16         THE WITNESS:  Okay.  Sorry.  388.  This

17    appears to show the revenue expected for a

18    generic room, less direct expenses, so that

19    would be your gross.  And then it has an

20    adjustment there for other non-continuing

21    expenses, and that would be the BI value.  So

22    revenue less saved expenses and non-continuing

23    expenses.

24         That's just a generic -- this is not tied

25    to any sort of time period or number of rooms or

1    anything like that.  This is just kind of an

2    estimate of a -- if a room were not rented for a

3    night that you would have expected it to have

4    been rented, that's what the estimated BI Value

5    would be for that one room.

6  BY MR. HASSON:

7        Q.   Do you have any recollection as to why you

8  asked Mr. Hunnius to do this for you?

9        A.   I think I had done an initial estimate on

10  potential exposure, and I think I asked them to do

11  some additional work to kind of verify my initial

12  estimate on exposure, but I don't remember exactly.

13  I'm assuming that's what was done here, but I don't

14  know.

15        Q.   What do you mean by an "initial estimate

16  on exposure"?

17        A.   That's exactly what it is.  Right after

18  the loss initially, "Get me an estimate for what the

19  exposure might be."

20        Q.   Do you recall what that estimate was?

21        A.   I don't remember off the top of my head.

22        Q.   But that was done shortly after the loss

23  was reported?

24        A.   Yes.

25        Q.   And this is in August of 2016?

1    A.   Yes.

2    Q.   Almost a year later?

3    A.   Yes.

4    Q.   Any recollection as to why you had him do

5   this almost a year later?

6    A.   I think it was to verify some of the

7   assumptions I made early on in my estimate.

8    Q.   Okay.

9        MR. CHIN:  Objection to form on the last

10      question.

11       MR. HASSON:  One of these days, James,

12      you'll have to school me on how to ask questions

13      that you like the form of.

14       MR. CHIN:  What's that?  That what?

15       MR. HASSON:  You'll have to school me on

16      how to ask questions that you like the form of.

17  BY MR. HASSON:

18   Q.   I'll show you what's been marked as

19  Exhibit 298.  Do you recall Tracy Dodd at US Helm

20  asking for permission to do some destructive testing

21  in the Hilton Atlanta Northeast?

22   A.   I do remember her asking, yes.

23              (Exhibit 298 was

24              marked/identified.)

25  BY MR. HASSON:

1     Q.    And she says in her e-mail that that would

2  be very helpful, right?

3     A.    That says -- yes.

4     Q.    Did you give her permission to do any

5  destructive testing in the hotel?

6     A.    I don't think so.  I think we may have

7  asked to be present on a floor for which demolition

8  had been scheduled but had not been completed, and to

9  be able to look at the different layers rather than

10 looking at a room finished and after demolition; that

11 I felt like that was giving us a full idea of where

12 the mold was at in the rooms.

13    Q.    But you never authorized your consultants

14 to remove drywall, right?

15    A.    I don't remember where that final

16 resolution on that came back.

17    Q.    Is it possible that you did authorize your

18 consultants to remove drywall?

19    A.    I think we may have had them do that on a

20 limited number of rooms, but I don't remember if we

21 did or not.

22    Q.    Well, I thought you told me earlier that

23 removal of drywall would be destructive testing and

24 that AFM doesn't do that.

25    A.    I did.

1    Q.   Well, if AFM doesn't do destructive

2  testing, then why would AFM -- why would you at AFM

3  authorize your consultants to remove drywall?

4    A.   The reason we don't do destructive testing

5  is it's not our property.  In this specific case, this

6  was property that was going to be demolished and

7  thrown out and wasn't being repaired.

8         And I think the reason we were trying to

9  do this is that we discovered in our investigation

10  that in previous remodels at this hotel, apparently,

11  rather than removing the drywall and finishes that

12  existed on the room, that a piece of drywall had just

13  been put up over the old finishes on the wall, and

14  then they would paint -- or put wallpaper on that wall

15  on top of it.

