Exhibit 6

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF GEORGIA

 3

 4   SKY HARBOR ATLANTA
     NORTHEAST, et al.,
 5

              Plaintiffs,        CIVIL ACTION
 6

       vs.                       NO. 1:17-cv-3910-JPB
 7

     AFFILIATED FM INSURANCE
 8   COMPANY,

 9           Defendant.

     _____
10

11                   DEPOSITION OF

12               CHRISTIAN DAWKINS, P.E.

13                  March 13, 2020

14                    9:35 a.m.

15

16                   Zelle, LLP

17          1201 West Peachtree Street, N.W.

18                  Suite 610

19                Atlanta, Georgia

20

21

22   REPORTED BY:

23   LAURA R. SINGLE, CCR-B-1343

24

25
```

Page 1

```
1                    A P P E A R A N C E S
2
3    For the Plaintiffs:
4              MICHAEL A. DAILEY, Esq.
              Anderson Dailey, LLP
5              2002 Summit Boulevard
              Suite 1250
6              Atlanta Georgia  30319
                (404) 442-1800
7                mdailey@andersondailey.com
8
9
10
11
12
13
14   For the Defendant:
15             JONATHAN MACBRIDE, Esq.
              401 Plymouth Road
16             Suite 120
              Plymouth Meeting, Pennsylvania  19462
17               (612) 339-2020
                jmacbride@zelle.com
18
19
20
21
22
23
24
25
                                          Page  2
```

```
 1                    I N D E X

 2

 3   EXAMINATION OF CHRISTIAN DAWKINS, P.E.      PAGE

 4   BY MR. DAILEY.................................  6

 5

 6                   *       *       *

 7

 8   NUMBER              DESCRIPTION            PAGE

 9   For the Plaintiffs:

10   Exhibit 48  *   Liberty Report, 12/22/15      186

11   Exhibit 206 *   Liberty Building Forensics    179
                     Group report, 2/5/16

12

13   Exhibit 300 *   E-mail, 6/16/16 (ES-0015416   272
                     - 0015418)

14

15   Exhibit 534 *   WJE Hilton Atlanta Northeast  181
                     Building Façade and

16                   Mechanical System Condition
                     Survey, Final Report,

17                   11/22/03

18   Exhibit 536     Letter to James V. Chin from   17
                     Christian N. Dawkins, P.E.,

19                   and Wade T. Anderson, P.E.,
                     1/13/20

20

21   Exhibit 537     French Engineering, Inc.,     165
                     Report

22

23   Exhibit 538     Copies of photographs         256
                     (late filed exhibit)

24

25           *   Exhibit marked in prior deposition

                                         Page 3
```

```
 1                     I N D E X
 2
 3   NUMBER              DESCRIPTION              PAGE
 4   For the Plaintiffs:
 5   Exhibit 539    Deposition of Christian        271
                    Dawkins, P.E., 4/11/19
 6
 7   Exhibit 540    Subpoena to Produce            274
                    Documents, Information, or
 8                  Objects or to Permit
                    Inspection of Premises in a
 9                  Civil Action to Chris
                    Dawkins of Engineered
10                  Solutions International, LLC
11   Exhibit 541    Subpoena to Testify at a       281
                    Deposition in a Civil Action
12                  to Chris Dawkins of
                    Engineered Solutions
13                  International, LLC, 3/9/20
14   Exhibit 542    Subpoena to Testify at a       282
                    Deposition in a Civil Action
15                  to Engineered Solutions
                    International, LLC, 3/6/20
16
17   Exhibit 543    Subpoena to Produce            284
                    Documents, Information, or
18                  Objects
                    or to Permit Inspection of
19                  Premises in a Civil Action
                    to Engineered Solutions
20                  International, LLC, 1/14/20
21
22
23
24
25
```

                                            Page  4

```
1              P R O C E E D I N G S
2              (Pursuant to Article 10(B) of the Rules and
3         Regulations of the Georgia Board of Court
4         Reporting, a written disclosure statement was
5         submitted by the court reporter to all counsel
6         present at the proceeding.)
7                        *       *       *
8              MR. DAILEY:  This will be the deposition of
9         Mr. Dawkins, taken by Plaintiff pursuant to its
10        Rule -- excuse me.  This will be taken as a
11        witness identified by the Defendant pursuant to
12        its Rule 26 disclosures in this case and as an
13        expert witness who may testify and speak to
14        various opinions.
15             The deposition is being taken for all
16        purposes permitted by the Federal Rules of Civil
17        Procedure, including cross-examination,
18        discovery, and preservation of testimony and for
19        use at trial.
20             The deposition is being taken by agreement
21        as to the date, place, time of the taking of this
22        deposition, although I'm aware that there have
23        been some subpoenas served and most recently
24        additionally served.  So those obviously note
25        today is by agreement established date and time.
```

                                                     Page 5

```
 1              So, Madam Court Reporter, if you would swear
 2        our witness.
 3              (The witness was sworn.)
 4        MR. MACBRIDE:  I will note for the record
 5        that he's here only in his individual capacity in
 6        response to his individual deposition subpoena.
 7        MR. DAILEY:  Okay.  Thank you for that
 8        report.
 9                    CHRISTIAN DAWKINS, P.E.
10   Having been first duly sworn to state the truth, was
11   examined and testified as follows:
12                    EXAMINATION
13   BY MR. DAILEY:
14        Q.   Is that how you understand matters?
15        A.   Yes; but you are the attorneys and I'm not
16   and so a lot of what you said went right over my
17   head.
18        Q.   All right.  Well, in that connection, let me
19   ask you this.  Are you represented by counsel here
20   today for purposes of your deposition?
21        A.   Yes.
22        Q.   Mr. MacBride and his firm, Zell, LLP, are
23   representing you for purpose of today's deposition,
24   Mr. Dawkins?
25              MR. MACBRIDE:  Yes.
```

Page 6

```
 1                THE WITNESS:  I believe that's my
 2          understanding.
 3     BY MR. DAILEY:
 4          Q.    Thank you.
 5                I believe you've been deposed on at least a
 6     few previous occasions; have you not?
 7          A.    Yes.
 8          Q.    So I'm sure that you're generally familiar
 9     with the process, but it's always helpful to sort of
10     remind ourselves of the rules of the road.
11                I represent the Plaintiff along with other
12     lawyers in this case.  I'm going to be asking you
13     some questions today in particular with respect to
14     the opinions that is reported that you have and will
15     be testifying to at trial as well as any facts that
16     you have identified that support the opinions that
17     you are presenting.
18                I'm going to do my best to ask my questions
19     clearly, but I am certain that there will be moments
20     when I don't.  So if I do that, would you please just
21     let me know you do not understand or my phrasing is
22     confusing to you in some manner; and I'll do my best
23     to either restate or rephrase the question.
24                Is that an agreeable way to proceed?
25          A.    Yes.
```

Page  7

1        Q.    I appreciate that you're responding
2    verbally.  I know our court reporter is also
3    appreciative.  We all have a habit to nod our heads
4    or say uh-huh or uh-uh, but our record will be
5    clearer if we can speak verbally.
6            Also it's difficult for her to get us both
7    down if we happen to be talking simultaneously, so
8    try to await the conclusion of my question before you
9    begin.  And I'm certain Mr. MacBride appreciates that
10   as your attorney.
11           MR. MACBRIDE:  If you don't, I'll be sure to
12       let you know.
13   BY MR. DAILEY:
14       Q.    I'm entitled -- well, before I say that, if
15   you need a break, just let me know.  Certainly if
16   there's a question pending on the table, I would like
17   for that to be responded to.  If I'm in the middle of
18   a topic that seems appropriate to try to close, then
19   I'll do that and then take the break as quickly as
20   possible.  But this is not an endurance test.  We
21   want to provide whatever convenience breaks are
22   necessary.
23           I'm entitled to your best information and
24   your best recollection.  Do you promise to give me
25   that today?

Page 8

1          A.    Yes.

2          Q.    Thank you.

3                So we were mentioning just in the preamble

4     that you have been deposed previously.  How many such

5     times?

6          A.    I don't know exactly, but probably about 50.

7          Q.    You are a veteran.

8                MR. MACBRIDE:  Including once in this case.

9                MR. DAILEY:  I think that's true.  I saw

10         that on the papers that I saw.

11    BY MR. DAILEY:

12         Q.    In all cases among those 50, were you being

13    deposed because litigation was pending between

14    parties?

15         A.    I believe so.

16         Q.    All right.  Obviously, in every case there's

17    a plaintiff and there's a defendant.  Have you

18    typically testified only on behalf of defendants or

19    only on behalf of plaintiffs?

20         A.    I have testified on behalf of both.

21         Q.    Do you have any rough approximation of what

22    the division might be?

23         A.    I don't.

24         Q.    Fair to say you would need to actually go

25    back and pore over 50 file project matters to

Veritext Legal Solutions
866 299-5127

1    actually know that with certainty?

2         A.   Yes.

3         Q.   Is there a greater number of one?  I know

4    you can't be specific, but --

5         A.   It's hard -- I mean, it's hard for me to

6    recollect that exactly.

7         Q.   How about just a range?

8         A.   I mean, probably more defense and less

9    plaintiff but there have been several plaintiff

10   cases.

11        Q.   Are you involved in cases that are pending

12   at the moment other than this one?

13        A.   I have to think.  You know, I don't know.  I

14   almost need to go look at a log or something.

15        Q.   Do you remember the most recent deposition

16   that you had taken?

17        A.   Yes.

18        Q.   When was that?

19        A.   And it's not in the expert log because it

20   was like about two weeks ago.  It was a matter

21   involving some stormwater runoff in a residential

22   community.

23        Q.   And had Engineering Solutions been tasked to

24   make an investigation of that storm runoff problem?

25        A.   That particular job was Beech Consulting.

1        Q.    Beech Consulting?

2        A.    Yes.

3        Q.    And I understand Beech Consulting is a firm

4     that you own individually?

5        A.    It is.

6        Q.    And have worked with it since -- was it

7     2003?

8        A.    Yes.

9        Q.    What is the focus of Beech Consulting's

10    work?

11       A.    Forensic investigations solving problems

12    typically with existing facilities, existing

13    buildings.

14       Q.    And I believe you began your work at

15    Engineering Solutions in 2018; is that right?

16       A.    Yes.

17       Q.    Obviously, you were working with Beech prior

18    to.  Was it a specific discussion point that you

19    would be able to continue your work on behalf of

20    Beech when joining Engineering Solutions?

21       A.    Yes.

22       Q.    And why is it that you wanted to keep Beech

23    Consulting going?

24       A.    It just made business sense.  Wade Anderson

25    works for Beech Consulting and I work for Engineered

Veritext Legal Solutions
866 299-5127

1    Solutions International, his company.  And we work

2    together a lot on matters that involve both

3    companies, and we just have never merged our two

4    companies.

5         Q.   Is there a different industry type of work

6    that you're doing for Beech Consulting as opposed to

7    Engineering Solutions?

8         A.   No.

9         Q.   Does Beech Consulting's work have anything

10   to do with your previous career with the United

11   States Navy?

12        A.   No.

13        Q.   Okay.  So is Beech Consulting ever retained

14   to provide investigative or consulting services of

15   the kind that Engineering Solutions has been retained

16   in this case?  I realize the subject matter may be

17   different; but I'm just asking, do you do that kind

18   of forensic investigation and evaluation through and

19   by Beech Consulting?

20        A.   The same type of work?  Is that what you're

21   asking me?

22        Q.   Yes.

23        A.   Yes.

24        Q.   Okay.  Is there any agreed protocol that you

25   and Mr. Anderson have established to know which way

                                           Page 12

1    you funnel work that you become aware of?

2        A.    In some.   Most of my work with Engineered

3    Solutions International is out of state because

4    Engineered Solutions has more out-of-state licenses.

5    And we obviously, because we have two companies, have

6    confused clients over the years because they go, I

7    thought you were -- so we agreed several years ago

8    that anything that we were doing for FM Global, for

9    instance, or AFM would be through Engineered

10   Solutions International so as not to confuse that

11   client.

12       Q.    And by the same token, Beech Consulting's

13   work will be the main for Georgia-based clients?

14       A.    Correct.

15       Q.    Is there any additional staff at Beech

16   Consulting other than Mr. Anderson?

17       A.    No.

18       Q.    How many projects typically in a year will

19   Beech Consulting be engaged?

20       A.    Probably a hundred or more.   That's another

21   question that's difficult to answer without

22   specifically looking at maybe a jobs list.

23       Q.    Okay.   So it's substantial.

24            If you need support are you able to draw

25   from Engineering Solutions for that?

Veritext Legal Solutions
866 299-5127

1      A.   And it's Engineered Solutions International,

2  but that's okay.

3      Q.   Engineered, I apologize.

4           MR. MACBRIDE:   I think your first question

5           was how many jobs in a year there were for Beech

6           Consulting.

7           MR. DAILEY:   And he said a hundred or more

8           projects.

9           MR. MACBRIDE:   And then you asked him if he

10          could draw the information from Engineered

11          Solutions.

12          MR. DAILEY:   I'll go back to it.

13          MR. MACBRIDE:   Right.

14  BY MR. DAILEY:

15      Q.   In the event Beech Consulting needs staff

16  support, are you able to draw from the staff at

17  Engineered Solutions International?

18      A.   Yes.  You can say ESL if you would like.

19      Q.   I'm going to.

20      A.   Engineered Solutions International, LLC.

21  But the answer is yes to your question.  On occasion

22  Wade will assist me with a Beech Consulting project.

23      Q.   And if that assistance is coming for and

24  from ESL, it will always be from Mr. Anderson?

25      A.   Not necessarily.

                                          Page 14

1      Q.   There could be other staff members of ESL

2  that you can involve in Beech Consulting work?

3      A.   There have been in the past, yes.

4      Q.   Does Beech Consulting -- is it invoiced by

5  ESL for drawing on that staff support?

6      A.   Yes.

7      Q.   Obviously, it pays it in due course?

8      A.   Yes.

9      Q.   By the same token, does ESL ever retain or

10  employ Beech Consulting to assist it in project work?

11      A.   No; and I can explain.  I'm a W-2 employee

12  of ESL, so I would do that -- provide those services

13  as a W-2 employee and keep track of my time, and then

14  we would invoice that work to a client from --

15  directly from ESL based on timesheets.

16      Q.   Are you saying because you are a W-2

17  employee it would not be appropriate for ESL to be

18  using your services from Beech Consulting?

19      A.   Right.  Beech Consulting would not send an

20  invoice to ESL for services that I provide.

21      Q.   You said -- and I guess I'm just trying to

22  make sure that I can apprehend what's the main

23  advantage of this division.  You said it just seemed

24  to make more sense.  Was it because of the historical

25  relationships that you had with clients?

1        A.   No.  It's really more related to the way our

2    ownerships of the two entities are done.

3        Q.   Okay.  So is he -- he's an employee of Beech

4    Consulting, Wade Anderson is.  Is he a part owner?

5        A.   He is not.

6        Q.   He is not.

7             You're an employee at ESL; is that right?

8        A.   Yes.

9        Q.   Are you a part owner?

10       A.   No.

11       Q.   Okay.  You're the 100 percent owner of Beech

12   Consulting?

13       A.   Yes.

14       Q.   And is Mr. Anderson the 100 percent owner of

15   ESL?

16       A.   You need to ask him that.  I believe the

17   answer is yes, but ask him that.

18       Q.   I'll get a chance.  I'll talk to him and ask

19   him.

20            Do you know what the size of the staff is at

21   ESL?

22       A.   Yes.

23       Q.   How many folks?

24       A.   He has an engineering tech working with him

25   and he has an administrative assistant working with

 1    him.

 2         Q.   Who is the engineering tech?

 3         A.   He's just come on board.  For years it was

 4    Della Taylor, and Andrew -- I don't know Andrew's

 5    last name yet.  He's just recently come aboard to

 6    replace Della, and I've not met he or the

 7    administrative assistant yet.

 8         Q.   And you don't know her name?

 9         A.   I believe it's Christine.  I've e-mailed

10    with her once or twice, but I have not met her yet

11    either.  They're both relatively new employees.

12         Q.   Both joined in 2019?

13         A.   I believe 2020.

14         Q.   2020?

15         A.   (Witness nods head affirmatively.)

16         Q.   So the curriculum vitae that was supplied as

17    part of the expert report document with the gracious

18    assistance of Zell's firm.  I'll mark that at some

19    point, but let me just ask some questions before I

20    get into it.

21              MR. MACBRIDE:  I have the color copies of

22         the report.  Do you want to mark -- it's in part

23         of his report.  Do you want to just mark that?

24              MR. DAILEY:  That makes sense.

25              (Exhibit 536 was marked for

Veritext Legal Solutions
866 299-5127

1          identification, attached at the end of

2          the original transcript.)

3    BY MR. DAILEY:

4          Q.    So, Mr. Dawkins, I'm showing you what's

5    marked as 536.

6          A.    Okay.

7          Q.    This is the Engineered Solutions, ESL,

8    report identified as an expert report from you and

9    Mr. Anderson dated January 13, 2020; is that right?

10         A.    Yes.

11         Q.    And there's a cover letter and report

12   document, I think, dated -- that's addressed to James

13   Chin, an attorney at law at Zell, LLP; is that right?

14         A.    Yes, sir.

15         Q.    We'll come back to that and ask some more

16   questions about its substance, but I know that

17   attached to it is the curriculum vitae for both you

18   and Mr. Anderson; is that right?

19         A.    Yes, I believe so.  It's pretty far at the

20   back, yes.  I got it.

21         Q.    So as I read it, it references your 37 years

22   of experience in building construction systems and

23   civil engineering disciplines.  It recites that you

24   have a strong background in building systems forensic

25   investigations, building and site systems

                                              Page 18

1    construction and facilities, and utilities assessment

2    master planning.  Is that all correct?

3         A.   Yes.

4         Q.   So as to the first of those three sort of

5    general categories, building systems forensics

6    investigations would be using your professional skill

7    and experience to investigate a problem and attempt

8    to identify contributing causes or issues?

9         A.   Right; or sometimes solutions.

10        Q.   And solutions perhaps?

11        A.   Yes.

12        Q.   Building and site systems construction and

13   facilities, is that when you are rendering consulting

14   advice to contractors or builders?

15        A.   Or owners that have a property being

16   constructed or being renovated.

17        Q.   And then utilities assessment master

18   planning, what does that entail?

19        A.   That would be more within the facility site,

20   you know, water, sewer, stormwater drainage, all the

21   systems that are around a building or that feed into

22   the building.

23        Q.   It says master planning along with that

24   utilities assessment.  As I read it as a layperson, I

25   would divine that perhaps you're actually creating

Page 19

1    master planning drawings and specifications?

2          A.    In past, yes.  Not now but presently, you

3    know, we'll help a client with maybe more than one

4    building on a larger site and help them figure out

5    where to put things or assess things.  Infrastructure

6    is a better word than things.  Infrastructure within

7    that property.

8          Q.    I see.

9                Then it goes on to state that you've also

10   practiced in urban areas site civil engineering

11   design.  I sort of understand that, but can you

12   elaborate what that is referring to?

13         A.    That is more of roadway utility systems that

14   are outside of buildings; parking areas, streets --

15         Q.    All right.

16         A.    -- utilities that are away from a building.

17         Q.    Parks, street scape master planning and

18   design, that seems to be self-evident.  Have you

19   worked with cities and counties on park design and

20   construction?

21         A.    Yes.

22         Q.    How many such projects?

23         A.    Oh, gosh, that goes back a ways.  If you go

24   to page 2, you can see some -- where that is.  That

25   goes back to before 2003, although I've helped a few

Page 20

1    clients with facilities assessment inside a larger

2    development.

3         Q.   Now, are you typically -- in connection with

4    parks and street scape master planning, are you

5    working with the governmental units or are you

6    working with retained or hired contractors who are

7    building for those units?

8         A.   Typically, working for the governments there

9    but that goes back a ways.

10        Q.   Meaning you were doing that in greater

11   volume at an earlier time?

12        A.   I did that -- I did more of that work up

13   until 2003 and then transitioned to more solely

14   focused on building forensics.

15        Q.   Construction phase management of new

16   buildings construction or renovation projects seems

17   understandable as expressed.  Does that also get into

18   some of that utilities assessment and master planning

19   work?

20        A.   Some but sometimes it's the building itself

21   and more often of late the building itself.

22        Q.   When you say of late, would that be from the

23   2003 time period forward?

24        A.   Yes.

25        Q.   Site grading, do you consult or evaluate on

                                              Page 21

1   site plans or site construction work?

2        A.   On occasion, yes.

3        Q.   And paving operations?

4        A.   Yes.

5        Q.   That's where they're going to put the

6   asphalt down or concrete?

7        A.   Right; or what its condition is.  So, yeah,

8   on occasion.

9        Q.   Urban streetscape projects, what will that

10  entail?

11       A.   That was -- that goes up until '03.  I don't

12  know.  I may have worked on one or two but in a very

13  small way since then.  That was basically tearing up

14  an existing urban street and reconstructing it as a

15  linear park, and I can go into a lot more detail if

16  you would like to.

17       Q.   When you say linear park, what do you mean?

18       A.   We would take everything out, reconstruct

19  the sidewalks, add pedestrian lighting, revisit the

20  street lighting, revisit all overhead utilities,

21  revisit the width of streets, basically reconstruct

22  everything within the right-of-way to include

23  possibly relocating or putting underground utilities.

24  So it's just a major reconstruction of a street.

25       Q.   It sounds like that work would be done

Veritext Legal Solutions
866 299-5127

1    almost exclusively for cities, counties, and public

2    government entities?

3        A.   Yes.

4        Q.   Okay.  And are you endeavoring in those

5    projects to perhaps both improve traffic flow but

6    also provide additional amenities and aesthetic

7    features for pedestrians and linear park attendees?

8        A.   The answer is yes.  You might have

9    bicycle -- you might be adding bicycle

10   infrastructure, enhancing pedestrian infrastructure

11   while also serving, you know, vehicular components

12   within that right-of-way.

13       Q.   I'm sure that's interesting work to do.

14       A.   It was really enjoyable.

15       Q.   And if you're getting to know a community

16   when it's completed, then you get to experience their

17   satisfaction.

18       A.   That's right.

19       Q.   Finally, it says that you have -- well, this

20   is good, too.  You've been a building consultant

21   since 1993.  Is that when you began your private

22   career?

23       A.   Yes.

24       Q.   Okay.  And you had left the military at that

25   point in time?

Veritext Legal Solutions
866 299-5127

1          A.    That's correct.

2          Q.    And prior to that you obviously worked for

3     the United States Navy Civil Engineering Corps as an

4     enlisted member of the Navy?

5          A.    I was actually a commissioned officer.

6          Q.    What was your rank?

7          A.    I finished as a lieutenant commander.

8          Q.    Where were you posted?

9          A.    It's down at the bottom.   Under employment

10    history, there's a list of my prior assignments.   If

11    you want to go through them, we can verbally; but

12    they're all --

13         Q.    Let's talk about them a little.   It's good

14    to get a sense of that.   This is covering a period of

15    time that ranges from when to when?

16         A.    1981 to 1993.

17         Q.    So 12 years.   You started where?

18         A.    I started in El Centro, California.

19         Q.    Is there a base there or something?

20         A.    Yes.   Yes.   And that's all -- this is all

21    written down here.   Naval air facility, El Centro,

22    California.

23         Q.    As a lieutenant commander, were you -- I

24    know there's a Naval air -- what would be the proper

25    term for its component of the Navy as a whole?

Page 24

1       A.    Well, you've got the pilots community, the

2   air community.  I mean, I'm not sure --

3       Q.    Is that where your officer responsibilities

4   were directed to the air community?

5       A.    No.  I was -- Civil Engineer Corps officers

6   are part of the Civil Engineer Corps that supports --

7       Q.    All branches of the --

8       A.    I could easily have been assigned to a

9   submarine base or a ship's facility --

10      Q.    I understand.

11      A.    -- just as easily as I was to an air base.

12      Q.    All right.  And what were you doing for the

13  air base?

14      A.    I was the assistant public works officer.

15  So we were in charge of maintaining and constructing

16  new infrastructure and support of that Naval air

17  facility.

18      Q.    All right.  How long did you work there?

19      A.    I was there for two years.

20      Q.    And then went where?

21      A.    Then we went to the U.S. Naval support

22  activity in Souda Bay, Crete.

23      Q.    Okay.  I need to be going up from the

24  bottom.  That's why I'm not following you as quickly.

25            While you were at El Centro, what was the

Page 25

```
 1   main public works project you might have been engaged
 2   in?
 3        A.   Well, we maintained all the buildings, all
 4   the air fields, all the roads, all the utility
 5   systems within that -- within that complex.  So it
 6   was a very -- a lot of variety, if that's the right
 7   word.
 8        Q.   And at Souda Bay what were you doing?
 9        A.   Basically, doing the same thing.  That
10   happened to be an air facility on a Crete Air Force
11   base.  So we maintained our part of the air field
12   pavements, the buildings that were ours, the utility
13   systems that were ours, landscape that was ours.  I
14   mean, that goes back -- for any of the public works
15   assignments, you're maintaining basically the entire
16   base.
17        Q.   Greece is not a bad place to be.
18        A.   It was awesome.
19        Q.   I can imagine.
20             Then it looks as if you moved up to Norfolk,
21   Virginia?
22        A.   Yes, sir.
23        Q.   And served as the executive assistant and
24   aide to commander there for the Atlantic Division?
25        A.   Yes, sir.
```

Veritext Legal Solutions
866 299-5127

1       Q.    Who was that person?

2       A.    The first admiral I worked for there was

3   named Don Connor, and he retired after about eight

4   months followed by serving admiral David Bottorff.

5       Q.    Bottorff?

6       A.    Bottorff, B-O-T-T-O-R-F-F.

7       Q.    And what specific project work were you

8   engaged in?

9       A.    I more served that Navy admiral.  I was

10   there about 15 months and basically assisted that --

11   he was -- that particular admiral was over, you know,

12   support to all of the -- basically, he worked for

13   the -- it's been a long time -- commander in chief of

14   the Atlantic, which is a four-star admiral.  This

15   particular admiral worked for that four-star and was

16   provided support to all of the Atlantic fleet

17   facilities, which is a lot of geography.

18       Q.    So there you were based in Norfolk and your

19   project work took you to many different locations?

20       A.    Right.

21       Q.    Approximately, how many different locations?

22       A.    Oh, gosh.  I was there 15 months.  We

23   traveled about ten days a year.  We went to Iceland,

24   Scotland.  We took a couple of trips out -- we took

25   at least one trip out to California coordinating with

Page 27

```
 1   some of the -- that was not the Atlantic fleet area
 2   but coordinating with some of the Civil Engineering
 3   Corps senior staff there, Spain, Italy.  You know, I
 4   don't -- you're pushing me back pretty far.  I can
 5   pull out my Day-Timers and look them up.
 6          Q.   If you're traveling ten days a year and
 7   you're there just 15 months, are you there --
 8          A.   Ten days a month --
 9          Q.   Oh, ten days a month.
10          A.   -- over that period.
11          Q.   So that explains it.
12               If you went to Iceland, for example, would
13   you be there for that ten days and --
14          A.   Not necessarily the entire ten days but
15   maybe two or three.
16          Q.   Are you there to bring your brainpower and
17   your consulting expertise or are you actually in the
18   field directing project work?
19          A.   No.  We were -- I was serving that Navy
20   admiral in that role.  He was the brainpower.  I was
21   his -- I was extending his time in that role.
22          Q.   You helped him execute whatever it was he
23   wanted --
24          A.   It was great to see a lot of projects going
25   on, but I was in the background basically extending
```

Veritext Legal Solutions
866 299-5127

```
1    his time so that he could provide whatever, you know,

2    direction he needed to.

3        Q.   All right.  And if you were at a foreign

4    country like Iceland or Italy, were there American

5    personnel and facilities at those locations that you

6    were visiting or --

7        A.   Yes; part of the Navy infrastructure at

8    those locations.

9        Q.   Any project or assisting extending the

10   admiral's work that you remember most from that

11   15-month period?

12       A.   No.

13       Q.   A blizzard of good time?

14       A.   (Witness nods head affirmatively.)

15       Q.   All right.  And then it looks like you moved

16   on to Ceiba, Puerto Rico?

17       A.   Well, yeah.  I was stationed in Gulfport,

18   Mississippi.  I worked for a Navy mobile construction

19   battalion, often referred as the Seabees; and I was

20   the company commander and the equipment officer for

21   that battalion.  We were based in Gulfport,

22   Mississippi.  We would spend eight months at home and

23   then we would deploy for eight months to wherever the

24   Navy told us to go, which happened to be Sigonella,

25   Sicily, for the first deployment and then came home
```

Page 29

1    for eight months and then went to -- it was called

2    Roosevelt Roads.  I don't think I -- yeah.  I did put

3    that in there.  Navy station Roosevelt Roads, which

4    is -- if you look at a map, it's right where Ceiba

5    is, the town of Ceiba, in Puerto Rico.

6         Q.   What were you doing while your time was in

7    Italy?

8         A.   There I was directing construction, and I

9    had the equipment company.  So that was all

10   horizontal -- you know, roadways, pavements, grading,

11   you know, some of that in support of vertical

12   construction but the equipment.

13        Q.   Is that somewhat akin to working as a

14   project manager?

15        A.   Probably.  We had about a hundred guys in

16   our company that were actually doing work.  Yeah,

17   project management and some direction, although I had

18   help with who gave direction.  I had some wonderful

19   chief petty officers that more directly directed.

20        Q.   And then -- this caught my eye.  The

21   Presidential Retreat at Camp David?

22        A.   Yes.

23        Q.   Were you actually stationed in Maryland?

24        A.   Yes.

25        Q.   At Camp David at all times?

Page 30

1      A.    We lived just off of Camp David.

2      Q.    And what kind of work was going on?

3      A.    It was similar to the other public works

4   assignments.  We maintained all the buildings; all

5   the utilities; all the roadways; and then, of course,

6   the landscaping, you know, grounds.

7      Q.    And you were at Camp David how long?

8      A.    About 39 months, I think.

9      Q.    '90 to '93?

10      A.    Yeah.  Yes.  It was about January -- it

11   might have been December '89 by a few days, but

12   basically January 1990 through April of '93.

13      Q.    And who was your commanding officer while

14   you're doing work at --

15      A.    I had two commanding officers for about half

16   of that period.  Mike Berry, B-E-R-R-Y, was my first

17   commanding officer through about halfway through that

18   time and then Joe Camp was the second commanding

19   officer I served under there.

20      Q.    And do you recall what positions or rank

21   Mr. Berry and Mr. Camp would hold?

22      A.    They were both Navy commanders.

23      Q.    Did you have a project staff that reported

24   to you directly when you were working at Camp David?

25      A.    Yes.

Page 31

1        Q.    Approximately, how large was that?

2        A.    I would rather not say.  It supports the

3    president.  You know, it supports the White House;

4    and a lot of what we did there was classified, so I

5    would rather that not be on the record.

6        Q.    All right.  And then in 1993 were you

7    decommissioned at that time?

8        A.    I separated from the Navy.

9        Q.    You went to work in Raleigh, North Carolina?

10       A.    Yes.

11       Q.    Kimley-Horn & Associates; is that right?

12       A.    Yes.

13       Q.    What kind of firm is that?

14       A.    It's a multidisciplinary consulting firm.

15       Q.    How big?

16       A.    When I started, it was about maybe 850 or so

17   employees.  When I left, it was well over a thousand,

18   probably about 1,250 or more.

19       Q.    What kind of work were you doing there?

20       A.    I worked -- I did about three or four things

21   there.  I started working in the marketing

22   department.  I worked on -- I managed their

23   continuous quality improvement program and then

24   migrated to the civil engineering design group and

25   then from there sort of migrated into the building

Veritext Legal Solutions
866 299-5127

 1    forensics group, which was a component of the
 2    structures department.
 3         Q.    You were there ten years?
 4         A.    Yes.
 5         Q.    What title were you assigned when you
 6    commenced?
 7         A.    When I commenced?
 8         Q.    In 1993.
 9         A.    I think they called me a project manager.
10         Q.    And what subsequent titles did you --
11         A.    I maintained that title the whole time.  I
12    did become a shareholder of the company.  So I had,
13    you know -- I don't know if they had senior project
14    managers.
15         Q.    By the time you left, did you have a staff
16    who was reporting to you?
17         A.    Not all the time.  If you were managing a
18    project, you would have some engineers and some techs
19    that were helping you on that project; but they might
20    be shared by other engineers that were managing --
21    that were running those projects.  So the answer is
22    yes but not all the time.
23         Q.    Depending on the project, project sensitive.
24               Were you engaged in any marketing on behalf
25    of Kimley-Horn?

Page 33

1       A.   Well, yes, back in the -- when I started,

2   yes.

3       Q.   What was the nature of your marketing

4   activities?

5       A.   Helping write proposals for work.

6       Q.   Were you as a project manager encouraged to

7   identify opportunities for the firm to do work for

8   different and new clients?

9       A.   Yes.

10      Q.   So you helped write a proposal for work.

11  This was where perhaps the firm had been contacted

12  and was expressing interest?

13      A.   It could be -- if it was a private client,

14  it might be a private client that says, hey, we need

15  to do X; this is what we see as our project; can you

16  write a proposal for helping us design it or plan it

17  or work with -- or do both and help us work with the

18  city in getting the project approved or it could be

19  response to a request for proposal that was put out

20  by a city or a state government saying they want to

21  do this, this, and this and we would have to develop

22  a proposal to respond to that request for proposal.

23      Q.   As the product manager, did you have

24  latitude to make a determination on your own if a

25  response to a request for proposal would be created

Page 34

1    and submitted or if you would actually write a

2    proposal in an effort to interest that client in

3    retaining Kimley-Horn?

4         A.    Typically, we were responding to RFPs

5    initiated by whatever the government entity was.  On

6    occasion we might be working on the planning side of

7    a project that turned into a design.  So, I mean,

8    most of the time you were responding to an RFP is

9    what we call it in short; but other times you might

10   be involved in helping develop that -- the scope of

11   the next phase with the particular city government.

12        Q.    Someone who is reading this transcript might

13   not know what an RFP is.  That's a request for

14   proposal?

15        A.    Yes.

16        Q.    Thank you.

17              Did you leave voluntarily from Kimley-Horn?

18        A.    Yes.

19        Q.    Why was that?

20        A.    I just decided to start -- by the time I had

21   gotten to year, you know, eight -- maybe years eight,

22   nine and ten, I was helping with the civil

23   engineering discipline -- you know, helping with the

24   civil engineering designs and managing a few of my

25   own, but I was also doing more and more building

Veritext Legal Solutions
866 299-5127

1    forensics, which I had done a lot of that in my Navy

2    days.  I just knew that that's where my best skill

3    sets were and where I enjoyed working the most.  So I

4    thought, well, I'm doing a lot of building forensics

5    with Kimley-Horn.  I'll start Beech Consulting and go

6    out on my own.

7         Q.   So to make sure that we understand building

8    forensics -- I mean, I asked you earlier about

9    building systems forensic investigation.  Does that

10   response you gave me then encompass the same

11   reference you're making now to building forensics?

12        A.   Yes.

13        Q.   Okay.  I don't know that I asked you much

14   about forensic work when you were in the Navy.  Can

15   you tell me more about what you did then at various

16   places that would fall under that rubric?

17        A.   Sure.

18             Well, we were -- in all the public works

19   roles we were assessing the condition of our

20   infrastructure, whatever it was, much of which was

21   building but some might be the pavements or utility

22   systems.  You're assessing it and saying, well, it's

23   not functioning like we need it to or we've got to

24   grow it, you know.  I mean, there's any number of

25   reasons why you would assess; but you would assess it

Page 36

```
1    for function and then develop a scope of renovation,
2    for lack of a better term, and then work with
3    designers to help you figure out like on a larger
4    scale project what needed to be done.  All the --
5    everything that needed to be done beyond just the big
6    scope.  Say, we need to replace this roof or we need
7    to replace these walls or we need to redo the
8    interiors.  I'm thinking of a barracks, for instance,
9    or a medical facility.  I mean, we had all these
10   various -- a hangar, a warehouse.
11          So anyway we would essentially assess what
12   needed to be done, are we going to do the work
13   in-house with our in-house staff or are we going to
14   develop a design to be put out to bid as a contract.
15   So you're assessing all the time and then writing up
16   a scope of retrofit, which may turn into a design
17   that you'll manage.  And then possibly if you're
18   there long enough, the design turns into a -- it goes
19   to an RFP.  It becomes a construction contract that
20   you then manage while that work is being done.  That
21   was a long answer.
22        Q.   It was a good one.  It helped me.
23        A.   Okay.
24        Q.   It sounded, though, at the initial structure
25   when you're doing your assessing that you're looking
```

Page 37