16         So you would get the sandwich effect where

17  you would have drywall, wallpaper, drywall, wallpaper,

18  drywall, wallpaper.  And we didn't really have a good

19  idea of how extensive that was or where mold may or

20  may not have been within that series of wall finishes,

21  and I think we were just trying to coordinate being

22  able to observe that as it's coming down during

23  demolition.

24    Q.   So a couple of questions about that.  Had

25  you ever seen that before where a building had

1  multiple levels of dryboard stacked over the top of

2  each other?

3      A.   Yes, I had seen that before.

4      Q.   Do you have any understanding in this

5  hotel why that was done?

6      A.   I don't know specifically why it was done

7  in this hotel.  I have a general idea of why somebody

8  might do it.

9      Q.   Why might someone do that?

10      A.   You can turn your room around a lot

11  faster.

12      Q.   Did Ms. Dodd or any of your consultants go

13  and remove drywall in the hotel, to the best of your

14  recollection?

15      A.   I don't remember if we ended up doing that

16  or if we were just present when it occurred.  I don't

17  remember how that ended up resolved.

18      Q.   Do you recall any significant findings

19  when they went in and removed the layers of drywall in

20  terms of which layers mold might have been present at

21  or anything like that?

22      A.   I don't remember specifically.

23      Q.   You're welcome to review this entire

24  thing.  I think my questions are going to be limited

25  to the first three pages, but you're welcome to review

1   the entire letter.

2        A.   (Reviews document.)

3                     (Exhibit 299 was

4                     marked/identified.)

5   BY MR. HASSON:

6        Q.   Is this the letter in which you explained

7   to Crestline what your coverage decision was and what

8   the basis of that decision was?

9        A.   I'm going to say yes.  Yes.

10        Q.   Are you aware of any significant basis

11   that led to your decision to deny the claim that you

12   did not set out in this letter?

13             MR. CHIN:  Object to form.

14             THE WITNESS:  Can you ask the question

15        again?

16   BY MR. HASSON:

17        Q.   Are you aware of any significant basis for

18   your decision to deny coverage that you chose to not

19   include in this letter?

20             MR. CHIN:  Objection to form.

21             THE WITNESS:  I'm going to say no.

22   BY MR. HASSON:

23        Q.   You didn't intentionally withhold some

24   basis for denial of coverage --

25        A.   At the time this letter was written, I did

1   not withhold a basis for denial.

2       Q.   At the bottom of the first page there's a

3   sentence that begins, "Not only has Crestline failed

4   to identify a specific event during the policy period

5   which resulted in the claimed damage, but most, if not

6   all, of the claimed damages are excluded under the

7   policy, terms and conditions."  Do you see that?

8       A.   I see that.

9       Q.   In your mind when you wrote this letter,

10  what claimed damages were not excluded under the

11  policy terms and conditions?

12          MR. CHIN:  Objection to form.

13          THE WITNESS:  So you're asking why I wrote

14      "most, if not all"?

15  BY MR. HASSON:

16      Q.   Yes.

17      A.   At the time I wrote this letter, I thought

18  that it may have been possible to isolate a bathroom

19  and say that the damages within this bathroom were due

20  to an event of physical loss or damage, but the repair

21  costs for any bathroom did not exceed the deductible.

22  So that's, I think, what my thought process was for

23  why I wrote "most, if not all."

24      Q.   In the Proof of Loss, do you have any

25  recollection of an amount for pinhole leaks in the

1   bathroom being expressed as -- you know, a typical

2   pinhole leak would be around $2000 or something like

3   that?

4       A.   I think there was a reference to a typical

5   pinhole, and I think it was somewhere around $2000.  I

6   don't remember the exact numbers.  I don't remember

7   the categories or names, but there's something like

8   that in there, yes.