```
 1    at existing facilities that the Navy has and
 2    determining whether they're doing the job that's
 3    needed or whether they're big enough to accommodate
 4    the demands that are placed upon it.
 5              Were you doing work -- in the case we're
 6    involved in now here with the Hilton hotel, we're
 7    looking at a structure that's been there for a long
 8    time.
 9         A.   Right.
10         Q.   A number of problems or issues are being
11    identified.  Were you needing to use your forensic
12    skills for the Navy for that purpose or was it more
13    to accomplish an end?
14         A.   No.  I mean, we did what we called an annual
15    inspection summary.  Every year you would assess
16    every component of infrastructure on the base; your
17    buildings, your utilities, your roads basically so
18    you could plan how you're going to allocate the money
19    you were given for maintaining the place.
20              You know, the roof over on that warehouse is
21    20 years old.  The roof on this one is two years old.
22    That one is approaching the end of its operable life.
23    This one is new.  It's probably okay on the
24    two-year-old, but the 20-year-old we better be
25    allocating funds for.  That's just a fast example.
```

1            So we're assessing the condition or there

2    may be a change of use.  We may say, hey, we don't

3    have planes using this hangar anymore, we need to

4    demolish it because the hangar is too small for

5    anything but it's in operation now.  You know, it's a

6    cradle-to-grave assessment.

7        Q.   If you came to a conclusion about the

8    allocation of funds in order to meet any of the

9    objectives you're describing, was it your -- did you

10   have any power to make that allocation or were you

11   making recommendations to your commanding officer?

12       A.   I had power to make that allocation.

13       Q.   Would that be true through most of your

14   assignments for the Navy?

15       A.   All the public works assignments, yes.

16       Q.   Did the Navy have in-house financial and

17   accounting people to help you arrive at those

18   allocations consistent with an overall budget?

19       A.   Yes.

20       Q.   Did the Navy typically try to rely on its

21   own personnel for that work?

22       A.   Not necessarily.

23       Q.   When would it turn to outside assistance?

24       A.   I mean, you only had so many in-house staff,

25   so you can only do so much work inside.  Sometimes

Veritext Legal Solutions
866 299-5127

1   those people are -- their role was to maintain, not

2   to go build new.  So you might be -- it was a mix of

3   in-house and contract.

4        Q.   And I understand --

5        A.   So I often tried to push using contract to

6   extend the ability of the in-house force so that your

7   in-house is maintaining construction contracts or

8   either renovating something that needed renovating or

9   building the new so that you're not tying your

10  maintenance people up on, you know, not getting --

11  not maintaining the place because you decided to go

12  do some projects that would tie them up for a year.

13       Q.   That's helpful.

14            What I was thinking of more specifically was

15  did you need to turn to outside assistance for

16  evaluating your budget, how much money you had to

17  allocate for this project or that?  Did you mostly do

18  that in-house?

19       A.   Not for budget.

20       Q.   Okay.

21       A.   We turn to them for other things,

22  specifically design.

23       Q.   So you left them in 2003.  Did you have

24  clients that you were able to already begin working

25  with at Beech Consulting when you started that firm?

Veritext Legal Solutions
866 299-5127

1       A.   Yes.

2       Q.   Were any of them clients that you had worked

3   with at Kimley-Horn?

4       A.   Yes.

5       Q.   I'm not trying into whether or not that

6   was -- were there noncompetes that you had to worry

7   about when you left?

8       A.   Not -- I mean, there was some noncompete

9   language, but we can go into that if you would like

10  to.

11      Q.   I'm not really interested in that so much as

12  when you got started at Beech who comprised your

13  initial roster of clients?

14      A.   A few contacts with insurance companies, a

15  few -- a builder.  Gosh, it goes back a ways.  Those

16  two come to mind.

17      Q.   The insurance companies, can you remember

18  the names?

19      A.   Travelers significantly.  There was an

20  independent firm -- an independent adjusting firm

21  called Engle Martin, who I had known.  There were a

22  couple of attorneys.  I was doing -- the last few

23  years at Kimley-Horn I did a lot of work on synthetic

24  stucco, EIFS, exterior insulation and finish systems;

25  and that was -- there was a lot of work related to

Page 41

1     EIFS, particularly '96, '97, '98, '99.  There was a
2     little bit of that still going on, so I was helping a
3     number of clients with the EIFS; but --
4          Q.   Sometimes plaintiff's attorneys who were
5     representing homeowners?
6          A.   I don't remember.  It was -- I think it was
7     a few attorneys.  There was one attorney that was
8     doing defense work for general contractors that I
9     worked with some.  You're really pushing it.  I mean,
10    it's 17 years ago or something like that, but that's
11    okay.
12         Q.   It's my only chance to talk to you.
13         A.   Right, exactly.
14         Q.   The builder, does that name come to your
15    mind?
16         A.   Yes; John Wieland Homes.
17         Q.   He's a well-known fellow.  In 2003 he was
18    pretty well known still?
19         A.   Uh-huh (affirmative).
20         Q.   What were you doing for Wieland Homes?
21         A.   Helping them with warranty type jobs and I
22    helped them with some of the -- they built a number
23    of synthetic stucco homes, so I helped them with
24    solving -- some of them had water intrusion issues,
25    and we had to figure out how to solve them.

Veritext Legal Solutions
866 299-5127

1      Q.    Were there any class actions that John
2  Wieland was dealing with that you remember?
3      A.    Not that I remember.
4      Q.    This would be individual homeowners that had
5  raised claims with his company?
6      A.    Possibly.
7      Q.    Did your work for John Wieland Homes also
8  simply advise them how they might change their
9  construction method to avoid potential future
10  problems?
11      A.    In a few cases.
12      Q.    Was there a time when he simply stopped
13  using stucco, synthetic stucco?
14      A.    I don't know.
15      Q.    You don't know?
16      A.    I don't know.
17      Q.    Did any of your testimony in deposition
18  relate to work for John Wieland Homes?
19      A.    One that I remember.
20      Q.    What was that about?
21      A.    That was about hard-coat stucco in the
22  Jacksonville, Florida, area.
23      Q.    So educate me, if you might, about the
24  difference between synthetic stucco and hard coat?
25      A.    Synthetic then, not now, was what the

Veritext Legal Solutions
866 299-5127

1    industry calls a barrier system.  What that means is

2    the synthetic stucco's base coat, not what you see

3    but what's immediately behind that base coat, with

4    reinforced mesh is indeed the water barrier or the

5    WRB.  You can call it whatever --

6          Q.   Water resistive barrier?

7          A.   Or weather resistant.

8               In those days, EIFS was a barrier system,

9    which I rather would call an exposed barrier system.

10   Today it's a water managed system meaning the barrier

11   is behind the cladding.  Hard-coat stucco is a

12   concealed barrier system.  So the hard-coat plaster

13   is the cladding, and then there's a WRB behind that

14   cladding.  I was helping them on -- that's -- kind

15   of the difference between barrier EIFS and hard coat

16   is where the location of the WRB is within the wall

17   system.

18         Q.   All right.  Do you remember which of the

19   insurance companies -- was it an insurance company

20   you did any work for synthetic stucco issues?

21         A.   We did a lot of work for Zurich back in

22   those days.

23         Q.   Any work with FM Global or Affiliated?

24         A.   On a few occasions.

25         Q.   Can you estimate how many?

1      A.   Not -- I mean, not with precision but a few.
2  I helped -- I helped FM look at six hotels.  I
3  remember that job -- that were synthetic stucco.
4      Q.   Where were these hotels located?
5      A.   Oh, gosh.  I think they were -- they were
6  kind of all over.  One was in, I think, Cedar Rapids.
7  I mean, this is -- this could be like memory.
8      Q.   Do your best.
9      A.   There were six hotels.  One was in Cedar
10 Rapids.  I think one was somewhere in Missouri.  One
11 was in Raleigh -- Cary, North Carolina.  One was in
12 Greensboro, North Carolina.  That's four of them.
13     Q.   You're doing well.
14     A.   That's about as much as can I remember.  If
15 I could look at the file, I would go, oh, yeah.
16     Q.   Specifically, what was the insurance company
17 asking you to do with -- were there different tasks
18 for different locations or were they all relatively
19 the same task?
20     A.   We were trying to find the sources of water
21 intrusion into those hotels.
22     Q.   So was your work -- did you do any
23 destructive evaluations or just all visual?
24     A.   I think there was some destructive being
25 done by other consultants who were working the hotel

Page 45

1    owner, and we observed some of that.

2         Q.   In those six instances, were you able to

3    come up with and identify a cause -- a causative

4    factor for the water intrusion?

5         A.   Yes.

6         Q.   And obviously you would communicate that in

7    a written report to the insurance company FM Global?

8         A.   I believe so.  I mean, this goes back a

9    ways.

10        Q.   This would have started sometime in 2003

11   forward?

12        A.   Yeah.  It might -- I think some of that job

13   started with Kimley-Horn and rolled over to when I

14   was -- when I started with Beech; but I, you know...

15        Q.   Did the client relationships that you had

16   built up while working at Kimley-Horn contribute to

17   your confidence in being able to start up Beech and

18   do it on your own?

19        A.   Yes.

20        Q.   I mean, obviously we -- in the legal

21   profession, we have folks who are referred to as good

22   at client development.  Sometimes the term is rain

23   maker for the superstars in our field.  But I'm

24   divining from that that you were pretty good at

25   marketing and client development while working at

Page 46

1    Kimley-Horn; is that right?

2         A.    I don't know.

3         Q.    Did they tell you you did good work?

4         A.    I don't know.

5         Q.    You don't know?

6         A.    I don't know the answer to that question.

7    Hopefully, I did a good enough job on whatever I was

8    doing at the time to be called back; but I'm not

9    going -- I'm not going to attest that I'm an awesome

10   marketer.

11        Q.    I wasn't asking you to brag on yourself.  I

12   mean, do you feel like that's a skill-set that you

13   perform well?

14        A.    I don't know.  I would rather my client -- I

15   would rather my client say that.

16        Q.    Well, in your annual reviews at

17   Kimley-Horn -- did you have annual reviews?

18        A.    I believe so.  I think we did.  I can't

19   remember, specifically.

20        Q.    Was client development one -- client

21   relations one of the factors they took into account

22   in assessing your progress?

23        A.    Yes.

24        Q.    Did anybody ever complain or give you

25   criticisms about your client relations work?

Veritext Legal Solutions
866 299-5127

1          A.    Not that I remember.

2          Q.    Did you sometimes get a pat on the back or

3     good work?

4          A.    Perhaps.  Maybe.

5          Q.    When you started Beech Consulting, how many

6     clients did you have on the roster?

7          A.    I don't remember.

8          Q.    Was it more than ten?

9          A.    Probably not.  I mean, that's -- here's the

10    deal.  I mean, there could be like four or five

11    adjusters at Travelers that may have called me.  So

12    is that four clients or is that one?  I mean, I

13    started working for myself with the hopes that I

14    could make a living --

15         Q.    Sure.

16         A.    -- working for Beech Consulting instead of

17    working for Kimley-Horn.

18         Q.    And I think you said at least presently

19    there's a hundred plus projects each year that Beech

20    Consulting is doing; is that right?

21         A.    Right.

22         Q.    So how long did it take you to ramp up from

23    2003 to that kind of volume?

24         A.    Probably a year to two.  Probably by the

25    beginning of 2005 but that's rough, very rough.

Page 48

```
 1        Q.    That's a good record.
 2        A.    Thank you.
 3        Q.    With respect to the six hotel projects you
 4   were doing for FM Global that had to do with
 5   synthetic stucco, how long did that work continue
 6   from start to finish?  I realize each project was
 7   different.
 8        A.    I think we did most of the assessment work
 9   in the late Kimley-Horn days.  Then there was
10   follow-up services in '03, but I -- it was a
11   pretty long -- that was a long time ago.
12        Q.    Have you continued to keep your relationship
13   with FM Global active since working on those six
14   hotel projects?
15        A.    On occasion.
16        Q.    And how often would you say you have worked
17   with them since then?
18        A.    I can't give you a precise number.
19        Q.    Who is your contact with FM Global?
20        A.    That can vary.
21        Q.    Can you elaborate and help me understand how
22   that varies?
23        A.    There were -- there was an executive general
24   adjuster named John Southall, who is now retired.
25   That's who I worked on those EIFS hotels with back
```

Veritext Legal Solutions
866 299-5127

1    in -- a long time ago.

2         Q.   When did he retire?

3         A.   I don't remember.

4              There was a gentleman named Bob Gunderson --

5         Q.   What position --

6         A.   -- that might call on occasion.

7              I believe Bob was a general adjuster, but I

8    don't remember.

9         Q.   You would call him?

10        A.   What's that?

11        Q.   Did you say you would call him?

12        A.   No, no.  He might call and say I've got

13   something I need you to help me with.

14             Dominic Thurston on occasion.  Gosh, some of

15   these guys go back a ways.  You know, Joel Brown on

16   occasion.  I'm trying to remember.  I don't remember

17   every name.  I think if I sit here -- I can waste a

18   lot of time trying to remember every name, but those

19   come to mind.  There's some others.

20        Q.   Mr. Southall, you worked with him on hotels.

21   With Mr. Gunderson, do you remember the type of

22   projects you were being called on there?

23        A.   I might help him on roofs, roof assessments.

24        Q.   Mr. Thurston?

25        A.   I mean, it's going to vary from job to job.

Veritext Legal Solutions
866 299-5127

1    I've helped -- I might have helped Mr. Southall on

2    some roofs, not only on EIFS.  Roof assessments, that

3    comes to mind.  I remember one time a very large tree

4    had struck the rear of a warehouse up in North

5    Carolina.  So we were -- I was helping Mr. Gunderson

6    on that one to sort out the structural scope of

7    repair was for that particular facility.

8         Q.   Have you done some other projects with

9    Mr. Thurston?

10        A.   I've helped him with a few roofs here and

11   there.

12        Q.   Are these on commercial buildings?

13        A.   Yes.

14        Q.   Warehouses?

15        A.   Warehouses, industrial facilities.

16        Q.   And Mr. Brown, what kind of work have you

17   assisted him with?

18        A.   Similar.

19        Q.   Warehouses?

20        A.   Warehouses, industrial facilities, roofs,

21   maybe a medical -- like a senior living facility.  I

22   mean, you know, you kind of go back through your

23   memory.  Some roofs on some assisted living

24   facilities.

25        Q.   So the tree that struck the warehouse in

Veritext Legal Solutions
866 299-5127

1    North Carolina that you're helping Mr. Thurston

2    with --

3        A.    That wasn't Mr. Thurston.   That was

4    Mr. Gunderson.

5        Q.    I'm sorry.

6        A.    It's all good.

7        Q.    That has a plainly evident reason why he

8    needs your assistance.   Like, with warehouses,

9    industrial facilities, and roofs, are you looking at

10   wear and tear on the facility, are you looking at

11   water intrusion problems, are you looking at other

12   kinds of issues?

13       A.    I could be looking at water intrusion.   In

14   that case we were looking at how to structurally

15   repair the building because the tree took out a rear

16   wall that was supporting the roof structure.   We were

17   trying to figure out what the repair scope was to get

18   the roof structure back to support it and, you know,

19   shored, remove and replaced, you know, get the wall

20   that collapsed back in order.   I mean, the

21   assignments vary.

22           I looked at a roof collapse one time at a

23   chicken plant in Gainesville, Georgia, with

24   Mr. Gunderson.   We were trying to figure out both

25   cause and origin and scope of repair to about a

Page 52

1    football field worth of roof structure that

2    completely fell.

3          Q.    This was a chicken --

4          A.    That was a chicken facility, a chicken

5    processing plant in Gainesville, Georgia.  So the

6    scope of the assignments may vary.

7          Q.    You mentioned Travelers previously, and

8    we've been talking now about FM Global.  Are there

9    any other insurance companies that you've done work

10   with?

11         A.    Yes.

12         Q.    Which are they?

13         A.    Amica, Cincinnati on occasion.  I mean,

14   there have been some others that attorneys might be

15   working for.  I mean, those come to mind as

16   significant.

17         Q.    The projects with Amica, do you recall

18   approximately how many such projects you worked on?

19         A.    Maybe 150 or so over a six-or eight-year

20   period.  That's a complete guess.

21         Q.    All right.  Would those 150 or so projects

22   be varied in terms of the kind of issues you're

23   evaluating and dealing with?

24         A.    Yes.

25         Q.    Similarly with Cincinnati approximately how

Page 53

```
 1    many projects have you worked with --
 2         A.   Not very many.  Maybe ten.  I mean, I'm
 3    just...
 4         Q.   Who at Amica is your contact?
 5         A.   It varies.  You know, there's -- I believe
 6    the senior claims supervisor is a gentleman named
 7    Taylor Quarles, but I'll get a call from various
 8    people that are under Taylor to help them with a
 9    variety of assignments.
10         Q.   Anyone else there at Amica?
11         A.   I mean, some folks on his team.
12         Q.   I understand that.
13         A.   Right this second I'm not remembering every
14    name.
15         Q.   I was thinking at Mr. Quarles' level that
16    might also work at Amica.
17         A.   Not that I know of.
18         Q.   Once you've worked with other members of
19    Mr. Quarles' team, do they on their own then
20    sometimes just contact you again directly?
21         A.   Yes.
22         Q.   Which is a way of growing the business,
23    isn't it?
24         A.   If they need the assistance, I'm glad to
25    help them.
```

Veritext Legal Solutions
866 299-5127

1          Q.    So you've been successful in developing an

2      impressive roster of clients.  Do you do anything on

3      your own initiative to let them know you appreciate

4      that kind of work other than obviously maybe saying

5      so?  But, I mean, do you sponsor any kind of

6      marketing events for your clients at Beech

7      Consulting?

8                MR. MACBRIDE:  Objection.

9                THE WITNESS:  The answer is no.

10    BY MR. DAILEY:

11         Q.    No golf outings?

12         A.    No.

13         Q.    No receptions?

14         A.    No.

15         Q.    Do you invite people like Mr. Quarles or

16    some of the folks at FM Global to accompany you to a

17    sporting event or any other kind of social outing?

18         A.    No.

19         Q.    Do you prefer not to do that?

20         A.    I actually do prefer not to do that.

21         Q.    Do you also feel that you're fortunate in

22    that you have not appeared to have required that kind

23    of outright marketing effort?

24                MR. MACBRIDE:  Objection.

25                THE WITNESS:  It's just something we don't

Veritext Legal Solutions
866 299-5127

```
 1        do.
 2   BY MR. DAILEY:
 3        Q.   What about Mr. Anderson; does he engage in
 4   any affirmative marketing efforts?
 5             MR. MACBRIDE:  Objection.
 6             MR. DAILEY:  Why is that an objection?
 7             MR. MACBRIDE:  You're asking about what
 8        Mr. Anderson does, so I'm objecting to the extent
 9        that he's not Mr. Anderson.
10             MR. DAILEY:  But he knows Mr. Anderson.
11             MR. MACBRIDE:  I understand, but he's not
12        Mr. Anderson.  What his understanding is of what
13        Mr. Anderson does may or may not be accurate.  So
14        I'm objecting.
15             MR. DAILEY:  Okay.  Well, I don't believe
16        that's a proper objection, but you're entitled to
17        make it.
18   BY MR. DAILEY:
19        Q.   Do you know if Mr. Anderson engages in any
20   marketing activity?
21        A.   I believe that he doesn't, but I would
22   qualify that answer by saying I understand you'll be
23   deposing him, so clarify that answer.
24        Q.   Sure; but understand I'm entitled to your
25   best information.
```

Page 56

```
 1        A.   I understand.
 2        Q.   I'm just asking you -- I realize you can
 3   caveat what you don't know along with telling me what
 4   you do know.
 5        A.   Right.
 6        Q.   I am entitled to ask you --
 7        A.   Of course.  I get that.  I believe the
 8   answer is no.
 9        Q.   How old are you, Mr. Dawkins?
10        A.   I am 61.
11        Q.   61 years old.  So you would have been born
12   in 1958?
13        A.   You're good.
14        Q.   How old is Mr. Anderson?
15        A.   You know, I think Wade is about 45, but you
16   need -- I'll say the same thing.  Ask him.  Ask him
17   to clarify.
18        Q.   Where did you grow up?
19        A.   I grew up in Greensboro, North Carolina.
20        Q.   Great city.  I grew up in Charlotte.
21        A.   Did you really?  How about that.
22        Q.   Did you go to Grimsley High School?
23        A.   I did not.
24        Q.   Page?
25        A.   I went to Western Guilford.
```

Page 57

1      Q.   Page is in Raleigh, I guess.

2      A.   No.  Page is in Greensboro.

3      Q.   Is it also --

4      A.   Yeah.  My wife went to Grimsley High School,

5  but I went to Guilford High School.

6      Q.   And you got out when?

7      A.   '77.

8      Q.   '77?

9      A.   Yes.

10     Q.   And then did you go straight to college or

11  work?

12     A.   I went straight to NC State.

13     Q.   NC State, the Wolfpack.

14     A.   Yes.

15     Q.   That was soon after the '74 championship.

16     A.   It was.

17     Q.   They were still feeling good.

18          What did you study there?

19     A.   I studied civil engineering.

20     Q.   Your degree was conferred in 1981?

21     A.   Yes.

22     Q.   Did you graduate with any kind of honors or

23  academic distinctions?

24     A.   No.

25     Q.   There was a period of time before you went

Page 58

```
 1    on to get a master's; is that right?
 2         A.   That's correct.
 3         Q.   What did you do then after you were
 4    graduated in 1981?
 5         A.   I served in the Navy Civil Engineer Corps.
 6         Q.   Did you volunteer?
 7         A.   I did.
 8         Q.   Apart from wanting to serve your country,
 9    had you received any advice or counseling that a
10    stent in the Civil Engineering Corps would be helpful
11    to the long-term career path you wanted to pursue?
12         A.   I just decided I wanted to give the Navy
13    Civil Engineering Corps a try, so I signed up.  It
14    sounded like a great place to start.
15         Q.   See the world.
16         A.   That's exactly right.  I mean, that was my
17    goal was to get to see some of the world while I
18    was -- while I was serving.
19         Q.   All right.  So 1987 -- so you're working
20    your studies at Georgia Tech while you were still in
21    the Navy; is that correct?
22         A.   Yeah.  The Navy -- if you look at the
23    employment history, I left the job in Norfolk, the
24    Atlantic Division in Norfolk.  The Navy sent me to
25    Georgia Tech for a year, and I was able to get my
```

Page 59

```
 1    master's in civil engineering while at Tech.  And
 2    then I left Tech and went down to Gulfport,
 3    Mississippi.  So I'm very grateful for the Navy to
 4    send me to school.
 5         Q.   Particularly since students today have to
 6    carry around so much educational debt.  It's a great
 7    thing, although -- we can talk about this --
 8              MR. MACBRIDE:  That's another day.
 9              MR. DAILEY:  Exactly.
10    BY MR. DAILEY:
11         Q.   All right.  So when you studied your -- I
12    don't know what a master's in civil engineering at
13    Tech might entail.  Did you get the opportunity to
14    focus your study in particular areas or was it a
15    general curriculum?
16         A.   It was a focused curriculum.
17         Q.   What were you focusing on?
18         A.   Construction management.
19         Q.   That's right up your alley by then.  You had
20    been a project manager with the Navy for a time,
21    correct?
22         A.   Yes.
23         Q.   What additional things do you believe you
24    learned as a consequence of your master's program?
25         A.   I got exposed to more studies.  It was a
```

Page 60

1    great experience.

2        Q.    What is Tech's approach to study?  Do they

3    do a case method or lecture?

4        A.    It was a combination of class work.  They

5    had a core curriculum for construction management

6    focus and then some electives and then you had to

7    write a paper that was six hours of your credits.

8        Q.    Did that paper get reviewed by an academic

9    committee?

10       A.    It did.

11       Q.    I assume it passed?

12       A.    Yes.

13       Q.    It mustered with them?

14       A.    Yes.

15       Q.    Were you required to sit for like an oral

16   examination with respect to your paper?

17       A.    No.  It was just reviewed and approved.  I

18   guess, you know, they signed it.  The three

19   professors signed it.

20       Q.    All right.  So at what point in time did you

21   actually secure your professional engineer license in

22   Georgia and North Carolina?

23       A.    In North Carolina I believe 1990.  In

24   Georgia I think about '99 by reciprocity.  I think

25   that's right.  But that's -- I'm pretty sure the 1990

Page 61

1    is right.  I'm not exactly sure on the 1999.

2         Q.   So prior to 1999 had you joined the

3    International Institute of Building Enclosure

4    Consultants?

5         A.   I had not.

6         Q.   Did IIBEC -- because I saw you had a

7    registration or a certification with it or just a

8    membership?

9         A.   I have a membership with them.

10        Q.   I see.  I apologize.

11             Prior to IIBEC assuming that title name, it

12   was something RRC or --

13        A.   Roof Consultants Institute, which later was

14   shortened to RCI, but it stood for Roof Consultants

15   Institute.  And the name IIBEC, International

16   Institute of Building Enclosure Consultants, became

17   the name of the association this past March, March of

18   '19.

19        Q.   Are you a certified roof consultant?

20        A.   I'm a professional engineer who performs

21   roof consulting.

22        Q.   There is a certification as part --

23        A.   There is.  RRC, registered roof consultant.

24        Q.   Registered roof consultant.

25             Is that not something you felt you needed?

Veritext Legal Solutions
866 299-5127

1          A.    I didn't feel like I needed it.

2          Q.    Does your membership in IIBEC allow you

3     to -- does it make it easier the reciprocity that you

4     might seek with other states?

5          A.    No.

6          Q.    Is it only if you have that registered roof

7     consultant?

8          A.    The registered roof consultant is a

9     certification inside of IIBEC.

10         Q.    Do you understand it to assist with

11    reciprocity among state licensure?

12         A.    It's not a state license.

13         Q.    I realize that, but the fact you have it

14    does it help you?

15         A.    I don't think it does.  I have never had to

16    put that in front of a state board because my

17    reciprocity, if I went to another state board, would

18    be to become a P.E. in their state.

19         Q.    I see.

20               Which you consider to be a broader and more

21    impactful registration than a registered roof

22    consultant in any event; isn't that so?

23         A.    Yes.

24         Q.    So in 1990 did you sit for an examination in

25    North Carolina?

Page 63

1        A.   No.  Oh, I'm sorry.  I thought you meant --
2    no.  In 1990, yes.  My apologies.  I misunderstood
3    your question.
4        Q.   Did you pass it on your first sitting?
5        A.   I did, yes.
6        Q.   In then 1999 or about -- you're not sure
7    exactly about Georgia; but whenever it was, did you
8    also sit for an examination?
9        A.   No.
10        Q.   Reciprocity was granted by virtue of being
11    licensed in North Carolina?
12        A.   Right; and some other paperwork.
13        Q.   What other paperwork is that?
14        A.   Letters of recommendation, I think your
15    transcripts, proof that you were a North Carolina
16    P.E.  It was administrative, but it involved some
17    letters of recommendation from other professional
18    engineers.
19        Q.   Do you recall any of the engineers who gave
20    you the letters of recommendation?
21        A.   Yes.
22        Q.   Who are they?
23        A.   The two commanding officers I worked for at
24    Camp David, a principal at Kimley-Horn & Associates,
25    and I don't remember the other two.

Page 64

1          Q.    Who is the principal at Kimley-Horn?

2          A.    Mr. Ed Vick.

3          Q.    V-I-C-K?

4          A.    V-I-C-K, yes.

5          Q.    The two commanding officers you've already

6     identified for me?

7          A.    Right; Mike Berry and Joe Camp.

8          Q.    There were two others?

9          A.    There were two others.  I don't remember.

10         Q.    So just to breeze through your professional

11    organizations you are a member of IIBEC?

12         A.    Yes.

13         Q.    And have been since when?

14         A.    Since about '03, 2003.

15         Q.    Do you attend their annual convention or

16    meetings and trade shows?

17         A.    I have not every year.  I attended last

18    year.  I was planning on attending this year.  It was

19    canceled yesterday or postponed yesterday.

20         Q.    And do you know Christopher Giffin --

21         A.    I do.

22         Q.    -- from IIBEC?

23         A.    Yes.

24         Q.    Have you worked with him in the past?

25         A.    Yes.

Page 65

1      Q.   What kind of projects have you worked with

2    Christopher Giffin on?

3      A.   We worked beside each other on Hilton

4    Atlanta.  We've been opposite each other on a few --

5    I can remember two litigation cases, but I've known

6    Chris predominantly through RCI and later IIBEC.  We

7    may have worked on some other projects, but I can't

8    recall those.

9      Q.   As I recall it, you're a national board

10   member at IIBEC; is that right?

11     A.   Yes.

12     Q.   You're in a term that just got underway and

13   will continue through 2021?

14     A.   Yes.

15     Q.   All right.  That's a region two director, I

16   believe it states in the CV; is that right?

17     A.   Yes.

18     Q.   And you have purview over the mid-Atlantic

19   and southeastern states IIBEC chapters?

20     A.   Yes.

21     Q.   Mr. Giffin is also active in the

22   organization at IIBEC; is he not?

23     A.   He is.

24     Q.   Have you served on the same board with him

25   at the present time?

Veritext Legal Solutions
866 299-5127

```
 1          A.   I have for the past year.
 2          Q.   Okay.  Are you familiar with the other
 3    expert consultants that are identified to testify in
 4    this case besides Mr. Anderson?
 5          A.   Well, yeah, Wade Anderson.  This is a lawyer
 6    question.  I don't know if Mike Wilson is identified.
 7    I know Mike with Williamson & Associates and I know
 8    Chris Giffin.  That's all I --
 9          Q.   Do you know any folks from J.S. Held at
10    IIBEC?
11          A.   I do know a few folks.
12          Q.   Randy Ison?
13          A.   Yes.
14          Q.   Is he active in IIBEC?
15          A.   No.
16          Q.   Is he a member?
17          A.   I believe the answer is no.
18          Q.   You said you were opposite Mr. Giffin in a
19    couple of litigation cases.  What were those cases?
20          A.   One was a condo.  I'm trying to remember the
21    name of it.  It was a condo building.  I know it's on
22    Peachtree Street, but I don't remember the name of it
23    right this second.
24          Q.   There are a number of those.
25          A.   There are.
```

Page 67

1        Q.    Was it an older building?

2        A.    Yes.

3        Q.    Was it -- I'm going to try one.  The Briary?

4        A.    No, it wasn't that one.  It might have been

5    something Renaissance, with the name Renaissance in

6    it; but I'm completely winging that.

7        Q.    What kind of structure was it?

8        A.    It was a five- or six-story condo building.

9        Q.    What were the -- was the owner contesting

10   with an insurance company?

11       A.    I have no idea.

12       Q.    Okay.  You don't know the litigation parties

13   that were --

14       A.    I don't remember the litigation parties.

15       Q.    What was your role in that?

16       A.    I helped -- I helped consult regarding water

17   intrusion issues and a few construction -- other

18   components assessing some parking deck structure.

19   It's been a long time.  That's all -- that's all I

20   can remember.

21       Q.    Approximately, how long ago was that?

22       A.    It was a pretty long time ago.  Like maybe

23   10 to 15 years ago.  It was a pretty long time ago.

24       Q.    Were you working for an attorney in that

25   instance?

Veritext Legal Solutions
866 299-5127

```
 1        A.   Yes.
 2        Q.   Do you know the name of the attorney?
 3        A.   His name is Jason Pettus, but I don't
 4   remember what firm he was working for then.
 5        Q.   Did you give a deposition in that case?
 6        A.   Yes.
 7        Q.   And did you testify at trial?
 8        A.   No.
 9        Q.   Do you know if the case resolved by
10   settlement?
11        A.   I believe it did, but I don't -- that's not
12   accurate.  Don't trust me.
13        Q.   You're not sure.  I'll write that down.
14             What was Mr. Giffin -- who was he testifying
15   for?
16        A.   I believe he was working for the owners in
17   that case.  Well, via the owner's attorney.
18        Q.   Did the two of you have differing opinions
19   to offer in that matter?
20        A.   I don't remember.
21        Q.   What were your findings and conclusions as
22   you expressed them?
23        A.   I don't remember.
24        Q.   Okay.  Do you recall who owned the
25   Renaissance?
```

Veritext Legal Solutions
866 299-5127

```
 1        A.   I think the association, the owners'
 2   association, owned the common property and then it
 3   was individual owners owned individual units.  I'm
 4   not sure.  I hope that answers the question.
 5        Q.   It was one of the unit owners contesting
 6   with the association?
 7        A.   I don't remember.
 8        Q.   You said there was a second litigation case
 9   you were opposite Mr. Giffin.
10        A.   Yes.
11        Q.   What was that one?
12        A.   It was a brick veneer building.  I do not
13   remember much more than that right now.
14        Q.   Located in Atlanta?
15        A.   Located in this area but I don't remember
16   where.
17        Q.   And for whom were you providing services?
18        A.   I was providing services for an attorney
19   with Mozley, Finlayson & Loggins.  I don't remember
20   her name right now.  Bob Finlayson may have been the
21   senior attorney on that, but I was working
22   predominantly with another attorney.
23        Q.   And it was a brick veneer building.  Were
24   there water intrusion issues there?
25        A.   Yes.
```

Page 70