9       Q.   Did you interpret that as an indication by

10  the insured that they recognized that the typical

11  pinhole leak was not going to exceed the $25,000

12  deductible in the policy?

13          MR. CHIN:  Object to the form.

14          THE WITNESS:  I don't know what they

15      intended by that.  I could not tell from the

16      proof what they intended by that.

17  BY MR. HASSON:

18      Q.   On the second page of your letter, Sky

19  Harbor 175978, the bottom of that top paragraph you

20  wrote, "However, AFM has not found any fungus, mold or

21  mildew which was the direct result of insured physical

22  loss or damage.  Rather, it appears the fungus, mold

23  or mildew has developed over time and began well

24  before the policy inception."

25      A.   I see that, yes.

1     Q.    What was the basis of your determination

2  that "the fungus, mold or mildew developed over time

3  developed well before the policy inception"?

4     A.    I believe that statement, the basis for

5  that statement were the building condition reports we

6  reviewed that were dated from the late '90s, early

7  2000's.

8     Q.    Aren't you assuming that the mold present

9  as documented in those reports had not been previously

10  remediated?

11     A.    That assumption is being made, yes.

12     Q.    In the next paragraph there's a sentence

13  that reads, "AFM has observed the continuing lack of

14  action in determining and correcting the pre-existing

15  conditions so as to prevent further deterioration to

16  the property."

17     A.    I see that.

18     Q.    What are you referring to there?

19     A.    I think what I'm referring to there is the

20  noted condition of the construction defects on the

21  exterior façade that allows the water to get into the

22  building, and that I think there's been some

23  discussions about some sort of temporary measure,

24  doing some sort of polymer or whatever to the exterior

25  of the building.  I don't believe that was done at

1   this point in time.  And the construction defect

2   itself hadn't been repaired.

3       Q.   So your understanding is that by January

4   26, 2017, work had not been done to seal the exterior

5   façade?

6       A.   I don't believe that it had at that point,

7   but I -- I don't know.  I don't know if it's been done

8   yet.

9       Q.   Was there any other lack of action that

10  you were referring to when you made that statement?

11      A.   I don't remember if I was referring to

12  something else or not.

13      Q.   Were there any other pre-existing

14  conditions which you recall thinking, "Hey, these guys

15  haven't addressed that"?

16      A.   I don't -- I don't know.

17      Q.   If during the course of -- let me ask it a

18  better way.

19          Have you, in the course of a claims

20  investigation, ever encountered a situation where

21  damage was caused by more than one source, and at

22  least one of the sources was excluded under the terms

23  of the policy?

24      A.   Yes.

25      Q.   How do you as an adjuster reconcile

1    situations like that where there are multiple causes

2    for a loss, and at least one of those causes is

3    excluded, but one or more others or not?

4            MR. CHIN:  Objection to form.

5            THE WITNESS:  I think I try to stick to

6        what the words in the policy are.  So what is

7        the direct event?  What is the damage caused by

8        that event?  What would it take to repair that

9        damage?

10           If other damage is at the same time

11       repaired, that happens.  If there's damages

12       outside of that that needs to be repaired at the

13       same time, then no.

14   BY MR. HASSON:

15       Q.   Have you ever encountered a situation

16   where it is impossible to determine how much of the

17   damage was caused by something that's excluded and how

18   much of the damage was caused by causes that are not

19   excluded?

20       A.   I -- I don't know.  I don't know.

21       Q.   Did you consider in this case whether some

22   of the multiple sources of water intrusion were

23   covered under the policy and others were not?

24       A.   I would say yes to that.

25           MR. CHIN:  Object to form.

1          THE WITNESS:  I'm going to say yes to that

2     question.

3 BY MR. HASSON:

4     Q.   How did you, then, make a determination

5 about denying coverage in its entirety, given that

6 there were multiple sources of water intrusion, some

7 of which may have been covered?