```
 1        Q.    Do you know if the Mozley firm was
 2   representing the owner?
 3        A.    I don't remember.
 4        Q.    And was it your task to identify what might
 5   be the cause of the water intrusion problem?
 6        A.    Yes.
 7        Q.    What was Mr. Giffin's role?
 8        A.    I don't remember.
 9        Q.    You're obviously working beside Mr. Giffin
10   here in the Hilton case.  What is -- are there any
11   other matters in which you have worked with
12   Mr. Giffin in that capacity?
13        A.    I don't think so.  Not that I can remember
14   right this minute.  I mean, I may have read a report.
15   I may have worked on a property that he wrote a
16   report on, but I'm working on it two years later,
17   so -- I mean, I've known Chris pretty well for about
18   I'd say six to seven years, but I had read a report
19   here and there by him because I was working on a
20   property after he was -- after he had worked on it.
21        Q.    Okay.  You know that he works at WJE?
22        A.    Yes.
23        Q.    Did you read a WJE report in this matter?
24        A.    Yes.
25        Q.    Okay.  But there's another matter that you
```

Page 71

1    think you might have also read a WJE report that you

2    were working on and came in behind --

3         A.   Yes.

4         Q.   Okay.  In that other matter, did you agree

5    with the findings and conclusions that WJE had

6    presented?

7         A.   I don't remember.  I mean, it was a long

8    time ago.

9         Q.   How long ago was that one?

10        A.   Are we talking about this condo?

11        Q.   Yes, sir.

12        A.   Yes.

13        Q.   Well, you didn't actually specify, I

14   think -- I was asking about other matters with Giffin

15   and may have wrote a report.  I was just trying to

16   remember -- I was just trying to ask to that other

17   matter.

18        A.   In other matters, I may have -- I've read

19   some WJE reports over the years.  I don't know if

20   they were -- I can't recollect if they were authored

21   by or co-authored by Chris Giffin.

22        Q.   Although just -- I do want to go back to my

23   notes because you did begin this discussion of other

24   matters by saying you may have read a report that WJE

25   worked on in which Mr. Giffin wrote the paper.

Page 72

1          A.     Right.

2          Q.     So it's possible there was some instances

3     where he was the author and there may have been other

4     instances where he was not?

5          A.     Correct.

6          Q.     Are you familiar with other folks that work

7     at WJE?

8          A.     Yes.

9          Q.     Which folks are they?

10         A.     I worked with an architect named Jim Brown,

11    an engineer named Ralph Leistikow, formerly another

12    architect named Brice McQueen.  Brice now works for

13    another company.

14         Q.     Which company is that?

15         A.     Merik, M-E-R-I-K.

16                Those are the ones that immediately come to

17    mind.

18         Q.     Have you ever worked with Mr. Brown?

19         A.     Yes.

20         Q.     On what matter?

21         A.     We were co-consultants on a mid-rise

22    condominium a few years back where we had to observe

23    a lot of destructive testing being done by another

24    consultant.

25         Q.     And what were the issues that you were

Veritext Legal Solutions
866 299-5127

1    observing that destructive testing in order to

2    assess?

3        A.   We were trying to assess sources of water

4    intrusion.

5        Q.   Is water intrusion a fairly typical issue

6    that you are called upon to work on and assess?

7        A.   I would say yes.  It's not the only issue,

8    but a lot -- it's a major component of our practice.

9        Q.   Anything else with Mr. Brown?

10       A.   Not that I can think of right this minute.

11       Q.   Mr. Ralph Leistikow, you worked with him?

12       A.   Yes.

13       Q.   On what?

14       A.   The most -- there was a pedestrian bridge

15   over at the botanical garden years ago that was under

16   construction.

17       Q.   By Harden Construction?

18       A.   Maybe.  I don't remember.  It collapsed

19   during construction.  It was awful from the

20   standpoint of I think one gentleman lost his life and

21   several others were hurt.  I worked on -- and

22   actually Wade worked on that, too, with me that.  We

23   work on assessing that collapse.  And Ralph Leistikow

24   was working beside us for another party, but we were

25   conducting our investigation beside each other.

Veritext Legal Solutions
866 299-5127

1     That's the most memorable.

2          Q.   Who was your client in that instance?

3          A.   I was working for Mozley, Finlayson &

4     Loggins; and I don't remember who they were

5     representing.  They may have been representing the

6     general contractor, but --

7          Q.   Was this a claim that was brought by the

8     estate of the person who was deceased?

9          A.   I don't know.

10         Q.   And what were your findings there?

11         A.   I never really resolved them fully.  We

12    closed the file before -- I think due to some

13    agreements between the parties the file got closed.

14         Q.   Did you produce a report?

15         A.   No.

16         Q.   And do you know who Mr. Leistikow was

17    working for?

18         A.   I don't remember, no.  I might not have

19    known then.  I definitely don't remember now.

20         Q.   Do you know if he produced a report in that

21    matter?

22         A.   I don't know.

23         Q.   Did you have any disagreement with

24    Mr. Leistikow as you did that work?

25         A.   We didn't discuss our conclusion at the

Veritext Legal Solutions
866 299-5127

1   time.

2       Q.   What were you tasked to look at?  The

3   structural --

4       A.   We were looking at the structural issues at

5   that particular location.

6       Q.   And the third person was Brice McQueen?

7       A.   Yes.

8       Q.   Did we cover all the projects you remember

9   with Mr. Leistikow?

10      A.   Yeah.  There may be others, but I can't

11  recall them specifically.  I've met with Ralph more

12  than once.  I don't believe he's in the Atlanta area

13  anymore.  I think he's up near Charlotte or Raleigh

14  now.

15      Q.   And then Brice McQueen?

16      A.   Brice McQueen I've known more through IIBEC,

17  but Brice was an architect working under Chris

18  Giffin.  I've known Brice more through IIBEC than

19  with his time with Wiss Janney, although we have

20  co-consulted on several jobs since he joined Merik.

21      Q.   What kind of jobs are those?

22      A.   We had done some balcony assessments on a

23  mid-rise condo in Buckhead, and Brice took over the

24  design of the retrofit of those balconies after Beech

25  Consulting assessed them and kind of rated which ones

Page 76

1    needed the most work the soonest.

2        Q.   So there was a concern the structural

3    support was not adequate?

4        A.   That's a little strong.

5        Q.   How would you describe it?

6        A.   I would say the structural -- they didn't

7    have toppings, so the reinforcing bar was beginning

8    to corrode; and we wanted to get in front of that and

9    get that, you know, properly covered so that it would

10   not deteriorate any further.  We addressed some

11   handrail guardrails that needed some retrofit in

12   conjunction with that work at the slabs, at the

13   balcony slabs.

14       Q.   So would it be fair to say that Beech came

15   in and did an evaluation, identified some

16   recommendations, and Mr. McQueen performed some

17   design drawings to effectuate your recommendation?

18       A.   Yeah; and/or specifications.  He might not

19   have developed drawings but specifications; and he

20   advertised it, you know, for bid for the condo

21   association.

22       Q.   So this was kind of a maintenance question

23   that the association was interested in addressing and

24   fixing?

25       A.   Yes.

Veritext Legal Solutions
866 299-5127

1      Q.   You weren't aware of any litigation or

2   parties in dispute?

3      A.   No.  This was not litigation.

4      Q.   All right.  When Mr. McQueen was working

5   under Chris Giffin as an architect, did you have an

6   occasion to work with him then?

7      A.   I don't believe so.  I just knew him through

8   RCI and later IIBEC.

9      Q.   All right.

10          MR. DAILEY:  Do you want to take a break?

11          MR. MACBRIDE:  Absolutely.

12          (A recess was taken.)

13   BY MR. DAILEY:

14      Q.   I guess the only thing I didn't ask you

15   about here are the American Society of Civil

16   Engineers.  What kind of organization is that?  Is

17   that just a membership organization?

18      A.   I'm a member.  I'm not an active member, but

19   I've stayed a member of that since I've been out of

20   school.

21      Q.   So we had talked about IIBEC.  Obviously,

22   you've been involved in a lot of continuing education

23   and presentations, some of which are IIBEC related;

24   is that right?

25      A.   Yes.

Page 78

1      Q.   Just tell me generally what their program is
2    and what is your contribution to it.
3      A.   I got actively involved probably -- I've
4    maintained a membership, I believe, since 2003 since
5    I started Beech Consulting.  Formerly RCI and now
6    IIBEC is closely aligned with a lot of my practice,
7    so I found them to be a good entity to, you know,
8    keep up with emerging technologies with, get
9    professional development training from.
10             I probably got involved in maybe -- I got
11   involved on the executive board of the Georgia
12   chapter.  It might show in the specific dates.  Yeah,
13   2014.  And then I was the president of the chapter of
14   2017 and then asked to consider running for the
15   region two director role last year, which I did; and
16   then I have that role through 2021.
17             I have been very active, if that's the right
18   word, since 2014; but, I mean, IIBEC exists to serve
19   its membership, provide professional development,
20   continuing education, and whatnot.  I have been part
21   of teaching two of IIBEC's classes; exterior wall
22   science and technology in August of '17 and I helped
23   co-teach professional building consulting this past
24   February.
25             Q.   These classes, do they offer them each year?

1   Do they announce a curriculum that they're going to

2   offer that year or are these in the nature of

3   seminars that they put on and interested attendees

4   can travel to attend them?

5        A.    The answer is a little mix.  The exterior

6   wall science and technology in August of '17 was

7   taught.  It's an IIBEC class taught by the

8   professionals from the Georgia chapter as was the

9   professional building consulting class this past

10  February.  This coming July, subject to Coronavirus

11  travel restrictions, actually Wade and I will be

12  co-teaching exterior walls science and technology for

13  IIBEC directly with another architect from Louisiana.

14  So that's an IIBEC class sponsored by IIBEC.

15            In answer to your question, yes, on the

16  national calendar; but the chapter classes get put on

17  the national calendar, too, because they are -- they

18  are IIBEC classes but taught by professionals that

19  are local.  I hope that answers your question.

20       Q.    So the classes you've identified, the

21  exterior walls, the professional building

22  consultant --

23       A.    Right.

24       Q.    -- and the exterior walls that's coming up

25  if you're permitted, these are Georgia chapter

Page 80

1    classes?

2         A.    No.

3         Q.    These are national classes?

4         A.    The one in Tallahassee in July is a

5    national.  I mean, in other words, IIBEC sanctioned

6    that class as a national class that IIBEC is putting

7    on the calendar and IIBEC is coordinating.  Whereas,

8    the same class was taught here in August of '17 by

9    the Georgia chapter.  Wade and I had and a local

10   architect here in Atlanta taught that class together.

11        Q.    As a leader in the Georgia chapter, you were

12   able to set that up --

13        A.    Right --

14        Q.    -- and announce it and do it?

15        A.    Right; and, of course, coordinate that with

16   the international staff at IIBEC to get approval to

17   do it and then -- so anyway.

18        Q.    There are continuing education credits that

19   attendees earn as a consequence of being there?

20        A.    Correct.

21        Q.    In your field as a professional engineer, do

22   you have approximately 15 hours of continuing

23   education you're required to have each year?

24        A.    Each year, that's right.

25        Q.    So when IIBEC has a national sanctioned

1   class, how many such national sanction classes will
2   they have in a typical year?
3        A.   I would have to look at the calendar.
4   Probably 10 or 12.
5        Q.   Obviously, you're on the board at the
6   national organization.  You had taught the class in
7   August of 2017.  Did you encourage them to have a
8   national class on the same topic?
9        A.   We decided it would be good for folks in
10  this region to have access to that class, so we
11  approached IIBEC national and said can we teach it;
12  it looks like -- you know, we can look at the
13  calendar and go it hasn't been taught.  It wasn't
14  taught for the last two years in the Atlanta area.
15  You know, the folks from North Carolina, South
16  Carolina, Georgia, Alabama might want to come.  So I
17  hope that answered your question.
18        Q.   That does.
19            MR. MACBRIDE:  I want to just make sure.
20      That was for the 2017.
21            THE WITNESS:  Correct.
22            MR. MACBRIDE:  You're asking about the
23      national, right?
24            THE WITNESS:  Well, they're both national
25      classes.  That's what's odd.

Veritext Legal Solutions
866 299-5127

1          MR. MACBRIDE:  Right.

2          THE WITNESS:  The one in Tallahassee this

3      coming July is a national class.  It's the same

4      exact class.  It just so happens that Wade and I

5      helped teach the Georgia chapter class in August

6      of '17.  It was still a national class taught by

7      and sponsored by the chapter.  The one

8      Tallahassee is sponsored by IIBEC national.

9  BY MR. DAILEY:

10     Q.    I see.

11          So that August 2017 class would have

12  appeared on IIBEC's national calendar?

13     A.    Correct; and it would have said led by

14  Georgia chapter.

15     Q.    Understood.

16          Do sometimes chapters do their own classes

17  that are not part of the national program?

18     A.    Yes; but to a -- but smaller.  They're not

19  IIBEC classes.  There might be, you know, a

20  presentation on building commissioning or EIFS.

21     Q.    Do the attendees still they get continuing

22  education credit --

23     A.    Yes.

24     Q.    -- even though it's not national class?

25     A.    Yes; like one hour.  We don't have monthly

Page 83

```
 1    meetings; but at a luncheon meeting, we might have a
 2    one- or two-hour professional development class
 3    taught by somebody like on green roofs or hail or
 4    EIFS or name a subject related to the building
 5    enclosure.
 6         Q.   Sure.
 7              Whereas, the national class will be able to
 8    give you a greater number of continuing education
 9    credits?
10         A.   Yes.
11         Q.   Typically, how many?
12         A.   Well, those two-day -- the two classes we
13    mentioned right now are 16-hour classes.  Two days,
14    eight hours each day classes.
15         Q.   Eight hours each day?
16         A.   Right.
17         Q.   That translates to how many credits?
18         A.   16 hours of professional development.
19         Q.   So you get a credit for each hour?
20         A.   Correct.
21         Q.   I see.
22              Well, that knocks out your national -- your
23    annual requirement in one sitting, doesn't it?
24         A.   It does.
25              (A discussion was held off the
```

Page 84

1          record.)

2     BY MR. DAILEY:

3          Q.    The second page of your CV lists the

4     principal areas of your practice, and you have

5     identified these to be building systems

6     investigation, roofs and wall claddings, evaluation

7     and analysis, and civil engineering urban design.

8     Does that pretty much cover the waterfront?

9          A.    Yes.

10         Q.    All right.  Is there any new evolving

11    practice that's pushing into that -- competing with

12    those three categories?

13         A.    I think these three cover it, yeah.

14         Q.    And you've stated that in building system

15    investigations you've done approximately 800 general

16    building or site investigations of either commercial

17    or residential construction?

18         A.    Right.  As a consultant, yes.

19         Q.    And when you use the term consultant, would

20    that also include forensic investigation?

21         A.    You know, I specified sort of what I did in

22    the Navy versus what I've done as a consultant.  The

23    second bullet there is, you know, some other --

24         Q.    Understood?

25         A.    -- assessments.

                                             Page 85

```
 1        Q.    The consultant is in your private practice
 2   as opposed --
 3        A.    Correct.
 4        Q.    -- to your military service?
 5        A.    Since 1993.
 6        Q.    And of that you describe about 650
 7   commercial or residential roof system investigations.
 8        A.    Yes.
 9        Q.    So is that like 650 of the approximate 800?
10        A.    No.  That's like -- general building is
11   going to be looking at the building.  Roofs are going
12   to be looking at roofs.
13        Q.    I see.  I see.
14              So this is in addition to?
15        A.    Yes.
16        Q.    Although some of the general building
17   might --
18        A.    I mean, there is -- it's like a Venn
19   diagram.  There's some buildings where I've looked at
20   roofs but only looked at roofs, and then others we
21   just looked at a whole building.  And I qualify by --
22   you know, it might be decks.  You know, there's a lot
23   of things under the building systems where we're
24   saying, hey, this is the kind of things we might be
25   doing there.
```

Page 86

1      Q.    I see those described.

2      A.    Yeah.

3      Q.    You put structures, window systems,

4   retaining walls, decks, special construction systems,

5   and roofs' wall claddings?

6      A.    Right.

7      Q.    And then go on even more with other

8   studies --

9      A.    Right.

10     Q.    -- identifying construction defects,

11   collapse, leakage, water intrusion, mold studies?

12     A.    Right.

13     Q.    Are you a mold expert?

14     A.    No.

15     Q.    Is there some official designation in the

16   engineer field for mold experts?

17     A.    I would probably say an industrial hygienist

18   would be -- when we worked on some, you know,

19   investigations needing assistance specifically with

20   mold, not the water intrusion that causes it, we

21   might get an industrial hygienist to come aboard and

22   be part of the team, especially with regard to

23   remediating the mold.

24     Q.    And that's because there should be certain

25   protocols observed in the remediation process?

Page 87

1        A.    Yes.

2        Q.    You say that you performed about 325 wall

3    cladding systems reviews, I guess, and related wall

4    component evaluations --

5        A.    Yes.

6        Q.    -- throughout the southeastern U.S.

7              Some of the examples you've given are

8    Portland Cement based stucco/plaster, brick veneer,

9    mass masonry, storefront glass systems?

10       A.    Right.

11       Q.    You've included condensation cause/origin

12   and/or remediation studies and various panel or lap

13   sidings.

14       A.    Yes.

15       Q.    When was this document prepared; do you

16   know?

17       A.    I keep it updated.  I last prepared this

18   document in March of '19, if you see that little

19   bottom footer.

20       Q.    March 2019?

21       A.    Right.

22       Q.    Your CV additionally describes about 650

23   exterior installation finish systems, or EIFS.

24       A.    Right.

25       Q.    Cladding investigations to determine sources

Page 88

 1    of moisture intrusion and/or wall substrate damage

 2    and repairs methodology.  Of course, there are other

 3    things that are listed; but we can read those.

 4              Substrate, just definitional purposes --

 5        A.   That's like the wall sheathing that's behind

 6    the EIFS cladding and/or the structure behind the --

 7    you know, it could be in some cases the structure,

 8    wall studs, or it could be blocked in a few cases;

 9    but, you know, the wall assembly would be the

10    substrate.  But usually when I say that, I'm

11    referring to the wall sheathing.

12        Q.   To observe tear off and/or reevaluate

13    re-cladding activities and/or to evaluate related

14    building components.

15        A.   Right.

16        Q.   And you've listed windows, doors, roofs, and

17    other wall penetrations.

18        A.   Right.

19        Q.   And here you've estimated these projects

20    include about 45 commercial and 590 residential

21    buildings.

22        A.   Right.

23        Q.   Located in the states of North Carolina;

24    South Carolina; Georgia; Alabama; Tennessee; Florida;

25    Kentucky; Arkansas; Ohio; Iowa; Missouri; Arizona;

Page 89

1   and Rota, Spain?

2        A.   Yes.

3        Q.   Is Rota from your military time?

4        A.   No, it was not.

5        Q.   When was that?

6        A.   That was about, I'm guessing, '97 or '98.

7   It was while I was still with Kimley -- no.  I'm

8   sorry.  I've given you the wrong date.  No, I

9   haven't.  I'm so sorry.  I joined Kimley-Horn in '93.

10  Yeah, '97, '98 is about right.  It's when I was with

11  Kimley-Horn.

12       Q.   So obviously the work that you perform is a

13  lot of southeastern states, but you get into some of

14  the other parts of the country as well; do you not?

15       A.   Yes; on occasion.

16       Q.   Does IIBEC assist in expanding your network

17  and your visibility to prospective clients?

18       A.   Maybe.  I mean, people -- you, of course,

19  network while you're there.  People know about your

20  practice, but it's not -- that's not the primary

21  purpose of IIBEC.  But naturally the more people you

22  talk to the more possibility of, oh, he may know

23  something about that subject.

24       Q.   Are referrals a large basis for your client

25  development?

1    A.   I would think so.  I just don't like

2  answering those questions because that's -- the

3  answer is that the phone rings sometimes and it's

4  somebody I have not met yet.

5    Q.   And I think we've already talked about

6  several of these items in this column to the right.

7  Not all of them, of course.

8         Any of these that stand out in your mind?

9  I'm looking at the civil engineering urban design

10  category that you think -- if I really wanted to feel

11  like I knew your practice that you want to say a few

12  words to by way of description?

13    A.   I think what's written speaks for itself

14  pretty well.  I mean, there's some specific projects

15  called out; but it was general civil engineering

16  design, streets, parks -- you know, streets and

17  roadways, parks, sidewalks but also those same kind

18  of parking facilities around, you know, building

19  structures, some CVS's and Walgreens anyway.

20    Q.   You did a taxiway extension at Briscoe Field

21  Airport in Lawrenceville, Georgia?

22    A.   Yeah, I worked on that.

23    Q.   When was that done?

24    A.   That would be in the Kimley-Horn years.  So

25  it would probably be 2000 -- probably around 2000.

Page 91

1   And I worked with an airport engineer from Charlotte

2   on that, but our Atlanta office assisted that

3   Charlotte office.

4        Q.   And the Neighborhood Park & Legion Stadium

5   Fields and Building complex, what city was that?

6        A.   That was a stadium along with some other

7   park infrastructure in Wilmington, North Carolina.

8   That was more of a master plan for -- which included

9   some structural assessments of the stadium

10  infrastructure and to give the City kind of a plan,

11  okay, over the next five years you should do this

12  first followed by the next infrastructure upgrade.

13  It was a master plan upgrade or an upgrade master

14  plan is a better way to say it for the City of

15  Wilmington.

16       Q.   You've also listed your direction of

17  multiple Hurricane Hugo emergency disaster recovery

18  operations in southeastern Puerto Rico.  This was

19  1989.

20       A.   Yes.

21       Q.   What specifically were you doing there?

22       A.   Well, Hurricane Hugo devastated that eastern

23  end of Puerto Rico, and I was the equipment

24  officer -- we talked about that earlier.  I was the

25  equipment officer of the Seabee battalion.  So we

Page 92

1    were predominantly sending crane crews out along with

2    electricians to get emergency power to hospitals,

3    schools, public facilities, sewer lift stations, that

4    kind of thing.  That was one role.

5              We were also clearing roads with some of the

6    equipment like the bulldozers and front-end loaders.

7    We were clearing roads; and then we also were

8    delivering water and other, you know, emergency

9    supplies to various communities throughout that area

10   in the aftermath of Hurricane Hugo.

11       Q.   Were most structures completely destroyed?

12       A.   What's that?

13       Q.   Were most structures completely destroyed?

14       A.   A lot of the residences were -- you know, at

15   ground zero were pretty -- they weren't really

16   extremely well built, so they didn't withstand -- I

17   think that was a category four hurricane.  They

18   didn't withstand that very well.  There was a lot

19   of -- you know, it devastated the roads and

20   accordingly devastated the power -- you know, the

21   electrical grid.  So there was a lot of road clearing

22   and a lot of -- like I said, emergency generators

23   were needed until the power grid got back up.

24       Q.   There was something I wondered about.  You

25   have a lot of experience in water intrusion studies

Page 93

1    and evaluation.  Obviously, if a problem is chronic

2    or longstanding that is a causative factor for water

3    intrusion, there can be multiple rain events that are

4    contributing to any damage that's observed.

5              How do you assess as a professional

6    engineer -- obviously, if you have a hurricane,

7    you're having a potentially catastrophic contribution

8    to the damage you see.

9         A.   Right.

10        Q.   Is there any rule of thumb that you go by

11   when you take into account larger rain events or

12   larger storms, maybe not on the order of a Hurricane

13   Hugo but certainly significant rain storms that last

14   more than a single day or single afternoon?  How does

15   that factor into your damage evaluation?

16        A.   Well --

17             MR. MACBRIDE:  Objection.

18             THE WITNESS:  What do you mean by damage?

19        Let's talk a little bit about what you mean by

20        damage.

21   BY MR. DAILEY:

22        Q.   Well, that sort of, I think, unwittingly --

23   I'm asking a question that's provoking a response

24   that your previous interrogator had asked you.  You

25   said let's talk about damage in specific.

Page 94

1       A.    Right.

2       Q.    I'm thinking of -- let me back up from the

3    damage.

4       A.    Okay.

5       Q.    Obviously, if you have mold, that's an

6    ultimate kind of damage that perhaps has resulted

7    from these problems; but prior to that, you have

8    conditions of the building that you are assessing and

9    evaluating that in your professional judgment are

10   allowing water to intrude the building enclosure if

11   that -- have I said that kind of accurately?

12      A.    Say that one more time to make sure I

13   understand.

14      Q.    There are conditions of the building

15   itself --

16      A.    -- right.

17      Q.    -- that you will look for to see if water is

18   able to penetrate the building enclosure because of

19   them.

20      A.    Right.

21      Q.    So maybe the brick cladding, which naturally

22   absorbs moisture --

23      A.    Right.

24      Q.    -- because of the material that's involved,

25   or maybe because there are gaps behind the brick

1    cladding; and if there's one place of penetration,

2    then water can get in further to the interior.

3         A.   Right.

4         Q.   Maybe there's a leak on the roof that's

5    identified, so water is not only coming from the side

6    but from above --

7         A.   Right.

8         Q.   -- and coming down?

9              Those are all conditions that I'm making

10   reference to.  And some of those conditions, do they

11   grow worse because of the continuing impact of rain

12   events over time?

13             MR. MACBRIDE:  I just want to say, you're

14        just talking generally?

15             MR. DAILEY:  I am.  I'm not on the Hilton

16        Hotel.

17             MR. MACBRIDE:  I just wanted to make sure.

18             THE WITNESS:  Yeah.  I mean, generally, say,

19        for a one-time event, you might see some

20        staining, you know, like new staining, like a

21        water stream stain running down the back of a --

22        like, if you can see the back of the sheathing --

23        if you've opened the gypsum wall board up and you

24        can see into the stud cavity -- like I say, we're

25        general here, not block substrate.

Page 96

1          So, yeah, you might see -- in a one-time

2     event, you might see just a water stain or you

3     might see some -- you know, an individual

4     ceiling -- water stain on a ceiling tile or

5     whatever the ceiling finish is.

6          If it's chronic, you might see more than one

7     stain or some mold or heavy rust versus maybe a

8     little surface rust after a hurricane, for

9     instance, where there's been no power for two

10    weeks because you can't get power back on since

11    the electrical grid is down and they don't have

12    emergency generators.

13         You might see a little surface rust, you

14    know, where water got in incidental to

15    essentially a one-time event.  Whereas, if the

16    rust is pervasive, lots of rust as in -- on

17    occasion you'll open up a steel stud wall and the

18    sill track is not there any more.  The studs are

19    suspended in air, you know, four inches above

20    what used to be a sill track.  That tells you --

21    a situation like that is going to tell you, oh,

22    this has been going on a really long time.  I

23    hope that answers your question.

24  BY MR. DAILEY:

25         Q.   That's really helpful.  So that helps me

Veritext Legal Solutions
866 299-5127

1    most understand your process of saying that the

2    evidence I'm looking at and evaluating tells me this

3    is going on for a longer period of time.

4              I mean, do you consult weather records at

5    all when you do this?  Is that something that you

6    sometimes do?

7         A.   Sometimes.

8         Q.   And what circumstances would prompt you to

9    consult weather records?

10        A.   Usually with weather records I'm usually

11   trying to figure out what wind speeds were more often

12   than not.  Once in awhile -- I mentioned the

13   stormwater job that I was just deposed on that's not

14   reflected in this document.  I looked at some weather

15   records there related to what the rainfall intensity

16   was on a specific day because it led -- because on

17   that specific day we had a flood downstream.  But I

18   don't generally usually track weather records down

19   for precipitation.

20        Q.   Let's say if you had them and looked at

21   them -- I mean, I realize there's -- every job has a

22   budget probably and there's only so many things that

23   you do to respond to the question.

24        A.   Right.

25        Q.   Would weather records that show the amount

Veritext Legal Solutions
866 299-5127

1   of rain that took place and the perhaps wind speeds

2   associated with a rainstorm -- would that factor into

3   your analysis if it was readily available to you?

4        A.   Maybe.   I mean, it depends on what the

5   client asks me to do.

6        Q.   Understood.

7        A.   So the answer is maybe and maybe not.

8        Q.   As a general proposition, do rain events

9   that are much more severe than others have relevance

10  to your evaluation of water intrusion issues?

11       A.   Again, it goes back to -- the answer to that

12  question is maybe.   If I'm looking at a specific

13  event, maybe; but if I'm looking at a long continuum

14  of time, no.

15       Q.   All right.   When you're interested in

16  knowing what the wind speeds are, what does that data

17  tell you?

18       A.   That's usually related to whether there's

19  some, you know, breach or opening or tear -- you

20  know, was there enough wind speed, say, to blow a

21  roof off or to break some windows or that kind of

22  thing.   Usually when I am tracking wind speeds, I'm

23  more interested in what was going on here.   I mean,

24  what was going on at -- I mean, specifically at the

25  time of some sort of loss.

Veritext Legal Solutions
866 299-5127

1                I mean, the last time I tracked that was we

2      had some wind damage on a roof here in Atlanta and I

3      was asked -- I was asked to see if I could help them

4      pinpoint when it happened, so we -- we knew when the

5      owner had said they saw the problem and so we

6      analyzed three different airport locations that

7      triangulated this particular location in downtown

8      Atlanta.  You know, it looks like these three days

9      are probably, you know, the likely first places to

10     look, so...

11          Q.   You got those wind speed records from the

12     U.S. Weather Service?

13          A.   Yes; from one of the NOAA websites.  I don't

14     know which one.  I can't chapter and verse tell you

15     which one.

16          Q.   Again, I'm speaking generally; but obviously

17     as I read records in this case, you know, I see

18     people making reference to the fact that, for

19     example, caulking will appear to be eroding.

20     Presumably any caulking that's applied only has a

21     certain duration that its effectiveness is optimal;

22     is that correct?

23          A.   Yeah.  It has an operable life.

24          Q.   What is it, typically?

25          A.   It varies between -- from material to

Page 100

1    material.  I mean, urethane caulks maybe a ten years

2    or so.  Silicone caulks, maybe little bit longer.

3    I'll qualify that by saying I have never told an

4    owner -- or let me rephrase that.

5            When I'm asked by an owner to assess a

6    building and they've got urethane caulk on it, one, I

7    want to know how long the caulk has been in place

8    and, two, I'll usually say seven to ten years on

9    urethane caulks because the ones on the south face

10   might be more -- they're getting a lot more sun and

11   UV than the ones on the north face and, therefore,

12   don't trust -- if a manufacturer says ten years, I'm

13   like not on the south and west faces.  So start

14   evaluating heavy at maybe year five because I think

15   your life is going to be seven on urethane for

16   heavily exposed areas that don't get a lot of shade.

17       Q.   If it's in a shaded area, what's -- is it a

18   little bit longer than seven to ten?

19       A.   It might last a little longer, although it's

20   still going to -- urethane is still going to break

21   down just from -- it's going to get some sun maybe,

22   you know, other than something that's facing due

23   north might not get some sun.  It might not get

24   direct sun, if that's the right word.  East, west,

25   and south are going to get it.

                                             Page 101

1      Q.   So the sunshine factor is -- does heat have

2   anything to do with the durability of the urethane or

3   is it just the ultraviolet radiation exposure?

4      A.   It's a mix.  It's a mix of just pure

5   exposure to just weather.  You know, it starts inside

6   a container, you know.  It has no -- it gets exposure

7   to no air, no thermal movement, no UV, no rain.  You

8   know, all the things that can get to the exposed

9   surface affect it.  And, of course, thermal

10  movement -- you know, it's moving -- it's elongating

11  and compressing throughout a day and then, you know,

12  throughout, you know, winter cycles versus summer

13  cycles.

14     Q.   And as that process continues, do you

15  develop cracks and openings in the caulking?

16     A.   You can.  You can get -- you know, it can

17  fail cohesively, which means it fails inside itself,

18  or it can fail adhesively meaning it loses its stick,

19  you know, to whatever it's adhered to, whatever it's

20  sealed to.

21     Q.   What makes silicone a better substance in

22  terms of durability?

23     A.   That's a question for Dow than me or other

24  silicone manufacturers.  It seems to be from a

25  function -- you know, from looking at it as a

Page 102

1    forensic engineer, it lasts longer.  It seems to hold

2    up better over time than a urethane caulk; but as far

3    as chemical -- there's chemical reasons why that

4    exists, but I'm not -- I'm not the chemical engineer.

5        Q.   I will ask one question about the Hilton.

6    What was the substance for the caulking you used

7    there that you observed?

8        A.   I believe at the brick-to-window

9    terminations and expansion joints I believe that

10   urethane.  It was urethane caulk.

11       Q.   Is there any question in your mind or --

12       A.   You know, we might go and look and find some

13   silicone in some places.  So the answer is generally

14   urethane caulk; but if you can go up and find a prior

15   repair location or something like that, there may be

16   some silicone caulk there.

17       Q.   All right.  Is James Chin the person that is

18   your contact person for purposes of performing the

19   work that you and your firm have performed in this

20   matter?

21       A.   Since it was in litigation, James or members

22   of his team but since it was in litigation.

23       Q.   When do you understand litigation commenced?

24       A.   I think sometime in '17.  I mention it in

25   the report.  Since January '17.

Veritext Legal Solutions
866 299-5127

1        Q.    Okay.  The complaint was filed in 2017.

2   Were you retained for any work prior to January 2017?

3        A.    Yes.

4        Q.    What work was that?

5        A.    Initially, I came out to assess the

6   building.  I believe -- it's all in our report, but

7   September of '15 I did a site visit and we looked at

8   the -- some of the exterior of the building but

9   for -- and that was part of it and then looked at the

10  ninth and tenth floors, which were under interiors

11  renovation.  I did that in September of '15 and wrote

12  a report regarding that in October of '15.

13       Q.    Was that task requested by the insurance

14  company for the property, FM Global?

15       A.    It was asked -- it was Joel Brown.

16       Q.    Joel Brown?

17       A.    Yeah.

18       Q.    He worked for FM Global; does he not?

19            MR. MACBRIDE:  Objection.

20            THE WITNESS:  Does this say AFM or FM?  I

21       thought it was AFM, but it doesn't matter.

22            MR. DAILEY:  Can we go off the record just a

23       minute?

24            (A discussion was held off the

25       record.)

Page 104

1    BY MR. DAILEY:

2         Q.   Mr. Brown, you have known him for how long?

3         A.   I'm not sure.  Maybe ten years but that's a

4    guess.

5         Q.   Okay.  Obviously, it was sometime prior to

6    September of '15 that you had first met him?

7         A.   Right.

8         Q.   Had you done any project work for Mr. Brown

9    or the company he represents prior to September of

10   2015?

11        A.   Yes.

12        Q.   Approximately, how many such projects?

13        A.   I'm not -- I can't remember exactly.  Maybe

14   two or three assignments per year, something like

15   that.

16        Q.   And whom did you understand Joel Brown to

17   work for?

18        A.   I think FM Global.  I looked at -- I

19   addressed the letter to FM Global.

20        Q.   I saw that.

21        A.   I mean, I've sent letters to Affiliated FM

22   on occasion, too; but I do know that I sent that

23   letter to FM Global.

24        Q.   Do you understand Affiliated FM Insurance

25   Company to be part of the FM Global group of

Page 105

1   insurance companies?

2       A.   Yes; but I'm not intimately aware of how

3   that works.

4       Q.   All right.  Those two to three assignments

5   per year would have -- if it was approximately ten

6   years, then maybe in the first five years you would

7   have had anywhere from 10 to 15 assignments from

8   Mr. Brown before this September '15 visit?

9       A.   Not necessarily Mr. Brown.

10      Q.   It could be other representatives?

11      A.   Other FM Global representatives.

12      Q.   And are you able to recall those?

13      A.   No.

14      Q.   You need to get your log?

15      A.   Yes.

16      Q.   So when he contacted you with respect to

17  what ultimately became a September 2015 site visit,

18  what did he tell you he was interested in having

19  performed?

20      A.   I think I wrote it down in my report, but I

21  would say --

22      Q.   Let's refer to it.  We marked this as 536.

23           MR. DAILEY:  Is that right?

24           THE COURT REPORTER:  Yes.

25  BY MR. DAILEY:

Veritext Legal Solutions
866 299-5127

1          Q.   Let's see.  Is your first report in the body

2     of this?

3          A.   Yes.  It's the first enclosure of the

4     January report, right.

5          Q.   All right.  So right off the bat, you said:

6     Dear, Mr. Brown.  At your request, ESL has conducted

7     an investigation of parts of the building interiors

8     and some exterior walls at the referenced Hilton

9     Atlanta Northeast building in Norcross, Georgia.

10              And then you go on to say the purpose of the

11     investigation as being to determine the cause and

12     origin of moisture or water intrusion that has led to

13     reported mold/mildew within the exterior and interior

14     walls of guest rooms and hallways within the

15     building.

16              Did I read that right?

17          A.   Yes.

18          Q.   Okay.  Anything else that you would add?  I

19     realize you can't write everything in your mind when

20     you're writing the report, but is that --

21          A.   That was it.

22          Q.   Okay.  Then how did your investigation

23     proceed with respect to this request?

24          A.   We were toured through the ninth and tenth

25     floors by Mr. Dan Tracy, the building, I guess,

                                             Page 107

1    engineer, and a gentleman Mr. Lin, I think, was

2    working in some capacity with the renovation.  And

3    those two folks took us through the ninth and tenth

4    floors.  I photographed a number of conditions

5    throughout the building as we talked -- as we walked

6    through and talked a little bit with Mr. Lin or

7    Mr. Tracy about what was going on.

8             And then I looked at the exterior walking

9    in; but then at the conclusion of talking with, I

10   believe, Ms. Adams and Mr. Lin and Mr. Tracy in

11   Ms. Adams' office --

12       Q.   Ms. Adams was the --

13       A.   Marcy Adams.

14       Q.   -- general manager?

15       A.   Yeah.

16            We had a meeting -- after we looked at the

17   ninth and tenth stories for a bit and photographed

18   what was going on, we came back down and met with

19   Ms. Adams and Mr. Tracy and Mr. Lin.  This is

20   Mr. Brown and me.  So the five of us met.  I kind of

21   gave them a verbal debrief of what I had seen.

22            And then after that, they had about a

23   three-story scaffold set up on the -- kind of the

24   left end of the front elevation near the front

25   entrance, and I spent sometime after that meeting

Veritext Legal Solutions
866 299-5127

1    really looking closely at the exterior brick just to

2    see what I could see going on at the exteriors

3    because most of the investigation had been interiors

4    up to that point.

5         Q.   How high did the scaffolding go?

6         A.   About three stories.

7         Q.   Three stories?

8         A.   It may be in a photo here.

9         Q.   All right.  We'll take a look at those in a

10   moment.

11        A.   Yeah.

12        Q.   Were there wall openings from the scaffold

13   that you could observe?

14        A.   There was no wall openings.  It was just

15   the --

16        Q.   No destructive testing?

17        A.   No, no, no.  No destructive testing.  I

18   didn't do any destructive testing, although the

19   contractor that was doing the renovation project had

20   done quite a bit of demolition up on the ninth and

21   tenth floors.

22        Q.   All right.  Your report of October 22,

23   2015 -- which by the way is addressed to Mr. Brown.

24        A.   Right.

25        Q.   -- does state that color contact sheets of

Page 109

1    digital photographs were taken during your site

2    visit.  They're in the file if you require them.

3    Orientation references to roof slopes or wall

4    elevations that is front right, rear, and left --

5         A.   Right.

6         Q.   -- are from the viewpoint facing the front

7    of the building, which faces south, southwest towards

8    the facility's parking lot and the main artery going

9    by, which is Peachtree Industrial Boulevard.

10        A.   Right.

11        Q.   And then you have a category, which is your

12   observations, findings, and conclusions.  So rather

13   than me reading that --

14        A.   Right.

15        Q.   -- why don't you -- with reference to what

16   you have put in your report, could you summarize

17   those for us?

18        A.   Sure.  I mean, they're written.  I stand by

19   them, if that's the right way to put it.  I mean, do

20   you want me to --

21        Q.   Well, maybe I should ask a question or two

22   because obviously you've got it looks like six bullet

23   points --

24        A.   Right.

25        Q.   -- of observations, findings, and

Veritext Legal Solutions
866 299-5127

1  conclusions.

2         The first bullet is really sort of giving a

3  contextual description of the structure; is that

4  right?

5      A.   Yes; just how it's clad, how old it is.

6      Q.   And you said the exterior walls are clad

7  with a combination of brick veneer and also with

8  two-story and five-story fixed panel metal frame

9  assemblies?

10     A.   Right.

11     Q.   These terminate at their left or right jambs

12 and the heads and the sills of those windows

13 terminate with the exterior brick veneer; is that

14 right?

15     A.   Right.

16     Q.   And you referenced the photographs where

17 this can be viewed.

18     A.   Right.

19     Q.   And you also point out that the views of

20 conditions taken at various interior locations were

21 on the ninth and tenth floors as shown in the

22 photographs you've referenced?

23     A.   Right.

24     Q.   Those were the only floors that you toured?

25     A.   That's correct.

Page 111

1        Q.    And those were the floors that the

2    contractor at that point was engaging in renovation?

3        A.    To my knowledge, yes.

4        Q.    Did anyone tell you what the purpose of the

5    renovation was?

6        A.    I knew it was interiors; but, I mean, that's

7    all I knew.

8        Q.    So we've got a description of the building

9    and what you're going to show.  In bullet point two,

10    you describe the investigation of the exterior walls

11    at the ninth and the tenth stories that were

12    partially open.  So you're looking at the exterior

13    walls but from the inside; is that correct?

14        A.    Correct.

15        Q.    And tell me how that -- to make it more

16    interesting instead of me asking these questions --

17        A.    Sure.

18        Q.    -- just tell me what are you presented with,

19    what are you looking at, and what are you able to see

20    as you do that from the interior view towards the

21    exterior walls.

22        A.    Right.

23            I knew from looking at the exterior it was

24    predominantly brick veneer other than the places

25    where the windows were where I mentioned.  So brick

                                        Page 112

1  veneer has to sit on a steel shelf and --

2      Q.   Is this brick veneer providing any support

3  for the building?

4      A.   No.  Brick veneer is a facade.  It's a

5  cladding.

6           So it's sitting on steel shelves.  The

7  shelves are attached to the building structure and

8  behind the shelf is steel studs, which I could see

9  the back of.  I know for sure at the tenth floor -- I

10  can't remember.  I have to look at the photos.  I'm

11  looking at -- on many locations on the exterior

12  walls, I can see the back of the wall sheathing

13  that's attached to the exterior sides of the wall

14  studs and I can see some insulation, you know, that

15  had been not fully removed yet and then --

16      Q.   What was that wall sheathing?

17      A.   It's a gypsum product.

18      Q.   A gypsum product?

19      A.   Yeah.

20      Q.   And this would be -- the wall sheathing

21  would be -- we used a term earlier -- water resistive

22  barrier?  Is that what the --

23      A.   No.  That's not --

24      Q.   I'm mistaken.

25      A.   The building wrap -- you know, I said

Page 113

1   possibly at that time 30-pound felt.  In later

2   investigations, we were able to confirm that.  You

3   had a 30-pound felt paper on the exterior side of the

4   gypsum sheathing, which is serving as your water

5   barrier and your air barrier for the wall.

6        Q.   Okay.

7        A.   And then you've got the sheathing.  Then

8   that's attached to the wall studs, which are cold

9   formed steel or some folks like to say gauge metal.

10  Attached to the inside of that wall stud is the

11  gypsum wall board or we can call that drywall.

12       Q.   That's what we see inside the hotel room?

13       A.   Yes.

14            And then there's a covering of either paint

15  or gypsum -- I mean, a vinyl covering over that

16  drywall.

17       Q.   What was the significance of the vinyl wall

18  covering to you?

19       A.   If there's water and/or negative pressure,

20  it's an impermeable covering that restricts the

21  ability of any water that gets into the wall cavity

22  from drying basically through the drywall drying out

23  the wall cavity.  So it's basically not a good thing

24  if you've got water intrusion into the building.

25       Q.   When you say impermeable covering, are you

                                          Page 114