8          MR. CHIN:  Objection to form.

9          THE WITNESS:  That -- what I thought about

10    was the bathroom example we talked about

11    previously, is that I don't think I was ever

12    been able to determine in the bathroom, in hotel

13    Room 315, the water damage in this bathroom is

14    due to a pipe leak.  I don't think I ever did

15    that.  But I considered the possibility that

16    that may have occurred.

17       So if that did occur, what would that

18    damage be and what would it take to repair that?

19    And my investigation determined that the cost to

20    repair a bathroom, which may or may not have

21    been an insured event which caused the damage,

22    would have been several thousand dollars.

23       And the per-occurrence deductible is

24    $25,000, so I didn't feel like I was going to

25    have to get a fine-toothed comb to determine

1      exactly what a bathroom repair would cost, in

2      relation to the deductible that would have

3      applied for the occurrence.

4   BY MR. HASSON:

5      Q.   We talked earlier about water penetration

6   through the roof, and Liberty having identified in

7   their report an area of damage in the hotel that they

8   attributed to water penetration through the roof.  Do

9   you recall that?

10     A.   I recall discussing water penetration

11  through the roof.  I don't recall discussing an area

12  damaged by that water penetration.

13     Q.   So you don't recall Liberty ever

14  identifying an area damaged by water penetration

15  through the roof?

16     A.   I don't recall that.

17     Q.   Okay.  And I believe you indicated that

18  you -- Strike that.

19         What is your understanding as to the cause

20  of the water and mold damage on the inside of the

21  demising walls between rooms?

22         MR. CHIN:  Objection to form.

23         THE WITNESS:  One, I don't think there's a

24  single cause to the damage to the demising

25  walls.  I think there's multiple ways that

1  moisture and water are getting in there.

2      I think it's the construction defects.

3  You get wind-driven rain.

4      I think it's the improper weather barrier

5  that allows humid air to get in.

6      There's the condition of the negative air

7  pressure in the building which exacerbates that.

8  I mean, in Atlanta it's a pretty humid

9  environment.

10     So at least those three, and that that's

11  occurring over an extended period of time.

12     That condition of the building defect

13  being a properly-installed weather barrier is

14  not a new thing.  That's -- I think it's been

15  done since the building was first put together,

16  so that's been going on for 30 years now.

17     And the negative air pressure, I don't

18  know exactly when that started, but that is not

19  something that's new.  That's -- the system is

20  not set up correctly to allow enough return air

21  and the supply aren't balanced, so you end up

22  with negative air pressure.

23     So I think that's -- I think that's what's

24  going on there.  You had those multiple things.

25     And that with those conditions, I don't

1     think any of them can be identified as a

2     discrete event.  And anyone that might be able

3     to say, "Hey, this is a discrete event,"

4     there've been multiple discrete events that

5     would fit that bill, some of which would predate

6     when the hotel was purchased by Sky Harbor.

7          So these are not -- I tried my hardest to

8     find some way we would pay for something.  I

9     really could not -- tried to find some of way to

10     get the policy to be able to respond to us.  I

11     wasn't able to do it.

12   BY MR. HASSON:

13     Q.    What is the basis for your belief that the

14   negative pressure created by the HVAC unit had been

15   ongoing prior to the purchase of the hotel by Sky

16   Harbor?

17     A.    I don't know -- I don't know the answer

18   that question.

19     Q.    Okay.

20          MR. HASSON:  Guys, let me review my notes

21     real quick and we may be done.

22          (Off the record at 6:42 p.m.)

23               --------------

24          (On the record at 6:46 p.m.)

25                EXAMINATION

1  BY MR. CHIN:

2      Q.    Mr. Brown, during the investigation and

3  adjustment of this claim, did you receive letters and

4  e-mails from the lawyer sitting across from the table

5  from you, Mr. Ray Steinbrecher?

6      A.    I did.

7      Q.    Who did Mr. Steinberger represent?

8      A.    I think he represented Sky Harbor and

9  Crestline.

10     Q.    When you received letters and e-mails from

11  Mr. Steinbrecher, did they contain subject lines, or

12  RE -- that's R-E colon -- lines, such as the letters

13  that you sent back to him?