```
 1    saying, in other words, that air can't penetrate that
 2    vinyl covering to provide any drying --
 3         A.    That's right.
 4         Q.    -- that might occur?
 5         A.    That's right.
 6         Q.    Okay.  Is it helpful at this point to refer
 7    to photographs, you know, just to keep this
 8    chronology clear?  Because I want to do it -- I want
 9    you to understand today I'm not here to contest your
10    opinions.  I just want to understand them.
11         A.    I understand.
12         Q.    So obviously for anyone who reads the
13    transcript, I would like it to be maximally
14    understood, including myself when I go back to read
15    it.
16         A.    Right.
17         Q.    Would it be useful you think at this point
18    to having described this component now look at the
19    photographs that you had referenced?
20         A.    If you would like to.
21         Q.    Why don't we do that.
22         A.    Yeah.
23         Q.    And I'm going to rely on you to direct my
24    attention to it.
25         A.    Do you want me to call out page numbers?
```

Page 115

1          Q.   Yes.

2          A.   Why don't we just start -- we can just go

3     through the photos if you would like and I'll show

4     you kind of what I'm talking about.

5          Q.   I mean, we have other bullet points and --

6          A.   Right.

7          Q.   After you show some photos, maybe we return

8     to the next bullet point.  I don't know.  But maybe

9     we can cover it all simply by going through the

10    photos.

11         A.   Maybe.

12              MR. MACBRIDE:  Can we just go off the record

13         for a second?

14              MR. DAILEY:  Sure.

15              (A discussion was held off the

16         record.)

17              THE WITNESS:  On page 1 of 20 -- there on

18         page 1 of 20, there's a couple of exterior -- I

19         have four exterior views -- quick exterior

20         general views of the building.

21    BY MR. DAILEY:

22         Q.   And you'll see underneath each photo there's

23    a Bates number that we're --

24         A.   It's an image number.  It's our -- it's our

25    photograph number, which I refer to on occasion in

Veritext Legal Solutions
866 299-5127

1     the report.

2         Q.   Yeah.

3              So, I mean, go ahead and speak out which

4     ones you're looking at.

5         A.   Okay.  Yeah.  If I am looking at a specific

6     image number?

7         Q.   Please.

8         A.   Sure.

9              Well, in general, I mean, with regard to

10    that first bullet, I know it's brick veneer and I'm

11    presuming there's a 30-pound felt or some other

12    building wrap behind it because I don't think that

13    shows in these photos.  And I think I say that --

14        Q.   And the 30-pound felt is -- its purpose,

15    again, is what?

16        A.   It's the water barrier --

17        Q.   The water barrier.

18        A.   -- and an air barrier --

19        Q.   And an air barrier.

20        A.   -- for the exterior wall.

21        Q.   And it's constructed of paper?

22        A.   It's a real thick tar.  You know, it's a

23    tar -- a lot of people call it tar paper, but it's an

24    asphalt tar material embedded in a very thick paper.

25        Q.   Okay.  Thank you.

                                        Page 117

1      A.    So I'm pretty much presuming that's on the

2   exterior because these photos are all taken from the

3   interior unless I've got -- again, I did no

4   destructive testing.  Let me look back because I've

5   got some photos at the rear -- I'm sorry, at the

6   later pages that, you know, show a shelf angle or two

7   and a lot of exterior views of the brick.

8      Q.    So as you were mentioning the brick

9   cladding, you're referencing image 4241 through 4244;

10  is that right?

11     A.    Let me get back to that page.

12     Q.    The first four.

13     A.    Yeah, the first four.  Yeah, 4241 to 4244.

14  And they're just general elevation views of the

15  front.  It's predominantly right elevations.  There's

16  not a lot of the left and rear at that point.  And

17  then the rest of the photos until you get to the last

18  few pages of the photo sheets are interior views of

19  the wall stud cavities either on the exterior walls

20  or interior walls.

21     Q.    So some of these interior photos, for

22  example -- and you tell me what's a good example of

23  showing some of the layers that work within -- work

24  inward from the brick cladding.

25     A.    Right.

                                              Page 118

1           I mean, maybe start at 4250, for instance,

2    on page 2, top left corner.  You can see -- you're

3    looking there at the back of the wall sheathing and

4    then you're looking at the stud cavity that the

5    sheathing is attached to; and then, of course, the

6    drywall and installation have been removed at this

7    location.

8           And, you know, a lot of this -- I can't tell

9    you that photo shows you everything that's in that

10   bullet because then in later photo we've got -- you

11   know, we saw the vinyl had not been fully removed

12   from the drywall.  So, you know, the bullet is a

13   summary of everything that's shown in other photos,

14   too; but that's a typical view of the wall cavity and

15   then, of course, window -- you know, the photos that

16   follow it, 4253 and 4254, are of the sill area of the

17   window that's, you know, installed in that wall

18   cavity.

19        Q.   Does insulation also go in the wall cavity?

20        A.   Yes.  You know, like in photo 4256, that's

21   some extruded polystyrene insulation, you know, board

22   type insulation that's been installed there.

23        Q.   Is it part of the recommended construction

24   that there be an airspace between the sheathing and

25   the interior drywall?  I mean, things are not just

Page 119

1    flush together.  There seems to be a little bit of

2    space.  Is it intended to have some air space in

3    there?

4        A.   Most of the air space in a brick veneer wall

5    is really between the back of the brick and the

6    exterior face of the sheathing.  There's an air space

7    there.

8        Q.   I see.

9        A.   It should be there and in this case is

10   there.

11       Q.   Why should it be there?  It recommended that

12   it be there?

13       A.   Yeah.  It's the way -- yeah, the way

14   industry shows installation of brick.  It can have a

15   one-to-four-inch gap.  There are some rare instances

16   where that gap is filled with mortar but not in this

17   building's set up.

18       Q.   Are there advantages to having the

19   one-to-four-inch gap?

20       A.   It's whatever the designer asked for.

21   There's various reasons why it might be bigger.  In

22   this case it was about an inch.  We're jumping -- now

23   we're jumping ahead to what I found later because

24   right now --

25       Q.   I apologize.

                                        Page 120

 1        A.    That's all right.  This is the -- this is
 2   the first site visit.  So these photos are generally
 3   showing various conditions of exterior and interior
 4   walls and windows where I can see them and stains,
 5   you know, either on drywall or behind vinyl.
 6        Q.    So where are you seeing stains?
 7        A.    Such as photo 4266 on page 3.  You can see
 8   the stain.  That's a stain at the corner where the
 9   lower left corner of that window abuts with the
10   drywall, which is telling me I've got a leakage issue
11   there or a condensation issue there or both by virtue
12   of seeing that stain; and then if you look at 4267,
13   it's an overall view of that same location.
14            And then 42 -- well, that's just kind of
15   showing you a general view; but you can see a lot of
16   rusted studs there.  The rusted studs are telling me,
17   hey, we have something going on here that's recurring
18   because the studs won't rust unless there's recurring
19   water.
20        Q.    Can you direct me to where you see the
21   rusted studs?
22        A.    Look at the -- I'm at 4267.  Do you see the
23   jamb, the left jamb of that wall system that's below
24   the window?  That's rust and along the top plate of
25   the wall studs.

                                           Page 121

1        Q.    Are these wall studs made of metal?

2        A.    Yes.

3        Q.    Okay.

4        A.    Yeah, those are light gauge metal studs.

5        Q.    So the rusting that you're directing my

6   attention to --

7        A.    Right.

8        Q.    -- actually appears on the metal material?

9        A.    It's on the metal stud, yeah.  I mean,

10  there's a closer view of it like in 4259, which is at

11  a different location.  Do you see the rusted top

12  plate?  It's the plate at the top of that little stud

13  wall that's going horizontal.  Do you see that?

14       Q.    There's a rust color?

15       A.    Yeah.

16       Q.    If it was not rusting, then we would see

17  like a smooth silver sheen?

18       A.    It would look silver, that's right, like

19  some of the other studs that are adjacent to it.

20       Q.    Is there anything that this kind of rusting

21  that you observe in 4259 -- is there anything that

22  that's telling you based on your --

23       A.    It looks like -- I mean, if you look, the

24  top plate is heavily rusted.  So I'm either getting

25  water from condensation at that window that's

Page 122

```
 1    dripping down and soaking that top plate.  If you
 2    look at the wall stud that's almost directly under
 3    the window, there's a lot of rust on it, too.  It's
 4    telling me, again, I've got a water source.  It's
 5    either -- is the rough opening leaking or the wall?
 6    Basically, where the wall and window meet is the
 7    rough opening that surrounds -- you know, the stud
 8    wall opening that the window is being installed
 9    inside of.  I mean, it looks like I might have a
10    rough opening leak or I've got condensation --
11    recurring condensation going on which is leading to
12    the rusting of the metal.
13         Q.   When installation of a window is made in
14    that opening --
15         A.   Right.
16         Q.   -- what is typically done to seal the
17    perimeter of the window or is there something --
18         A.   Well, to seal around the window is caulk;
19    but what should also be present is a pan flashing, a
20    flashing system, under the window that diverts water
21    back to the air space back to the face of the
22    wallboard -- not the wallboard -- to the face of the
23    30-pound felt or whatever the building wrap over the
24    exterior wallboard is.
25              I mean, we're bouncing around here.  If you
```

Page 123

1    look at photo -- go back a page to photo 2 of 20 and

2    look at the underside of the window shown in 4243 --

3    excuse me, image 4253 and 4254.  At that location, I

4    should be seeing the back of a flashing system under

5    that window, not the window itself.  So I knew just

6    from looking at that window right there that there's

7    a defect in the waterproofing installation because I

8    should be -- I shouldn't be able to see the back of

9    that window.  I might see part of it, but I should be

10   seeing the back dam -- I should be seeing the back

11   dam of the flashing that's under that window.

12           And if you notice all the rust that you can

13   see better in 4253 -- do you see that top plate is

14   heavily rusted and that jamb to the right of that at

15   the right corner is heavily rusted.  So I can see

16   I've got a recurring water problem going on there

17   incidental to likely condensation during parts of the

18   year and/or water coming through the rough opening on

19   a recurring basis.

20       Q.   Is it your conclusion that the term that you

21   use, the flashing, that should redirect any water

22   that does come to the exterior of the wall sheathing?

23       A.   It should divert any water that gets into

24   the rough opening back to the 30-pound felt that's on

25   the exterior side of the sheathing, yes.

Page 124

1        Q.    As you're looking at, for example,

2   photograph 4253, is it your testimony that you see no

3   flashing at all?

4        A.    Correct.

5        Q.    Did you see this replicated in any other

6   window?

7        A.    Yes.

8        Q.    Approximately --

9        A.    Because this is the first site visit.

10  Remember, this is the first site visit.  So I'm

11  looking later, you know, starting I think in January

12  of -- we looked at this in September of '15, wrote

13  the report in October of '15.  I think in January or

14  February of '16 we were called back to start looking

15  at other floors.  So I got to see some other

16  representative construction at other floors that was

17  similar to what we're seeing here in September of

18  '15.

19       Q.    So in September of '15 you say you saw it at

20  other windows.  Were you referring to seeing it at

21  other windows also in September of 2015?

22       A.    Yes; because there's other windows photoed.

23  You know, I've got 20 pages of photographs.

24       Q.    So as we continue on page 3, are you --

25       A.    Photoing general conditions that I'm seeing

                                        Page 125

1    going room by -- we're kind of walking through

2    different guest rooms, as you can see.  Usually I'll

3    photo a guest room number so later I can go, oh, yeah

4    photo 4263 is at room 1030, so that's on the tenth

5    floor.

6          Q.    I see.

7                And if we turn to page 4, what is depicted

8    there?

9          A.    Page 4 is showing you additional symptoms of

10   recurring water intrusion.  Most notably in these

11   photos is the rusted sill tracks and rusted studs.

12   I'm still in room 1030 at the top six photographs

13   there.

14         Q.    The sill track is depicted where?

15         A.    Best in 4269.  Do you see the wall studs?

16   When I say wall studs, I'm referring to something

17   that's vertical.

18         Q.    Right.

19         A.    And then the sill track is what the wall

20   stud is sitting down in, which is actually a stud

21   turned -- laying flat on one side and then basically

22   you see the wall studs are coming down into the sill

23   tracks almost like a stud that's laid horizontally on

24   the floor.

25         Q.    And then adjacent to that sill is a rusted

Page 126

1    feature; is that correct?

2        A.   Yeah; adjacent -- you're still on 4269.

3        Q.   I am.

4        A.   It would be good for you to have the bigger

5    photos, too.  I'm sorry.

6        Q.   That's okay.

7        A.   We can look together at mine, if you want

8    to.

9             Yeah.  Do you see the right wall stud about

10   maybe two inches above that sill track?  It's got a

11   lot of rust on it right at that location.  And then

12   the sill track is not only rusted but some of it is

13   gone.  So that's telling me water has been there on a

14   recurring basis a lot, and then --

15       Q.   Do you know for sure whether they tore it

16   out or --

17       A.   You know, I'm not sure.  We just saw it this

18   day, so I don't know what -- I don't know what the --

19   that would apply to a lot of photos that you look at

20   later.  That's what I saw that day.  I don't know

21   what the contractor did.

22            I'll go ahead and jump ahead a little bit to

23   another conclusion because 4270 is right beside it.

24   That's an interior wall.  If you look at that

25   photograph 4270, you see a lot of rust on wall studs;

Page 127

1    and that's on an interior wall.

2              4271 is a close-up view.  I was trying to

3    see -- what was bothersome about -- if I've got an

4    exterior wall leak, I think -- if I've got an

5    exterior water leak -- I'm looking back.  Yeah.

6              Okay.  We were talking about 4269.  4269 is

7    on the exterior wall below the window because I

8    sequenced these.  You know, I changed some overall

9    views.  Here's overall views of a window.  Here's

10   some staining at the window in 4266.  Here's an

11   overall view of where I was.  And then if you take a

12   look at 4269 going back to that, that's exterior

13   wall -- I can see that's exterior gypsum because it's

14   dark gray.

15             Do you see the dark gray?

16        Q.   I do.

17        A.   So I can tell I'm on the exterior wall then.

18   When I go to 4270, I'm on an interior wall and you

19   see how the gypsum wallboard here is white because

20   that's just the back side of the drywall; but it's on

21   the other side of the room.  The adjacent room is a

22   better way to say that.

23             But I'm seeing rust on the wall studs on the

24   interior wall.  4271 is a close-up view of the

25   interior wall.  4272 is a generally close-up view of

Page 128

1    rusted studs on the interior wall.  See, it's pretty

2    close to the exterior wall on the left side of that

3    photo.

4            So those -- the rust on the interior wall

5    studs here was telling me something else is going on

6    here specifically negative air pressure because I

7    shouldn't be seeing -- it's one thing to have a leak

8    on an exterior wall, fair enough, or condensation.

9    Both of those are going to cause the rust on the wall

10   studs under the window.

11           When I start seeing it on these interior

12   walls, there's no exterior water getting to that

13   exterior wall.  I mean, I said exterior wall.  That

14   interior wall is not getting exterior water.  Of

15   course, we have a bathroom right behind it.  There

16   may be a little interior water getting to the closest

17   wall stud to the bathroom, but then after that we're

18   far from the exterior wall and we're generally far

19   from the bathroom.  So this rust is telling me

20   something else is going on here.  We shouldn't be

21   seeing rust.

22       Q.   Why are you confident that water from the

23   exterior is not making its way to the interior wall?

24       A.   Ask that again.

25       Q.   You said -- your premises is, because I see

Page 129

1    rust on this interior wall and on the studs adjacent

2    to it --

3         A.   Right.

4         Q.   -- that something else is going on.  And at

5    one point I heard you say that exterior water should

6    not be making its way all the way to this point.

7         A.   Right.

8         Q.   How is it that you would be confident of

9    that?

10        A.   Because of where it is on the stud for one.

11   I mean, look at the sill track in 4269.  That's

12   obviously got water that's been getting to that sill

13   track, but it's gravity.  You know, water is

14   naturally going to go to the slab or to the sill

15   track that's sitting right on the slab.  Go to 4270

16   and look at those upper studs.  That's not gravity.

17   That's defying gravity.  So that's probably vapor,

18   airborne vapor, that is condensing at times inside

19   the wall.

20             And how does that vapor get there?  It gets

21   there multiple ways.  One, evaporation of water

22   either from the bathroom to our rear at this photo --

23   I'm at 4270 -- or to the front exterior.  I may have

24   that reversed.  I think I do.  I think the exterior

25   wall is to my right in 4270 and the wall that you can

1    see in the left side of that photo is an interior

2    wall.  So I'm -- just for orientation.

3            But what's bothering me is that rust that's

4    up high.  That's telling me that's from condensation

5    that's recurring and it's because of vapor that's in

6    the wall.  That's either from evaporation of water in

7    the sill tracks, fair enough, or just vapor that's

8    getting sucked into the wall.

9            We're at a pretty early stage in the

10   investigation at this point, but I'm trying to point

11   out why, in addition to free water leakage,

12   condensation at the exterior walls, and free water

13   leakage from splash or plumbing in the bathrooms,

14   we've got a vapor problem in the interior walls.

15       Q.   And if the vapor problem is as you

16   believe --

17       A.   Right.

18       Q.   -- the rust that is showing in 4270 --

19       A.   Right.

20       Q.   -- on the wall studs appears to be higher

21   up.

22       A.   Correct.

23       Q.   If it's a water vapor, why wouldn't it

24   uniformly cover the wall studs from top to bottom?

25   Why wouldn't you see evidence of rust?

Page 131

1      A.   Oh, because of variations.  It could be a

2   board joint in the drywall that let's more air

3   conditioned air -- so basically this condensation is

4   probably occurring during the hotter months of the

5   year when there's hotter and humid air in the wall

6   cavity, which is attached to the exterior wall,

7   remember.

8          And some -- for some reason a little bit

9   colder air conditioned air from the room -- guest

10  room makes it through a board joint or a joint in the

11  vinyl or there's a fastener -- a wall fastener that's

12  closer to the surface that thereby is a thermal

13  bridge, if that's the right term, from the face of

14  the fastener into the stud.  I mean, it could be a

15  variation of reasons.

16     Q.   Were you able to identify and conclude at

17  this point in your investigation?

18     A.   I was not analyzing that depth.  But if you

19  look at photo 4273, do you see the heavy rust and a

20  hole?  That's probably a fastener location where

21  there was a drywall screw.  So the drywall screw is a

22  thermal bridge.  The face of the screw is sitting

23  right outside the drywall, right, and then it's going

24  through the drywall to the wall stud.  So it's

25  probably carrying some colder temperature to the wall

Page 132

1    stud, which is inside the cavity.  The cavity has got

2    airborne moisture in it.  There's a -- we reach a dew

3    point.  There's a certain dew point temperature of

4    the surface that's then going to cause condensation.

5    Condensation is now free water, and that causes

6    rusting.

7         Q.    Did you attempt to challenge your own

8    observations?  Could you identify as you were

9    evaluating possibilities --

10        A.    Uh-huh (affirmative).

11        Q.    -- was there any different causative factors

12   that you considered other than the one you're now

13   describing?

14        A.    I mean, close to the bathrooms, maybe it's

15   free water; but away from the bathrooms, what's going

16   on?  Something is not right here.  So the answer to

17   your question is yes.  We're always challenging our

18   conclusions.  Wade, of course, looked at this with

19   me.  We worked together.  You know, hey, peer review

20   this with me; let's look at this together.  This

21   issue continues throughout other photos.  We can make

22   this deposition go 20 hours, if we need to.

23        Q.    No.

24        A.    I mean, just look real quickly at 4276 and

25   then 4277 and 78 and 79.  They are closer views of

                                        Page 133

1    that same location, and you see I'm well inside the

2    room.  That's a door -- that's a door that goes

3    between two units, and you can see 4276 overall.

4    I've got rust at the door jamb, a lot of rust at the

5    door jamb.  I'm away from the exterior wall and I'm

6    away from the bathroom, and then 78 is the top right

7    corner of that same door.  4277 is the lower right

8    corner.  And then 79 is -- I walk through the door

9    into the adjacent guest room, and then 80 is looking

10   back at the stud on the other side.  Those five

11   photos, 76 to 80, are all generally the same location

12   and they're far away from both exterior wall and

13   bathroom.  So I'm like, something is going on here.

14        Q.   When you say far away, are you able to for

15   the record approximate --

16        A.   Sure.

17        Q.   -- how many feet that might be?

18        A.   Yeah.  I think the -- from the exterior --

19   wall, let's use 4277 as the point.  That's probably

20   about five to six feet from the exterior wall and I'm

21   guessing about ten feet from the bathroom wall.  And

22   as discussed earlier, you're seeing rust in the upper

23   up at the jamb area -- I'm sorry, jamb area.  4278 is

24   the head of the door.  I've got a lot of rust on the

25   studs that are five feet off the floor at that

Page 134

1     location.  Actually, 4280 is also way, you know, high

2     up -- another high up about five feet above the

3     floor.

4          Q.    What are lines we see running in 4280?

5          A.    Those are electrical conduits.

6          Q.    Okay.  On the ninth and the tenth floors --

7     this an approximate -- I think there are 272 rooms in

8     the hotel.

9          A.    Right.

10         Q.    On the ninth and tenth floors, do you know

11    how many rooms that represented?

12         A.    If we divide -- how many floors?  Two to

13    ten, is that nine floors?  I think that's right.  And

14    then divide the 272 by 9 and that gets you about 30

15    rooms per floor.

16         Q.    I'm trying to remember Ms. Adams' testimony.

17    I think she talked about approximately 30 to 32

18    rooms.

19         A.    I think that's right.

20         Q.    Did you see these conditions replicated

21    in -- number one, first, did you look at each and

22    every 30 of the 32 rooms available on nine and ten?

23         A.    On the first site visit, I don't think I

24    looked at every room.  I was looking at --

25         Q.    How many rooms did you look at?

Page 135

1        A.    We might could figure it out from looking at

2    my photos because I typically try to take a photo

3    when I enter a room so I'm telling myself and my

4    reader, you know, okay, we've moved to a different

5    room.  The answer is I don't know.  We could figure

6    that out from looking at the photos.  I would say 10

7    or 12.

8        Q.    10 or 12 rooms perhaps.

9             Do we have photographs in each of the 10 or

10   12 rooms that show this same degree of rusting

11   occurring?

12       A.    Yes.  Well, where I could.  Now we're

13   jumping ahead to subsequent site visits.  Some site

14   visits I got to see what I'm seeing here in the

15   photos we've just been talking about.  Other times we

16   were only allowed to see what the room looked like

17   before it was demoed.  So there I was just seeing

18   vinyl wall covering and gypsum and windows and maybe

19   some stains on drywall, that kind of thing.

20             So the answer is it varies from floor to

21   floor depending on what the owner and the owner's

22   attorney allowed us to see.

23       Q.    Those were subsequent site visits?

24       A.    Those are subsequent site visits.

25       Q.    This September of 2015 you had a fairly wide

Page 136

1   latitude; you could basically look at anything that

2   you wanted to on floors nine and ten?

3        A.   Given that, I think -- let's see.  Is

4   this -- some floors had the drywall removed.  I could

5   see the wall studs.  Others just had the vinyl

6   removed.  The photos on page 7 of 20 are showing

7   places where the vinyl has been removed but the

8   drywall is still in place.

9        Q.   Obviously, there were different levels of

10  renovations?

11       A.   Correct; various levels of demolition that

12  was -- that had been accomplished at that point in

13  time.  So I didn't get to see wall studs.  The answer

14  to your first question was I didn't get to see wall

15  studs exposed at every floor because I got to see

16  what was made available to us at the time of the site

17  visits.

18       Q.   All right.  How would you categorize the

19  extent of rusting that you're observing.  Is it

20  minimal, modest, moderate, or significant?  Are those

21  good categories?  Which do you use?

22            MR. MACBRIDE:  Which photo?

23            THE WITNESS:  That's about what I was going

24       to ask.  Some of the photos at the exterior walls

25       where the sill track is gone or the stud -- I

Page 137

1        mean, there's some photos on page 1, I think.

2        Like, 4269 we spent a fair amount of time on.

3        That's significant, substantial.  Photo 4252 and

4        others near it, that's very substantial.  I mean,

5        that's rusting.  That's terrible.

6            On some of the interior walls, I would say

7        moderate would probably be a good descriptor

8        because it's not just a little bit but it's

9        not -- I mean, look at 4290.  I think 4290 is

10       backing up to a bathroom.  It is.  You know, it's

11       backing -- that's backing up to a bathroom wall.

12       That's sill track is substantially damaged or

13       rusted is probably a way better descriptor.

14           So, yeah, substantial there.  Generally

15       moderate within these photos at interior walls

16       but not minimal.  But minimal would mean maybe it

17       happened one time.  This is telling me something

18       is going on on a recurring basis.

19  BY MR. DAILEY:

20       Q.   Obviously, having had the benefit of reading

21  your report, I understand that what you are

22  ruminating about and trying to ascertain what else is

23  going on is leading you to consider a negative

24  pressurization of the building itself.

25       A.   Right.

Veritext Legal Solutions
866 299-5127

1        Q.   Is there a point in time when you felt like

2   you -- since that is a conclusion that you're

3   advancing in this case, that it's a contributing

4   cause of rusting -- we have an ultimate issue of mold

5   and mildew.

6        A.   Right.

7        Q.   When was it that you reached your conclusion

8   that negative pressurization was, in fact, an

9   important contributing factor?

10        A.   As we finished the more recent report, you

11   know, we really dug in deeper.  Plus we had a chance

12   to look at more of the building.  In September,

13   October of '15, I was saying this needs to be looked

14   at and it -- I think I used -- we can go look at my

15   exact words.  I think I said indicates like, it looks

16   like it's doing that; but we weren't -- we weren't

17   100 percent there.  But those interior -- the mold on

18   interior walls and rusting on interior wall studs was

19   telling us it's probably likely, but we --

20        Q.   When you say you dug in and you really came

21   to that for the most recent report, are you referring

22   to the most recent report of January 13, 2020?

23        A.   Yes.

24        Q.   In the weeks immediately preceding January

25   13 is when you finally formulated your ultimate

Page 139

1   conclusion?

2       A.   Probably not weeks.  I mean, this has been

3   going on a long time.

4       Q.   Don't let me speak for you.

5       A.   No.  I'm saying probably within -- I mean, a

6   long time before weeks in advance of that report.

7   Liberty had studied it far deeper than us, Liberty;

8   and they had said there was negative pressure in the

9   building, too.  But we -- and we agreed with them.

10  We had come to the conclusion a long time before we

11  wrote the January '20 report, but I can't give a

12  specific --

13      Q.   I don't mean to be critical.  I think I'm

14  hearing two things.  First, you said without a

15  question from me that it was right when we got around

16  to writing this report and dug in we came to our

17  final conclusion.  Now you feel that you should more

18  accurately state, I think, a period of time earlier

19  than that.

20      A.   Right.

21      Q.   So for purposes of your testimony and so

22  that I have something to carry away from this

23  deposition and know where you stand --

24      A.   Right.

25      Q.   -- where would you pinpoint it?

Page 140

1        A.   I can't --

2             MR. MACBRIDE:  I'm just going to object to

3        the preamble to that question.  His prior

4        testimony will stand for itself.

5             MR. DAILEY:  It will, and I'm not trying

6        to --

7             MR. MACBRIDE:  I know you're not.

8             You can go ahead and answer.

9             THE WITNESS:  And my answer is I can't

10       pinpoint it.  That's what I was trying to say.

11       We knew in October of '15 it sure looks like it,

12       but we looked at the ninth and tenth floors and

13       some exterior brick.  So I would say that's

14       something -- honestly, I thought it would -- I

15       never dreamed you and I would be sitting here

16       today, but -- because I just wrote the report

17       based on what I saw at that moment in time and

18       listed here are the sources of water, which

19       stands.  But as we dug deeper, we found more and

20       more pieces of negative pressure, you know,

21       whether --

22  BY MR. DAILEY:

23       Q.   Okay.  So maybe another way --

24       A.   Which is way more articulated in the second

25  report.

Veritext Legal Solutions
866 299-5127

1          Q.   I understand.

2               But so I can understand what digging deeper

3     means, because that seems to be sort of the by-word

4     for you coming to your final conclusion --

5          A.   Right.

6          Q.   -- can you briefly describe what the digging

7     deeper events were?

8          A.   Sure.  This is a short answer.  It's the

9     subsequent site visits and further -- and then

10    further synthesis of what we gathered from those

11    subsequent site visits.  Remember, in September of

12    '15 I did not look at the roof.  I really didn't look

13    at the rear wall or the left wall.  I looked at the

14    ninth and tenth floor interiors, and I looked at

15    exterior walls closely on the front elevation.

16         Q.   Okay.  And then taking the simple answer

17    that you have given, it was the subsequent site

18    visits.  How many subsequent site visits are we

19    speaking about?

20         A.   I can't do that from memory, but they're

21    identified in the second report.

22         Q.   All right.  That's Exhibit 536.  Can you

23    tell us -- can you go and find where you're saying --

24         A.   Yeah.  Let's see.  I think it's the fourth

25    paragraph -- the fifth paragraph.

                                          Page 142

1        Q.   Since our initial September 22, 2015, site
2   visit to the building --
3        A.   Yes.
4        Q.   -- further investigative activities have
5   included ESL site visits and visual photographic
6   surveys of the various areas of the building's
7   interiors, exteriors, roofs, and HVAC systems that
8   were conducted at the request of Mr. Joel Brown of
9   AFM on March 2, 8, and 9, 2016.
10              So that would be the first of the subsequent
11   visits; is that right?
12        A.   Yes.
13        Q.   On April 28, 2016?
14        A.   Yes.
15        Q.   June 20, 2016?
16        A.   Is this a question every time?
17        Q.   Yes.  I just want you to confirm what I'm
18   sort of implyingly asking.
19        A.   Sure.
20        Q.   Then he -- you have the dates July 11 and
21   July 12, 2016?
22        A.   Yes.
23        Q.   And then October 10, 2016?
24        A.   Yes.
25        Q.   November 18, 2016?

Page 143

1       A.   Yes.

2       Q.   And January 9, 2017?

3       A.   Yes.

4       Q.   And the January 9 you're attending

5    examinations under oath of Mr. Tracy.  What is that?

6       A.   Those are on September 29 and 30 of '16.

7       Q.   Okay.  I'm sorry.  So January 9, 2017, was a

8    site visit?

9       A.   It was.

10       Q.   Okay.  And then you went to the examinations

11   under oath on September 29 and 30 of 2016?

12       A.   Correct.

13       Q.   So basically you want us to appreciate that

14   you listened to information that was reported at

15   those examinations?

16       A.   Yes.

17       Q.   Again, an examination of Marcy Adams on

18   September 30, 2016?

19       A.   Right.

20       Q.   And of Mr. Frank Lin on October 27, 2016?

21       A.   Correct.

22       Q.   Okay.

23       A.   And then there's one more site visit in

24   February of 2019 in the next sentence.

25       Q.   I see that.

Page 144

1              So several additional site visits?

2        A.    Correct.

3        Q.    Did each one result in a report or was this

4   just a successive of visits that you were requested

5   to make?

6        A.    None.  The only report, other than our first

7   report in October of '15, is the January 13, 2020,

8   report.  The answer to your question is no.

9        Q.    Okay.  Obviously, you take photographs to --

10       A.    Right.

11       Q.    -- document what is being observed.  Do

12  you -- if you're not writing a report, do you keep

13  handwritten notes of your visits?

14       A.    Yes.

15       Q.    And what do you typically include in the

16  handwritten notes during site visits?

17       A.    Anything of significance.  Maybe I learned

18  the roof at the first story was re-roofed in 2010 --

19  the answer is very little.  I only write things that

20  I need to remember.  Most of my notes are from my

21  photographs.

22       Q.    Have you looked at your file notes in the

23  recent days?

24       A.    I probably looked at them some before we

25  wrote the January 2020 report.  I haven't looked at

Page 145

1   them since.

2       Q.   How extensive are your file notes?  How many

3   pages of notes do you have?

4       A.   I don't know.  Probably a page per site

5   visit.  Most of them say see photos, visited on this

6   date, who was present, see photos unless there was

7   something of significance here or there that might --

8   that I want to jog my memory, oh, you know, we looked

9   at -- there's a chase, for instance, at the east -- I

10  think it's the eastern end of the building.  At one

11  of the site visits or two, we looked at -- we were

12  able to look in that chase and basically see a lot of

13  exterior wall from the interior untouched.  So I

14  might have a field note that says see photos at east

15  chase accessible from the second floor but not a lot

16  of notes.

17      Q.   When you say untouched, what do you mean?

18      A.   It wasn't -- it hasn't been -- there was no

19  destructive testing or demolition by the contractor,

20  et cetera.

21      Q.   Okay.  And a chase is a what?

22      A.   It's a floor-to-roof -- second-story-to-roof

23  stack, for lack of a better term.  It's open like a

24  chimney chase or utility chase.  You can see all the

25  way to the roof, the underside of the roof, of

Page 146

1    course.

2         Q.   So that opening is there to run utilities?

3         A.   I'm not sure what the designer had in mind.

4    There's some HVAC ducts in it, but the answer is we

5    haven't looked that deep to figure out what that

6    specific chase's role was.

7         Q.   I see.

8              All right.  So what's the best way for you

9    to tell me what you learned at the subsequent site

10   visits?  If I ask you what you did at each one, I'm

11   suspecting you're going to say I'm not sure I can

12   recall; but I don't want to put words in your mouth.

13   Do you remember each of the site visits and what you

14   were observing?

15        A.   No.  Some of them I did and some of them

16   Wade did and some of them Wade and I did together.

17        Q.   Do you know which ones of these listed you

18   did?

19        A.   Not without looking at our field notes, no.

20        Q.   Okay.

21        A.   I did most of them.  Wade was there for

22   several with me and then he -- but he did a couple by

23   himself, too.  That would be in our field notes.

24        Q.   So when I was asking you questions earlier

25   about handwritten notes, are those the field notes?

Page  147

1          A.    Is that what notes?

2          Q.    The handwritten notes in your file, are

3    those one in the same as field notes?

4          A.    Not always.

5          Q.    Not always.

6                So what are field notes?

7          A.    Field notes are notes that I took while we

8    were on site.

9                MR. MACBRIDE:  I think what he might have

10         said is just because they're handwritten notes

11         doesn't mean they are field notes.  There are

12         other handwritten notes.  I think he

13         misunderstood your question.

14               THE WITNESS:  Yeah.

15   BY MR. DAILEY:

16         Q.    I was asking about handwritten notes that

17   were in your file.

18         A.    Right.

19         Q.    You were saying usually I just at the most

20   will say who is there and see photos.

21         A.    Correct.

22         Q.    But that -- are you telling me that does or

23   does not qualify as a field note?

24         A.    That does qualify as a field note.

25         Q.    Okay.  Are there any other handwritten notes

                                              Page 148

1    that you keep separate and apart from field notes in

2    the file?

3         A.   Yes.

4         Q.   And what do those handwritten notes concern?

5         A.   They might concern review of a document or

6    they might concern notes that I took during the EUOs

7    that I attended.  I think that would summarize other

8    handwritten notes.

9         Q.   All right.  Have you produced those to your

10   attorney?

11        A.   Yes.

12             MR. DAILEY:  Have you produced those to us?

13             MR. MACBRIDE:  Yeah.  They're pretty

14        substantial.  Well, I believe we have.  I don't

15        know if there's a privilege log with ESL's

16        production.

17             MR. DAILEY:  All I can say is I asked my

18        folks in California to send me everything that is

19        pertinent to him.  I have one field note I think

20        I've seen, but I don't think I have anything

21        else.

22             MR. MACBRIDE:  We can check at a break.  I

23        wasn't involved in that production.

24             MR. DAILEY:  I understand.  Nor was I.

25             MR. MACBRIDE:  So I don't want to make

                                        Page 149