14     A.    Yes.

15     Q.    You indicated previously when we were

16  looking at exhibits, such as 295 and 294, that your

17  letters, which had RE: lines, that's R-E colon, or

18  subject lines, would often be cut and pasted from

19  other correspondence.  Do you remember that, sir?

20     A.    Yeah.

21     Q.    Is it possible that you cut and pasted the

22  RE: or subject lines in your correspondence from the

23  correspondence you received from Mr. Steinbrecher?

24     A.    I don't know where I copied and pasted it

25  from.

1    Q.   But is it possible that you cut it and

2   pasted it, then, from letters that you received from

3   Mr. Steinbrecher, if you don't know?

4    A.   Possible.  I don't know.

5        MR. CHIN:  That's all I have.

6        And he's going to read and sign.

7           (Time noted: 6:55 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    DISCLOSURE

 2   STATE OF GEORGIA
     COUNTY OF FULTON
 3

 4   WITNESS: JOEL BROWN

 5        Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
 6   Judicial Council of Georgia, I make the following
     disclosure:
 7
          I am a Georgia Certified Court Reporter.
 8
          I am not disqualified for a relationship of
 9   interest under the provisions of O.C.G.A. 9-11-28(c).

10        I am a representative of Vargas Reporting
     Services, Inc.
11
          Vargas Reporting Services, Inc. was contacted by
12   the offices of  HASSON LAW GROUP, LLP to provide court
     reporting services for this proceeding.
13
          Vargas Reporting Services, Inc. will not be
14   taking this proceeding under any contract that is
     prohibited by Georgia law.
15

16

17

18

19

20        _____

21             Marianne Vargas, CCR, CVR-M
               Certified Court Reporter
22              Certificate Number B-1832

23

24

25
```

1                    C E R T I F I C A T E

2    STATE OF GEORGIA:

3    COUNTY OF FULTON:

4        I hereby certify that the foregoing proceeding

5    was taken down as stated in the caption, and the

6    colloquies and questions and answers were reduced to

7    typewriting under my direction; that the foregoing

8    transcript is a true and correct record of the

9    evidence given upon said hearing.  I further certify

10   that I am not of kin or counsel to the parties in the

11   case, and am not in the regular employ of counsel for

12   any of the said parties, nor am I in any way

13   interested in the outcome of the case.

14       This certification is expressly withdrawn and

15   denied upon the alteration, disassembly, and/or

16   photocopying of the foregoing proceedings, including

17   exhibits, unless such is done by the undersigned

18   certified court reporter and the signature and

19   original seal is attached thereto.

20       This day, April 4, 2019.

21

22

23       _____

24            Marianne Vargas, CCR, CVR-M
             Certified Court Reporter
25              Certificate Number B-1832

1                    ERRATA SHEET

2      I, JOEL BROWN, the witness herein, do hereby
    certify that I have read the transcript of March 29,
3    2019, of my deposition testimony, and the same is true
    and correct, to the best of my knowledge, with the
4    exception of the following changes noted below, if
    any:

5
    Page_____ Line_____ should read:_____
6
    Reason for change:_____
7
    Page_____ Line_____ should read:_____
8
    Reason for change:_____
9
    Page_____ Line_____ should read:_____
10
    Reason for change:_____
11
    Page_____ Line_____ should read:_____
12
    Reason for change:_____
13
    Page_____ Line_____ should read:_____
14
    Reason for change:_____
15
    Page_____ Line_____ should read:_____
16
    Reason for change:_____
17
    Page_____ Line_____ should read:_____
18
    Reason for change:_____
19

20

21            _____
              JOEL BROWN
22
    Sworn to and subscribed before me,
23   the undersigned Notary Public, on
    this _____ day of _____, _____.
24
    _____
25            Notary Public