```
 1          representations --
 2               MR. DAILEY:  I would like to see those, if
 3          we can run them down.  I feel like the witness is
 4          going to be maximally descriptive within his
 5          capability today; but even if we can later see
 6          those field notes, that would be great.
 7               MR. MACBRIDE:  I mean, as I said, I'll check
 8          and see.  I don't see why they wouldn't have been
 9          produced, but who knows.  They may have been
10          during the litigation period, too, or your folks
11          may not have found them to send them to you.
12               MR. DAILEY:  That's possible, too.
13               MR. MACBRIDE:  There's an answer somewhere
14          in there.
15     BY MR. DAILEY:
16          Q.   Going back on, is there any field notes that
17     you create -- I mean, do you transfer them from
18     handwriting into a typed document?
19          A.   No.
20          Q.   Since I don't have those notes right at the
21     moment, maybe I can ask you this question.  Even
22     though we can't identify precisely which of the site
23     visits you were at, tell me generally what were
24     you -- what additional information was coming to your
25     attention as a consequence of additional site visits
```

Page 150

1    that contributed to and ultimately formed a part of

2    your opinion?  Because that's ultimately my task here

3    today is to understand all your opinion and what you

4    base them on.

5         A.   Sure.

6              You're specifically referring to field

7    visits, not review of reports by others?

8         Q.   I know that may be part of it, too.  So

9    we'll talk about that.

10        A.   Right.

11        Q.   Right now I'm on the field visits.

12        A.   On the field visits, I got to see -- I think

13   I got to see every floor except the fifth.  I don't

14   think there's any -- we did not make a site visit to

15   the fifth story; but during subsequent site visits,

16   typically, we were escorted through a floor or two

17   during those site visits or we were allowed to visit

18   the roofs of the building, you know, more of the

19   exteriors than we had access to during the September

20   2015 site visit.

21             But I would say it was predominantly one

22   floor or two at a time.  You know, we would look at

23   the eighth floor.  I think we looked at eight and

24   seven either over a one- or two-day period.  Then

25   later they said the sixth floor is open or they may

Page 151

1    have sequenced the project -- the renovations

2    project, but we were told you can come on this day

3    and look at, say, for example, the fourth story

4    floors in whatever condition they were.  Sometimes it

5    was before any demolition.  Other times it was with

6    the vinyl removed.

7            Other times -- I think on the seventh floor

8    I got to see with everything removed -- all interior

9    drywall was removed, and I got to see wall -- you

10   know, how the wall studs looked.  So it varied from

11   floor to floor.  And that is reflected in the

12   photographs, in the investigation photographs.

13       Q.   That sounds like that would be something

14   that might stick in your mind more because you saw a

15   lot on the seventh floor where everything was

16   removed.

17       A.   Yes.

18       Q.   So does that help you understand which of

19   these dates might be when you looked at the seventh

20   floor?

21       A.   No.  I can't remember.  You know what?  I

22   think in the photographs it might show because I

23   think I put a date -- I did -- during the development

24   of the second report because this is 61 photos

25   taken -- 61 pages of photographs taken.  This is not

1   all of our photos.  And I put a -- I did put a date

2   beside each image number so that we could tie that

3   back to a specific site visit date.

4        Q.   So when I see a date, it's ESL, for example,

5   2016 and then 1010, is that the room?

6        A.   Let's see.

7        Q.   I'm looking at 2692, for example.

8        A.   What page?

9        Q.   46.

10       A.   Page 46 of 61?

11       Q.   I just plucked it out.

12       A.   Okay.  Let me quickly get there.  Which

13   photo?  Top left corner?

14       Q.   Top left corner.

15       A.   Yeah.  So that's September -- that's pretty

16   bad.  It's October 10th, 2016, and then image number,

17   you know, 2692.

18       Q.   All right.  So 1010 is not the room number;

19   it's October 10?

20       A.   That's October 10 of 2016, yeah.

21       Q.   I was thinking 1010.  I think I saw a

22   picture of --

23       A.   Exactly.  You did.

24       Q.   All right.  So following up on the seventh

25   floor, can you find where you were looking at the

Page 153

1    seventh floor from these photos?

2         A.   I believe so.  It will take a second to find

3    it.

4              MR. MACBRIDE:  Look at page 22.

5              THE WITNESS:  Okay.  Yeah.  There we go.

6    BY MR. DAILEY:

7         Q.   So page 22?

8         A.   Yes.

9         Q.   Of the 61 pages of photographs?

10        A.   Right.

11        Q.   Starting in the upper left-hand corner --

12   the entire page of photographs, does this seem to

13   represent the seventh floor?

14        A.   I don't think the photos -- I don't think

15   the top six photos.  I think they're from the sixth

16   floor possibly.  Let me look at a -- let me find a

17   room number.

18        Q.   609?

19        A.   609, yeah.

20        Q.   It's reflected on page 20?

21        A.   Correct.

22             So basically everything from photo 6604 to

23   6621 is in room 609.  So then, yes, seventh floor

24   photos start at image 7003.

25        Q.   All right.  Can you direct my attention to

                                              Page 154

1  specific conditions you observed that assisted you in

2  reaching further conclusions?

3       A.   I would say generally all of them.  This was

4  a second chance to look at wall studs exposed.  What

5  I could see different than what I had seen in

6  September of '15 is I could -- if you go to page 23,

7  there's several photos where I can -- I'm looking at

8  the side of the wall.  I can see the -- how the side

9  of the wall interfaces with the windows, and I can

10  see brick.  And that told me --

11       Q.   Which photo?

12       A.   Start with maybe 7017 or actually the one

13  preceding that two before 7008, and these are places

14  where I can see air openings into the interior of the

15  building that weren't properly --

16       Q.   And in 7008 can you put your finger on what

17  you're looking at?

18       A.   See the brick right here on the left side of

19  the photo.

20       Q.   Is that brick right here?  It almost looks

21  like block to me.

22       A.   That's brick.  That's brick veneer.  And

23  then there's some other photos that are similar in

24  subsequent photos.

25       Q.   Like 7019 maybe because the mortar is

Page 155

1   dripping down --

2        A.   Yes, that's a good photo.   That's correct.

3   So these photos showed me that there was a lot of air

4   leakage from the exterior wall or water leakage, for

5   that matter, to the interiors at these locations.

6        Q.   So is it your conclusion that -- is it your

7   finding that we should not be seeing the brick?

8        A.   You shouldn't be seeing the brick there.

9        Q.   What should we be seeing?

10        A.   You should be see waterproofing that's

11   turned into the window openings that would be over

12   gypsum sheathing.   You should be seeing the back of

13   the sheathing only or you should see some form of

14   waterproofing turned into the window opening, not the

15   brick itself.

16        Q.   Were you able to inquire -- since obviously

17   there's a lot of either renovation/demolition work

18   that's going on here, were you able to talk to any of

19   the contractors to understand what they had removed?

20        A.   No.

21        Q.   Did you ask for that opportunity?

22        A.   We asked for a lot of opportunities to

23   investigate without being escorted and without being

24   shown what we were shown.

25        Q.   But, I mean, even if you were escorted, it

Page 156

1    would be possible perhaps to have a contractor
2    respond to questions; but that was not --
3         A.   That was not made available.  Mr. Tracy
4    wasn't allowed to talk to us nor anybody from the
5    contractor.  So, I mean, I -- I've articulated a
6    paragraph that explains we were limited in our view.
7         Q.   I saw that.  I guess I'm wondering was it
8    challenged?  Did you -- were you told that these are
9    the conditions upon which you will be permitted to
10   view or did you specifically request as part of the
11   review that -- as part of the visit that you get to
12   query relevant individuals so that you can make sure
13   that you are seeing what you think you are seeing?
14        A.   Right.
15        Q.   Did you do the latter?
16        A.   I talked to Mr. Brown more than once and
17   said why don't -- if they would give us a room --
18   well, you know, first I said, well, let's just --
19   give us a room -- I know they're going to be doing
20   demo on this entire floor.  They shut the floor down
21   at a time.  I know this room -- I know if we were to
22   say let's just pick sixth floor, we'll take any room
23   they'll give us and just do our own -- do cuts and
24   see it.  I know they're going to demo it tomorrow.
25   Nope.  You've got to -- the answer was -- excuse me

Page 157

1   for benefit of the record.  The answer was, you can

2   cut all you want; you've got to restore it to its

3   identical condition after you cut it, which was

4   impossible for us to do.  We don't have -- in

5   addition to -- it's a lot of work to do that, so

6   the --

7        Q.   It would be a lot of work and you would have

8   to retain a contractor to assist you to do that?

9        A.   Correct.

10            And identical means we've got to replace the

11  vinyl that we cut with -- we're going to naturally

12  cut a hole in that or we're going to peel it back and

13  have to adhere it back.  I mean, we can go through

14  what that would entail, but --

15       Q.   You were directing your requests to

16  Mr. Brown of FM Global?

17       A.   Yes.

18       Q.   And did he communicate that request on to

19  the folks at Sky Harbor?

20       A.   You'll have to ask him that, if you haven't

21  already.  I believe the answer is yes, though,

22  because he came back and said, yes, we can do it if

23  we return it to identical conditions prior to us

24  cutting it.  So I suspected that that meant he talked

25  to them about it.  After that I said, well, okay, how

Page 158

1    about if they just give us a room the day before they

2    demo it and, you know, we'll show up the day before

3    they demo it.  We'll cut all we want.  We know it's

4    being demoed tomorrow.  The answer was no.

5        Q.   Did Mr. Brown come back again and say that

6    he had received a response?

7        A.   My understanding is he did and that was not

8    allowed, but you need to check that with him.

9        Q.   But I'm asking you did he -- did you speak

10   with him and did he come back and he said, Chris,

11   I've asked them and they've declined?

12       A.   My recollection is the answer to that

13   question is yes.

14       Q.   Okay.

15           MR. DAILEY:  Why don't we take a break for

16       lunch.

17           MR. MACBRIDE:  Sure.

18           (Lunch recess taken, 12:27 - 1:23 p.m.)

19           MR. DAILEY:  Can you remind me where we left

20       off?

21           (The record was read back by the court

22       reporter.)

23           THE WITNESS:  So I asked if we could cut.

24       The answer is if you return it to identical -- or

25       can you just give us a room that's going to be

1          demolished next?  And alternatively I said, well,

2          let us be there when the demo contractor

3          demolishes and we can watch them cut, and that

4          was also not an option.  This is all in my report

5          also.

6     BY MR. DAILEY:

7          Q.   On the second page of your expert report,

8     you identify further investigation activities that

9     include a review of various on-hand technical

10    research literature or newly provided historical

11    documents and investigation reports.

12         A.   Right.

13         Q.   The Lstiburek, J.W. Lstiburek, article of

14    1998 --

15         A.   Yes.

16         Q.   -- the Pressure Response of Buildings.  The

17    journal that this appears in is what?

18         A.   For the record, I don't have page 2 of 7 in

19    my copy.

20         Q.   You don't?

21         A.   I don't.  It's double printed but not that

22    one page.  It's missing page 2.  Somehow it just

23    probably went through the copier because everything

24    else looks like it's here.

25              MR. MACBRIDE:  Let me just double check.

                                        Page 160

1               THE WITNESS:  I'll see if it's in the back.

2               MR. MACBRIDE:  That's weird.

3               MR. DAILEY:  I can put it in.

4               MR. MACBRIDE:  No.  I think the easiest

5          thing to do is I'm going to -- give me one

6          second.  I'll have them re-print that first page

7          with those two, and we can just add it to that.

8               MR. DAILEY:  Okay.

9               (A recess was taken.)

10  BY MR. DAILEY:

11       Q.   So the article that I was referring to and

12  listed first in your list of articles and research

13  materials is this a Department of Energy conference

14  material?

15       A.   It might be.

16       Q.   It says something DOE.

17       A.   We put it on our, you know, documents.  It

18  should be in our documents provided; but, yeah, I

19  think this was a paper that was presented at Oak

20  Ridge National Laboratory conference.

21       Q.   Do you know of Mr. Lstiburek?

22       A.   It's actually Lstiburek, but I can see how

23  you could mispronounce it.  I don't know that I could

24  pronounce Lstiburek even reading that without the L.

25  I've been to a seminar he's put on one time years

                                        Page 161

1    ago.  He's a pretty published building scientist.

2         Q.    Does he work in private business or --

3         A.    I'm not sure.  I'm not sure.  I believe he's

4    affiliated with the University of Wisconsin in some

5    form, but I don't -- I'm betting he practices as a

6    consultant, too.  I've attended one of his building

7    sites professional development course -- not course

8    but he was just a guest speaker once, very

9    knowledgeable.

10        Q.    When was that attendance; do you know?

11        A.    Probably 2014 or '15.  Wade and I were

12   working down in North Charleston on a job, and he was

13   speaking.  So we went to that while we were working.

14   You know, we knew he was -- he spoke at the

15   building -- it was building -- in South Carolina I

16   don't know if they call themselves low country, but

17   it was building enclosure -- I'm not sure what it is,

18   BEC.  It's an arm of AIA, a subsidiary of AIA.  It

19   might be Building Enclosure Council, but it's BEC.

20   He was a guest speaker at one of their luncheons, so

21   we went to it.

22        Q.    I see.

23              And then in addition there are what appear

24   to be a number of reports that have been exhibits in

25   this case at various points in time like the CH2M

                                        Page 162

1    Hill report of 2003, the 11/24/2003 Wiss Janney --

2    I'll say WJE because I'm never sure about the

3    pronunciation of that -- 3/11/2004 Williamson &

4    Associates report, the 3/19/2004 Marx Okubo

5    Associates property condition and engineering

6    assessment report.  Those are all reports that

7    address directly the Atlanta Hilton property; do they

8    not?

9        A.   Yes; starting with the WJE.  I believe

10   starting with the WJE report, I believe the answer is

11   yes.

12       Q.   The CH2M is a general --

13       A.   That's a general --

14       Q.   -- piece of literature?

15       A.   Right.

16       Q.   Vertex Engineering Services, Inc., report.

17            MR. DAILEY:  Have you seen that one?

18            MR. MACBRIDE:  Which one?

19            MR. DAILEY:  It's the 5/24/2004 Vertex

20       Engineering Services, Inc.

21            THE WITNESS:  It's in our file.

22            MR. MACBRIDE:  There's been so many reports.

23       This would have been -- I mean, this would have

24       been produced in the documents produced by them.

25       I can't tell you whether I've seen that during --

                                    Page 163

1             THE WITNESS:  And it may have been an

2         enclosure to the ATC Associates report.  I mean,

3         some of these might be enclosures to other

4         reports that are cited; but it's in there.

5             MR. MACBRIDE:  That is correct.  There are

6         some reports that incorporate other reports as

7         part of their report.

8    BY MR. DAILEY:

9    Q.   For some reason my eyes don't recognize that

10   one.

11             French Engineering, Inc., construction

12   specifications document, why was this one included?

13   A.   It was a document we reviewed, so we're

14   saying we reviewed it.

15   Q.   Did it have anything to do with work on the

16   exterior cladding in 2016?

17   A.   It looked like it.  As I've noted in the

18   report or as Wade noted it in the report, we don't

19   have the drawings that go with it.  It was a

20   specifications package, and it looks like it was the

21   specifications package for some repairs that were

22   done on the north wall of the building real close to

23   the one-story roof, which is at the rear of the guest

24   tower.

25             We noted that there was prior repair work

Page 164

1    done at that location of the building, and this

2    specifications package looks like it matches that

3    work.  And we have not been able to locate the

4    drawings that go with it.  That document refers to

5    drawings specifically, and we have never seen the

6    drawings that go with the specifications package.

7              MR. DAILEY:  Let me mark this one, if I may.

8              (Exhibit 537 was marked for

9         identification, attached at the end of

10        the original transcript.)

11   BY MR. DAILEY:

12        Q.   So I just happen to have the French

13   Engineering, Inc., report.  I have a bunch of the

14   others, but this one has not gotten as much

15   attention.

16             You recognize this to be the report you were

17   referencing?

18        A.   It looks like it is.

19        Q.   It says the scope of the work covered in

20   this project manual is for phase one renovation work

21   for the exterior cladding.  I'm reading from --

22        A.   Are you on a certain page?

23        Q.   I don't know if there's a page number that

24   corresponds here.  I guess I was wanting to get from

25   you if you were able to -- this talks about the

Page 165

1   project being at the Norcross Hilton Hotel.  It talks

2   about the owner is AEW Capital Management.  The

3   engineer is listed as French Engineering, Inc.,

4   and --

5               MR. MACBRIDE:  What page are you on?

6               MR. DAILEY:  Well, I can't tell you.

7               MR. MACBRIDE:  Paragraph number?

8               MR. DAILEY:  I've turned inside to page --

9       what's listed as 1 of 5.  So this seems to be

10      like an amalgamation of things.

11              MR. MACBRIDE:  I gotcha.

12  BY MR. DAILEY:

13      Q.   And this would appear to be a bid form --

14      A.   Right.

15      Q.   -- in anticipation of actual work being

16  done?

17      A.   That's right.

18      Q.   So are you able to tell me what it appears

19  that -- what kind of work was to be done?

20      A.   Well, that's why I said the drawings would

21  help you immensely because they go with this, and I

22  have never seen the drawings.  But if you look at --

23  let's see if we can go to the specifications.  If you

24  go to like -- I'm on the first page that I've got

25  after the cover page where it says, masonry

                                            Page 166

1    restoration and cleaning, unit masonry, and then

2    division five -- I'm sorry, division four.  Excuse

3    me.

4              Do we have the same pages?

5        Q.   Yours are front and back and mine are not.

6        A.   That's the page I'm on.  If you go down to

7    almost the bottom of that first page, it says

8    division four, masonry.  And so they've listed a

9    section for masonry restoration and cleaning and

10   another one for unit masonry.  And then you go to the

11   next page and they've got a section on -- several

12   sections on waterproofing and moisture protection.

13   It's mentioning sheet metal flashing and trim,

14   self-adhering sheet waterproofing, and joint

15   sealants.  And then in division nine, exterior

16   sheathing and painting.

17             So it looked to me like -- this has always

18   looked to me like some retrofit of flashings down at

19   the second story, base of wall, and a little bit at

20   the top of some windows that's visible on the north

21   wall of the window and maybe a little bit around the

22   east and west walls because we noted during

23   subsequent site visits -- the ones after September of

24   '15 -- in September of '15, I did not go on any

25   roofs.  I didn't see the back of the building.  I

Page 167

1  just saw those rooms up top and a little bit of the

2  front.  But when we went back for the first site

3  visit of the entire facility and got on the roofs, we

4  noted that there's been some work done on the

5  exterior walls.  And I said this must be the spec

6  package for that, and these spec sections that are

7  included are consistent with the observation.

8           MR. MACBRIDE:  If you look at that first

9      page, page 1 of 5 --

10          THE WITNESS:  I don't have those in my copy,

11     by the way.  Are they the very first pages?

12          MR. DAILEY:  No.

13          THE WITNESS:  Okay.  Sorry.

14          MR. DAILEY:  You go in a few.

15          THE WITNESS:  Okay.

16          MR. MACBRIDE:  Look at the base bid right

17     there.  Look at 1.1 and see if that helps.

18          THE WITNESS:  There we go.  Yeah, yeah.

19     Thank you.  Yeah.

20          It says, between second floor curtain wall

21     sills and roof membrane termination bar at first

22     floor roof as well as between second floor window

23     wall heads and third floor window sills on the

24     north elevation of this building.  Thank you.  I

25     might have read that, but we flew through this.

Page 168

1           This provided historical context for us.  It
2           didn't provide a great deal of detail.
3     BY MR. DAILEY:
4           Q.   Well, the base bid is saying provide labor,
5     tools, equipment, rigging --
6           A.   Right.
7           Q.   -- all the necessary paraphernalia --
8           A.   Right.
9           Q.   -- and remove and replace existing brick
10    cladding --
11          A.   Right.
12          Q.   -- and perform the specified flashing and
13    waterproofing renovation between the second floor
14    curtain wall sills and the roof membrane termination
15    bar at the first floor roof.
16          A.   Right.
17          Q.   And then also as between the second floor
18    window wall heads and the third floor window sills on
19    the north elevation.
20          A.   Right.
21          Q.   Does this described work and its location
22    have any significance to the opinions that you're
23    presenting in this case?
24          A.   Yes.
25          Q.   And in what way?

                                      Page 169

1      A.    Well, we saw other locations of the building

2    where they're missing flashings at windows and from

3    review of wall cuts done by Wiss Janney in, I think,

4    2003 -- but don't quote me exactly on the date -- and

5    done by the Liberty Building Forensics Group in 2015.

6    Those conditions at windows and doors are consistent

7    with the photographs from those wall cuts.  I mean,

8    what they're saying they're trying to fix sounds

9    similar to what the wall cuts taken by Liberty and

10   WJE show.

11     Q.    This is not a complete building wide work or

12   is it?

13     A.    No, it's not.

14     Q.    It looks to be very focused.

15     A.    No.  It's focus to that -- I think to

16   that first paragraph 1.1 on page 1 of 5 of the base

17   bid section.  It looks like it's limited to that

18   area, which is also consistent with photographs we

19   took of that area that don't look like the rest of

20   the building.

21     Q.    Meaning you don't see adverse conditions in

22   this area where work was performed as opposed to

23   other areas of the building?

24     A.    No.  You can't tell if they're adverse

25   conditions unless you can cut the brick and see.  So,

Page 170

1   no, I can just tell that the flashing was coming out

2   of the wall and the brick was a slightly different

3   color.  I could tell that retrofit work had been done

4   at those locations predominantly on the north wall.

5   And, like I say, this says it very well.  At the base

6   of where the second floor meets the roof and to some

7   degree between the second story window heads and the

8   third story window sills.

9           You're asking questions.  I don't want to

10  get ahead of you, but I think I've got a few photos

11  of that location in my photographs --

12      Q.   Okay.

13      A.   -- but I have to find them.  It would be in

14  the 61-page --

15      Q.   Presentation?

16      A.   -- presentation, right.  They'll have roof

17  in them, too.  Yeah.  Here we go.

18      Q.   We're now looking at Exhibit 536?

19      A.   Correct.  And you're on --

20      Q.   Which page?

21      A.   Start on page 5 of 61 because that's that --

22  if you look at photo 5054, we're standing on that

23  one-story roof.  The long wall that's on the left

24  side of the photo is the north wall of the building

25  and the small wall that's closest to you in that

Page 171

1    photograph is the west wall of the building.  So I

2    think a good photo to kind of show you that something

3    is going on is 5060, the bottom left corner photo.

4    You see the brick is a different color than the brick

5    above.

6        Q.   I see where you're referring.

7        A.   And the flashing details.  As you keep going

8    to page 6, you can see some wall cuts like photo

9    506 -- it's 5082, isn't it?  5082 in the center of

10   that page is a place where it looks like somebody has

11   done an investigative cut of the brick, but the

12   flashing details -- these photos are overall views.

13   The flashing details at the base of the wall there

14   like in photo 5105 and 5107 indicate some prior work.

15   So that's -- and that's consistent with this French

16   Engineering document, even though I would love to see

17   the drawings that go with this specification package.

18   So that's where we saw -- we noted that there was

19   retrofit work done at the building.

20       Q.   Now, is the -- in and of itself the fact

21   that retrofit work is being done, is that -- are

22   you disapproving of the fact that retrofit work was

23   done?

24       A.   No.

25       Q.   You were just pointing to it as evidence

Page 172

1    that you believe conditions that you observed in

2    other places perhaps also were taking place in this

3    area?

4         A.   That's right.

5         Q.   Okay.  So you've identified the WJE report

6    and the Liberty report as perhaps the two most

7    significant ones?

8         A.   Not necessarily.

9         Q.   Not necessarily?

10        A.   No.  They're just listed as documents we

11   reviewed.

12        Q.   Okay.  And these documents, were they

13   reviewed in the weeks preceding the preparation of

14   this January 13, 2020, report?

15        A.   They were reviewed over the course of -- I'm

16   not sure.  They've been reviewed over the course of

17   the investigation period, not just a few weeks

18   before.

19        Q.   Okay.  And was any efforts made to speak to

20   the people who were actually preparing these other

21   reports to interview them about their findings?

22        A.   Were you finished with the question?

23        Q.   I am.

24        A.   No.  I would qualify that by saying I have

25   talked to Chris Giffin about his because his -- we

                                          Page 173

```
 1    found his report -- we found a reference to his
 2    report reading the Williamson report.  And I know
 3    Chris Giffin pretty well, you know, as a peer and
 4    friend.  And I called him and said, hey, Chris,
 5    there's a report here by your Atlanta office in 2003;
 6    can you see if -- it's just referenced.  All we had
 7    was a reference to it and was able to find out that
 8    they had indeed done it and it was -- we were able to
 9    get a copy of it.
10         Q.   Did he give you any other information about
11    that report or just --
12         A.   I don't think I talked to him much about it
13    after we got it.  We got it and had the photographs
14    that they had taken.  He told me he had done the roof
15    component of that report and that another consultant
16    in their group had done the walls component of that,
17    but I have not talked to him in depth about their
18    report.
19         Q.   So after the presentation of the various
20    reports that your office reviewed, you then have a
21    category of observations and findings?
22         A.   Right.
23         Q.   In it you introduce this category by saying
24    the following are the most significant observation
25    and findings subsequent to our initial report.
```

Page 174

1        A.    Right.

2        Q.    So, if we may, let's just go down and

3    explore them.  The first bullet point is basically a

4    confirmation of the -- based on site visits, review

5    of exterior wall cuts, and photographs from the WJE

6    and Liberty reports, you're able to describe the

7    manner in which this structure was built?

8        A.    Yes.  It's supplementing what we found

9    before because we could confirm, you know, the

10   30-pound felt, which we could see at those openings

11   at the seventh floor ourselves; we could see in WJE's

12   2003 photos or Liberty's 2015 photos.  So we saw that

13   three different ways.

14            I think the only other thing that changed

15   from our first visit was that we noted that there had

16   been a quarter inch gypsum wallboard put over the

17   initial drywall in the rooms.  So there was two

18   layers of drywall and two layers of vinyl, which we

19   didn't note during the first site visit, but as we

20   investigated rooms.

21            I believe the rest of that bullet -- you

22   know, the rest of -- from outside in is the same as

23   in our first report, but that was a new finding.

24       Q.    Okay.  Then in the second bullet point, you

25   discussed the substantial as-installed openings

                                        Page 175

1    within the 30 number felt paper.

2        A.   Right.

3        Q.   And you described these as improper openings

4    within the 30-felt installation as being visible

5    at -- and then you list where.

6        A.   Right.

7        Q.   Terminations with windows' rough openings

8    and you explain that what you observed were 30 -- you

9    say 30 --

10        A.   I call it 30-pound felt.

11        Q.   Okay.  30-pound felt stopped short of and is

12    not termed into the openings at the jambs leaving an

13    improper opening to the wall sheathing --

14        A.   Right.

15        Q.   -- and/or the building interior.

16            Secondly, at terminations at the underside

17    of steel shelf angles.

18        A.   Right.

19        Q.   And you're explaining that the 30-pound felt

20    stopped short of the underside of shelf angles

21    leaving an improper opening to the wall sheathing

22    below shelf angles.

23        A.   Right.

24        Q.   And, therefore, a pathway for water to

25    migrate behind the 30-pound felt --

Page 176

1     A.   Right.

2     Q.   -- with no way for it to be directed back to

3  the exterior.

4     A.   Right.

5     Q.   Okay.  You go on to explain where these

6  conditions can be seen in ESL's photographs.

7     A.   Right.

8     Q.   Have we looked at these previously?

9     A.   We can.  Most of them are better seen in the

10  WJE or Liberty photos because I was looking at the

11  underside of the shelf angle through an opening in

12  the wall that was about that big.  They're in my

13  photos if you want me to show you where they are.

14     Q.   Yeah; if you don't mind.

15     A.   We've got one with good photos and one with

16  smaller photos.  One is on page 25 of 61 and it's

17  photo 7087.  I'm looking up at a shelf angle.  I'm

18  looking at the underside of a shelf angle there

19  looking up -- kind of looking up the wall toward the

20  ceiling.  That's one.  Let me see.  I just happened

21  to open to that page.  Let me see if there's some

22  others.

23          There's a little tiny piece of a shelf angle

24  on page 23 of 61 and it's photo 7007.  You can -- can

25  you see the -- the brick is kind of painted white.

                                              Page 177

1      It goes up under -- that's going -- that brick is

2      stopping on the underside of that shelf angle and

3      then you're looking at the horizontal leg of the

4      shelf angle that's above that location, you know,

5      holding up the brick on that eighth story wall.  On

6      7017 there's a little view of the shelf angle there.

7      I think photo 7018 is a closer view at the top of the

8      brick wall and the shelf angle that's under that

9      location.  So those are a few.  I mean, we can go

10     find them all if you would like me to.

11          Q.    No.  That's fine.

12          A.    I think I said in the report that those

13     showed -- we got a little view of that, but it's a

14     pretty restricted view.  We got much better views

15     from viewing Liberty's cuts.

16          Q.    Basically, you're saying that the 30-pound

17     felt should be brought all the way up and make the

18     sealant effectively hide that angle?

19          A.    It should -- no.  It should go -- the angle

20     is shaped like an L.  I mean, I can draw it if you

21     want me to draw it, but the paper -- the L has a

22     horizontal leg and a vertical leg.  The paper should

23     be going under the vertical leg -- behind the

24     vertical leg, not stopping a few inches short of the

25     underside of the horizontal leg.  Does that make

Page 178

1   sense?

2       Q.   It does.  Thank you.

3            The third bullet point says, at the top of

4   the steel shelf angles, especially at the walls'

5   inside or outside corners, there are improper

6   openings both within through-wall flashings --

7       A.   Right.

8       Q.   Which you call TWF?

9       A.   Right.

10      Q.   -- installed over the shelf angles and

11  improper gaps between steel shelf angles.

12      A.   Yes.

13      Q.   Is there something you can show me?

14      A.   I can't show you that in photos.  That shows

15  up very well in the Liberty photos and the WJE

16  photos, and I did not -- I keep saying I, but Wade

17  and I did not put photos by others in our report.

18      Q.   I don't know if these are going to be -- let

19  me show you what's been previously marked as Exhibit

20  206.  Is this the report?

21      A.   It may be.  They released several reports.

22           MR. MACBRIDE:  No.  It's December 22nd,

23      2015.

24           MR. DAILEY:  December 22nd?

25           MR. MACBRIDE:  Yeah.  It actually says like

                                          Page 179

1       building envelope investigation.

2           THE WITNESS:  You might be able to tell from

3       looking at one of these.

4           MR. MACBRIDE:  It is the 12/22/2015 building

5       envelope water damage is what it's titled.

6           THE WITNESS:  Yeah.

7           MR. DAILEY:  12/22.

8           MR. MACBRIDE:  12/22/2015.

9           THE WITNESS:  Building envelope water

10      damage.

11          MR. MACBRIDE:  No.  That's the HVAC.  They

12      have like four -- they've got four December 2015

13      reports.

14          THE WITNESS:  That's right.  There's four

15      December 22nd reports.  One of them includes,

16      probably about -- it's kind of like our report,

17      about 50 pages of photos about three per page.

18  BY MR. DAILEY:

19      Q.   I'm going to pull this one out because

20  sometimes you're referencing that.

21      A.   Uh-huh (affirmative).

22      Q.   I don't think I've got the other one.

23          MR. MACBRIDE:  I can go off the record and

24      see if we can get a copy if you want.

25          MR. DAILEY:  Yeah, that would be great.

                                        Page 180

```
 1              (A recess was taken.)
 2    BY MR. DAILEY:
 3        Q.    So while we're attempting to put our fingers
 4    on the Liberty report to which you mentioned -- to
 5    which you referred, we're now looking at the WJE
 6    report, which was one of the others that you had
 7    recommended for their photographs.
 8        A.    Right.
 9        Q.    We're looking at what's marked as Exhibit --
10        A.    534.
11        Q.    -- 534.  So are you able to see any of the
12    photos you were --
13        A.    Yeah.  There's some brick-cut photos in
14    here, and I don't know if I'm looking at every one.
15    I believe that's all roof at the beginning.
16        Q.    I'm sorry.  Go ahead.
17        A.    Are there some things you want to ask me
18    about these?
19        Q.    Well, first show me what -- we were looking
20    at shelf angles; were we not?
21        A.    We are.
22        Q.    Why don't you identify the photos and then
23    tell me what they reveal.
24        A.    Well, their figure 28 shows, you know, at
25    this particular cut the three wall flashings not
```

Page 181

1    extending all the way to the shelf angle, which means

2    water that gets to the through-wall flashing can run

3    basically -- one, it does two things.  It can rust

4    and damage the shelf angle, but it also provides an

5    avenue for water to run back behind -- you know, back

6    behind the flashing that's not well adhered to it and

7    also stopped short of it and then find a shelf angled

8    joint and then get in the brick wall that way.

9    That's a good example.

10          These are photos are not super clear.

11   There's one where they pointed out the flashing

12   vertical leg was wrapped in front of the building

13   paper rather than behind the paper.  I can't remember

14   which one that is.  This is another view of the

15   through-wall flashing stopping short of --

16        Q.   So just so I'm oriented --

17             MR. MACBRIDE:  That's figure 31.

18             THE WITNESS:  Thank you.

19             Figure 31 is showing a gap between the

20        flashing and the top side of the brick, which

21        would allow -- the water -- it would divert water

22        right into the brick rather than to the exterior

23        all the way, and then they were taking close-ups

24        of rusted --

25        Q.   Figure 30?

Veritext Legal Solutions
866 299-5127

1          A.    Figure 30, thank you.

2                Rust indicating that water is not making it

3    to the exterior but getting to the steel shelf angle

4    and causing it to rust.

5                Yeah.  Here is figure 32.  It's the one

6    that's showing the -- that's the top of the flashing

7    over the building paper, so it's not terminated

8    properly meaning water that gets behind the brick in

9    the air space between the brick and the sheathing

10   with the paper over it gets to the paper and then

11   runs behind the flashing and into the wall area below

12   rather than being diverted out by the flashing at the

13   wall.

14               I think this is another -- this is a photo

15   showing that, photo 33, where they're showing lap

16   joints in the flashing that aren't sealed, which

17   means water that gets to the flashing can run behind

18   that lap joint.  I think that's pretty much it on

19   those unless there's other photos you want to go

20   through.

21               MR. MACBRIDE:  When we get the other report.

22               THE WITNESS:  Yeah.  Yeah.

23   BY MR. DAILEY:

24        Q.    And then on page 4 of your expert report, I

25   think you're discussing a related issue but maybe in

Page 183

1  a different spot.  It says that the Liberty wall cuts

2  photographs show that the heads of the building

3  window assemblies are not head-flashed --

4       A.   Yes.

5       Q.   -- thereby allowing rainwater that traverses

6  through above the described TWF openings/shelf-angle

7  gaps --

8       A.   Right.

9       Q.   -- to improperly migrate directly into

10  window systems through open joints at the heads of

11  windows.

12       A.   Correct.

13       Q.   And so you're pointing out the head flashing

14  should have been installed above the windows?

15       A.   Yes.

16       Q.   Did you see this on multiple instances?

17       A.   I saw lots of stains on windows when we were

18  inside because we were doing most of our

19  investigations from inside.  I saw a lot of stains at

20  the heads of windows.  That's from two sources,

21  leakage or condensation.

22            So as we continued to get Liberty's photos

23  and understand the building a little bit better and

24  then subsequently Wiss Janney's, it made -- those

25  stains made a lot more sense and the photos -- the

Page 184

1    Liberty photos that we may or may not be looking at

2    show what I'm talking about here.

3         Q.   Do you know when it was Mr. Giffin sent the

4    WJE report over to you?

5         A.   No.

6         Q.   In the past year?

7         A.   No; earlier than that.

8         Q.   Earlier than that?

9         A.   Yeah.

10        Q.   And the Liberty report, similarly, did you

11   have that --

12        A.   We had some Liberty reports before -- I

13   think before January of '17 but maybe not all.  It's

14   hard to know exactly when we got all Liberty reports.

15   We got some of them but not all of them until later.

16   I believe we got the Wiss Janney report sometime

17   in -- I can't remember.  I'm sorry.

18        Q.   Who --

19        A.   Because I called Chris -- I'm just trying to

20   remember when I called him and said, hey I found a

21   reference to a report you-all wrote years ago.

22        Q.   So when did the Liberty reports come to you?

23   Excuse me.  You answered previously you weren't sure.

24             From whom did you get the Liberty reports?

25        A.   I think from either Mr. Brown -- I got one

Page 185

1   from Mr. Brown sometime after our October report, but

2   it was one report.  And he said, hey, Chris, there's

3   this Liberty report; would you look at it and see how

4   it compares with your report, your October report.

5   And I called him and said they looked -- they've

6   looked at the roof.  We didn't look at the roof, but

7   generally they've identified some of the same issues

8   that we had identified.

9        Q.   I'm showing to you now what's previously

10  marked as Exhibit 48.

11       A.   Okay.

12            MR. MACBRIDE:  I think we just need to be

13       careful because when we were looking for this --

14       it's marked Lin 48.  I'm not sure at Lin's

15       deposition they followed the same convention.  So

16       there may be another 48 in our continuous.  So I

17       just want to make to make sure we call this one

18       Lin 48 just in case.

19            MR. DAILEY:  I'm happy to do that.

20            MR. MACBRIDE:  That may not be the case.

21       I'm just not sure.

22            MR. DAILEY:  I understand.  It seems that

23       the court reporters always reference whose

24       deposition is going on so that may be all that

25       is.

Page 186

```
 1              MR. MACBRIDE:  We just didn't find it,
 2         Number 48, in our list.  I'm just concerned it
 3         might be duplicative.  It may not be, but I just
 4         want to make sure the record is clear since we're
 5         not remarking it.
 6  BY MR. DAILEY:
 7         Q.   In any event, we have Lin 48 in front of
 8  you?
 9         A.   Okay.
10         Q.   And it's the December 22, 2015, report that
11  you had stated was the source of the Liberty
12  photographs that you found impressive.
13         A.   Right.
14         Q.   So if you could direct my attention to the
15  flashing.
16         A.   I think -- let's go to -- do you want to
17  call it by their photo page numbers or do you want to
18  call it by the Sky number?  What do you want to call
19  it by?
20         Q.   Well, I think the Sky --
21         A.   Or do you want to call it by the figure
22  number?
23         Q.   Well, probably Sky and figure numbers.
24         A.   Okay.  So SKY-7793, which is the -- yeah.
25  The top photo, figure 141, is showing -- it looks
```

Page 187

1    like some condensation occurring at the windows at

2    that location.  And then figure 143, if you look

3    closely, I think you can see four locations of wall

4    cuts there in that photo.  It's a small photo.  You

5    can see you're looking at a tenth-story window.

6    You've got a wall cut at its top left corner, a wall

7    cut at its top right corner, a wall cut at its lower

8    left corner, and then a wall cut at an outside corner

9    at the right side of the adjacent -- below and

10   adjacent to that window.

11        Q.   I see that where you're pointing.

12        A.   Does that make sense?  In some ways it's

13   nice to keep that photo out so then you know where

14   you are later.

15             It looks like -- so it looks like figure 145

16   on the next page, which is page SKY-7794, is that

17   outside corner.  I don't think that one is shown in

18   that figure 143.  I think that's a fifth cut.

19        Q.   I think you're right.

20        A.   But figure 146 -- no.  You know, it may be.

21   I think, yeah, because that is an outside corner.

22   Yes, it is.  Wait a second.  Yeah, that's it.  That's

23   it.  Thank you.  It's the far right -- far right and

24   lower cut that is shown in figure 143 is where

25   figures 145 and 146 and some other photos subsequent

Page 188

1   are located.

2            So 145 is kind of a close view of that

3   outside corner at the head of a window.  146, this is

4   what I meant by gaps in the through-wall flashing.

5   You can see -- in 146 you can see the through-wall

6   flashing is turning down over the shelf angle, but

7   you can see -- you can see the back of the shelf

8   angle in between the left and right through-wall

9   flashings.

10           Do you see that?  I can point it to you on

11  yours if you want me to.  That's through-wall

12  flashing right here on the right side of the photo.

13       Q.   Okay.

14       A.   And then that rust area is the back of the

15  left shelf angle, and there's a gap in the

16  through-wall flashing right there, and then there's

17  also an opening between the left shelf angle and the

18  right shelf angle.

19       Q.   I see that.

20       A.   That's air right there.

21       Q.   I see what you're pointing to.

22       A.   So if water comes down the wall and comes to

23  this location, it's going to run in between -- it's

24  going not to be directed to the exterior like it's

25  supposed to be.  It's going to be dropped right into

Page 189

1    the top of this window, which is kind of telling you

2    a lot of things at once.  I mentioned openings in the

3    through-wall flashing, but this is also showing you

4    there's no head flashing at that window.  There

5    should be a head flashing sitting up under that

6    window to divert water back to the exterior of the

7    head.  So that water is running into the top of the

8    window.

9             And actually figure 147 is a great photo of

10   what I was just saying -- I didn't know that was

11   coming -- because that's the same location but a

12   closer view.  So you see there's a gap in the through

13   wall.  There's a gap in the steel shelf angles

14   because there's that triangular opening and then can

15   you see the water would run right into that window

16   joint at the head of the window.

17            And then 148 is another view looking down

18   the left -- looking down the left side of that

19   through-wall flashing.

20        Q.   So having removed the brick in 147 --

21        A.   Right.

22        Q.   If the brick were not removed and in place,

23   your testimony is that water would get behind it in

24   any event?

25        A.   It always gets behind the brick.

Page 190

1      Q.   Because it's --

2      A.   Because of the porosity of the brick and

3   more porosity of the mortar joints.  So it's going to

4   get -- it's going to get through.

5      Q.   I understand.

6           Is there any kind of acceptable level of

7   moisture absorption for brick in the building trades

8   or is it just standard that there's always a certain

9   volume of water that is anticipated will get through

10  the brick material because of its porosity?

11     A.   It's going to get -- I don't know.  You're

12  asking -- that's a hard question to answer.  There

13  may be some high tech amount of absorption, but the

14  brick veneer is porous.  It's ultimately going to

15  get -- it's ultimately going to go through; and as I

16  said, the mortar joints are more porous.

17          So the first water that's going to get to

18  the air cavity is going to be through mortar joints.

19  If it's a long rain, some may get through the brick,

20  too.  Think about three-and-half-inch-by-eight-inch

21  brick times a perimeter mortar joint around it.

22  There's plenty of places for water to get into that

23  cavity.

24     Q.   All right.  The next bullet point on page 4

25  says, as discussed in the first report but further

Page 191

1    viewed during subsequent investigations at the

2    building --

3         A.   Right.

4         Q.   -- there are numerous water stains and to a

5    lesser extent mold/mildew on the interior side of

6    exposed gypsum sheathing boards --

7         A.   Right.

8         Q.   -- and significant to substantial rusting of

9    both steel wall studs and sill tracks at the bases of

10   the studs on the exterior walls.

11        Now, in earlier photos we looked at studs

12   and sills.

13        A.   Right.

14        Q.   We looked at what you have identified as

15   rusting.

16        A.   Right.

17        Q.   The water stains, have we seen those?

18        A.   A little but we were really focused on steel

19   studs when we were talking earlier.  I can point you

20   to some photos of stains, if you would like me to.

21        Q.   At least two or three examples.

22        A.   Sure.  Sure.  Sure.  Let's see here.  In the

23   September photos -- we'll go to some later ones.

24        Q.   We're back to the photos appended to your

25   report?

                                        Page 192

1      A.    To the September photos.

2      Q.    This is in Exhibit 536?

3      A.    Right.

4            Look at page -- I mean, there's -- well, we

5      were looking at rusted studs on page 2 of 20, photos

6      4250 to 52.  If you look at that wall sheathing

7      that's behind those rusted studs, there's a lot of

8      staining on that gypsum.

9      Q.    I'm sorry.  Which document are we in?

10     A.    We're in my report, my September photos

11     enclosure --

12           MR. MACBRIDE:  It's page 2 of 20.

13           THE WITNESS:  Page 2 of 20 in my September

14           '15 report.

15           MR. MACBRIDE:  Michael, it's that one right

16           there, the first set of photographs one through

17           20.

18           MR. DAILEY:  Excuse me.  I apologize.

19           MR. MACBRIDE:  That's okay.  There's a lot

20           of reports.  We're bouncing between three reports

21           right now.

22           THE WITNESS:  Page 2 of 20, the top three

23           photos, 4250 to 4252.  You see some stains on the

24           sheathing there.  A better photo, I think, is on

25           the next page, 3 of 20, photos 4260 and 4261.

                                           Page 193

1          And 60 is an overall view kind of at the left

2          side of that window.  You can see the double stud

3          that's right under the left jamb of the window.

4          And then photo 4261 is a closer view of that

5          double stud.  To the right of that, you can see a

6          lot of staining on the sheathing right there,

7          which is an indication of leakage at that

8          location.

9    BY MR. DAILEY:

10         Q.   The staining that you're identifying are the

11   vertical lines?

12         A.   Yeah.  See the vertical streaks in the back

13   side of the gypsum?

14         Q.   Okay.  Thank you.

15         A.   I mean, there's photos like that in the --

16   do we need to keep going or stop there?

17         Q.   No.  I just want to see them.  Now that

18   you've highlighted it for me, I can look out for

19   myself and hopefully pick up where you --

20         A.   There's more in the subsequent site visits.

21   When we got to view exterior walls, I believe you'll

22   see other views of that condition.

23         Q.   Now, you described the water stains and then

24   you say to a lesser extent mold and mildew on the

25   interior side of exposed tracks -- excuse me,

Page 194

1    interior side of exposed gypsum sheathing boards.

2         A.   Right.

3         Q.   I assume you used the word to a lesser

4    extent because you didn't see the evidence of mold

5    and mildew as frequently?

6         A.   That's exactly right.  You saw a lot more

7    mold on the drywall.  You've got to be distinct about

8    which wallboard you're talking about.

9         Q.   Drywall would be the interior wall of the

10   hotel room itself?

11        A.   Correct.

12        Q.   Do you have an explanation why you would see

13   more on the interior as opposed to the exterior

14   gypsum board?

15        A.   Because there's a lot more paper.  There's a

16   lot more food on the interior drywall than -- mold

17   food is, you know, some kind of organic material like

18   paper, one.  Two, the drywall paper was immediately

19   behind vinyl wall covering in many cases.  And so the

20   vinyl was keeping the moisture present at that paper

21   surface and thereby allowing mold growth to increase

22   and last longer.

23        Q.   Was vinyl wall covering a typical covering

24   at some earlier point in time?

25        A.   I think it's been used.  It's an interior

Page 195

1    finish that's used.

2        Q.    Because of the problem that you are

3    identifying, the impermeable nature of that, have

4    there been any code changes that restrict its use?

5        A.    No, not that I know of.  There may be a new

6    one now, but it's been used -- I've seen it used in

7    many settings.

8        Q.    All right.  You do in the next bullet point

9    make reference to where you see more significant to

10   substantial mold/mildew stains on the interior side

11   of the exposed gypsum wall board.

12       A.    Right.

13       Q.    So obviously you're using words of

14   gradation, significant and substantial, as a higher

15   intensity.  What is your continuum that you typically

16   would use?

17       A.    I think probably what I've used here.  I

18   mean, you know, minor --

19       Q.    Minor is first?

20       A.    I would say minor, moderate, significant,

21   substantial.

22       Q.    Okay.

23       A.    I think that's a pretty good continuum for

24   what typical language I use or that Wade and I used.

25       Q.    I wasn't so far away.  I was kind of close.

Page 196

1              On the next bullet point, you write:

2    Further investigation activities indicate that the

3    window systems throughout the building are not

4    thermally broken --

5        A.   Right.

6        Q.   -- and are thereby far more prone to

7    recurring constant condensation at their interior

8    surfaces during the cooler seasons of each year.

9        A.   Right.

10       Q.   So you write further, in our March 16, 2016,

11   site visit to the building, you observed condensation

12   at a number of the tenth story guest room windows.

13       A.   Right.

14       Q.   And during our investigation, many water

15   stains were noted on windows, interior surfaces,

16   which are from prior condensation and/or leakage from

17   adjacent wall cavities.

18       A.   Right.

19       Q.   Have we looked at those?

20       A.   We looked at that picture in the Liberty

21   report a second ago.  Let's see.  I do my photos by

22   date because I've got them dated in here.  Let's see.

23   Here we go.  Sorry.  Let's see.  I don't have them

24   memorized.  That's on page 14 or wherever it is.  I

25   can't remember if we do this in perfect sequential

Page 197

1    date.  It should be in the March photos, which means

2    it ought to be close to the front.

3              There's some good stains visible.  Look at

4    page 1 of 61 and then go to image 4156.  Do you see

5    the kind of droplets kind of staining?  That's

6    indicative of condensation.  But let me stay there

7    and see if there's --

8         Q.   4156?

9         A.   Yes.

10             These copies are not -- you know what?  The

11   best photo in these set of copies -- I mean, it shows

12   up really well when you're looking at a full screen

13   photo, but go to page 3 of 61 and go to image 4185.

14   I think you've -- mine is bigger than yours.  It's

15   hard to see in those small photos; but if you look at

16   the left sill area beside that jamb, that's water.

17   That's condensation.  You can see it better in my

18   photo than yours.  Can you see that?  That's it.

19   That's what we saw that day on the tenth floor.

20        Q.   Okay.

21        A.   There's an infrared photo on page 2.  One of

22   the other consultants had a -- that was not my --

23   that was not Engineered Solutions infrared camera,

24   but they were doing some infrared photography.  And I

25   took a picture of their infrared because you can see

1    how much colder -- the darker blue is colder

2    temperature.  You see the little 44.6.  Your photo is

3    way smaller than mine.  Do you see how cold the metal

4    is compared to the rest of the wall?  So the metal is

5    hovering around maybe 44 or less degrees right there.

6    That's what's causing that condensation.  That's on

7    the same day.  Hopefully, that -- does that show you

8    an example photo?

9         Q.    Correct.

10              So infrared would be -- it's basically a

11   temperature measurement?

12        A.    It's a way to see a lot of temperature at

13   once.  You can see how much colder the metal is than

14   the drywall or the glass.  If you look -- you're

15   looking at the left -- lower left corner of that

16   photo is drywall and what you're seeing dark is part

17   of the metal window assembly.  And then inside that,

18   you know, L, for lack of a better term, to the right

19   side and above that L, that L is the window frame.

20   It's the glass in the window.

21        Q.    Even in an ideal world, do you not have a

22   cooler temperature with the metal?

23        A.    Well, I pointed out the windows are not

24   thermally broken.  Newer windows are thermally

25   broken.  They've got a piece of polyurethane, a hard

Page 199

1    plastic, that breaks the outside metal frame from the

2    inside metal frame.  It thermally breaks it.  It

3    stops the conduction of the temperature from outside

4    to in.

5             If that's properly insulated around the

6    window, the terminal break stops the cold temperature

7    from making it to the inside.  So basically the

8    inside heat would heat the interior part of the frame

9    separated by the plastic from the outside, and the

10   cold temperature on the outside would stop at that

11   plastic piece.

12        Q.   And condensation would not result?

13        A.   That's correct.

14        Q.   Let me ask you this.  Was it a requirement

15   that windows be thermally broken?

16        A.   No, I don't believe so.  This was built in

17   '86?

18        Q.   Yes.

19        A.   It's code today.  I don't believe it was

20   code when the building was built.

21        Q.   Do you know when the code changed?

22        A.   Somewhere around -- remember, we went

23   through the energy crisis and all that.  I think

24   that's when the code started making changes to -- but

25   that predates my practice to a degree.  I think today

Page 200

1    windows are required to be built thermally broken.

2    Again, I'm trying to figure out why water is getting

3    in the building --

4         Q.   I understand.

5         A.   -- and this is one of the sources, whether

6    it was code or not.

7         Q.   The next bullet point says, the exteriors

8    investigations at the building indicated many wall

9    and windows locations with deteriorated caulking or

10   irregularities within brick veneer mortar joints,

11   which are related to normal aging and wear of these

12   construction components.

13        A.   Right.

14        Q.   Additionally and most notably at or near

15   the -- at near the roof areas, you write there are a

16   number of penetrations through the exterior walls.

17        A.   Right.

18        Q.   And these deteriorated caulk joints combined

19   with the above-discussed defective WRB/TWFs

20   installations are locations where concentrations of

21   rainwater migrate behind the brick veneer and/or

22   window systems and thereby create a recurrent

23   probability of uncontrolled water migration into the

24   building stud wall cavities or leakage into the

25   window assemblies.

Page 201

1    A.   Right.  You left out a couple of things

2    besides the deteriorated caulk joints.

3    Q.   Which are those?

4    A.   You said these deteriorated caulk joints;

5    and I had, comma, partially opened mortar joints and

6    other openings within the brick veneer combined with

7    the above-discussed.  We skipped some stuff, but

8    that's okay.

9    Q.   No.

10   A.   The spirit of it is these are places water

11   can get into the brick more readily and then you add

12   to it the openings and the WRB building paper or the

13   through-wall openings at the through-wall flashings

14   that are then letting water either get to the gypsum

15   board or into the tops of the windows, which is a

16   water -- basically, a leakage problem into the walls.

17   Q.   At any of your subsequent visits, because I

18   don't think you did -- well, let's say beginning with

19   your September 2015 site visit to the property and

20   any of your subsequent visits, did you perform any

21   kind of moisture testing?

22   A.   I might have.  I may have.  I don't -- there

23   wasn't a big -- moisture testing is a snapshot in

24   time.  So it's not tremendously valuable.  The answer

25   is maybe.  It might show up in some of my photos.  I

Page 202

1    might have taken a moisture meter with me on that

2    September '15 site visit, and I believe I did.  There

3    may be a picture of it laying on the floor somewhere.

4    We didn't do a lot of moisture testing.

5         Q.   Did you report any data and preserve that?

6         A.   No.

7         Q.   Okay.

8         A.   Unless it's in my field notes and I don't

9    have those committed to memory.

10         Q.   Are there more than one kinds of moisture

11   metering devices?

12         A.   Yes.

13         Q.   What are they?

14         A.   There's non-intrusive meters that send

15   essentially a radio signal through a certain amount

16   of thickness of substrate that's under the moisture

17   meter, and then there are capacitance -- I believe

18   that is the right word -- capacitance meters where

19   you actually make contact with the material and it

20   sends a signal between two probes.  And that also --

21   but either of those can give you an indication.  They

22   cause an electrical current that they can tell you

23   that that may be water there.

24         Q.   Do you have a capacitance meter?

25         A.   We do.

Page 203

1          Q.   Do you have a non-intrusive meter?

2          A.   Yes.

3          Q.   So do you know -- I mean, you didn't record

4     any data; but if you had brought one, which one do

5     you think you would have brought?

6          A.   I might have brought both, if I brought

7     them.  They're both small.  I'm going to look at the

8     first site visit photos.  I mean, we were advised not

9     to destroy -- not to -- we were kind of under the

10    guise you're going to see what you see and don't cut

11    and don't test, so I didn't feel like I could use the

12    meter.

13          The answer to your question is, at least in

14    September of '15, I've got the pinprick that's a

15    Delmorst model BD-9 moisture meter that's in

16    photograph 4249 on page 1 of 20.  I might have --

17    it's also shown in 4250.  I've got it with me on that

18    day, but I don't think -- in subsequent visits, we

19    were told not to -- you know, we couldn't cut things

20    and couldn't alter finishes.  I didn't want to leave

21    pinpricks or any -- I didn't want to leave any

22    alterations to the finishes, so I don't think I used

23    them.

24          Q.   A pinprick is made with what?

25          A.   There's two little pinprick probes on that

Page 204

1    meter that you can see in that photo.  You've got a

2    real small copy of it, and I've got a bigger one.

3    You can see there's two little pinprick probes right

4    there on the right -- upper right corner of that

5    instrument that you can poke into the drywall.

6         Q.   I see.

7         A.   It will give you...

8         Q.   And is this a capacitance or --

9         A.   That's the capacitance meter.

10        Q.   Okay.

11        A.   Because it's trying to make a current

12   between the two probes that are about an inch part.

13   If you put those probes against metal, you'll get a

14   reading.  So you've got to know -- you have to be

15   careful with all these meters to make sure you don't

16   get a false positive because you're hitting metal.

17        Q.   There's a little screen that would show the

18   readout and the information?

19        A.   Yes.

20        Q.   Is it printed off for you?

21        A.   No.

22        Q.   You have to actually write it down and

23   record it somewhere?

24        A.   (No response.)

25        Q.   And the answer to that is, yes, you have to

Page 205

1   write it down?

2        A.   Yes, you have to write it down.   My

3   apologies for not answering your question right.   I

4   was looking to see if there was any other...

5        Q.   The last bullet point on page 4.   The roofs

6   investigations at the building indicate a number of

7   improper as constructed conditions that are probable

8   leakage sources and a number of visible prior repairs

9   at the roofs.   However, ceiling staining below the

10   roof areas was not observed during our investigations

11   at the building.

12        So you're saying here that you -- what are

13   the improper as constructed conditions that you

14   describe as probable leakage sources?

15        A.   I call them out in the next paragraph on

16   page 5 but it's places where there's only a caulk

17   keeping water out where a base flashing meets a wall,

18   holes through the roofing.   It looked like the drains

19   have rework around some of the drains.   Is that an

20   adequate answer?   It's written and shown in the

21   photographs, but we can go over it to the extent

22   you --

23        Q.   No.   This is good.

24        You also say there were a number of varying

25   membrane patch areas throughout the roofs.

Page 206

1        A.   Right.  Right.

2        Q.   Is the use of a membrane patch typical,

3   customary, frequently done?

4        A.   When I'm looking at a roof that's ten years

5   old and I see five or six patches, it tells me

6   something has gone on before, you know.  I mean, in

7   fairness, it might not be leakage.  It could be

8   something like a hurricane or a tornado came through

9   and damaged the roof and it was patched in that

10  location or it could be there was a problem at the

11  seams.

12           This is a modified bitumen roof system.

13  There might have been a problem at the seam and it

14  was letting water in and somebody noticed it and

15  somebody went up -- you know, went up and repaired it

16  in the past.

17       Q.   You said this is a modified bitumen roofing

18  system?

19       A.   Yes.

20       Q.   Can you describe what that is?

21       A.   It's a cap sheet.  It's about a three-foot.

22  There's some photos of it.  And not every roof is, by

23  the way.  Because the roof down -- the first story

24  roof is a membrane roof, but the roof at the top of

25  the guest tower is a modified bitumen cap sheet roof.

Page 207

```
 1              Can you see -- great photos would be on page
 2     4 of 61, photographs 4755 and 4760 and actually 4761.
 3     Do you see about how it's a three-foot strip of --
 4     it's a real thick, like maybe 90 mill thickness, tar.
 5     It's like a real thick shingle, but it's rolled out
 6     and either tarred down to the substrate or another
 7     base sheet.
 8          Q.   You're pointing to this?
 9          A.   Yeah.  I'm pointing to all three really.
10     They're about three-foot strips that are rolled out
11     and either torched -- they heat up the underside and
12     it's torched applied down to the next -- whatever is
13     under it, which is hopefully a base sheet that's of
14     similar construction.  It's got granules on it that
15     are similar to the granules on shingles, but not --
16     it's an industrial commercial grade.  It's much
17     thicker.
18              You can see how it's rolled out.  In photo
19     4761 you can see a differing color of membrane around
20     the storm drain -- around the roof drain, excuse me.
21     That's telling me that it looks like the roof drain
22     might have been leaking at some time and they
23     retrofitted them.  I saw a patch shown in 4760.  If
24     you take a look at that -- to the left of that vent,
25     there's a -- do you see there's differing color?
```

Page 208

1      Q.   I do.

2           So is the photo at 4755 and 4761 --

3      A.   Right.

4      Q.   Is that a picture of the same condition?

5      A.   4755 is just a general overview photo and

6   4761 is a closer view of one of the roof drains.

7      Q.   But is it the same roof drain as --

8      A.   I'm not sure.

9      Q.   How many roof drains did you count?

10     A.   I didn't count every roof drain.

11     Q.   Then you write on page 5 at the top --

12     A.   Right.

13     Q.   These are the ones you called out?

14     A.   Right.

15     Q.   I wrote them down.

16          The next one says, the Liberty report

17   documented leakage into the building from improperly

18   installed pipe joints within the guest room tower's

19   roof drain leaders.

20     A.   Right.

21     Q.   But you were not able to directly view those

22   conditions?

23     A.   Right.

24     Q.   So they -- did they form a part of your

25   opinion?

Page 209

         A.   A small amount.  Anywhere that there's -- I
    believe there's eight chases that are interior chases
    in between two rooms times eight locations on each
    floor.  There's a chase where like -- I mean, this is
    a good photo.  Look back at 4755.  That roof drain is
    in the middle of the roof, right?  So underneath that
    roof drain is a vertical pipe going down somewhere
    down below.  There's a chase that's in between two
    rooms at that location all the way down the stack,
    and they had photographed leakage of pipes in that --
    in one of those chases or maybe more.  They mention
    it in their report.
         Q.   Is a chase a mechanical room?
         A.   It's like a chimney stack.
         Q.   Chimney stack, okay.
         A.   It's just a vertical empty space that you
    can run pipes through.  So if there's leakage
    occurring there, one, it's free water that's getting
    in there; but it's also humidity.  It's also
    humidifying that stack.  That water is going to
    evaporate inside that stack and be uncontrolled
    humidity coming into contact with drywall, you know,
    the outside -- the exterior side of the interior
    drywall, right?  And then we've got air conditioning
    in the two rooms and vinyl wall covering on there.

                                            Page 210

1    We could have a condensation source at those chases,

2    and that condensation could be from humidity created

3    by pipes leakage or it could be just from humidity

4    because that's unconditioned air inside that stack,

5    inside that chase.

6         Q.    So in your report, you're talking and your

7    addressing Liberty's documented leakage from

8    improperly installed pipe joints?

9         A.    Correct.

10        Q.    You're not addressing, are you, the chase?

11        A.    It's addressed later in the report.

12        Q.    It is?

13        A.    Yeah.

14        Q.    Further investigation, you write, indicate

15   that the guest rooms' fan coil units were the

16   building's originally installed FCUs and were at the

17   end of their operable life.

18        A.    Right.

19        Q.    What was the operable life?

20        A.    Operable life is about 15 to 20 years.

21   These are about 30 years old.  We've got photographs.

22   We looked at -- when we opened up some of the fan

23   coil units -- they had been opened up prior to us

24   getting there, and we could see them -- the date

25   stamp was 1986, so they looked like they were

Page 211

1    predominantly old.

2         Q.   Did they appear to be operating at the time?

3         A.   They weren't operating at the time because

4    the rooms were in the process of demolition.

5         Q.   Okay.  Did you inquire if they were

6    operating?

7         A.   We may have if Mr. Tracy answered that

8    question.  I mean, it looked like they probably were

9    generally in operation or going to be reused.  It

10   looks like they were reusing them and not installing

11   new ones incidental to the interior renovations.

12        Q.   A moment ago when we were talking about the

13   bitumen cap sheet roof --

14        A.   Right.

15        Q.   -- you were talking about its useful life.

16   What is the typical --

17        A.   Probably about 20 years, give or take.

18        Q.   At the time of your inspections, how far --

19   how old was the roof?

20        A.   I'm not sure.

21        Q.   Did you inquire?

22        A.   Maybe.  I don't remember.  Mr. Tracy and

23   others were not really allowed to talk to us.

24   Admittedly, I pushed that a little bit; but then on

25   occasion Mr. Tracy would go, I'm not allowed to talk

Page 212

1   to you.  I was like, okay.

2       Q.   The next bullet point on page 5 says that

3   the building is under negative pressure due to the

4   building's HVAC systems exhausting more air volume

5   than the systems provide in the form of make-up air

6   to the building.

7       A.   Right.

8       Q.   Can you describe that in layman terms?

9       A.   Right.  I kind of broke this into two

10  sections.  So, I mean -- and they're interrelated.

11  But the first part is about the common air systems to

12  the building.  So this first bullet and its

13  sub-bullets are related to common systems and the

14  bathroom exhaust; and then in a second -- in the next

15  section, we talk about the fan coil units.

16          And Wade, when you depose him, is our staff

17  mechanical; and I'm a civil by training.  So he

18  can -- I understand this, but he obviously

19  understands it to a greater degree.  But basically

20  you've got a system that provides air conditioning to

21  the corridors, to the hallway corridors, and then

22  you've also got continuous exhaust fans serving each

23  of the guest room bathrooms.  And if the continuous

24  exhaust fans are sucking more air out of the building

25  than the supply systems that are feeding air into the

1   corridors are sending -- I'll keep that as a

2   sentence -- then you can have a negative air

3   situation.

4           Basically, you're sucking more air out of

5   the continuous exhaust than you were supplying to the

6   corridors; and when that happens, the exterior walls

7   are the next source.  Any openings in the exterior

8   wall are a source of infiltration, air infiltration,

9   into the building.

10      Q.   Okay.

11      A.   I think Liberty studied this heavier than we

12  did, and we looked at Liberty.  Liberty said the

13  building is under negative pressure, and we agreed

14  with them.  That's a short summary of those bullets.

15          The other -- we noted at one of the supply

16  systems on the roof there was a hole in the supply

17  line, which was allowing supply air to blow out,

18  which means if the continuous exhaust is pulling at a

19  set rate and the supply is not making it down to the

20  corridor but blowing out a hole in the roof, there's

21  another source of negative air pressure in the --

22  negative pressure is going to pull unconditioned air

23  into the building through the exterior walls, which

24  is not a good thing.

25      Q.   And your point is that given the climate and

Page 214

1   conditions typically here you're going to have more

2   humid air on the outside and it will be sucked in?

3        A.   That's right.

4            During the summer months -- during the

5   hotter and humid months of the year, if you're under

6   negative pressure, that negative pressure is pulling

7   into the wall cavities.  The rooms are being air

8   conditioned, so they're going to provide a cooler

9   surface for that hot unconditioned air inside the

10  wall cavities.

11           And so if the dew point temperature is

12  reached, i.e., at the wall studs or a fastener or at

13  the interior face of the vinyl wall covering that

14  might be 72 degrees and we've got 90 degree, 90

15  percent relative humidity air inside the wall cavity,

16  then that's a point of condensation, which would lead

17  to recurring mold growth.

18       Q.   You testified that Liberty had studied this

19  issue more deeply than did --

20       A.   Than we did.

21       Q.   -- your firm.

22           Do you know did Liberty do any testing of

23  the balancing of the supply?

24       A.   I would rather -- we haven't like studied

25  their report in depth.  Wade probably studied it more

1    in depth than I did.  So I'm not in a position at

2    this moment to say, oh, yeah, Liberty did this or

3    that.

4              We asked when we could if test and balance

5    studies had been done on the building; and we asked

6    for those as a document, that we would like to

7    receive the test and balance study or studies that

8    had been done for the building over its operation in

9    life and never were able to get a copy of one.

10        Q.    To whom did you make your request?

11        A.    We make it through Mr. Brown who would pass

12   it on to the owner.

13        Q.    Do you know if -- did you ask Liberty if

14   they had done that?

15        A.    Possibly when we could.  Wade spent a lot

16   more time with Mr. Snell, Don Snell, who was the

17   mechanical engineer working for Liberty.  Wade and

18   Don spent at least one day together on site.

19        Q.    So you know that you didn't ask Liberty for

20   the testing?

21        A.    No.  I mean, we were pretty much told from

22   the outset, you know, that we had to request -- any

23   requests we made we made to Mr. Brown who would then

24   send it on to the owners.  We weren't allowed to get

25   documents directly from Liberty because they had

1    counsel on day one of -- not day one, not the
2    September '15 visit but when we started making
3    subsequent visits after the September '15 visit.  His
4    name is on one of the Liberty reports.
5    Mr. Steinbrecher was present during at least the
6    first site visit and maybe some of the subsequent
7    ones.
8         Q.   So ESL was required to make any request that
9    it did make for test and balance study information to
10   Mr. Brown?
11        A.   Right.
12        Q.   Could not make that directly to Liberty?
13        A.   Correct.
14        Q.   As between you and Mr. Anderson, it would
15   have only been Mr. Anderson who would have made that
16   request of Mr. Brown?
17        A.   No.  We asked for it as a team.
18        Q.   You asked for it together?
19        A.   Yeah.
20        Q.   Did Mr. Brown say he had reached out to
21   Liberty?
22        A.   I don't know if he reached out to Liberty or
23   not.  He might have reached out to Mr. Steinbrecher
24   or other attorneys.  I don't know who -- I don't know
25   who he reached out to.

Page  217

1      Q.    Okay.  I've been asking you about two

2   sources of inquiry.  One would be to my clients

3   directly?

4      A.    Right.

5      Q.    And Mr. Steinbrecher was the person that

6   apparently was the contact then.  I think you're

7   telling me you didn't get any response from

8   Mr. Steinbrecher?

9      A.    Well, I don't know -- or those documents

10   don't exist.

11      Q.    You don't know?

12      A.    I don't know, that's right.

13      Q.    As far as Liberty, you said that you believe

14   that you and Mr. Anderson did reach out to Mr. Brown

15   to inquire if Liberty did conduct testing?

16      A.    No, no, no.  If the owner had -- no.  If the

17   owner had -- if the people operating the facility had

18   done a test and balance study of their own, we would

19   love to see that.

20      Q.    Okay.  What about the Liberty report?

21   Because we started this conversation by you telling

22   me Liberty had done a much deeper analysis of this

23   question.

24      A.    Right.

25      Q.    And then we moved to whether Liberty itself

Page 218

1    had done any test and balance --

2         A.   And the answer is I don't know.

3         Q.   Okay.  You didn't initiate any request

4    toward Liberty for an answer to that question?

5         A.   No.

6         Q.   Okay.  Do you know if Mr. Anderson did?

7         A.   He may have.  You will need to ask him that.

8    We had the reports, though, at a certain point during

9    this investigation.

10        Q.   Do those reports reflect the test and

11   balance?

12        A.   I don't think they do; but they analyzed it,

13   analyzed the systems.

14        Q.   What's involved in the test and balance?

15        A.   Ask Mr. -- that's getting in the weeds, so

16   ask Mr. Anderson that.

17        Q.   And a final question on this subject is, we

18   know ESL did not do a test and balance?

19        A.   We did not.

20        Q.   If I look at page 6 --

21        A.   Right.

22        Q.   -- the third paragraph, the following

23   as-found conditions have generally been present since

24   original construction --

25        A.   Right.

Page 219

1        Q.    -- and have contributed to local negative

2    pressure within the guest rooms' walls.

3        A.    Right.

4        Q.    The first item you list is the steel stud

5    demising walls provide an air path at their

6    intersections/connections with the exterior walls --

7        A.    Right.

8        Q.    -- which evidence a number of air and water

9    leaks.

10        A.    Right.

11        Q.    Secondly, the FCU grills indicate air

12    leakage at their drywall connections and in some

13    cases are set back from the drywall or have cabinet

14    leakage.

15        A.    Correct.

16        Q.    Help me understand air leakage at their

17    drywall connections.  What is that making reference

18    to?

19        A.    Imagine a pipe that's carrying air instead

20    of water.  It's got to be sealed to the wall it's

21    attached to.  If I separate it from the wall and I

22    put suction on it -- which a fan coil unit is doing

23    at its base.  It's sucking air in its base, running

24    it through the cooling coils, and supplying it at the

25    top at least in this building.  If that suction

Page  220

 1   component of the fan coil unit is not sealed -- not a

 2   continuous duct and then sealed at the walls but it

 3   instead is back from the wall and we put suction

 4   there, it's going to, of course, suck air through the

 5   grill; but it's also going to be sucking it from the

 6   wall that it's not attached to.  And that is the

 7   whole point of this next section.  We've got negative

 8   air related to the common system in the hallway, but

 9   then we've got localized negative air pressure

10   incidental to the fan coil units not being well

11   connected to the walls.

12          So they're sucking air from the room, but

13   they're also sucking it from the wall cavity that

14   engulfs the room.  And then that wall gravity at the

15   demising walls where the walls in between units --

16   that wall is connected to the exterior wall.

17          And we know from earlier discussions today

18   and from looking at the photos there's a lot of holes

19   in the WRB that are allowing water get into the

20   exterior water cavity, which is going to humidify it

21   or it's going to allow hot humid Atlanta summer air

22   into those same openings into the exterior wall.  And

23   then because we've got negative pressure from the fan

24   coil unit, it's sucking that air into the -- into

25   the -- basically, into the room's wall cavities.

Page 221

1      Q.   What are the FCU grills?

2      A.   They're basically what you see at the walls.

3  If take a look at photo --

4      Q.   Is it a component of the FCU unit?

5      A.   Yeah.  You get two engineers to explain this

6  to you.  Let me see if I can find a good -- here's

7  a -- let's see.  That's a supply duct that's been

8  taped up.  Let's see if we can find --

9      Q.   You're pointing at 536 again?

10     A.   I'm sorry.  Yeah.  Let me find you a good

11 photo.

12     Q.   Okay.

13     A.   A lot of these are under demolition.

14         MR. MACBRIDE:  I think unfortunately almost

15     all the pictures have the grills removed.

16         THE WITNESS:  Yeah.  I know.  I was trying

17     to find one that maybe showed...

18         MR. MACBRIDE:  Do you want to take a break

19     while he's looking for the photo?

20         MR. DAILEY:  Yeah.

21         (A recess was taken.)

22 BY MR. DAILEY:

23     Q.   What page are we on?

24     A.   Let's start with 34 of 61.  So if we go to

25 page 34 of 61 of our second report or our photos from

                                        Page 222

1    our second report and look at the bottom right corner

2    photo, image 0175, you can see that there's a grate

3    that's been pulled off of the return duct and the

4    vent that still has a grate in it at the top is the

5    supply duct.

6           So the fan coil unit essentially is pulling

7    air into the bottom rectangular area, pulling it

8    through the fan coil unit system, and supplying it

9    back to the -- which cools it and sends it back to

10   the room via that top vent that's not fully in the

11   photo.

12          If you capture that and then you look maybe

13   at -- on the same page, look at photo 171, bottom

14   left corner photo, the fan that's pulling the air is

15   in that assembly that's inside the wall.  There's no

16   connection between that fan area and the vent.  In

17   other words, the vent -- the suction is happening

18   farther back.  It's not flush with the wall or

19   connected by a vent to the wall, which means the

20   suction pulls from the room but it also pulls from

21   inside the space of the fan coil unit.

22          If there's an opening in the wall anywhere

23   inside that closet area, that's going to pull outside

24   air into the building.  And there's various views of

25   that in our photos.  Maybe go to photo 35.

Page  223

1       Q.   How did you identify if there was an opening

2    in the closet?

3       A.   We didn't always look, but we saw there's

4    cabinet leakage.  There's not a vent that -- there's

5    not -- I shouldn't say vent.  There's not a duct.

6    It's not ducted.  Basically, if I put a negative

7    pressure, a fan sucking is going to pull from

8    wherever it can get its suction.  If it's open in

9    here, it's pulling from inside the closet and the

10   room, not just the room.

11      Q.   Are you objecting to the fact that this

12   cover grill is not in place?

13      A.   No, no, no, no.  The cover grill has nothing

14   to with it.  It's the space between the wall and the

15   where the fan is in the fan coil unit.

16      Q.   On the back side that we cannot see?

17      A.   Go to page 35 of 61 and look at the top

18   center photo, 178.  The fan is inside that little

19   dark opening, not -- the fan is going to pull air

20   from the room, which is in the foreground of the

21   photo.  We're standing in the room taking that photo.

22   But it is also going to pull air from within the

23   closet space that that --

24      Q.   Is the fan --

25      A.   Essentially the fan coil unit --

Page 224

1       Q.    Is this the fan machine here?

2       A.    The fan is right under that.

3       Q.    Right under that?

4       A.    Yeah.

5       Q.    Okay.

6       A.    So it's going to pull air from wherever it

7  can get it.

8       Q.    Where should the duct that you're referring

9  to be --

10       A.    In between the fan and the opening.  In

11  other words, it shouldn't be just a dead space there.

12  It should be a ducted -- it should be ducted.

13       Q.    Ducted out into the room in which the

14  photographer is standing?

15       A.    Yes; ducted to that -- to the frame that you

16  can see -- it should be ducted to the frame where you

17  can see this opening.

18       Q.    So it's not pulling it all -- by properly

19  doing that, you would not be pulling at all from the

20  closet?

21       A.    That's right.  You're pulling only from the

22  room.  So, yes, it should be pulling it from -- only

23  from the room, not from wherever it can get it.  And

24  you've got a similar condition -- and this is called

25  out in the report.  I'll show you a similar

Page 225

1    condition, if you would like to see it.  You've got

2    some openings where the continuously running exhaust

3    in the bathrooms -- you've got openings in the

4    drywall at those locations, which is doing exactly

5    the same thing.  It's pulling air from the wall

6    cavity.  I'm trying to find the photo as I'm talking.

7            Essentially, if you don't have a tight seal

8    at the continuous exhaust vent, the same thing is

9    happening.  Water -- I mean, air is being pulled from

10   the wall cavity and the bathroom at the same time,

11   which is going to have the same effect.

12       Q.   Why will the air in the closet be more

13   dangerous to be pulled from as opposed to just the

14   room?

15       A.   Because it's attached -- this closet wall --

16   let me tell you what photo I'm on.  49 of 61,

17   photograph 2327.  And the one before it is kind of

18   showing where we are in that particular room.  This

19   is a way better view than some of the ones I showed

20   you a minute ago.  You see the fan is inside -- the

21   fan is inside the assembly that's in the upper part

22   of that photograph.  Does that make sense?

23       Q.   Yes.

24       A.   That's where the fan is.  There's a grill --

25   there's a grill where the photo is being taken that's

Page 226

1    been removed, right?

2         Q.   Correct.

3         A.   So the air is -- it's just sucking -- it's

4    sucking within the closet and from the room.  The

5    grill is, of course, letting air go through the

6    grill; but it is also sucking within this room.  The

7    walls of this closet are attached to the side wall of

8    the guest room, and that side wall of the guest room

9    is attached to the exterior wall.  This is not all

10   theory.  We've also got all this rusted studs and

11   mold on that guest room side wall at many locations.

12        What we were trying -- what Wade and I were

13   trying to get to is, okay, we've got to figure out

14   why this is so prevalent.  And, of course, negative

15   air -- the whole -- the building common systems being

16   negative would contribute to that; but as we looked

17   closer, we were like, but these fan coil units are

18   providing a localized negative pressure in addition

19   to the building system, so it's a little bit of both.

20        Q.   Then the third item is -- you might have

21   spoken about this as you were talking -- the bathroom

22   exhaust sleeves/terminations are not sealed to the

23   sheetrock.

24        A.   Correct.  Go to page 51 of 61 and go to

25   photo 2610.  I know you've got a very small

1    photograph.  But in the lower right corner of that

2    vent, do you see that dark spot in the -- that's

3    where the -- that's the continuous -- that's the

4    continuous exhaust in the bathroom right there.  Do

5    you see the lower right corner where it meets the

6    drywall?  Your photo is really small, but you can see

7    it right here.

8         Q.    All right.

9         A.    That's an opening in the drywall.  That's an

10   opening to the wall cavity.  It's the same principle.

11   This duct right here is pulling air -- is pulling in

12   theory humid air out of the bathroom, right, and

13   pulling it up, up, up into the main system of the

14   building, right?  But since it's not sealed, it's

15   also pulling it from the wall cavity right there at

16   that hole.  If you blow this photo up, you can see it

17   a little bit better.  And there may be a better photo

18   here in a minute.

19         So that's our point.  That's putting

20   negative pressure in the wall cavity that ultimately

21   is attached to the exterior wall where we either have

22   water leaks or we have just air leaks.  So I hope

23   that explains it.  I'll see if I can find a better

24   photo of it.

25         These contact sheets are decent, but

Page 228

1    here's a -- if you go to page 52, there's a way

2    better photo of what I just explained.  52 of 61,

3    image 2631, top right corner.

4         Q.   52 of 61?

5         A.   We'll do more if you want to keep looking.

6    That's a great example of what -- that's a better

7    photo than I just showed you.  I was just showing you

8    the first one I came to.  There's a gap between the

9    drywall and the top of that -- and the top of that

10   duct assembly.

11        So remember that air -- that continuous

12   exhaust is sucking air 24/7 through this duct that

13   you can see; but since it's not sealed at the wall,

14   it's also going to pull air through that hole and

15   then put a negative pressure on the wall cavity,

16   which is attached to the -- you know, linked to the

17   exterior wall.  That's what we mean by that whole

18   section regarding localized negative air pressure.

19        Q.   Thank you.

20        A.   Sure.

21        Q.   The next bullet says, in at least five

22   locations, an exterior building chase creates a full

23   height unconditioned air stack that abuts with and is

24   partially formed by walls of adjoining guest rooms.

25        A.   Right.

Page 229

1        Q.    You further write:  At four of these

2    locations, two each on the front and rear elevations,

3    these chases are bisected by adjoining guest rooms'

4    exterior wall-to-demising wall intersections.

5        A.    Right.

6        Q.    These guest rooms' walls that abut with

7    exterior building chases are exposed to increased

8    unconditioned outside air leakage and interstitial

9    airflow.

10       A.    Right.

11       Q.    So I think I understand what is written

12   until we get to interstitial airflow.

13       A.    The interstitial airflow is the airflow

14   through the wall cavity through the interior wall.

15       Q.    Interstitial meaning through or --

16       A.    Well, I mean, I can show you a photo of the

17   exterior and you can kind of picture the interior at

18   the same time.  Go to my initial report, so page 14

19   of 20, and look at photograph 4360.

20       Q.    Okay.

21       A.    That is one of those -- this is one of those

22   five chases.  If you look at the exterior view of the

23   whole building, you'll see this -- and if you can --

24   the window to the left is one room, the window to the

25   right is in another room, and then in between those

Page 230

1   windows is a wall.  And then the exterior wall --

2   which it's sort of like a de facto exterior wall

3   except it's just steel studs and drywall.  And then

4   90 degrees to that in between those two windows is

5   the dividing wall between the units.

6           And so this stack right here, you know,

7   we're seeing the tenth floor of it.  It's a big stack

8   of unconditioned air, and so we know we've got wall

9   leakage through the brick getting to -- not to

10  mention it's just plain unconditioned air.  We have

11  plenty of sources of air leakage into that stack, and

12  we also have leakage into that stack through the

13  defective waterproofing behind the brick veneer.

14          So we've got two sources of moisture and

15  then you add to it the negative pressure that is

16  being put on the dividing wall.  It's sucking that --

17  it's sucking that humid air.  You know, whenever the

18  humidity is at a level that the dew point temperature

19  inside becomes -- you know, when they're in

20  balance -- that's not the best word; but when

21  basically a dew point temperature inside is less than

22  the dew point temperature of outside air humidified,

23  we're going to get condensation in the wall.

24      Q.   Did you take any measurements of the dew

25  points or the condensation points?

Page 231

1     A.   No; because that's -- we're looking at

2  essentially a 28-year -- at the time we're looking at

3  the building, right -- let's see.  '15.  It was built

4  in '86.  We're looking at a 29-year-old building.  So

5  it's not -- I mean, the answer is we didn't model it.

6  I think that might be the answer to your question.

7     Q.   I guess the question I have is, since -- I

8  mean, do any of the literature sources that you've

9  listed indicate that modeling is appropriate in order

10 to confirm the conditions that you believe are

11 working in conjunction with one another to create

12 this negative air pressure -- is not the ability to

13 model the clearest way to determining whether your

14 forensic beliefs are, in fact, occurring?

15    A.   We haven't felt the need to model because

16 the symptoms are consistent with what's going on.

17 And I was going to try to find you a photo that

18 showed you that pretty well.  Let's see here.  That's

19 a pretty good one.

20         Go to page 11 of 61 and go to photo 6029,

21 which is the bottom right-hand photo.  You see in the

22 photo -- actually, the photo before it is even

23 better, 6028, because in 6028 you're looking at the

24 entire wall.  Well, not the entire wall but you're

25 looking at the lion's share of the wall closest to

Page 232

1    the exterior wall.  And you see how much mold we've

2    got throughout the entire wall.  High, low, it

3    doesn't matter.  If it was free water, it ought to

4    all to be down at the bottom where gravity would take

5    it.

6            And then look at photo 6029 and you're

7    looking at the right side of the door that you're

8    looking at in photo 6028; but if you look outside the

9    window, there's one of those stacks.  That stack is

10   full of unconditioned air all the time.  So the

11   symptom is telling us -- the symptom is telling us,

12   hey, something is going on here.  And what's going on

13   is negative air pressure pulling in hot humid air,

14   which is coming into contact with the cool surface,

15   and the vinyl is the -- the vinyl that was taken off

16   there is the cold surface.  So the condensation is

17   occurring right there where the vinyl and the drywall

18   meet.  That's why we've got this mold at that

19   location.

20           There's other photos that are similar to

21   this both in this enclosure and in all the photos

22   we've taken.

23       Q.   Do you see the same conditions where the

24   exterior -- excuse me, the interior wall of the room

25   closest to the exterior wall was not also adjoining

Page 233

1   to a chase?

2        A.   Yes.  I mean, like go to the next page, 12

3   of 61, photo 6030.  There's no chase there.  You see

4   some mold stains.  There's your dividing wall right

5   where it meets the window.  You've got mold stains

6   right there.  That's a non-chase location.

7        Q.   Which photo are you --

8        A.   Photo 6030, top left corner.  And then in

9   6031 you can see that is beside a chase, the next

10  photo to its right.

11       Q.   But in 6030 what is the -- where is the mold

12  stuff that you want me to look at?

13       A.   The top of that wall.  Do you see the

14  staining at the top of the wall?

15       Q.   From the color it's --

16       A.   It's near the ceiling.  There's better

17  photos.  There's other photos that show it.  In other

18  words, the only -- the dividing walls have a problem

19  because of what we've explained both from building

20  negative pressure or localized fan coil unit or

21  continuous exhaust.  You kind of have continuous

22  exhaust helping you with localized, you have fan coil

23  units helping you with localized, and then you have

24  the building -- the overall building system helping

25  you.  All of those are contributing to negative air

Page 234

1    pressure.

2          It varies from -- it varied from room to

3    room when we were able to see, you know, the vinyl

4    pulled back.  You know, it could be there's more

5    negative pressure at one wall than another.

6          Q.   What's involved in modeling?

7          A.   Talk to Wade about that.  We haven't felt

8    the need -- we have not felt the need to model, but

9    if we did Wade would be the guy setting it up.  We've

10   used data collectors.  In past jobs we've used data

11   collectors, which record temperature and relative

12   humidity, and put them at various locations, one

13   outside and others inside walls or adjacent to

14   windows that were having condensation, and use that

15   to determine when dew points were occurring; but we

16   didn't -- there was not a need to model here.

17         Q.   Data collectors record what?

18         A.   Temperature and relative humidity at the

19   same time.

20         Q.   From the description it doesn't sound like

21   that's terribly elaborate.  I mean, is it just

22   placing the equipment so that it's in place?

23         A.   Yeah.  You've got to realize -- you've got

24   realize there's so many variables that it would be

25   difficult to model a perfect situation.  Let me just

                                    Page 235

1   use photo 6609 on page 21 as an example.

2       Q.   21 of 61?

3       A.   21 of 61.

4            It's another wall -- another dividing wall

5   that abuts with one of those unconditioned air

6   chases.  What you would have to know is you would

7   have to know is the fan coil unit at this room well

8   connected or not well connected to its wall.  You

9   would have to know is the continuous exhaust fan vent

10  well connected or not well connected to its drywall.

11  You would have to know is the insulation in the

12  dividing wall continuous or open and if it's open

13  where is it open and how much is it open.

14           So to model -- to model it -- I really

15  believe that modeling would be inconclusive is what

16  I'm driving to because we've got 272 rooms with too

17  many variables from room to room to draw -- to get

18  meaningful data from the modeling because there's

19  just too many variables.  What we've got is symptoms

20  that are very consistent with negative air pressure.

21  There's not another explanation, but you could talk

22  to Wade in more detail about modeling.

23      Q.   The variables you described, though, that

24  you say would make it difficult to model -- and you

25  listed three for me -- is the SEU unit connected or

Page 236

1    not well connected?

2         A.    Correct.

3         Q.    Is the continuous exhaust fan connected or

4    not well connected?

5         A.    Correct.

6         Q.    And is the insulation continuous or not?

7         A.    Correct; and, if not, where and, if not, how

8    much.  And then -- I mean, there's so many other -- I

9    mean, are there openings --

10        Q.    But those are visual, right?  You can look

11   and see whether the connection exists?

12        A.    If we were given access to be able to cut,

13   yes, but then there's other --

14        Q.    Before seven you had the access.  You could

15   see --

16        A.    No, sir.  No, sir.  The insulation had been

17   completely removed at that point.  I saw it

18   completely demolished.  I didn't get to see -- I

19   didn't get to see it being demolished.  I didn't get

20   to see how it was insulated or not or whatever is in

21   between.

22             But you can keep -- I mean, we're doing like

23   an analytical study of modeling on the fly here, what

24   is the openings outside, how much air, is there a gap

25   between the window jamb and the brick at this

Page 237

1    particular location that allows much more free flow

2    of air into the exterior wall assembly, are the caulk

3    joints tight or are they loose, is there an opening

4    in the mortar joint in that chase.  I mean, there's

5    just so many -- there's so many variables.  I don't

6    think it could be modeled with success because

7    there's too many variables.

8         Q.   But the variables you're mentioning --

9         A.   Right.

10        Q.   -- are symptoms that you believe contributed

11   to the negative pressure?

12        A.   Absolutely.  Absolutely.

13        Q.   So why is that an impediment to --

14        A.   Because you're asking me to model it and

15   draw a conclusion from a model's output.  I'm telling

16   you there's just way too many variables to draw -- I

17   just don't think it's modelable without a wide -- you

18   know, what conclusion are you going to draw?  I just

19   I think it's more than can be molded with

20   precision -- with precise output that gives you

21   something.

22        Q.   All right.  It could be that I'm not

23   understanding fully your description of modeling, but

24   we got into this discussion earlier when I was asking

25   you whether you did any of the test and balancing,

Veritext Legal Solutions
866 299-5127

1    and you said that you had not done so.

2         A.   Correct.

3         Q.   At some point, you said, you know, are you

4    asking me -- you're asking me if we were modeling and

5    we did not see a need to model is what your response

6    was.

7         A.   Right.

8         Q.   The testing and balancing process is in the

9    nature of a test; is it not?

10        A.   It's laborious.  It's a lot of work.

11        Q.   Help me understand how --

12        A.   Because there's -- because of how many vents

13   there are per floor.  I mean, it's -- we didn't have

14   that kind of access to the building.  It's not --

15   it's just beyond the scope of what we were asked to

16   do.

17        Q.   Okay.  In your analysis and summary of

18   conclusions, which is presented on pages 6 and 7 of

19   your expert report --

20        A.   Right.

21        Q.   -- you talk about the multiple as-installed

22   construction defects or conditions throughout the

23   hotel have led to recurring uncontrolled water

24   leakage --

25        A.   Right.

Page 239

1      Q.   -- into the building's exterior wall

2   cavities during rain events and have led to generally

3   constant unconditioned and often humid air leakage

4   into the building's stud wall cavities --

5      A.   Right.

6      Q.   -- over the building's operable life.

7           And then on page 7 you continue to say:  In

8   our opinion, there's no single event which has caused

9   all of the mold/mildew and deteriorated conditions

10  identified within the building.  Rather these

11  conditions have -- I'm skipping over the word --

12     A.   Sure.

13     Q.   -- these conditions have developed over the

14  life of the building and have been caused by the

15  exterior walls' chronic water and air leakage,

16  condensation at windows or within the wall cavities

17  and HVAC systems' operations and their effects on the

18  building's exterior and interiors walls' performance.

19     A.   Right.

20     Q.   You further write:  These mold/mildew and

21  deteriorated conditions are due to defective

22  construction and/or design, lack of appropriate

23  retrofit and maintenance of building components and

24  improper systems operation.

25           You conclude:  These conditions as noted

Page 240

1    have existed since the building was constructed and

2    have progressively and increasingly worsened as the

3    building and its various construction components have

4    aged from normal operation and exposure.

5         A.   Right.

6         Q.   So kudos to you for tying it all together in

7    that paragraph.  I think that -- certainly if you

8    accept your analysis and your conclusions from it,

9    that is a good descriptor of what your opinion is.

10             Is there anything else you would add to that

11   opinion?

12        A.   I think that sums it up pretty well.

13        Q.   I notice from the reports that you listed as

14   among those that you had reviewed --

15        A.   Right.

16        Q.   -- you have -- the fifth report listed down

17   is the 3/19/2004 Marx Okubo Associates limited

18   property condition and engineering assessment.

19        A.   Right.

20        Q.   Then the 2/22/2013 LM Consultant property

21   evaluation report.

22             Have you done work in the past forensically

23   for property of perspective purchasers of the

24   property to provide them a condition report of the

25   property they're interested in possibly purchasing?

Page 241

1        A.    Yes.

2        Q.    And I don't mean to state the obvious; but

3    that's done, is it not, in an effort to allow the

4    purchaser to evaluate the condition of the property

5    and whether or not it's feasible for them to proceed

6    with the transaction?

7        A.    Ask that again because I was thinking more

8    of a technical side of what we do, not --

9        Q.    What I was asking is, is that kind of

10   condition report or property evaluation report done

11   so that the perspective purchaser can have greater

12   insight into whether the property is suitable for

13   acquisition?

14            MR. MACBRIDE:   Objection.

15            THE WITNESS:   I mean, I presume that.

16        Usually when I have done those, I've been given a

17        format that the bank wants to see it in.   They

18        want to look at the site first, the walls second,

19        the roof third, the utility system fourth.   If we

20        look at, you know, Americans With Disability Act

21        compliance, they want to see that in this

22        section.

23            So we do an assessment based on what the

24        criteria is, what did they want us to look at.   I

25        don't presume why -- I've got common sense.   They

Page 242

1        want to know the condition, what do they have to

2        repair now, what can they repair later.  You

3        know, what's -- I mean, I get that; but as far as

4        how they use the information we give them, that's

5        up to them after we finish our technical report

6        where we're looking at the various components

7        they asked us to look at.

8    BY MR. DAILEY:

9        Q.   I understand that.

10            By the same token, sellers will sometimes

11   commission such reports prior to their contemplated

12   sale of the property to give them greater insight as

13   to what its current market value may be?

14       A.   They may.

15            MR. MACBRIDE:  Objection.

16            THE WITNESS:  I mean, they may.  I don't

17       know.

18   BY MR. DAILEY:

19       Q.   I mean, in your experience have you

20   understood that to have occurred?

21            MR. MACBRIDE:  Objection.

22            MR. DAILEY:  Why is that an objection?

23            MR. MACBRIDE:  He's not here to testify

24       about what building owners do and what his

25       understandings are.  So I'm objecting to you

                                        Page 243

1          asking him questions about what other people do

2          with his reports.  So I objected.

3               MR. DAILEY:  Well, I wasn't actually asking

4          about his reports.  I was asking about the

5          reports of the kind that he's listed.

6               MR. MACBRIDE:  Right; but you're asking him

7          what other people who commissioned those reports

8          commissioned them with the intention -- I mean,

9          that's not his -- he's not here to testify about

10         what other people -- I'm objecting.  He can

11         answer.  I mean, I would imagine the honest

12         answer is that every person has a different

13         intention every time they retain somebody; but,

14         you know, he can answer subject to my objection.

15    BY MR. DAILEY:

16         Q.   What's your answer?

17         A.   My answer is I typically ask a client

18    regardless of who they are what do you want us to do,

19    what do you want us to do for you.  In this case, it

20    was tell us the sources of water intrusion; but it

21    might be are my pavements -- is it time to replace my

22    pavements or not or is it time to replace this wall

23    or not or is it time to replace this roof or not and,

24    if so, why.  I mean, it can vary.  It just varies

25    from client to client what their need is.  I try hard

Page 244

1    to get to that need or Wade tries hard to get to that

2    need or we as a team try to get to that need and then

3    answer that question.

4           What the owner -- what the client does with

5    that is not my call.  We're their engineer.  We're

6    helping with an engineering study of some form or

7    maybe analysis after the study.  I hope that answers

8    your question.

9        Q.   In your own work, have you ever been asked

10   by an insurance company who is evaluating whether to

11   provide coverage for a particular piece of property

12   to do a condition evaluation assessment?

13       A.   Not to my knowledge, no.

14       Q.   Are you aware that that is sometimes done or

15   requested by insurance companies?

16       A.   Maybe.  I mean, I think some underwriters

17   may do that or others do it by telephone interview.

18   I just don't know the details of underwriting.

19   That's not my specialty.

20       Q.   That kind of information would be helpful to

21   understand the potential risk of any insurance

22   coverage extended; would it not?

23           MR. MACBRIDE:  Objection.

24           THE WITNESS:  I mean, from a common sense

25       standpoint, I would say yes; but I don't know.  I

Page 245

1        mean, that's not my specialty area.

2    BY MR. DAILEY:

3        Q.    Some of these reports that you've listed out

4    go back as far as 2003, 2004.  Do you know when

5    Plaintiff, Sky Harbor, actually acquired title to the

6    Hilton Hotel property?

7        A.    Not precisely.

8        Q.    Was it --

9        A.    Was it around '13?  I think somewhere in

10   there, but I -- I've got a timeline document I

11   developed, and I might have that written in there.

12   And I think it was sometime in '13.

13       Q.    Are you informed as to whether FM Global or

14   one of its member companies had extended insurance

15   coverage on this same Hilton property prior to Sky

16   Harbor having acquired title?

17       A.    No, I'm not aware.

18       Q.    So with your helpful assistance, we've gone

19   through the report.  Is there anything -- I realize

20   you stand by your report.  Obviously, you've taken

21   time to prepare it.  Did you write this report?

22       A.    Wade and I wrote it together.

23       Q.    Did you primarily write it or did you

24   actually share the responsibility?

25       A.    We shared the responsibility.  I mean, I

Page 246

1  probably led the charge, charge being get the report

2  written.

3       Q.   Sure.

4       A.   But Wade contributed greatly.  So I wouldn't

5  say I wrote it.  He probably wrote the lion's share

6  of the mechanical components because that's what

7  he -- that's where his wheelhouse starts, but he

8  understands enclosures extremely well and I

9  understand mechanical systems pretty well.  So we

10 collaborated on it or we wouldn't have both signed

11 it.

12      Q.   Is there anything in addition that you think

13 I should know to understand the opinions that are

14 expressed in this report?

15      A.   I don't think so.

16      Q.   Are there any additional facts or

17 circumstances or conditions not ascribed in your

18 report that you believe contribute to the opinions

19 which you are presenting in this report?

20      A.   I mean, there could be based on further

21 investigation; but right now the report stands as

22 written.  But, I mean, we may get another document

23 that adds new light to a specific area that's

24 addressed in this report.

25      Q.   I understand that.

Page 247

1              As of the time that this report was dated

2     and signed, January 13, 2020, was there anything else

3     not expressed herein that constitutes information or

4     facts or conditions that support the opinions

5     described?

6          A.    No.  I think this is a good -- it's more

7     than a snapshot.  I mean, it's a culmination of on

8     and off four years of investigation; but the answer

9     to your question is no.

10         Q.    So quickly -- helpfully you had provided the

11    past four years of your expert testimony.  That's

12    towards the very end of this document --

13         A.    Yes.

14         Q.    -- 536.

15         A.    Yes.

16         Q.    Some of them, I think, we touched on just by

17    virtue of the kind of questioning I was asking of

18    you.

19         A.    Yes.

20         Q.    Salem Bible Church versus CDH Architects,

21    you were doing this work for Davis, Matthews &

22    Quigley; is that right?

23         A.    Yes.

24         Q.    And this had to do with a church building.

25    You summarized it as providing investigations,

Page 248

1   review/analysis of prior investigations by others,

2   looking at construction documents, building code and

3   expert testimony for the plaintiff's attorneys

4   representing the church and regarding water intrusion

5   sources into the building at its roof and walls.

6          Were there any -- what were the nature of

7   the causes of the water intrusion that you identified

8   here?

9       A.   This one was predominantly that the builder

10   and designer decided to leave the wallpaper -- you

11   know, the 30-pound felt on the Hilton Atlanta, they

12   decided to leave it off completely on this particular

13   building, which was huge mistake.  It led to a lot of

14   water problems.

15       Q.   So you gave a deposition and appeared in

16   arbitration?

17       A.   Yes.

18       Q.   All right.  Do you know how that case was

19   resolved?

20       A.   I'm not sure how the arbitration was

21   resolved.  I gave a deposition also in the suit

22   against the builder, and that was settled the day

23   before trial.

24       Q.   Was it actually a court case or --

25       A.   It was a court case, but the architect

1    component -- the contractor had built it, of course,

2    defectively.  The architect had been on site

3    monitoring, providing construction phase services for

4    the owner while it was built defectively.  So the

5    arbitration in this matter was between the architect

6    and the owner, not the builder and the owner, which

7    had been resolved earlier.

8         Q.   I see.

9              Then 3344 Peachtree, LLC, versus Hardin

10   Construction and Site Technologies.  You were working

11   for attorney Roger Sumrall?

12        A.   Yes.

13        Q.   And these were condominiums building and a

14   pool amenity deck.  You gave a deposition in that

15   case; is that right?

16        A.   Correct.

17        Q.   What was your analysis of that matter?

18        A.   We were looking at water intrusion sources

19   from the -- I think it was a 27th floor amenity deck.

20   Figuring out what the cause of the leakage was at

21   various locations under the amenity deck.  I mean,

22   the leakage was occurring below -- in spaces below

23   the amenity deck.  We were figuring out what caused

24   them.

25        Q.   And what kind of causes did you find?

Page 250

1          A.   It was predominantly planter boxes that
2     were -- it was a unique amenity deck, very nice.   It
3     has planters, built-in planters, and the leakage was
4     all under -- we mapped them and figured out, ah, this
5     is interesting, so...
6          Q.   Do you know how that case resolved?
7          A.   I don't.
8          Q.   Home Depot versus Sun Construction Group.
9     This is the Mozley firm, Robert Finlayson?
10         A.   Yes, sir.
11         Q.   And it says that it was dealing with a
12    concrete retaining wall and a building site
13    infrastructure in Holly Springs, Georgia.
14         A.   Yes.
15         Q.   And what did you assess before giving your
16    deposition in that matter?
17         A.   Trying to figure out how the wall -- how and
18    why the wall fell.
19         Q.   I see.
20              Did you determine the --
21         A.   I believe so.
22         Q.   What did you offer as your opinion?
23         A.   That it was excessively loaded by
24    hydrostatic pressure due to a lot of plumbing --
25    well, let me back up.   Stormwater drain leakage that

Page 251

1   had filled the backfill behind the retaining wall and

2   overloaded it and caused it to fail.

3        Q.   Do you know how the case resolved?

4        A.   I think it's still in litigation right now.

5        Q.   Next is Central Baptist Church versus Church

6   Mutual Insurance.

7        A.   Yes.

8        Q.   It looks like it's also these lawyers that

9   you're working with.

10        A.   Yes.  Mr. Schmidt, yes.

11        Q.   And the structure type is the church

12   buildings' roofs.  What were you asked to evaluate

13   there?

14        A.   They were asbestos tile and the one roof

15   that was three-tab shingle, and that was really an

16   assessment of hail damage to those asbestos tiles and

17   shingles.

18        Q.   It says you testified at trial?

19        A.   Yes.

20        Q.   And that was recent in 2019?

21        A.   It was.  This past December.

22        Q.   Do you know what happened as the outcome of

23   the case?

24        A.   This case was, I guess, found for the owner.

25   My testimony was that there was no hail damage to

Page 252

1    either the three-tab shingles -- I'm sorry, the

2    architectural shingles or the asbestos tile.

3        Q.   So your side won?

4        A.   No.

5        Q.   I didn't think from that description --

6        A.   Yeah.

7        Q.   So they were claiming that it was, in fact,

8    storm damage?

9        A.   They were claiming they had damage to

10   shingles or asbestos tile from hail.

11       Q.   So the defendant was the insurance company?

12       A.   Yes.

13       Q.   And then the fifth case, I can't pronounce

14   that.  Can you?

15       A.   No.

16       Q.   Anyway a long name versus JR Custom Living.

17       A.   Right.

18       Q.   And this is a deposition that you gave in

19   2019.  It's residential property sites in Suwanee.

20   What were you evaluating?

21       A.   We were evaluating some flooding of

22   downstream property and determining if the lot

23   immediately adjacent to the property was the cause.

24       Q.   What did you determine?

25       A.   I determined that, of course, the property

Page 253

1    adjacent to the downhill property was contributing

2    but there were like, I think, eight other lots that

3    were also contributing.  So we did some analysis to

4    show, okay, yeah, we own this part of the downhill or

5    the downhill stormwater but not all of it.  So you're

6    flooding problem is a design issue, not a single

7    source issue.

8         Q.   How did that resolve?

9         A.   I'm not sure.  I believe they settled it,

10   but I'm the technical expert.  Sometimes I never know

11   how they come out.

12        Q.   On the last page of your exhibit report --

13        A.   Sure.

14        Q.   -- appended to it is a description of

15   billing rates.

16        A.   Yes.

17        Q.   So both you and Mr. Anderson have a billing

18   rate of 205 per hour?

19        A.   Yes, sir.

20        Q.   There's a description of how office expenses

21   are billed and direct expenses are passed on.

22   There's a postscript that neither you nor

23   Mr. Anderson have published any technical articles or

24   books in the last ten years.

25        A.   That's correct.

Page 254

1       Q.   But you have obviously created handouts at

2   continuing education seminars?

3       A.   Handouts, no.

4       Q.   You just make oral --

5       A.   Oral presentations, yes.

6       Q.   I'm sorry.  I misunderstood.

7            Is there any billing invoices from this

8   matter?  I know there's a lot of discussion about

9   those.

10           MR. MACBRIDE:  Your guess is as good as mine

11       what's in the file.

12           MR. DAILEY:  I feel so bad about that.  I'm

13       very good at removing this kind of stuff.  I will

14       help you do it after we conclude today.

15           MR. MACBRIDE:  I've got a plane to catch.

16   BY MR. DAILEY:

17       Q.   I copied all these, so I'm going to ask

18   you -- I don't want to go through all of them because

19   their voluminous and we've looked at a lot of photos.

20   I think they are relating to your visit in February

21   of 2019.  Do you know?  And I guess we can mark these

22   as the next exhibit in the stack.

23       A.   Okay.

24       Q.   Do you want to put those over in a single

25   pile --

                                             Page 255

1         A.    Okay.

2         Q.    -- towards the court reporter?

3               The reason I have suspicion that it's the

4    February 2019 meeting --

5         A.    Right.

6         Q.    -- is because the first -- one of the first

7    exhibits that I found at ES --

8               MR. DAILEY:  What's our number that we're

9         using for this exhibit?

10              THE COURT REPORTER:  538.

11              (Exhibit 538 was marked for

12        identification, attached at the end of

13        the original transcript.)

14   BY MR. DAILEY:

15        Q.    So these group of photographs, which have

16   individual document numbers --

17        A.    Right.

18        Q.    -- are marked for purposes of our deposition

19   as Exhibit 538.

20        A.    Right.

21        Q.    The beginning is 19503.

22        A.    Right.

23        Q.    I've got -- maybe we can just -- there's

24   three of each.  So if you wanted to have one --

25              MR. MACBRIDE:  There's three of every one of

Page 256

```
 1          these?
 2               MR. DAILEY:  Yeah.  The idea being he gets
 3          one and I -- I don't want to go through the
 4          process -- it's unnecessary time because I know
 5          we're trying to help you.  Maybe Laura and I can
 6          figure that out afterwards.
 7               MR. MACBRIDE:  They're going be attached to
 8          the transcript, so I don't really need a copy.
 9               MR. DAILEY:  No, you don't.  I would like a
10          copy since I spent a lot of time trying to put
11          these back in order when they were not properly
12          done by the person who was helping me.
13     BY MR. DAILEY:
14          Q.   This appears to be a sign-up sheet as I was
15     educated earlier --
16          A.   Right.
17          Q.   -- for the February 25, 2019, site visit; is
18     that correct?
19          A.   It looks like it.
20          Q.   Is your name on there?
21          A.   Yes; second from the bottom.
22          Q.   Okay.  I see Chris Giffin; I see Chris
23     Dawkins, yourself; I see Michael Allison.
24          A.   Michael Allen.
25          Q.   Allen?
```

Page 257

1      A.    Yeah.

2      Q.    Wade Anderson, Eric Gross at WJE -- he works

3  with Mr. Giffin -- Evan Ison.  Is that Randy Ison?

4      A.    That's -- Randy is above it.  I don't know.

5  I know Randy, and I may know -- let me see if I know

6  anybody else.  I know Tim Kelly, but I don't know the

7  other two guys from J.S. Held.

8      Q.    Keith Pilcher and Evan Ison.  Do you know if

9  Randy has another family member?

10      A.    I don't know.

11      Q.    Are these photographs that you took?

12      A.    I would have to look at my photographs, you

13  know, one, to know they're mine but I did provide

14  photographs and, two, I would love to see them in

15  sequence.  Because if you get them out of order --

16  you know, I'll usually shoot a room number if I'm in

17  a room number and the next --

18      Q.    As you did --

19      A.    I understand.  If they're out of order, I

20  might be going is this 1010 or is this 612.

21      Q.    Actually, there may be one or two

22  deviations --

23      A.    Right.

24      Q.    -- where something is missing; but,

25  otherwise --

1      A.    Right.

2      Q.    -- I'm pretty certain they are in order.

3      A.    Gotcha.

4      Q.    So this doesn't become laborious, can you

5   just generally educate us and authenticate these

6   photographs?  Are these photographs that you took on

7   February 25, 2019?

8      A.    There's no way for me to authenticate them

9   without looking at my --

10     Q.    At each one?

11     A.    No.  I need to look my photos to know

12  because there's a bazillion photos taken by all kinds

13  of parties of this matter.  But I could authenticate

14  them if could look at mine and go, yeah, that's mine

15  or see the image number.

16          MR. DAILEY:  Is he reserving signature?

17          MR. MACBRIDE:  Yeah, we'll read and sign.

18          MR. DAILEY:  Maybe during that process he

19     could --

20  BY MR. DAILEY:

21     Q.    I would like to authenticate them if they

22  are yours.

23     A.    Sure.

24     Q.    Because obviously it's my understanding they

25  were produced for purposes of your deposition and

Page 259

1   maybe also Mr. Anderson.

2          MR. MACBRIDE:  Maybe between now and

3      Mr. Anderson we can look and see whether

4      Mr. Anderson maybe can answer that question.

5          MR. DAILEY:  Okay.

6          MR. MACBRIDE:  I mean, I would tell you that

7      they're Bates stamped ES, but they've also got

8      photographs from everybody else.  Just because

9      they are Bates stamp doesn't mean they took them.

10         MR. DAILEY:  Understood.

11         MR. MACBRIDE:  Otherwise, I would say

12     they're from their production.

13         THE WITNESS:  We took photos during every

14     site visit, too.  So, I mean, there's a lot.

15  BY MR. DAILEY:

16     Q.   There may be others.  This was the only sort

17  of --

18     A.   Right.

19         MR. MACBRIDE:  Given the conditions of these

20     rooms.

21         THE WITNESS:  It would be great to see the

22     image numbers, too, because that would help us

23     authenticate it.  See, there's not an image

24     number shown.  Because the photos were provided

25     not printed.  When we provided them digitally,

Page 260

```
 1        there's an image number such as I've got listed
 2        in my enclosure.  I don't know if we have -- I
 3        can look real quickly and see if there's image --
 4        are there any February 25th photos in our
 5        enclosure, which would help; but we'd have to
 6        almost go needle through a hay stack because this
 7        was selected photos, not every photo.  Good
 8        grief.  It would have been an incredible
 9        enclosure if we had.
10             MR. DAILEY:  May I do this so that I can
11        keep a copy?  Would you trust me to pull my one
12        copy off -- in fact, maybe I'll pull two and
13        leave one of each and then get them into
14        Ms. Laura's hands so she can --
15             MR. MACBRIDE:  Probably what I need --
16             MR. DAILEY:  We need to get one copy for
17        y'all.
18             MR. MACBRIDE:  What I would say is give her
19        the copy she can use as an exhibit and then send
20        me a copy of whatever you want Wade Anderson to
21        look at in the file.
22             MR. DAILEY:  Do you want me to send it up to
23        Pennsylvania where you are or do you want me to
24        send it here?
25             MR. MACBRIDE:  Oh, you mean it has to be
```

Page 261

```
 1            paper.  I would send it here because that way --
 2                 MR. DAILEY:  I don't think he wants to print
 3            them all off again.
 4                 MR. MACBRIDE:  Let me see something a second
 5            here.  Let's just get the Bates stamp numbers
 6            here.
 7                 MR. DAILEY:  This range begins at this
 8            number here.
 9                 I don't think we need to record this.  You
10            can go off.
11                 (A discussion was held off the
12            record.)
13       BY MR. DAILEY:
14            Q.   Mr. Dawkins, have you participated in any
15       conference calls with James Chin during the period of
16       your representation?
17                 MR. MACBRIDE:  I'm just going to object to
18            the extent you're asking about any discussions.
19            You can answer whether you had a call but not
20            discuss any discussions that happened during the
21            call.
22                 THE WITNESS:  The answer is yes.
23       BY MR. DAILEY:
24            Q.   Okay.  And how many such calls?
25            A.   I don't remember.
```

Page 262

1      Q.    Have you participated in calls where there

2  has been other persons in addition to yourself

3  participating with you?

4      A.    A few.

5      Q.    Okay.  And, for example, in December of

6  2019, did you participate in a call with Mr. Chin

7  where there were other persons?

8      A.    Possibly.  I mean --

9      Q.    You can't remember the exact --

10     A.    I can't remember days.

11     Q.    A few then.  So as to those few, can you

12  tell me who were the other parties that were on the

13  call with you?

14     A.    No, not with precision.

15     Q.    Mr. Giffin?

16     A.    Possibly.  I mean, the answer is not with

17  precision.  I mean it.  You know, was Wade on the

18  call?  Maybe.  Was Chris Giffin on the call?  Maybe.

19     Q.    Was Randy Ison on the call?

20     A.    Maybe.

21     Q.    Was -- who was the gentleman from Williamson

22  & Associates?

23     A.    Mike Wilson.

24     Q.    Mike Wilson, was he on the call?

25     A.    Maybe.

Page 263

1     Q.    So what did you understand the purpose of

2     the calls with multiple parties to be?

3     A.    Typically, to tell us either when a site

4     visit was or when reports were due.  I mean, that's

5     really about it.

6     Q.    Did -- and I'm not speaking for purposes of

7     this question about Mr. Chin; but during the calls in

8     question, were there comments exchanged between

9     participants other than Mr. Chin about the Atlanta

10    Hilton Hotel?

11              MR. MACBRIDE:  I'm going to object and

12          instruct you not to answer the substance of any

13          communications that were had in those

14          conversations with -- on the call with Mr. Chin.

15          It's protected by attorney-client privilege and

16          work product doctrine.

17              MR. DAILEY:  Was Mr. Chin representing you

18          at that time?

19              MR. MACBRIDE:  Mr. Chin was representing AFM

20          and Mr. Dawkins was a representative of AFM.

21          It's covered under the umbrella of the privilege

22          and work product, so I'm instructing him not to

23          answer.

24              The privilege doesn't just extend to AFM.

25          It extends to those people that work for AFM on

Page 264

```
 1          the project.  They're covered under the umbrella
 2          of the privilege.
 3               MR. DAILEY:  Well, I'm not -- for purposes
 4          of this question, I haven't inquired of any
 5          statements or communications from Mr. Chin to the
 6          group.
 7               MR. MACBRIDE:  It doesn't have to be just
 8          Mr. Chin's communications particularly with work
 9          product.  So I'm just instructing him not to
10          answer about any substantive discussions had on
11          those telephone conversations.
12     BY MR. DAILEY:
13          Q.   Are you going to follow your attorney's
14     direction?
15               MR. MACBRIDE:  Yes.
16               THE WITNESS:  Yes.
17     BY MR. DAILEY:
18          Q.   You said initially in response to my
19     question that there were a few of such calls.  Do you
20     remember when the first one took place?
21          A.   No.
22          Q.   Was it more than a year ago?
23          A.   I have no recollection sitting here.
24          Q.   I'm entitled to your best information.
25          A.   I understand that.  I don't remember.
```

Page 265

1      Q.   Okay.  Is it possible, Mr. Dawkins, that a

2  single rain event during 2014 or 2015 could have

3  adversely affected the condition of the roof at the

4  Atlanta Hilton Hotel?

5           MR. MACBRIDE:  Objection.

6           THE WITNESS:  In what way?  In what way?

7  BY MR. DAILEY:

8      Q.   In causing erosion to the caulking on the

9  buildings.

10     A.   At the roof?

11     Q.   At the roof level.

12     A.   Maybe.

13     Q.   Could such a rain event on those days have

14  introduced a large volume of water through openings

15  that you previously testified to?

16          MR. MACBRIDE:  Objection.

17          THE WITNESS:  Maybe.  You mean one event?

18  BY MR. DAILEY:

19     Q.   Well, I've read your report.  It makes

20  reference to events that you believe had been

21  occurring over the life of the building.

22     A.   That's correct.

23     Q.   So each -- implicit in that -- but correct

24  me if I'm wrong.  Implicit in that is that each event

25  has the ability to make a contribution.

Page 266

```
1          A.   It could depending on which way the wind is

2     blowing, depending on the rainfall intensity with

3     regard to a rain event.  I think those are your

4     two -- you know, how long -- both rainfall intensity

5     and how much wind and duration would all impact how

6     much it leaked, but it could leak.

7          Q.   All right.  Would you agree that some

8     rainfall events have greater intensity than others?

9          A.   Yes.

10         Q.   Some rainfall events are longer lasting than

11    others?

12         A.   Yes.

13         Q.   Some rainfall events are accompanied by

14    stronger wind forces or gales and other such events?

15         A.   Yes.

16         Q.   All right.  And where there is greater

17    intensity, greater duration, stronger winds is the

18    possibility of water penetration under the conditions

19    you're describing in your report enhanced?

20              MR. MACBRIDE:  Objection.

21              THE WITNESS:  I mean, it's such a general

22         question.  I mean, where and when and in what way

23         the wind is blowing and what is the rainfall

24         intensity, I mean, generally I can't answer that

25         question.  If you want to talk about a specific
```

Page 267

1       location on the roof and -- but all these become

2       hypothetical.

3           What if wind was blowing from this direction

4       and you're at this corner of this building and

5       you've got this hole?  The answer is probably

6       going to be maybe almost every time because I

7       just -- this is hypothetical.

8  BY MR. DAILEY:

9       Q.  Well, in the report that you've provided,

10  your expert report --

11      A.  Right.

12      Q.  -- did you make any attempt to assign --

13  number one, I guess you told me that you did not

14  consult any weather reports in constructing your

15  expert report of January 2020; is that right?

16      A.  That's right.

17      Q.  So is it a fair thing -- fair statement to

18  make that you did not attempt to differentiate

19  between any of the rain events that you say have been

20  occurring over the life of the building and

21  contributing to the conditions you observed --

22         MR. MACBRIDE:  Objection.

23  BY MR. DAILEY:

24      Q.  -- in terms of their intensity, their

25  duration, or accompanying winds?

Veritext Legal Solutions
866 299-5127

1      A.   We've not analyzed -- ask that -- that was a

2  long question, if you don't mind.  I'm sorry to make

3  you to ask it again, but I would like you to.

4      Q.   So your report states that you believe there

5  are rain events that have been contributing to the

6  conditions you observed --

7      A.   Right.

8      Q.   -- at the Atlanta Hilton Hotel.

9      A.   Right.

10     Q.   You also make the corollary finding and

11  conclusion that these rain events have been occurring

12  over the life of the building.

13     A.   Right.

14     Q.   So my simple, although lengthy question, was

15  is it a fair statement that you have not and

16  Mr. Anderson has not attempted in its evaluation of

17  those reoccurring rain events over the life of

18  building made any attempt to evaluate any of those

19  rain events for their duration, their intensity, or

20  their accompanying winds?

21          MR. MACBRIDE:  For all 28 years?

22          MR. DAILEY:  For all 28 years.

23          MR. MACBRIDE:  Objection.

24          THE WITNESS:  The answer is, no, we have

25      not.

Page 269

1          MR. DAILEY:  May I inquire what the basis of

2     the objection is?

3          MR. MACBRIDE:  It's a compound question.  I

4     mean, it went on so long.

5          MR. DAILEY:  Okay.  Well, I'm not --

6          MR. MACBRIDE:  I'm not objecting you can't

7     ask him whether they did the test.

8          MR. DAILEY:  No, no, no.  I understand.

9          MR. MACBRIDE:  It's the preamble to that and

10    things like that that I'm objecting to.

11         MR. DAILEY:  Well, he asked me to explain

12    it.  So I tried my best.

13         MR. MACBRIDE:  That may be good enough.

14  BY MR. DAILEY:

15    Q.   At no time have you attempted to evaluate

16  any different rain event versus another in terms of

17  intensity, duration, or accompanying winds?

18    A.   No.

19    Q.   Okay.  So what I would like to do is mark --

20  since we have a deposition of you -- and obviously we

21  can't spend forever talking about everything, but

22  there are some points discussed here.

23    A.   Right.

24    Q.   I'm going to mark your deposition as an

25  exhibit to this.

Veritext Legal Solutions
866 299-5127

1          (Exhibit 539 was marked for

2       identification, attached at the end of

3       the original transcript.)

4   BY MR. DAILEY:

5       Q.   Do you remember if you actually did read and

6   sign this?

7       A.   I did read and sign.

8       Q.   Well, it's my desire to have that as part of

9   this and particularly if there was any errata sheet,

10  which I don't have.  Do you seem to recall making --

11      A.   I feel like there is one, yeah.

12      Q.   We need to include that with permission of

13  Jonathan.  If we can track that down, then we'll make

14  it a part of this exhibit because that's my desire to

15  do.

16           You recall your deposition having been taken

17  on April 11, 2019, and Mr. James Chin was there with

18  you during that deposition?

19      A.   Yes.

20      Q.   Okay.  Had you been supplied a copy of the

21  deposition transcript subsequent to the deposition

22  actually being taken?

23      A.   I believe so.

24      Q.   Was the transcript -- did it appear to be in

25  a format similar to the one you have in front of you

Page 271

1  today?

2      A.   I believe so.

3      Q.   Well, let's do that.

4           Now, the other thing is there were some

5  exhibits to that, as I read through, that I saw the

6  examining witness asking of you.  Were there some

7  e-mail exhibits that he asked you about?

8      A.   That's an Anderson exhibit, not a Dawkins

9  exhibit, for what it's worth.  You know, I'm lucky I

10  saw that.

11      Q.   There's a Dawkins Exhibit 300.  I'm going to

12  give you a copy since it having been marked in the

13  previous -- this is an exhibit that constitutes an

14  e-mail from you dated June 16, 2016, to Joel Brown;

15  is that right?

16      A.   Yes.

17      Q.   And copied are Tracy Dodd, Randy Ison,

18  Charles Tauzin, Wade Anderson, Dominic Thurston at FM

19  Global.  Mr. Brown is also at FM Global; is he not?

20      A.   He is.

21      Q.   You write:  Joel and Team, Wade and I are

22  good for Monday morning 6/20 and have on and off

23  availability during the rest of the week.

24      A.   Right.

25      Q.   It goes on -- and I don't need to read it,

Page 272

1    but it goes on to describe a site investigation

2    that's being attempted to be arranged.

3            The next paragraph reads:  Our most

4    significant investigation activities needed going

5    forward are, one, getting Steve Gleason's prior brick

6    veneer wall cut photos and observations logs; two,

7    trying to -- getting to cut drywall from the interior

8    or being present as drywall is being removed within

9    the rooms to observe exterior and some interior wall

10   cavities for their typical as-installed conditions;

11   and, three, getting and reviewing as-built drawings

12   of the building and its mechanical systems.

13           Did I read that close to correct?

14       A.   Yes.

15       Q.   Did you ever get Steve Gleason's prior brick

16   veneer wall?

17       A.   We did.

18       Q.   And observation logs as well?

19       A.   I don't know if there's observation logs

20   with those photos, but we did get the -- those are

21   some of the photos we looked at earlier.

22       Q.   I think you told me previously that you

23   couldn't get access to cut drywall from the interior

24   or being present when the drywall was being removed.

25       A.   No, we weren't allowed to do that.

Page 273

1        Q.   And then, three, getting and reviewing

2    as-built drawings of the building and its mechanical

3    systems.  Did you get those?

4        A.   We got some.  I mean, I don't know if we got

5    all, but we got some.  They were pretty old, pretty

6    old and pretty hard to read.

7        Q.   Do you know where these came from?

8        A.   I have no idea.  We did get some drawings.

9        Q.   All right.

10           MR. MACBRIDE:  I just want to note we've

11           almost been at it for eight hours.  We've

12           probably taken just around an hour of breaks.  So

13           we're going to be getting up against the

14           seven-hour mark pretty soon.  I don't expect you

15           to go that much longer.  I just wanted you to

16           know.

17           MR. DAILEY:  Thank you.

18           (Exhibit 540 was marked for

19           identification, attached at the end of

20           the original transcript.)

21    BY MR. DAILEY:

22        Q.   I'm showing you what's been marked as

23    Exhibit 540.  This is a subpoena that's from the

24    Kabateck firm in Los Angeles, one of the Plaintiffs'

25    counsel in this case, directed to you, Mr. Dawkins,

                                              Page 274

1    for a deposition that apparently took place at an

2    earlier time on 1/27/20 or maybe it was being

3    scheduled for that earlier time.  Maybe it got

4    changed subsequently.  Actually, it's a production.

5              MR. MACBRIDE:  Yeah.  I don't think this is

6         a deposition.

7              MR. DAILEY:  This is not a deposition.  I'm

8         sorry.

9              MR. MACBRIDE:  Yeah.

10   BY MR. DAILEY:

11        Q.   Did you make a response to the documents

12   that were requested here?

13        A.   I believe we did.  I don't know that I've

14   ever seen this, but we may have seen it.

15        Q.   Well, I think --

16        A.   We've talked to counsel more than once about

17   producing our file, if that's what this is.

18        Q.   So part B of the document, documents

19   requested, it says produce the entire contents of

20   your principal's file related.  Is it your

21   understanding you have done that?

22        A.   Yes.

23        Q.   So that would include all of the categories

24   that we see listed here; documents, correspondence,

25   notes, e-mails, photographs, videos, or memorandum?

Page 275

1        A.    Yes.   We produced those to Mr. Chin and/or

2    team.

3        Q.    Have you produced to Mr. Chin all retainer

4    agreements and billing records for any work you

5    performed?

6        A.    We have.

7             MR. MACBRIDE:   I'll object.   That is not

8        what that request asks for.   I believe we

9        produced the billing records for his work on this

10       file.   I think we've also notified -- I mean,

11       we've lodged responses and objections to these.

12       So whatever they say, they say.

13            MR. DAILEY:   You have.

14            MR. MACBRIDE:   I don't -- I don't think he

15       was asked to produce records beyond his billing

16       records for this file.

17            MR. DAILEY:   Okay.

18            MR. MACBRIDE:   I just want to make sure

19       because it goes on to say more than just --

20            MR. DAILEY:   It does.   It does.   It says all

21       matters performed for AFM.   So there's two levels

22       here.

23            MR. MACBRIDE:   Right.

24    BY MR. DAILEY:

25       Q.    First, did you produce all billing records

                                          Page 276

1    and retainer agreements for work in this matter?

2         A.   Yes.

3         Q.   Okay.  And, again, I don't have them, so I

4    don't know where they are.  But you have no reason to

5    believe they were not produced?

6              MR. MACBRIDE:  My understanding is that

7         whatever they produced to us we produced to you.

8         I haven't seen the entire document production,

9         so...

10             MR. DAILEY:  All right.

11   BY MR. DAILEY:

12        Q.   And then as far as other work that you've

13   done for AFM, your attorney has interposed an

14   objection and you've been told to stand place in on

15   that point; is that right?

16        A.   That's correct.

17        Q.   And then billing-other associate, please

18   produce all retainer agreements and billing records

19   for Mr. Anderson that he has -- so that would be two

20   levels here again for this matter and for AFM for all

21   matters.

22        A.   Right.

23        Q.   Have you produced Mr. Anderson for all work

24   here in this particular case?

25        A.   Yes.

Page  277

1    Q.   All right.  Do you understand that an

2    objection has been interposed for other matters?

3    A.   Yes.

4         MR. MACBRIDE:  Yes.

5    BY MR. DAILEY:

6    Q.   The fourth item is billing records for any

7    work that your principal performed or was hired to

8    perform for AFM.  Again, you produced all the billing

9    records that ESL has for this case but not for other

10   cases?

11   A.   Right.

12        MR. MACBRIDE:  For the record, we filed an

13        objection to that request as well.

14        MR. DAILEY:  Understood.

15   BY MR. DAILEY:

16   Q.   Were you engaged at ESL for pre-litigation

17   insurance work?

18   A.   What do you mean by pre-litigation insurance

19   work?

20   Q.   Prior to the date of the filing of

21   litigation in 2017.  We had some back and forth

22   earlier.  You thought that or Jonathan may have

23   thought it was filed in January of 2017, the

24   complaint in this case, and so I was asking if you

25   had done any work for FM Global on this matter prior

                                        Page 278

1    to 2017?

2         A.   Correct.  We did, yes.

3         Q.   And does the billing records and other

4    retainer agreements that you're producing include

5    that earlier work?

6         A.   I believe so.

7              MR. MACBRIDE:  I think that was paragraph 2,

8         3, and 4 were not -- whether that was performed

9         in connection with the lawsuit or not.  So 2, 3,

10        and 4 would have covered pre-litigation requests.

11             MR. DAILEY:  Okay.

12             MR. MACBRIDE:  Five would have covered --

13        that's the way, I think, we interpreted it.  Five

14        covers litigation, right.

15             MR. DAILEY:  Five actually says

16        pre-litigation.

17             MR. MACBRIDE:  Well, it's titled lawsuit.  I

18        think either way they produced -- they didn't

19        distinguish -- I think they produced their

20        billing records for this matter.

21             MR. DAILEY:  Okay.

22    BY MR. DAILEY:

23        Q.   So let me look at number six, marketing

24    materials, advertisements, brochures and whatever

25    medium over the past ten years regarding the nature

Page 279

1    and value of your professional services.

2         A.   Right.

3         Q.   Do you have any such for Beech Consulting?

4         A.   No.

5         Q.   Do you have any such for yourself

6    individually?

7         A.   No.

8         Q.   Do you have any such, do you know, for ESL

9    that exists?

10        A.   No.

11        Q.   Okay.  Are you aware of any court orders

12   that have limited, stricken, or precluded your actual

13   or intended opinion testimony in any matter?

14        A.   One time I was delayed in providing

15   testimony.  It was in a state court in South

16   Carolina.  It was overturned.

17        Q.   I see.  I think I recall reading that in

18   your deposition.

19        A.   Okay.

20        Q.   You've answered the question on publications

21   for the last ten years.

22        A.   Right.

23        Q.   Presentations, you've described already.

24             Are there any guidelines, formal procedures

25   and policies that either Beech or ESL have about work

Page 280

```
 1    that you perform for clients in a written format?

 2         A.   In a written form like a standard practice

 3    document or something like that?

 4         Q.   Yeah.

 5         A.   The answer is no.

 6         Q.   I'm going to simply mark --

 7              MR. MACBRIDE:  Why don't we take a break.

 8         Not a break but I got the errata sheet for the

 9         deposition.  We can add that to the exhibit.  I

10         gave you a copy.

11              MR. DAILEY:  Thank you very much.

12              MR. MACBRIDE:  So that's being added to

13         Exhibit 539.

14              MR. DAILEY:  Excellent.

15              (Exhibit 541 was marked for

16         identification, attached at the end of

17         the original transcript.)

18    BY MR. DAILEY:

19         Q.   I'm showing you a subpoena that has a date

20    of March 9, 2020.

21         A.   Okay.

22         Q.   This one is not just a production subpoena

23    but also for testimony for the deposition that's

24    occurring today.  It has attached the same topics

25    under part C --
```

Page 281

1        A.    Right.

2        Q.    -- as did the previous one.  It's identical

3    language.

4             Would your responses as to all of these be

5    the same as you previously provided when I questioned

6    you about the first subpoena?

7        A.    If they were -- if they are indeed the same,

8    yes.

9        Q.    Okay.

10            (Exhibit 542 was marked for

11            identification, attached at the end of

12            the original transcript.)

13   BY MR. DAILEY:

14       Q.    I'm showing you what's now marked as Exhibit

15   542, this is a subpoena dated March 6, 2020, directed

16   to Engineered Solutions International.  It's a

17   subpoena for testimony.

18            Have you seen on the last page the topics --

19       A.    What's the difference between this and

20   Exhibit 541?  Because they both say date and time

21   3/13.  One has production, which was done earlier,

22   and testimony is checked and the other one has

23   testimony and production checked.  Is it a duplicate

24   document?

25            MR. MACBRIDE:  For the record, this is what

 1       we indicated earlier that Mr. Dawkins was not

 2       being produced in response to the 30(b)(6)

 3       subpoena served on Engineered Solutions

 4       International, LLC.

 5            MR. DAILEY:  And this is the subpoena that

 6       was your objection.

 7            THE WITNESS:  Yeah, I got it.

 8            MR. MACBRIDE:  We filed a motion to quash

 9       this subpoena.

10            MR. DAILEY:  I'm aware.  I just wanted to

11       get that out.

12            MR. MACBRIDE:  I'll also note for the record

13       we filed a motion to quash the certain document

14       requests in both the subpoena to testify and the

15       subpoena to produce documents.

16            MR. DAILEY:  Let me show you that subpoena

17       to produce documents so that we can have our

18       record -- I should have started with it, but it

19       was an earlier one.

20            MR. MACBRIDE:  We have the one that was

21       dated January 27, 2020.  Is that different?

22            MR. DAILEY:  Actually, this is the older

23       production subpoena.

24            MR. MACBRIDE:  No.  I think you served him

25       on the person and the company.  They're the same.

                                        Page 283

1            MR. DAILEY:  For some reason, she's given me

2       a --

3            MR. MACBRIDE:  Meaning they're separate

4       subpoenas.  They were served on the person and

5       company requesting the same documents.

6            MR. DAILEY:  They are, but I just want to

7       mark it.

8            MR. MACBRIDE:  That's why there's -- I just

9       remembered that's why there's a second document

10      subpoena.

11           MR. DAILEY:  You're on top of it.

12           MR. MACBRIDE:  No, I'm not.

13           (Exhibit 543 was marked for

14      identification, attached at the end of

15      the original transcript.)

16   BY MR. DAILEY:

17      Q.   Now I'm showing you Exhibit 543.

18      A.   Got it.

19      Q.   This is a production subpoena directed to

20   Engineered Solutions.  It has an earlier date of

21   1/14/2020.

22      A.   Right.

23      Q.   Like the first two subpoenas I showed to

24   you, this has a request for the production of

25   documents that are identically expressed with respect

                                        Page 284

1    to the file, billing, marketing materials, striking

2    testimony, your publications, et cetera, although

3    there's an additional one it looks like.  As to the

4    ones that are identical, would your responses be the

5    same in all cases?

6         A.   It's so hard to answer these questions

7    without reading every detail of this.  I'll tell you

8    the spirit of what we've done is to respond to

9    production.

10              You can ask Wade about this because I went

11   through the e-mails and they're all administrative in

12   nature.  So I don't know -- and Wade may have

13   produced e-mails for Engineered Solutions of which

14   I'm on.  But I went through the e-mails.  There was

15   no preliminary summary of technical findings or

16   conclusions in any of the e-mails.  It was more like,

17   hey, the site visit is on this date or can we talk on

18   this date or -- I mean, they were administrative in

19   nature, and I didn't waste the time to print them.

20   They were all in electronic form.

21              We talked to Ms. Kniffen about whether we

22   had to produce that or not, if that makes sense.

23   Anyway we sent a note saying they're not printed

24   because they're just plain administrative type stuff.

25         Q.   As far as striking any testimony, you've

Page 285

1   already responded on behalf of your own experience.

2   Do you know if Mr. Anderson has been stricken or had

3   his testimony limited in any way?

4        A.   I don't believe he has, but you need to

5   clarify that with him.

6        Q.   I shall.

7             MR. MACBRIDE:  I would also -- I just wanted

8        to wait for you to finish.  I'll note for the

9        record that we also filed objections and a motion

10       to quash to certain of these document requests as

11       well.

12            MR. DAILEY:  Okay.  Good.

13   BY MR. DAILEY:

14       Q.   Then your publication is number seven on

15   this list.  Have you co-authored publications with

16   Phillip Ambrose?

17       A.   Phillip Ambrose?

18       Q.   Yeah.

19       A.   No.  I don't know who Phillip Ambrose is.

20       Q.   Nor do I.

21            Do you know if Mr. Anderson may have

22   co-authored with him?

23       A.   You'll have to ask him --

24       Q.   I shall.

25       A.   -- because I don't know who Phillip Ambrose

Veritext Legal Solutions
866 299-5127

1    is.

2        Q.   All right.  Well, we've gotten

3    Mr. MacBride's report that there's an objection and

4    motion to quash to that.

5              MR. DAILEY:  I think I'm done.

6              MR. MACBRIDE:  We'll read and sign.

7              (Proceedings concluded at 5:42 p.m.)

8                       *      *      *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 287

```
1              VERITEXT LEGAL SOLUTIONS
2            FIRM CERTIFICATE AND DISCLOSURE
3
4    Veritext represents that the foregoing transcript as
5    produced by our Production Coordinators, Georgia
6    Certified Notaries, is a true, correct and complete
7    transcript of the colloquies, questions and answers
8    as submitted by the certified court reporter in this
9    case.  Veritext further represents that the attached
10   exhibits, if any, are a true, correct and complete
11   copy as submitted by the certified reporter,
12   attorneys or witness in this case; and that the
13   exhibits were handled and produced exclusively
14   through our Production Coordinators, Georgia
15   Certified Notaries.  Copies of notarized production
16   certificates related to this proceeding are available
17   upon request to litsup-ga@veritext.com.
18
19   Veritext is not taking this deposition under any
20   relationship that is prohibited by OCGA
21   15-14-37(a)and(b).  Case-specific discounts are
22   automatically applied to all parties, at such time as
23   any party receives a discount.  Ancillary services
24   such as calendar and financial reports are available
25   to all parties upon request.
```

Page 288

```
 1                    CERTIFICATE
 2  STATE OF GEORGIA:
 3  COUNTY OF GWINNETT:
 4            I hereby certify that the foregoing
    transcript was taken down, as stated in the caption,
 5  and the colloquies, questions and answers were
    reduced to typewriting under my direction; that the
 6  transcript is a true and correct record of the
    evidence given upon said proceeding.
 7            I further certify that I am not a
    relative or employee or attorney of any party, nor am
 8  I financially interested in the outcome of this
    action.
 9            I have no relationship of interest in
    this matter which would disqualify me from
10  maintaining my obligation of impartiality in
    compliance with the Code of Professional Ethics.
11            I have no direct contract with any
    party in this action and my compensation is based
12  solely on the terms of my subcontractor agreement.
              Nothing in the arrangements made for
13  this proceeding impacts my absolute commitment to
    serve all parties as an impartial officer of the
14  court.
              This the 31 day of March, 2020.
15
16
17
18
19
20
21
22
23
24
25        LAURA R. SINGLE, CCR-B-1343

                                            Page 289
```

```
 1                        DECLARATION

 2

 3         I hereby declare I am the deponent in the within

 4    matter; that I have read the foregoing transcript and

 5    know the contents thereof; and I declare that the same

 6    is true of my knowledge except as to the matters which

 7    are therein stated upon my information or belief, and as

 8    to those matters, I believe them to be true.

 9         I declare under the penalties of perjury

10    under the laws of the United States that the

11    foregoing is true and correct.

12

13         This declaration is executed this _____ day

14    of _____, 20___, at

15    _____, _____.

16

17

18

19         _____

20                   CHRISTIAN DAWKINS, P.E.

21

22

23

24

25
                                              Page 290
```